**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Benjamin I. Finestone
Anil Makhjiani
Mario O. Gazzola
Arman Cuneo
51 Madison Avenue, 22nd Floor
New York, New York
Telephone: (212) 849-7000

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Matthew Scheck
300 West 6th St., Suite 200
Austin, TX 78701
Telephone:  (737) 667-6102

*Counsel to Blockchain Recovery Investment Consortium, LLC, Litigation Administrator and
Complex Asset Recovery Manager, as Representative for the Post-Effective Date Celsius Debtors*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>             Debtors.<br><br>CELSIUS NETWORK LIMITED and<br>CELSIUS NETWORK LLC (POST-EFFECTIVE<br>DATE DEBTORS)<br><br>             Plaintiffs.<br><br>       against<br><br>TETHER LIMITED;<br>TETHER HOLDINGS LIMITED;<br>TETHER INTERNATIONAL LIMITED; and<br>TETHER OPERATIONS LIMITED<br><br>             Defendants. | **Complaint**<br><br>Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>(Jointly Administered)<br><br><br><br>Adversary Proceeding No.<br><br>_____ _____ |

---

[1]  The reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal
tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending
LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554);
Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK
Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal
place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite
209F, Hoboken, New Jersey 07030.

## COMPLAINT

Plaintiffs Celsius Network Limited and Celsius Network LLC (the Post-Effective Date Debtors) ("Post-Effective Date Debtors" or "Celsius" or "Plaintiffs" or "Debtors") bring this Complaint against Tether Limited, Tether Holdings Limited, Tether International Limited, and Tether Operations Limited ("Tether" or "Defendants"), and allege the following based on reasonable due diligence of the Debtors' books and records, on personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters:

## NATURE OF THE CASE

1.      Plaintiffs bring this case to avoid and recover preferential and fraudulent transfers of 39,542.42 Bitcoin[2] from Celsius to Tether, first intended to secure, and subsequently applied on account of, antecedent debt Celsius owed to Tether.  These transfers undoubtedly improved Tether's position, occurring at a time when Debtors were tumbling towards bankruptcy and the price of Bitcoin (and the value of Tether's pre-existing collateral) was collapsing violently.  Indeed, unlike so many other creditors who did not seek to dismember the Debtors during their slide into bankruptcy, as a result of these preferential transfers of Bitcoin, Tether insulated itself from the effect of Celsius's bankruptcy.  Tether's efforts, of course, are now subject to intervening federal bankruptcy law.  Thus, these preferential and fraudulent transfers of Bitcoin should be avoided, and the Bitcoin or its value should be recovered for the benefit of Celsius's estate.  This action also seeks to recover damages caused by Tether's below-market application of such Bitcoin on that same debt, in violation of the terms of the governing agreement.

---

[2]   Capitalized terms not immediately defined have the meanings ascribed to them below.  ECF document numbers in this Complaint refer to ECF document numbers from Case No. 22-10964-mg.

2.     In 2020, Plaintiff Celsius Network Limited entered into a loan agreement (the "Token Agreement") with Tether Limited, allowing Celsius to borrow stablecoins, Tether token ("USDT") and Euro Tether ("EURT"), from Tether Limited at an interest rate between 0.333-0.55% per month.  Like many of its peer cryptocurrency companies, Celsius relied in large part on "stablecoins" to operate certain critical aspects of its business.  "Stablecoins" are digital currencies whose prices are pegged to those of other assets (such as the dollar).  Stablecoins are typically backed by reserves of *non*-digital assets, like cash or marketable securities, to ensure price stability. The world's most popular stablecoin, USDT, has its price pegged to the United States dollar. USDT was created by Tether in 2014, and has been marketed and controlled by them since then.

3.     To provide security for the loan, Celsius posted collateral in one of several cryptocurrencies (*e.g.*, Bitcoin, Ethereum).  At the peak of its borrowing, Celsius would borrow nearly $2 billion in USDT from Tether, collateralized by tens of thousands of Bitcoin.

4.     The cryptocurrency market steeply declined in the summer of 2022, and the Debtors filed the above-captioned chapter 11 cases on July 13, 2022.  The Debtors' bankruptcy filing was harmful to many of its creditors.  But, during the ninety-day period prior to the bankruptcy filing (the "§ 547(b) Period"), Tether took steps to insulate itself from the effect of bankruptcy. Specifically, on several occasions, Tether demanded, and received, a significant amount of new, incremental collateral to improve its position in the impending bankruptcy.  That is, Plaintiffs transferred 15,658.21 Bitcoin to Defendants to satisfy these demands, each inherently on account of antecedent debt (defined below as the Preferential Top-Up Transfers).

5.     In addition to the Preferential Top-Up Transfers, also during the § 547(b) Period, Plaintiffs transferred 2,228.01 Bitcoin of excess collateral to Defendants in connection with $300,000,000 of new borrowings.  These transfers cross-collateralized Celsius's existing

borrowings from Tether (defined below as the Preferential Cross-Collateralization Transfers). These preferential transfers of Bitcoin are worth in excess of $800,000,000 in today's dollars, and are separate from and do not include over 7,000 additional Bitcoin transferred to Tether in connection with new advances of USDT and EURT to Celsius.   Nor do they include 36,684,477.42 EURT and 18,556,675.01 USDT of interest and principal payments made by Celsius to Tether during the ninety-day period prior to Celsius's bankruptcy filing.

