Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    Adv. Case No. 24-04018-mg

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    CELSIUS NETWORK LLC,

9

10          Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   CELSIUS NETWORK LIMITED, ET AL.,

13                Plaintiffs,

14          v.

15   TETHER LIMITED, ET AL.,

16                Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

Page 2

1                    United States Bankruptcy Court

2                    One Bowling Green

3                    New York, NY  10004

4

5                    September 24, 2024

6                    3:55 PM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KAREN

1    **HEARING re Case Management Conference Held Using Zoom for**

2    **Government. (Doc ## 6 to 9)**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **Transcribed by:  Sonya Ledanski Hyde**

1    A P P E A R A N C E S :

2

3    QUINN EMANUEL URQUHART & SULLIVAN, LLP

4        Attorney for Debtor/Plaintiff

5        51 Madison Avenue, 22nd Floor

6        New York, NY 11010

7

8    BY:  BENJAMIN FINESTONE (TELEPHONICALLY)

9

10   KRAMER LEVIN NAFTALIS & FRANKEL LLP

11       Attorney for Defendants

12       2000 K Street NW, 4th Floor

13       Washington, DC 20006

14

15   BY:  ARIEL NORMAN LAVINBUK (TELEPHONICALLY)

16

17

18

19

20

21

22

23

24

25

Page 5

1              P R O C E E D I N G S

2              CLERK:  Good afternoon.  Starting the four o'clock

3    hearing, recording, on September 24, 2024, calling Celsius

4    Network et al. v. Tether Limited et al., Case Number 24-

5    4018.  If we could have the parties give their appearances.

6              MR. FINESTONE:  Hi.  Good afternoon.  It's Ben

7    Finestone from Quinn Emanuel on behalf of the Plaintiffs.

8              CLERK:  Thank you.

9              MR. FINESTONE:  Thank you.

10             CLERK:  Do we have any additional parties making

11   appearance at this time?  I don't see anyone.  All right,

12   you can pause for -- for the parties that have joined, if

13   anyone is speaking on the record this afternoon, please

14   unmute your line and state your appearance.

15             MR. LAVINBUK:  Good afternoon.  Ariel Lavinbuk,

16   from Kramer Levin, for the Defendants.

17             CLERK:  Okay, thank you.  Are the parties ready to

18   begin or --

19             MR. LAVINBUK:  Ariel Lavinbuk, from Kramer Levin,

20   for the Defendants.

21             MR. FINESTONE:  That was a good trick, Ariel.  The

22   Plaintiffs are ready, Ms. Anderson.

23             CLERK:  I'm sorry?

24             MR. FINESTONE:  The Plaintiffs are ready to answer

25   your question.

Page 6

```
 1                CLERK:  Okay, thank you.  Judge, do you want to
 2      wait or do you want to --
 3                THE COURT:  No, we can go ahead.
 4                CLERK:  Okay.
 5                THE COURT:  Good afternoon.  So, Mr. Finestone,
 6      tell me about this case.
 7                MR. FINESTONE:  But for the record, Your Honor,
 8      just to be safe, Ben Finestone, Quinn Emanuel, on behalf of
 9      the Plaintiffs.  I'm receiving your question, I'm
10      interpreting your question more substantively than
11      procedurally, Your Honor, or am I interpreting it wrong?
12                THE COURT:  Well, I'm going to ask Mr. Lavinbuk --
13      I know, I read the letters.  Obviously, I disagreed with the
14      Defendants' position with respect to working out a
15      scheduling order.  I -- let me just deal with that first.
16      I've read, obviously, I have the Joint Rule 26F report, and
17      I have the proposed case management and scheduling order;
18      both are going to be approved.
19                I appreciate that you did that what I really
20      require to be done.  So, I know from the Defendants' letter
21      that they intend to make a motion to dismiss.  Why don't you
22      briefly discuss the personal -- obviously, I'm going to have
23      a motion and it'll be fully briefed and I'll deal with it
24      then.  But just briefly, describe for me why you believe
25      there's personal jurisdiction over the Defendants?
```