6.     Tether issued its final demand to Celsius for additional collateral on June 13, 2022. Pursuant to the terms of the Token Agreement between Celsius and Tether, Celsius was entitled to ten hours to deposit additional collateral with Tether to fulfill that demand.   But rather than affording Celsius the contractually permitted time to post new collateral (or, at worst, allow for a more orderly disposition of collateral), on that same day, Tether forged ahead with an improper application of 39,542.42 Bitcoin—the entirety of collateral that Celsius had posted——using the pledged Bitcoin to cover its exposure in full, but destroying Celsius's residual interest in the collateral.   This final preferential transfer (as defined below, the "Preferential Application Transfer"), worth in excess of $2 billion in today's dollars, also improved Tether's position because a substantial portion of the putative collateral was avoidable, and comprised of the Preferential Top-Up Transfers, which were commingled with the entirety of the posted Bitcoin.

7.     The Preferential Application Transfer also plainly breached the Token Agreement, and its effect was to purportedly dispose of Celsius's property (being held by Tether as collateral) at near the bottom of the Bitcoin market.   This breach of contract caused billions of dollars in damages to Celsius as described below.

8.     Tether applied Celsius's property (39,542.42 Bitcoin) to pay itself back for Celsius's outstanding loan, doing so for less than reasonably equivalent value at a time when

Celsius was insolvent.  As such, this application of collateral was a fraudulent transfer and should be avoided under the Bankruptcy Code and applicable state law.

9.     These preferential and fraudulent transfers of Bitcoin should be avoided and recovered from Tether, and Tether should be ordered to pay damages for its unlawful application of collateral.

## THE PARTIES

10.     Plaintiff Celsius Network Limited is a private limited company incorporated under the laws of England and Wales with a principal place of business in London, United Kingdom.

11.     Plaintiff Celsius Network LLC is a Delaware limited liability company with a principal place of business in Hoboken, New Jersey.

12.     Defendant Tether Holdings Limited is incorporated in, and is a citizen of, the British Virgin Islands.  It owns Defendants Tether Limited, Tether Operations Limited, and Tether International Limited.

13.     Defendant Tether Limited is incorporated in, and is a citizen of, Hong Kong.

14.     Defendant Tether Operations Limited is incorporated in, and is a citizen of, the British Virgin Islands.

15.     Defendant Tether International Limited is incorporated in, and is a citizen of, the British Virgin Islands.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) and the Standing Order of the United States District Court for the Southern District of New York referring to the Bankruptcy Judges of this District all cases and proceedings arising under the Bankruptcy Code.  This court also has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' preference and

fraudulent transfer claims arise under federal law, and has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state and foreign law claims, which arise out of the same nucleus of operative facts.

17.     This adversary proceeding is a "core" proceeding as defined in 28 U.S.C. § 157(b)(2).  In the event that this or any other Court finds any part of this adversary proceeding to be "non-core," Plaintiffs consent to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

18.     Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and relates to the above-captioned chapter 11 cases under the Bankruptcy Code already pending in this District.  Venue is additionally proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

19.     This Court's *Findings of Fact, Conclusions of Law, and Order Confirming The Modified Joint Chapter 11 Plan of Celsius Network LLC and Its Debtor Affiliates* (the "Confirmation Order"), ECF Doc. No. 3972, in the above-captioned chapter 11 cases, approves the Debtors' chapter 11 plan, which, at Article XII (12), provides that this Court "shall retain exclusive jurisdiction" to "resolve any cases, controversies, suits, disputes, Causes of Action, or other matters," like this one, "that may arise in connection with the Recovery Causes of Action brought by the Litigation Administrator."[3]

20.     The Court has personal jurisdiction over Defendants pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure because Plaintiffs' claims arise from and relate to

---

[3]   In prosecuting this action, the Debtors are directed by the Blockchain Recovery Investment Consortium ("BRIC"), serving as Litigation Administrator (Complex Asset Recovery Manager). *See* ECF Doc. No. 4172.

Defendants' continuous and systematic contacts with the United States. Each Defendant transacted business in and maintained substantial contacts with the United States, including by maintaining relationships with United States entities. Each Defendant has purposefully availed itself of the privilege of doing business in the United States, and has invoked the benefits and protections of its laws. Defendants' actions were directed at, and had the intended effect of, causing injury to persons located in the United States, including in this District. Indeed, Defendants have repeatedly submitted to the jurisdiction of courts in this District.

21.    The Court also has quasi in-rem jurisdiction because of Defendants' maintenance of one or more bank accounts in New York.

## FACTUAL BACKGROUND

### A.    Plaintiffs' Business And Reliance On Loans From Tether To Operate

22.    Celsius was a consumer-facing cryptocurrency company that was founded in 2017 by Alex Mashinsky, Shlomi "Daniel" Leon, and Nuke Goldstein. Celsius's primary product was a platform that allowed customers to purchase and deposit various cryptocurrencies. Like a traditional bank, Celsius paid interest to customers who deposited cryptocurrency on its platform. Celsius was known to pay some of the highest interest rates in the market to its depositors.

23.    In order to generate revenue, Celsius lent its customer-deposited cryptocurrencies to third parties, who in turn would pay Celsius interest. Celsius used revenue from those loans to pay its customers interest on their deposits. Celsius also operated a Bitcoin mining operation.

24.    Like many other crypto companies, Celsius borrowed "stablecoins" to fund its day-to-day operations. "Stablecoins" are digital tokens whose price is pegged to another asset (*e.g.*, the United States dollar or gold) and are typically backed by reserves of *non*-digital assets (such as cash or marketable securities) to achieve price stability.

25.     Defendants control and market the world's most popular stablecoin, USDT.  Each USDT token is purportedly backed by assets (such as cash and commercial paper) such that one USDT is worth one United States dollar.  Defendants also control and market the EURT token, which is purportedly backed by assets such that one EURT is worth one Euro.  Celsius relied on USDT and EURT to operate critical parts of its business.