Page 7

```
1            MR. FINESTONE:  Yes, Your Honor, thank you.  And

2    not to dodge the question, because I'm obviously going to

3    answer the question, but in case Your Honor was curious,

4    just about the amount -- thank you for the Court's

5    indication that it will enter those orders.  If Your Honor

6    was curious about the amount of time that the Defendant,

7    that the parties agree that the Defendant would have to file

8    that motion to dismiss, that's related to Your Honor's

9    question, that's because they accepted service under Federal

10   Rule of Civil Procedure 4, give them 60 days.  And then,

11   they had given us 30 days, Your Honor, of a totaling

12   agreement, beyond the deadline in 546(a), and in exchange we

13   had agreed in advance to give them 30 extra days; not that

14   we could give them, but that we would be agreeable to giving

15   them 30.  So, that's -- I just wanted Your Honor to have

16   that (indiscernible).

17           THE COURT:  And I'm fine with that.  I mean, the

18   schedule that you both agreed on is satisfactory to the

19   Court.

20           MR. FINESTONE:  Thank you, Your Honor.  To return

21   to the question that I said I wasn't dodging, Your Honor, we

22   believe there's personal jurisdiction for, I guess several

23   factual reasons.  One, there is a contract that underlies

24   these, the transfers that were made in the 90-day period

25   prior to the bankruptcy.  And that contract, at least Your
```

Page 8

1    Honor, from the, from the Debtor's perspective, the humans

2    that were negotiating that contract with Tether, were in,

3    were in the United States of America, they were in northern

4    New Jersey.  Tether knew that, and so Tether availed itself

5    of New York -- Tether engaged with New York -- it's New

6    Jersey, Your Honor.  Tether engaged itself with New Jersey

7    individuals and negotiating and ultimately entering into

8    this lending relationship with the Debtors.  The contract

9    was signed by Debtor representatives in New Jersey.

10          More specifically, Your Honor, because it's not

11   just the documenting of the contract, but then as a debtor-

12   in-possession, we're a reorganized debtor.  But as an entity

13   in bankruptcy, we're focused on the transfers that were made

14   pursuant to the contract.  And those transfers were each

15   authorized by an individual that was sitting in New Jersey.

16   And so, from our perspective, the incurrence of the debt was

17   done pursuant to a contract that was negotiated in, very

18   close to Your Honor's court.  And then the transfers that

19   we're seeking to avoid, Your Honor, were also authorized

20   from the northern east quadrant of the United States of

21   America.

22          In terms of, this is, of course, this is, of

23   course cryptocurrency, so it's not as easy to say the cash

24   that was transferred out was in a bank account in New York.

25   But we think that cuts in the Plaintiff's favor because

Page 9

1    there's really nowhere to say where the bitcoin was that was

2    transferred.  It was on every, it was on every exchange

3    around the globe, including in exchanges that were in the

4    United States.  And so, both from a personal jurisdiction

5    standpoint, Your Honor, as well as from a -- is, are these

6    transfers, should they be considered to be extraterritorial?

7    Assuming, arguendo, that the Court were to determine that

8    they cannot be extraterritorial to be subject to chapter 5

9    avoidance.  We believe that the transfers are also domestic,

10   Your Honor.

11            THE COURT:  Is there a choice of law provision in

12   the contract?

13            MR. FINESTONE:  It's not exclusive, Your Honor.

14   The choice of law is foreign law, and that will govern.  And

15   we were forthright about this in the complaint.  We believe

16   that will govern the breach of contract claim, but it,

17   unsurprisingly, we do not believe that BVI law governs,

18   whether or not there was a preferential transfer under 11

19   USC 547 or 548, Your Honor.  And it's not exclusive

20   jurisdiction, the contract.

21            THE COURT:  Mr. Lavinbuk, you want to address the

22   personal jurisdiction issue briefly?

23            MR. LAVINBUK:  I appreciate it, Your Honor, yes.

24   So, the complaint names four defendants -- sorry --

25            THE COURT:  You froze, but go ahead.  Why don't

1    you start again.  I heard you say there are four defendants.