**B.     The Token Agreement**

26.     On February 1, 2020, Plaintiff Celsius Network Limited and Defendant Tether Limited entered into a "Token Agreement" (the "Initial Token Agreement") allowing Celsius to borrow USDT from Tether.  Celsius agreed to collateralize the borrowing by posting collateral to Tether in any of the following cryptocurrencies: (a) Ether (ETH) tokens; (2) Tether Gold (XAUt); or Bitcoin (BTC) tokens.  If Celsius posted collateral to Tether in Bitcoin, the value of the Bitcoin was initially required to be 140% of the value of the amount borrowed.  Celsius paid Tether interest between 0.333% and 0.55%, per month, depending on the type of collateral posted by Celsius.  For example, if Celsius posted collateral in Bitcoin, it would have to pay Tether monthly interest of 0.55% on its borrowings.

27.     Significantly, the Initial Token Agreement provided that no change or modification to the agreement would be valid unless made in writing and signed by the Parties—Celsius Network Limited and Tether Limited.

28.     The Initial Token Agreement was amended on January 20, 2022 (as amended, the "Token Agreement" or the "Amended Token Agreement"), and is attached as Exhibit A.  Like its predecessor, the Amended Token Agreement authorized Celsius to borrow USDT or EURT if Celsius posted collateral in the form of Ether, Tether Gold, or Bitcoin.

29.     Like the Initial Token Agreement, the Amended Token Agreement was negotiated between Tether's representatives and Celsius personnel located in the United States.  Many of the

principal terms of the Amended Token Agreement, for example, were agreed to during an all-hands call in December of 2021, just a few weeks before the amendment was signed. United States-based Celsius employees—such as Alex Mashinsky, Ron Deutsch, and Joseph Golding-Ochsner—were present at that meeting and negotiated with Tether's top executives, including Tether's CFO, Giancarlo Devasini, and its Chief Investment Officer, Silvano Di Stefano. Celsius's lead throughout the negotiations was Joseph Golding-Ochsner, a Celsius attorney based in the United States.

30.    The negotiations surrounding the Amended Token Agreement centered on several key terms. Among the most important issues discussed during the negotiations was the contract's provision regarding the timeframe that Tether had to wait before it could start liquidating Celsius's collateral following a demand for additional collateral. Tether wanted to maintain the terms of the original agreement, which Tether believed allowed it to commence liquidation immediately after the value of collateral dropped below a certain threshold. Celsius proposed that it be allowed two business days to deposit additional collateral after receiving a demand for additional collateral before Tether would have any right to liquidate collateral.

31.    Ultimately, the parties agreed to change the procedure by which Celsius would post additional collateral and the circumstances under which a liquidation could happen. Unlike the Initial Token Agreement, the Amended Token Agreement required Tether to send notice of a collateral demand to Celsius if the value of Celsius's posted collateral dropped below a specified threshold. After receiving such a notice, the Amended Token Agreement provided Celsius ten hours to satisfy the collateral demand. This is in contrast to the Initial Token Agreement, under which Tether was entitled, "*without further notice to the Recipient*, to sell, dispose of, and liquidate the Collateral." Now, if Celsius was unable to satisfy the collateral demand in that 10-hour window,

only then was Tether permitted to "sell, dispose of, and liquidate the Collateral."  Celsius specifically negotiated for this 10-hour window, and regarded it as one of the "key changes in the amendment."  This provision was important for the stability of Celsius's business and to protect Celsius's residual interest in its collateral, as discussed below.

32.     The parties also extensively negotiated how Tether would deal with excess proceeds from Celsius's collateral in the event of a liquidation.  Celsius wanted excess proceeds returned, and Tether wanted to keep the windfall for itself.  This remained an open point through much of the negotiation of the Amended Token Agreement, and was only settled a few weeks later, following a meeting on or about January 12, 2022, between Mashinsky and Di Stefano.  Mashinsky was in Hoboken, New Jersey when this critical open item in the negotiation was finally resolved.

33.     The Amended Token Agreement reflects the agreement that they reached—an agreement expressly providing for and protecting Celsius's residual interest in collateral.  It was made clear that collateral pledged to secure loans under the agreement was to be held "for the benefit of" Celsius.  Moreover, the Amended Token Agreement expressly provided that, any "surplus" from an application of the collateral was to be returned to Celsius.

34.     The Initial Token Agreement was signed on behalf of Celsius Network Limited by its CFO, Harumi Urata-Thompson, an employee based in the United States.  The Amended Token Agreement was signed on behalf of Celsius Network Limited by two directors, Alexander Mashinsky and Shlomi "Daniel" Leon, both of whom were based in the United States at the time the agreement was negotiated and executed.  Loans under the agreement were made for the benefit of Celsius Network, Inc. and Celsius Network LLC—both United States companies.

35.     As stated above, Celsius borrowed USDT under the Amended Token Agreement.  Celsius posted collateral for those loans in the form of Bitcoin or Ethereum.  By the start of April

of 2022, Celsius had $512,330,000 in outstanding borrowings in USDT pursuant to the Amended Token Agreement.[4]  And as of the start of April 2022, Celsius had posted 16,505.17 Bitcoin to Tether as collateral to secure the 512,330,000 USDT in outstanding borrowing.  Transactions under the Amended Token Agreement were at times initiated and executed by Celsius employees based in the United States, and transfers under the agreement were often made from United States-based accounts.  In performing under the Amended Token Agreement, Defendants had continuous and systematic contact with Celsius's United States-based personnel.

> **C.     The Preferential Top-Up And Cross-Collateralization Transfers**

36.     The § 547(b) Period in this case began on April 14, 2022.  As of that date, Celsius had a balance of 512,330,000 USDT on its loan with Tether.  That USDT loan was collateralized by approximately 16,505.17 Bitcoin.

37.     Beginning at around the same time—April 2022—Bitcoin's price began a violent downward slide.  The price of Bitcoin continued to fall through early July 2022, around the time Debtors filed their voluntary Chapter 11 petitions.