2    Yes.

3              MR. LAVINBUK:  Thank you, Your Honor.  So, the

4    complaint names four defendants.  There are zero allegations

5    about three of them.  There are no jurisdictional

6    allegations, there are no substantive allegations; there's

7    nothing about them.  As to the fourth, the fourth is a

8    Tether entity that is based in Hong Kong.  It was the

9    contractual counterparty to something called the Token

10   Agreement; it's the contract that is at issue in this case.

11             THE COURT:  When you say the fourth, Tether

12   Operations Limited?

13             MR. LAVINBUK:  No, no, I'm sorry.  It's Tether

14   Limited, is the only defendant for whom there are any

15   allegations in the complaint.  As to the other three, there

16   are none -- no jurisdictional, no substantive, nothing.  As

17   to Tether Limited, it is, as the complaint alleges, a

18   foreign entity.  It's counterparty, the Plaintiff, Celsius

19   UK, also a foreign entity, this is Celsius -- sorry, I don't

20   have the name in front of me, but the complaint alleges it

21   to be a UK entity.  And the contract is governed by BVI law.

22   That's the choice of law.

23             Now, Mr. Finestone is right that there is not an

24   exclusive submission to jurisdiction, but the contract

25   itself is nevertheless governed by US law.  So, we have two

Page 11

1    counterparties, and the transfers are alleged to have

2    occurred pursuant to that contract.  Both counterparties are

3    foreign, they chose a foreign basis of law.  Mr. Finestone

4    noted, as the complaint does, that certain of the employees

5    for, I guess the Celsius UK entity, may have, at times, been

6    in the United States.  Our motion will show that under

7    Second Circuit and other cases in the Southern District, the

8    fact that the Plaintiff has employees in the United States,

9    does not mean that the Defendant has purposely availed

10   themselves of US law, when the place of performance is not

11   in the United States, when the Defendants did not go to the

12   United States to do any of those things; those are

13   considered incidental contacts under the law.  And those are

14   the only things that are cited in the complaint.

15            And so, again, we will put this fully in the

16   briefing, but we think there's a strong argument that there

17   is no personal jurisdiction over the one entity for whom

18   there are any allegations, because we are not directed -- my

19   client has not done anything in the United States.

20            As to the cryptocurrency that's at issue, I agree

21   with Mr. Finestone that the fact that it's crypto, in a

22   sense, makes it easy, because there is no bank account.

23   There's no bank account in the United States.  There's no

24   cash in the United States that left the United States to go

25   to my client.  This is merely crypto.  We will show, under

Page 12

```
1    the law, that the predominance of courts consider that

2    crypto exists where its owner exists, which is to say either

3    here or in the UK where the Celsius entity is, or in Hong

4    Kong, where the Tether entity is, but in all events, not in

5    the United States.

6              And so, here we think the complaint simply doesn't

7    allege anything that shows that our client purposely availed

8    itself of being in the United States.

9              THE COURT:  So, let me ask -- let me switch back

10   to Mr. Finestone.  The law in this circuit, with respect to

11   motions to dismiss, or lack of personal jurisdiction, really

12   sets up alternative tests.  And do you intend to take

13   jurisdiction about personal -- do you intend to take

14   discovery about personal jurisdiction?

15             MR. FINESTONE:  Your Honor, we plan on serving

16   discovery without delay.  We do, given that Mr. Lavinbuk's

17   client has been clear that it believes that there's an

18   absence of personal jurisdiction, we will include discovery

19   of the personal jurisdiction, just as a -- the way a lawyer

20   would say, Your Honor, we do believe -- I do disagree, and I

21   do believe that the allegations in the complaint are

22   sufficient to withstand the 12(b)(6) -- 12 -- a jurisdiction

23   pleadings motion.  But I think, especially given out of

24   respect for the efficient way that Your Honor controls --

25   it's not the Court's docket, we will include that in the
```

Page 13

1    discovery that we served, and will try to do this

2    efficiently and get -- bolster our allegations.  But I am

3    confident, Your Honor, we are not just simply saying that we

4    have employees that were in the United States.  We're saying

5    that the employees that we had in the United States are the

6    employees that Tether negotiated this arrangement with, and

7    they are the employees that directed the transfers that

8    we're seeking avoidance of your -- so it's much more

9    specific --

10            THE COURT:  When was the transaction negotiated?

11            MR. FINESTONE:  The governing contract, as

12   amended, Your Honor, was last amended and is effective

13   January 20, 2022.  The transfers that we're seeking

14   avoidance of are, obviously, in the 90-day period, prior to

15   the bankruptcy case.