38.     As Bitcoin's price started to fall, Tether became concerned that it, like all other creditors, would be exposed to Celsius's insolvency.  In response, Tether initiated a series of demands under the Amended Token Agreement to improve its security on the antecedent debt owed to it by Celsius.  In each case, Celsius responded to these demands by promptly depositing additional collateral with Tether.  Celsius made the following Bitcoin transfers to Tether—each on account of antecedent debt—during the § 547(b) Period:

---

[4]  Celsius also borrowed a small amount of EURT from Tether.  Those loans are not a subject of this Complaint.

39.     On or about May 3, 2022, Celsius transferred approximately 1,633.35 Bitcoin to Tether.

40.     On or about May 7, 2022, Celsius transferred approximately 2,044.00 Bitcoin to Tether.

41.     On or about May 9, 2022, Celsius transferred approximately 2,214.00 Bitcoin to Tether.

42.     On or about May 11, 2022, Celsius transferred  approximately 2,398.29 Bitcoin to Tether.

43.     On or about May 12, 2022, Celsius transferred  approximately 2,598.15 Bitcoin to Tether.

44.     On or about June 10, 2022, Celsius transferred  approximately 2,807.75 Bitcoin to Tether.

45.     On or about June 12, 2022, Celsius transferred  approximately 3,041.73 Bitcoin to Tether.

46.     In sum, Celsius transferred approximately 16,737.27 Bitcoin to Tether during the § 547(b) Period on account of antecedent debt.  This 16,737.27 Bitcoin—less approximately 1,079.06 Bitcoin released to Celsius on June 6, 2022, for which Celsius did not make an otherwise unavoidable transfer to or for the benefit of Tether—are avoidable as preferences (the "Preferential Top-Up Transfers").  The Bitcoin transferred from Celsius to Tether pursuant to the Preferential Top-Up Transfers was not held in segregated wallets or accounts.  To the contrary, this Bitcoin was commingled with the Bitcoin that Celsius had already transferred to Tether prior to the § 547(b) Period.  These transfers were not made in connection with contemporaneous extensions of USDT loans to Celsius.

47.      In addition to the Preferential Top-Up Transfers, Celsius borrowed additional USDT from Tether on three occasions throughout the § 547(b) Period.  On or about April 20, 2022, Celsius borrowed 100,000,000 USDT from Tether.  On or about May 5, 2022, Celsius borrowed 100,000,000 USDT from Tether.  On or about June 9, 2022, Celsius borrowed 100,000,000 USDT from Tether.  In each instance, Celsius posted Bitcoin in connection with the foregoing: 3,095.00 Bitcoin, 3,288.00 Bitcoin, and 4,317.00 Bitcoin, respectively.  This Bitcoin was commingled with Celsius's previous collateral postings and cross-collateralized Celsius's existing loan from Tether.  Of this 10,700.00 new Bitcoin posted by Celsius, approximately 2,228.01 was excess collateral.  Celsius's transfer of this excess—approximately 2,228.01 Bitcoin—to Tether (the "<u>Preferential Cross-Collateralization Transfers</u>") was, like the Preferential Top-Up Transfers, preferential and are subject to avoidance. During the § 547(b) Period, Celsius also made a series of principal and interest payments to Tether, on account of its loans.[5]  These transfers are separate and distinct from the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers on account of antecedent debt described above.

48.      The Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers dramatically improved Tether's position as a creditor.  If Tether had not received the

---

[5]  On April 22, 2022, Celsius made a principal payment to Tether of approximately 13,000,000.00 EURT.  On May 2, 2022, Celsius made interest payments to Tether of approximately 97,581.02 EURT and 2,789,566.67 USDT.  On May 5, 2022, Celsius made a principal payment to Tether of approximately 7,451,552.00 EURT.  On May 10, 2022, Celsius made a principal payment to Tether of approximately 3,809,470.00 EURT.  On May 17, 2022, Celsius made a principal payment to Tether of approximately 5,332,296.00 EURT.  On May 19, 2022, Celsius made a principal payment to Tether of approximately 12,250,000.00 USDT.  On May 30, 2022, Celsius made interest payments to Tether of approximately 3,517,108.34 USDT and 34,692.40 EURT.  On June 13, 2022, Celsius made a principal payment to Tether of approximately 5,000,572.97 EURT. On June 14, 2022, Celsius made principal payment to Tether of approximately 1,958,886.00 EURT. In sum, Celsius made principal and interest payments to Tether totaling about 36,685,050.39 EURT and 18,556,675.01 USDT during the § 547(b) Period.

Preferential Top-Up Transfers (15,658.21 Bitcoin) and Preferential Cross-Collateralization Transfers (2,228.01 Bitcoin) during the § 547(b) Period, Tether would not have been able to come close to making itself whole on its $812,330,000 USDT loan to Celsius, which it ultimately was able to do with the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers. Indeed, as of the Petition Date, without the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether would have had over $350 million less in collateral.

49.     Celsius is presumed to be, and in fact was, insolvent at the time of each of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers. As of March of 2022, Celsius, by its own account, had a negative net capital position of $60 million, even giving Celsius full credit for CEL Token (Celsius's own cryptocurrency) that it held in its treasury at a value of over $700 million. As noted above, cryptocurrency prices started drastically dropping in April of 2022, and as a result, the value of Celsius's assets—which were primarily in Bitcoin, Ethereum, CEL Token, and other cryptocurrencies—dropped significantly.

50.     Most notably, in April and May of 2022, CEL Token lost most of its value. Celsius's liabilities at the end of the third quarter of 2022 included over $14 billion of principal and interest payments owed to customers on their deposits, and billions owed to third-party lenders. Although those liabilities also declined, they did not do so at the same rate as Celsius's assets. As a result, in April, May, and June of 2022, the value of Celsius liabilities far exceeded the value of its assets.