16            THE COURT:  Did Celsius have employees in the UK

17   then?

18            MR. FINESTONE:  The CEO spent most of his time in

19   New Jersey, Your Honor.  I don't know to what extent there

20   were employees in the United Kingdom.  And in part, I don't

21   know it because I've been focusing on the employees that

22   we're going to need to, that we had to consider in

23   negotiating the case management or whatever, and the

24   employees that are relevant to our case, Your Honor.

25            THE COURT:  Let me ask, Mr. Lavinbuk, from your

Page 14

1    letter, I read not only do you plan to move to dismiss for

2    lack of personal jurisdiction, but also 12(b)(6), is that

3    correct?

4              MR. LAVINBUK:  Correct, Your Honor.

5              THE COURT:  And just very briefly, what are your

6    arguments under 12(b)(6)?  I understand -- we'll see what

7    the specifics are on personal jurisdiction, but what are

8    your arguments with respect to 12(b)(6)?

9              MR. LAVINBUK:  Sure.  There's a couple.  The first

10   one is, we're going to make an extraterritoriality argument,

11   which is technically a 12(b)(6) argument.  We believe the

12   facts necessary to sustain that argument are clear from the

13   allegations in the complaint.  That's number one.  We're

14   going to allege a failure to state a contract claim.  They

15   have a theory that we breached the contract by virtue of us

16   taking Celsius' instruction to liquidate the collateral.

17   We're going to show that that both doesn't violate the

18   contract, as well as the fact that we had other grounds to

19   liquidate even without Celsius' consent.  We're going to

20   make an argument that there is a failure to allege the prima

21   facie elements of a preference because at all relevant

22   times, Tether was over secured and, therefore, it wasn't

23   made better off by the provision of the collateral that was

24   provided.  So, those are the big ones.

25             THE COURT:  Okay.

1         MR. LAVINBUK:  It may well be that we also make

2    arguments that certain affirmative defenses under 547(c) are

3    just plain from the face of the complaint.

4         THE COURT:  All right.  Have you, the two of you

5    agreed on a briefing schedule, on the motion to dismiss?

6         MR. LAVINBUK:  We have, Your Honor.  And it was --

7    I'm sorry, it might have been lost in the mix.  We actually

8    proposed a briefing schedule with the letters last week.  I

9    believe it's Docket Entry 6 or 7.  And yes, as Mr. Finestone

10   noted, we actually had extensive conversations about a

11   schedule that honors the waiver that we gave, and the

12   totaling agreement that we gave while also accommodating for

13   end-of-year schedules and things of that nature.

14        THE COURT:  Just give me -- I apologize, I don't

15   have the letters in front of me -- just lay out for me the

16   schedule that you agreed upon.

17        THE COURT:  Sure.  So, we agreed to file our

18   motion to dismiss on or before November 14.  And just to

19   give you some color, part of that is that myself and many

20   members of our team are Jewish and we're out for much of

21   October, so we asked until November.  The Plaintiffs have

22   until January 21 to file an opposition to the motion to

23   dismiss.  And then we have 30 days, a month, until February

24   20.  And there was some agreement amongst the parties that

25   we hope Your Honor will bless, with respect to pages.  We

Page 16

1    asked for 40 pages for our opening brief, 40 for the op, and

2    25 for the reply.

3            THE COURT:  Yeah.  And I'm fine with that, because

4    this is more complicated than many of the cases that I have.

5    So, with respect to a hearing date, I'm not going to set a

6    hearing date now.  I will set the hearing date after the

7    briefing is completed and the Court has had an opportunity

8    to read the briefs.  We'll make sure we check with -- it'll

9    be at least several weeks after the reply brief is in, and

10   I'll make sure my courtroom deputy checks with both of you

11   to make sure the date is convenient.