51.     In addition to being balance sheet insolvent, Celsius also was unable to pay its debts when they came due and did not have adequate capital to operate its business. The liquid assets that Celsius held during this time period were only a fraction of the liquid assets Celsius needed to

operate its business and meet its expected obligations, rendering it insolvent on a cash flow and adequacy of capital basis.

52.    Each time Celsius fulfilled a collateral demand, by making the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, it was transferring its own interest in property to Tether on account of antecedent debt.  Tether provided no contemporaneous value to Celsius in exchange for the transferred property.

53.    Several of these transfers were initiated from the United States by United States-based Celsius employees, and Celsius employees in the United States gave notice of these transfers to Tether.  Finally, on information and belief, each of these transfers was ultimately overseen and approved by Celsius CEO Alex Mashinsky, who was based in Hoboken, New Jersey at the time of the transfers.

**D.    The Improper Application of Collateral**

54.    By June 2022, Bitcoin's dropping price had led to a dire situation for Celsius and the cryptocurrency market as a whole.  Celsius's customers began withdrawing deposits from Celsius at increasingly fast rates, putting it under immense financial distress.  Things became so bad for Celsius that on June 12, 2022, Celsius publicly announced that it was "pausing all withdrawals . . . [and] transfers between accounts."  This "pause" was never lifted before Celsius's bankruptcy filing, and, as a result, Celsius customers were never able to withdraw their assets.

55.    Tether, of course, knew of Celsius's vulnerable position—news of Celsius's "pause" was well known in the cryptocurrency market.  Moreover, on June 12, 2022, Celsius's CEO Alex Mashinsky reached out to Tether's CFO Giancarlo Devasini, asking for Tether's "help squeezing [Celsius] short sellers."  In the words of Rod Bolger—who served as Celsius's CFO at the time—Celsius was "desperate" for Tether's help.  Mashinsky and Devasini agreed to talk at nine in the morning on Monday, June 13, 2022.

56.     But Tether had no interest in helping, and instead was solely focused on improving its own position.  With the benefit of having received the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether embarked on a plan to first ask for additional collateral, and then apply Celsius's collateral to Celsius's entire outstanding loan balance.  This would ensure that Tether would extinguish its entire exposure to Celsius, at a time when other creditors (*e.g.*, customers) could not get access to any of their deposits held by Celsius.

57.     Tether set its plan in motion late at night (Eastern time) on June 12, 2022, when it issued a collateral demand to Celsius.  As noted above, Celsius satisfied that collateral demand promptly, transferring 3,041.73 Bitcoin to Tether early in the morning of June 13.  Several hours later, Tether made a second collateral demand to Celsius.  Celsius notified Tether that it was "working on preparing the BTC [Bitcoin]" to satisfy the collateral demand, and reminded Tether that it had ten hours to do so under the Amended Token Agreement.  However, Tether's representatives demanded immediate payment notwithstanding expressly acknowledging that Celsius ***"have 10h in the [Agreement]***..."

58.     Celsius continued to assure Tether that it was working on providing collateral as soon as possible.  But Defendants decided to proceed with an immediate application of Celsius's collateral—regardless of the terms of the Amended Token Agreement, which required a 10-hour waiting period before Tether could initiate the application process.  Amidst the chaos of June 13, 2022, Celsius's CEO Alex Mashinsky allegedly gave Tether permission to liquidate Celsius's collateral in an "orderly" manner.  However, in contravention of the terms of the Amended Token Agreement, Tether never obtained a written agreement from Mashinsky (or anyone else at Celsius) to amend this contractually mandated 10-hour waiting period.

59.     Indeed, Celsius was never provided the full 10-hour period to which it was contractually entitled to.  With more than half of Celsius's ten-hour period to post additional collateral remaining, Tether purported to begin a fire sale of Celsius's collateral.  Tether performed this "fire sale" by purportedly selling Celsius's Bitcoin in a series of tranches over a period of several hours.  Within hours, all of Celsius's collateral (39,542.42 Bitcoin) had been applied by Tether against Celsius's outstanding indebtedness to Tether (the "Preferential Application Transfer").

60.     Tether represented to Celsius that it applied the entirety of Celsius's collateral, 39,542.42 Bitcoin, at a dollar value of $816,822,948.  The Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers were commingled among this collateral.  On the application date, Celsius's outstanding loan balance under the Amended Token Agreement was $812,333,000.  Without the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether would have had only 21,656.20 Bitcoin in collateral.  At the same average price that Tether claims to have applied the 39,542.42 Bitcoin in satisfaction of the amounts owed Tether, Tether would have realized only $447,349,482.57, leaving a $364,980,517.43 deficiency.[6]  In other words, the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and Preferential Application Transfer clearly improved Tether's position as of the application date (just as it did as measured as of the Petition Date).

61.     Apart from the fact that these transfers were preferences under the Bankruptcy Code, Tether robbed Celsius of its contractually entitled 10-hour window to satisfy collateral demands.  At the time of Tether's last collateral demand on June 13, 2022, Celsius had sufficient

---

[6]  As noted above, at Petition Date prices, Tether would have faced a similar $374,616,278.28 shortfall.

Bitcoin on its balance sheet to post as collateral to Tether, including for, at least, the next 30 days. This was especially true given that Celsius had instituted a "pause" on customer withdrawals, which Tether was well aware of, resulting in the retention of, and access to, a significant amount of Bitcoin. If Celsius had been given the opportunity to meet the collateral demand—which it had the contractual right to do—it could have been able to avoid the disposition of its Bitcoin at near the bottom of the cryptocurrency market. Instead, that disposition was carried out for the benefit of just one creditor: Tether. Moreover, Celsius could have endured through the Petition Date, at which point the automatic stay would have intervened, stopping any attempt by Tether to apply collateral against its claim. Celsius could have retained pledged Bitcoin worth more than $2 billion today. Tether's breach has thus caused Celsius billions of dollars of harm.