12           MR. FINESTONE:  Thank you, Your Honor.

13           MR. LAVINBUK:  Thank you.  Your Honor, just for

14   full disclosure --

15           THE COURT:  Go ahead.

16           MR. LAVINBUK:  -- since you had asked about the

17   motion to dismiss, and I want to give the Court a full

18   picture of, we think, the defenses in the case.  I also want

19   to note, although likely not, susceptible on a motion to

20   dismiss, we also believe there are safe harbor defenses here

21   under 546(e).  And I note that in part because I see that

22   they're also being raised, or safe harbors are being raised

23   in the customer preference actions.  And so, I just want to

24   let Your Honor know, I think they will be different in this

25   case.  I think there will be elements that are the same, but

Page 17

1    I think in this case, they're likely to be different,

2    because the nature of the contract in this case is different

3    than the one in those cases.

4            THE COURT:  Okay.  But in any event, I will -- I

5    won't set a hearing date until all the briefing is completed

6    and the Court's had an opportunity to review the papers,

7    maybe not finally, but it'll be at least several weeks after

8    briefing is completed.  Anything else that either of you

9    wish to raise today?

10           MR. FINESTONE:  I'm tempted to respond to the

11   arguments that were previewed, but I don't think there's any

12   --

13           THE COURT:  Oh, I'll forget about it by the time

14   we -- you know, by tomorrow.  So, you know, you're welcome

15   to, but it's not going to do you much good.

16           MR. FINESTONE:  There's no utility in that.  Thank

17   you very much, Your Honor, and it is, the briefing schedule

18   was at Docket Number 7 in the adversary briefs.

19           THE COURT:  All right.  So, the scheduling order

20   will be entered.  I think, you know, Mr. Finestone, you've

21   been before me before; Mr. Lavinbuk, I'm not sure whether

22   you have or not.  Let me just briefly say, with respect to

23   any discovery disputes, that I generally don't take

24   discovery motions, motions to compel.  The parties meet and

25   confer and endeavor to resolve the issue.  If you can't, the

1    party seeking the assistance of the Court, contacts my

2    courtroom deputy, Diana Anderson, and arranges for a

3    hearing, usually within a day or two, I mean very quick.

4    And, other than on privilege issues, you know, I really need

5    briefs.  And when I do, I typically ask for just letter

6    briefs.  And I think what I'm able to do is -- it's, you

7    know, in 17 years, I could count on one hand the number of

8    discovery briefs I've actually had to hear and resolve.

9    Because when parties know that it's going to be resolved

10   immediately and motions to compel are not going to slow

11   anything down, somehow they manage to find a way to get

12   things resolved themselves.  So, that's what I do.

13           I don't -- let me ask you, additionally, whether

14   there have been any settlement discussions or discussions

15   about mediation at this point?

16           MR. FINESTONE:  Prior to the commencement of the

17   adversary proceeding, the parties did have one settlement

18   conference, Your Honor, and the parties remain, I think,

19   interested, or of the view that settlement discussions

20   should continue throughout the pendency of this lawsuit.  I

21   think that's all that I could say about that.  Mr. Lavinbuk,

22   do you agree with how I described it?

23           MR. LAVINBUK:  I do.  I think from our

24   perspective, it may well be that we need the Court to

25   adjudicate a motion to dismiss, to sort of move the parties

Page 19

1    forward.  But certainly, I agree with Mr. Finestone that we

2    had a cordial first meeting and we're interested in staying

3    in touch on these topics throughout.

4              THE COURT:  Okay.  There are a lot of people on

5    the screen.  I don't know whether anybody -- I think -- the

6    counsel for the parties have spoken.  Is there anybody else

7    who wishes to be heard?  All right.  So, the scheduling

8    order will be entered, and we'll proceed from there.  Thanks

9    very much.

10             MR. FINESTONE:  Thank you, Your Honor.

11             MR. LAVINBUK:  Thank you, Your Honor.

12             THE COURT:  And I really am pleased that you were

13   able to work out the schedule.  As I said, it's acceptable

14   to me.  All right, thank you very much, we're adjourned.

15             (Whereupon these proceedings were concluded at

16   4:13 PM)

17

18

19

20

21

22

23

24

25



Page 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 21

1                          C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 11, 2024