62.    Tether's disposition of Celsius's collateral was also commercially unreasonable. Established market practice and commercially reasonable standards of good faith dictate that Tether should have liquidated such a large block of Bitcoin over a period longer than several hours. Liquidating this amount of collateral over a period longer than several hours would (a) minimize the price impact of the sale, especially during a time where buyers in the cryptocurrency market had fear about the direction of the market; and (b) allow time to market the assets to find buyers willing to transact at market prices. If Tether had followed established market practices, it would have ensured that the Bitcoin would have been sold at the full prevailing market price. Instead, Tether applied Celsius's Bitcoin against obligations owed to it for an average price of $20,656.88 each—considerably less than Bitcoin's market closing price on June 13th, $22,487.39. In fact, Tether applied Celsius's Bitcoin at an average price considerably below Bitcoin's *low* price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent company, around the time when the collateral was allegedly liquidated.

63.     Upon information and belief, Tether's application of Celsius's collateral was accomplished through the use of United States intermediaries or counterparties, involved transactions routed through United States servers, involved contacts with Celsius's United States-based personnel, and/or involved the use of bank accounts, financial institutions, or cryptocurrency exchanges located in the United States.

## CAUSES OF ACTION

## COUNT ONE: PREFERENCE (11 U.S.C. § 547)
### (against all Defendants)

64.     The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth below.

65.     Plaintiffs have conducted reasonable due diligence into the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and the Preferential Application Transfer, including, *inter alia*, by reviewing the books and records of Debtors and other information about these transfers.  Plaintiffs have also conducted reasonable due diligence into known or reasonably knowable affirmative defenses that Defendant Tether Limited could assert, including under 11 U.S.C. § 547(c).

66.     Celsius made the Preferential Top-Up Transfers described in paragraphs 39 through 45 within the ninety-day § 547(b) Period.  The Preferential Top-Up Transfers totaled 15,658.21 Bitcoin.

67.     Each of the Preferential Top-Up Transfers was a transfer of Celsius's property—namely, Celsius's Bitcoins.

68.     Each of the Preferential Top-Up Transfers was made to or for the benefit of Defendants.

69. At the time of each Preferential Top-Up Transfer, Defendant Tether Limited was a creditor of Celsius within the meaning of section 101(10) of the Bankruptcy Code. Defendants received the Preferential Top-Up Transfers, or alternatively the Preferential Top-Up Transfers were made for their benefit.

70. Each of the Preferential Top-Up Transfers was made on account of antecedent debt owed by Celsius to Defendant Tether Limited, and each of the Preferential Top-Up Transfers related to that antecedent debt.

71. Each of the Preferential Top-Up Transfers was made within ninety days of the Petition Date, and was made while Plaintiffs were insolvent.

72. Each of the Preferential Top-Up Transfers was made on account of a demand by Tether, and as described above, was made outside the ordinary course of business.

73. The Preferential Top-Up Transfers, if not avoided, would allow Defendant Tether Limited to receive more than it would have if (i) Debtors' chapter 11 case were a case under chapter 7 of the Bankruptcy Code, (ii) the Preferential Top-Up Transfers had not been made, and (iii) Defendant Tether Limited received payment on account of the antecedent debt referenced herein, to the extent provided by the provisions of the Bankruptcy Code.

74. Celsius made the Preferential Cross-Collateralization Transfers described in paragraph 47 within the ninety-day § 547(b) Period. The Preferential Cross-Collateralization Transfers totaled 2,228.01 Bitcoin.

75. Each of the Preferential Cross-Collateralization Transfers was a transfer of Celsius's property—namely, Celsius's Bitcoins.

76. Each of the Preferential Cross-Collateralization Transfers was made to or for the benefit of Defendants.

77.     At the time of each Preferential Cross-Collateralization Transfers, Defendant Tether Limited was a creditor of Celsius within the meaning of section 101(10) of the Bankruptcy Code.  Defendants received the Preferential Cross-Collateralization Transfers, or alternatively the Preferential Cross-Collateralization Transfers were made for their benefit.

78.     Each of the Preferential Cross-Collateralization Transfers cross-collateralized antecedent debt owed by Celsius to Defendant Tether Limited, and each of the Preferential Cross-Collateralization Transfers related to that antecedent debt.

79.     Each of the Preferential Cross-Collateralization Transfers was made within ninety days of the Petition Date, and was made while Plaintiffs were insolvent.

80.     Each of the Preferential Cross-Collateralization Transfers was made outside the ordinary course of business.

81.     The Preferential Cross-Collateralization Transfers, if not avoided, would allow Defendant Tether Limited to receive more than it would have if (i) Debtors' chapter 11 case were a case under chapter 7 of the Bankruptcy Code, (ii) the Preferential Cross-Collateralization Transfers had not been made, and (iii) Defendant Tether Limited received payment on account of the antecedent debt referenced herein, to the extent provided by the provisions of the Bankruptcy Code.

82.     Celsius made the Preferential Application Transfer within the ninety-day § 547(b) Period.  The Preferential Application Transfer totaled 39,542.42 Bitcoin.

83.     The Preferential Application Transfer was a transfer of Celsius's property—namely, Celsius's Bitcoins.

84.     The Preferential Application Transfer was made to or for the benefit of Defendants.

85.     At the time of the Preferential Application Transfer, Defendant Tether Limited was a creditor of Celsius within the meaning of section 101(10) of the Bankruptcy Code.  At the time of the Preferential Application Transfer, Defendants received that transfer, or alternatively the Preferential Application Transfer was made for their benefit.

86.     The Preferential Application Transfer was made on account of antecedent debt owed by Celsius to Defendant Tether Limited.

87.     The Preferential Application Transfer was made within ninety days of the Petition Date, and was made while Plaintiffs were insolvent.

88.     The Preferential Application Transfer was made outside the ordinary course of business, including because it was made in violation of the terms of the Amended Token Agreement and while Celsius was under duress.

89.     In view of the facts that the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers are avoidable transfers, the Preferential Application Transfer, if not avoided, would allow Defendant Tether Limited to receive more than it would have if (i) Debtors' chapter 11 case were a case under chapter 7 of the Bankruptcy Code, (ii) the Preferential Application Transfer had not been made, and (iii) Defendant Tether Limited received payment on account of the antecedent debt referenced herein, to the extent provided by the provisions of the Bankruptcy Code.

90.     As of the date of this Complaint, Defendants have not returned the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, or the Preferential Application Transfer to Celsius.

91.     Plaintiffs are entitled to an order and judgment under 11 U.S.C. § 547 avoiding the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and the Preferential Application Transfer.

### COUNT TWO: RECOVERY OF PROPERTY (11 U.S.C. § 550)
### (against all Defendants)

92.     The allegations made in paragraphs 1 through 91 are adopted as if fully set forth herein.

93.     As alleged in paragraphs 64 through 91 above, Plaintiffs are entitled to avoid the Preferential Top-Up Transfers, the Preferential Cross-Collateralization Transfers, and Preferential Application Transfer under section 547 of the Bankruptcy Code.

94.     Defendants are the initial, immediate, or mediate transferees of the Preferential Top-Up Transfers, the Preferential Cross-Collateralization Transfers, and the Preferential Application Transfer, or the entities for whose benefit such transfers were made. Accordingly, Plaintiffs are entitled to receive a return of their property—15,658.21 Bitcoin, 2,228.01 Bitcoin, and 39,542.42 Bitcoin (without duplication), respectively, or, in the alternative, the value of such property—pursuant to 11 U.S.C. § 550 plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

### COUNT THREE: BREACH OF CONTRACT (BVI LAW)[7]
### (against Tether Limited)

95.     The allegations made in paragraphs 1 through 94 are adopted as if fully set forth herein.

---

[7]     Plaintiffs hereby give notice pursuant to Rule 9017 of the Federal Rules of Bankruptcy Procedure and Rule 44.1 of the Federal Rules of Civil Procedure of their intent to raise issues under the law of the British Virgin Islands ("BVI"), including but not limited to Defendants' liability for breach of contract and breach of the covenant of good faith and fair dealing.

96.     The Amended Token Agreement is a binding contract.

97.     Plaintiffs have fully performed their obligations and satisfied any conditions precedent under the Amended Token Agreement.

98.     Defendant Tether Limited has breached the Amended Token Agreement by improperly applying Plaintiffs' collateral to Plaintiffs' antecedent debt prior to the contractually required ten-hour waiting period after sending a notice of a demand.

99.     At the time of Defendant Tether Limited's last collateral demand on June 13, 2022, Celsius had sufficient Bitcoin on its balance sheet to post as collateral to Tether, including for, at least, the next 30 days.  If Celsius had been given its contractually entitled opportunity to meet the collateral demand, it could have avoided the disposition of its Bitcoin at near the bottom of the cryptocurrency market.  Celsius could have retained its pledged Bitcoin—worth more than $2 billion today.  Celsius has thus been harmed by billions of dollars as a result.

100.    At the very minimum, Plaintiffs have suffered $100 million in damages as a proximate result of Defendant Tether Limited's breaches of contract, corresponding to the difference between the average price for which Tether applied Plaintiffs' collateral and the price that would have been obtained had Tether not breached the Agreement.  Plaintiffs have suffered additional expectation, reliance, and consequential damages as a result of Defendant Tether Limited's breaches of contract in an amount to be proven at trial.

### COUNT FOUR: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (BVI LAW)
### (against Tether Limited)

101.    The allegations made in paragraphs 1 through 100 are adopted as if fully set forth herein.

102.    The law of the British Virgin Islands implies a duty of good faith and fair dealing in the performance of the Amended Token Agreement.

103.    Defendant Tether Limited has breached its duty of good faith and fair dealing under the Amended Token Agreement by improperly liquidating Plaintiffs' collateral, by arbitrarily and irrationally exercising its discretion under the Amended Token Agreement, resulting in the minimization of amounts due to Plaintiffs, and by unfairly interfering with the Plaintiffs' right to receive the benefits of the Agreement.

104.    At the very minimum, Plaintiffs have suffered $100 million in damages as a proximate result of Defendant Tether Limited's breaches of the duty of good faith and fair dealing, corresponding to the difference between the average price for which Tether applied Plaintiffs' collateral and the price that would have been obtained had Tether liquidated Plaintiffs' collateral in good faith and in a commercially reasonable manner on or around June 13, 2022.  Plaintiffs have suffered additional expectation, reliance, and consequential damages as a proximate result of Defendant Tether Limited's breaches of the duty of good faith and fair dealing in an amount to be proven at trial.

## COUNT FIVE: FRAUDULENT TRANSFER (11 U.S.C. §§ 548(A)(1)(B) AND 550)
### (against all Defendants)

105.    The allegations made in paragraphs 1 through 104 are adopted as if fully set forth herein.

106.    On June 13, 2024, Tether represented to Celsius that it applied the entirety of Celsius's collateral of 39,542.42 Bitcoin against Celsius's outstanding debt at a dollar value of $816,822,948.  That Bitcoin was property of the Debtors.  On the application date, Celsius's outstanding loan balance under the Amended Token Agreement was $812,333,000.

107.    Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding debt happened within two years of Celsius's bankruptcy petition, and while Celsius was (a) insolvent, (b) was engaged in a business or a transaction for which any property remaining with Celsius was an unreasonably small capital, or (c) intended to incur, or believed that it would incur, debts that would be beyond Celsius's ability to repay as such debts matured.

108.    Celsius received less than reasonably equivalent value in exchange for the application of its 39,542.42 Bitcoin.  Tether applied Celsius's Bitcoin against obligations owed to it for an average price of $20,656.88 each—considerably less than Bitcoin's market closing price on June 13th, $22,487.39.   In fact, Tether applied Celsius's Bitcoin at an average price considerably below Bitcoin's *low* price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent company, during the three hour window during which the collateral was allegedly liquidated.

109.    Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.  *See* ECF Doc. Nos. 7, 974.

110.    By virtue of the foregoing, Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding loan was a constructive fraudulent transfer avoidable under section 548(a)(1)(B) of the Bankruptcy Code.  Accordingly, Plaintiffs are entitled to receive a return of their property—39,542.42 Bitcoin or, in the alternative, the value of such property—pursuant to 11 U.S.C. § 550 plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

## COUNT SIX: FRAUDULENT TRANSFER (11 U.S.C. §§ 544(B) AND 550)
### (against all Defendants)

111.    The allegations made in paragraphs 1 through 110 are adopted as if fully set forth herein.

112.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent or otherwise voidable transfers are avoidable pursuant to Bankruptcy Code section 544(b) and other applicable law, including the relevant fraudulent or voidable transfer laws as enacted in the states of New York, New Jersey, and Delaware.

113.     On June 13, 2024, Tether represented to Celsius that it applied the entirety of Celsius's collateral of 39,542.42 Bitcoin against Celsius's outstanding debt at a dollar value of $816,822,948.  That Bitcoin was property of the Debtors.  On the application date, Celsius's outstanding loan balance under the Amended Token Agreement was $812,333,000.

114.     Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding debt happened within two years of Celsius's bankruptcy petition, and while Celsius was (a) insolvent, (b) was engaged in a business or a transaction for which any property remaining with Celsius was an unreasonably small capital, or (c) intended to incur, or believed that it would incur, debts that would be beyond Celsius's ability to repay as such debts matured.

115.     Celsius received less than reasonably equivalent value in exchange for the application of its 39,542.42 Bitcoin.  Tether applied Celsius's Bitcoin against obligations owed to it for an average price of $20,656.88 each—considerably less than Bitcoin's market closing price on June 13th, $22,487.39.   In fact, Tether applied Celsius's Bitcoin at an average price considerably below Bitcoin's *low* price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent company, during the time window during which the collateral was allegedly liquidated.

116.    Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.  *See* ECF Doc. Nos. 7, 974.

117.    By virtue of the foregoing, Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding loan was a constructive fraudulent or otherwise voidable transfer avoidable under section 544(b) of the Bankruptcy Code and applicable state law.  Accordingly, Plaintiffs are entitled to receive a return of their property—39,542.42 Bitcoin or, in the alternative, the value of such property—pursuant to 11 U.S.C. § 550 plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that this Court enter judgment in favor of the Plaintiffs and against Defendants and grant the following relief:

(a)    Avoid the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and Preferential Application Transfer as preferential transfers under 11 U.S.C. § 547:

(b)    Direct Plaintiffs to return the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and Preferential Application Transfer, or the value thereof, under 11 U.S.C. § 550.

(c)    Avoid Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding loan as a fraudulent or otherwise voidable transfer under 11 U.S.C. §§ 544, 548, and the law of New York, New Jersey, and Delaware.

(d)    Require Defendants to relinquish to Plaintiffs the 15,658.21 Bitcoin, 2,228.01 Bitcoin, and 39,542.42 Bitcoin (subject to § 550(d) and without duplication) preferentially transferred by Plaintiffs to Defendants during the § 547(b) Period (plus any

additional avoidable transfers that Plaintiffs learn, through discovery or otherwise, were made to Defendants during the § 547(b) Period), or, in the alternative, award Plaintiffs the present value of all Bitcoin (subject to § 550(d) and without duplication) preferentially transferred to Defendants during the § 547(b) Period.[8]

(e)     Requiring Defendants to relinquish to Plaintiffs the 39,542.42 Bitcoin (subject to § 550(d) and without duplication) fraudulently or otherwise voidably transferred by Plaintiffs to Defendants during the two-year period before filing of Celsius's bankruptcy petition (plus any additional avoidable transfers that Plaintiffs learn, through discovery or otherwise, were made to Defendants during the relevant period), or, in the alternative, award Plaintiffs the present value of all Bitcoin (subject to § 550(d) and without duplication) fraudulently or otherwise voidably transferred to Defendants.

(f)     Award Plaintiffs no less than $100,000,000.00 in damages for Defendant Tether Limited's breaches of contract and the covenant of good faith and fair dealing, plus additional damages to be determined at trial.

(g)     Award Plaintiffs their attorneys' fees, pre- and post-judgment interest, and costs; and

(h)     Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

---

[8]   Plaintiffs do not waive, and expressly reserve, any and all arguments with respect to the proper valuation date of the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and Preferential Application Transfer and/or the form of recovery on any judgments.

DATED:  August 9, 2024

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By _____/s/  Benjamin I. Finestone_____

Benjamin I. Finestone
Anil Makhjiani
Mario O. Gazzola
Arman Cuneo (*application for admission forthcoming*)
51 Madison Avenue, 22nd Floor
New York, New York
Telephone: (212) 849-7000
benjaminfinestone@quinnemanuel.com
anilmakhjiani@quinnemanuel.com
mariogazzola@quinnemanuel.com
armancuneo@quinnemanuel.com

-and-

Matthew Scheck
300 West 6th St., Suite 200
Austin, TX 78701
Telephone:  (737) 667-6102
matthewscheck@quinnemanuel.com

*Counsel to Blockchain Recovery Investment Consortium, LLC, Litigation Administrator and Complex Asset Recovery Manager, as Representative for the Post-Effective Date Celsius Debtors*