KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Daniel M. Eggermann
David E. Blabey, Jr.
Gabriel Eisenberger
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Ariel N. Lavinbuk
Brandon L. Arnold
Jane Jacobs (*pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>(Jointly Administered) |
| CELSIUS NETWORK LIMITED and CELSIUS NETWORK LLC (POST-EFFECTIVE DATE DEBTORS),<br><br>          Plaintiffs,<br><br>    against<br><br>TETHER LIMITED;<br>TETHER HOLDINGS LIMITED;<br>TETHER INTERNATIONAL LIMITED; and<br>TETHER OPERATIONS LIMITED,<br><br>          Defendants. | Adv. Proc. No. 24-04018 (MG) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

---

[1] The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

    A.    The Parties ................................................................................................ 4

    B.    The Token Agreement Between Celsius Network Limited And Tether Limited ...................................................................................................... 4

    C.    The Transfers At Issue In This Case ........................................................ 7

        a.    During The Preference Period, CNL Both Provided And Received BTC Pursuant To The Terms Of The Token Agreement ........................... 7

        b.    CNL Directs TLTD To Liquidate Its Collateral ........................................ 9

        c.    Subsequent Dispositions Of CNL's Collateral After The Application Transfer ................................................................................ 10

ARGUMENT ..................................................................................................................... 11

I.    The Complaint Does Not Allege Any Claims Held By Plaintiff CNLLC ...................... 11

II.    The Court Lacks Personal Jurisdiction Over Defendants .................................. 12

    A.    Defendants Are Not Subject To Specific Jurisdiction .......................... 13

        1.    The Complaint Makes Insufficient Allegations Specific To Defendants Tether Holdings Limited, Tether Operations Limited, Or Tether International Limited ............................................................... 14

        2.    The Complaint Fails To Plead That TLTD Purposefully Availed Itself Of Doing Business In The United States ......................................... 14

        3.    Plaintiffs Fail To Plead Effects-Based Specific Personal Jurisdiction ................................................................................................ 23

    B.    The Complaint Does Not Allege A Basis For *Quasi In Rem* Jurisdiction ............ 25

III.    The Complaint Fails To State A Claim For Breach Of Contract (Count III) .................. 25

    A.    Because CNL Gave TLTD "Permission To Liquidate," The Token Agreement Did Not Require TLTD To Wait Ten Hours To Start The Application Transfer .............................................................................. 26

i

B.    CNL's Insolvency Provided An Independent Basis For Liquidation .................. 27

C.    Plaintiffs' Causation Theory Fails As A Matter of Law Because It Would Itself Violate The Token Agreement ...................................................... 28

IV.    The Complaint Fails To State A Claim For Breach Of The Covenant Of Good Faith And Fair Dealing (Count IV) ............................................................ 29

V.    Plaintiffs' Avoidance Claims Rely On Impermissible Extraterritorial Applications Of The Bankruptcy Code (Counts I, II, V, VI) .................................... 31

A.    The Code's Avoidance Provisions Do Not Apply Extraterritorially ................... 31

B.    Plaintiffs' Fraudulent Transfer And Preference Claims Would Be Impermissible Extraterritorial Applications Of The Avoidance Provisions ........ 34

1.    The Top-Up And Cross-Collateralization Transfers Were Foreign Transactions ................................................................. 34

2.    The Application Transfer Was A Foreign Transaction ........................... 35

VI.    The Complaint Fails To State Any Preference Claims (Counts I and II) ........................ 36

A.    TLTD Was Fully Secured At The Time Of Each Allegedly Preferential Transfer And So None Of Them Resulted In TLTD Receiving More Than It Would Have In A Chapter 7 Liquidation .......................................... 36

B.    The Complaint Fails To State A Claim As To Certain Of The Alleged Preferences For Additional, Independent Reasons ............................... 41

1.    Plaintiffs Fail To Plead That The Cross-Collateralization Transfers Were Made "For Or On Account Of An Antecedent Debt" .................... 41

2.    The Application Transfer Was A Contemporaneous Exchange For New Value ................................................................... 43

CONCLUSION ................................................................................ 45

**Page(s)**

**Cases**

*AJ Ruiz Consultoria Empresarial S.A. v. Banco Bilbao Vizcaya Argentaria, S.A.*,
  2024 WL 460482 (Bankr. S.D.N.Y. Feb. 6, 2024) ..........................................................20, 22

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
  2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) ........................................................................12

*In re Ampal-Am. Israel Corp.*,
  562 B.R. 601 (Bankr. S.D.N.Y. 2017) ........................................................................32, 33, 36

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999) ...............................................................................................................42

*In re Berau Cap. Res. Pte Ltd*,
  540 B.R. 80 (Bankr. S.D.N.Y. 2015) .....................................................................................20

*Calder v. Jones*,
  465 U.S. 783 (1984) ...............................................................................................................13

*In re CIL Ltd.*,
  582 B.R. 46 (Bankr. S.D.N.Y. 2018) ........................................................................32, 33, 34

*In re Colonial Realty Co.*,
  980 F.2d 125 (2d Cir. 1992) ...................................................................................................33

*In re Crude Oil Commodity Futures Litig.*,
  913 F. Supp. 2d 41 (S.D.N.Y. 2012) ......................................................................................38

*Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*,
  24 F.4th 491 (5th Cir. 2022) ..................................................................................................23

*Dicks v. Cooks Junction, Inc.*,
  2023 WL 2775830 (S.D.N.Y. Apr. 4, 2023) ..........................................................................12

*Diversapack LLC v. Elite Staffing, Inc.*,
  2012 WL 1032687 (E.D.N.Y. Mar. 20, 2012) ........................................................................15

*Ecigrusa, LLC v. Silver State Trading LLC*,
  2022 WL 1321573 (N.D. Tex. May 3, 2022) ..........................................................................18

*In re Extended Stay, Inc.*,
  2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020) .............................................................11

Page(s)

*Falcon Creditor Tr. v. First Ins. Funding,*
381 B.R. 543 (B.A.P. 8th Cir. 2008) ........................................................38, 39, 40

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
141 S. Ct. 1017 (2021) ...........................................................................13

*In re Foxmeyer Corp.,*
286 B.R. 546 (Bankr. D. Del. 2002) .......................................................44

*In re French,*
440 F.3d 145 (4th Cir. 2006) ..................................................................32, 33

*Fuld v. Palestine Liberation Org.,*
82 F.4th 74 (2d Cir. 2023) ......................................................................12

*Ganino v. Citizens Utils. Co.,*
228 F.3d 154 (2d Cir. 2000) ...................................................................38

*Gargano v. Cayman Nat'l. Corp.,*
2010 WL 2245034 (D. Mass. June 2, 2010) ..........................................21

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
564 U.S. 915 (2011) ...............................................................................13

*Gowan v. Wachovia Bank, N.A. (In re Dreier LLP),*
453 B.R. 499 (Bankr. S.D.N.Y. 2011) ...................................................43

*Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc.,*
837 F.2d 224 (5th Cir. 1988) ..................................................................44

*Guo Jin v. EBI, Inc.,*
2008 WL 896192 (E.D.N.Y. Mar. 31, 2008) .........................................22

*In re Johnston Indus., Inc.,*
2006 WL 4899910 (Bankr. M.D. Ga. Nov. 21, 2006) ............................42

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria,*
937 F.2d 44 (2d Cir. 1991) .....................................................................12

*Kogan L. Grp., P.C. v. Brace,*
2020 WL 5038764 (S.D.N.Y. Aug. 26, 2020) ........................................15

*Lansing Trade Grp., LLC v. 3B Biofuels GmbH & Co., KG,*
612 F. Supp. 2d 813 (S.D. Tex. 2009) ...................................................17

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) ........................................25

*LCM XXII v. Serta Simmons Bedding, LLC*,
2022 WL 953109 (S.D.N.Y Mar. 29, 2022) ...........................................38

*Le Bleu Corp. v. Standard Cap. Grp., Inc.*,
11 F. App'x 377 (4th Cir. 2001) (per curiam) .......................................17

*Lehigh Coal & Navigation. Co. v. Geko-Mayo, GmbH*,
56 F. Supp. 2d 559 (E.D. Pa. 1999) ......................................................21

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015), *amended*, 2015 WL 13122396
(S.D.N.Y. Oct. 19, 2015) ......................................................................24

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013)..........................................................13, 23

*LNC Invs., Inc. v. First Fidelity Bank*,
247 B.R. 38 (S.D.N.Y. 2000)................................................................40

*In re Lyondell Chemical Co.*,
543 B.R. 127 (Bankr. S.D.N.Y. 2016)...............................................33, 34

*In re Maxwell Commc'n Corp.*,
186 B.R. 807 (S.D.N.Y. 1995).......................................................31, 32, 33

*Meeks+Partners Co. v. Amrit Dev., Inc.*,
2009 WL 10695108 (S.D. Tex. Jan. 26, 2009) ......................................20

*In re Midland Euro Exch. Inc.*,
347 B.R. 708 (Bankr. C.D. Cal. 2006)..................................................33

*Moncrief Oil Int'l Inc. v. OAO Gazprom*,
481 F.3d 309 (5th Cir. 2007) ....................................................15, 19, 21

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010)........................................................................31, 32, 34

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
631 F.3d 29 (2d Cir. 2010) (per curiam)...............................................35

*Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,*
322 F.3d 147 (2d Cir. 2003) ................................................................43

*Off. Comm. of Unsecured Creditors of Enron Corp. v. Whalen (In re Enron Corp.),*
357 B.R. 32 (Bankr. S.D.N.Y. 2006) ................................................42

*Off. Comm. of Unsecured Creditors Hydrogen, LLC. v. Blomen (In re Hydrogen, LLC),*
431 B.R. 337 (Bankr. S.D.N.Y. 2010) ..............................................36

*Off. Comm. of Unsecured Creditors v. AAF-McQuay, Inc. (In re 360networks (USA) Inc.),*
327 B.R. 187 (Bankr. S.D.N.Y. 2005) ............................................3, 37

*Off. Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Cap., LLC),*
501 B.R. 549 (Bankr. S.D.N.Y. 2013) ....................................... *passim*

*Palmer Clay Products Co. v. Brown,*
297 U.S. 227 (1936) ...................................................................39, 40

*Matter of Park N. Partners, Ltd.,*
85 B.R. 916 (Bankr. N.D. Ga. 1988) ................................................39

*In re Phoenix Steel Corp.,*
76 B.R. 373 (Bankr. D. Del. 1987) ..................................................44

*In re Picard,*
917 F.3d 85 (2d Cir. 2019) ...........................................................34, 35

*Plusgrade L.P. v. Endava Inc.,*
2023 WL 2402879 (S.D.N.Y. Mar. 8, 2023) ....................................14

*Quarmby v. Rexon Indus. Corp.,*
2022 WL 17812965 (W.D.N.Y. Nov. 28, 2022) ................................14

*Raad v. Bank Audi S.A.L.,*
2024 WL 967172 (S.D.N.Y. Mar. 5, 2024) ......................................25

*RJR Nabisco, Inc. v. Eur. Cmty.,*
579 U.S. 325 (2016) ................................................................3, 31, 34

*In re Robinson Bros. Drilling, Inc.*,
    877 F.2d 32 (10th Cir. 1989) ...........................................................44

*Rosenblatt v. Coutts & Co. AG*,
    750 F. App'x 7 (2d Cir. 2018) .........................................................21

*Rousey v. Jacoway*,
    544 U.S. 320 (2005)..........................................................................42

*Savage & Assocs., P.C. v. A.I. Credit Corp. (In re Teligent, Inc.)*,
    337 B.R. 39 (Bankr. S.D.N.Y. 2005)........................................37, 38, 41

*Sawtelle v. Farrell*,
    70 F.3d 1381 (1st Cir. 1995) ............................................................17

*Schentag v. Nebgen*,
    2018 WL 3104092 (S.D.N.Y. June 21, 2018) ..................................24

*Simon v. Philip Morris, Inc.*,
    86 F. Supp. 2d 95 (E.D.N.Y. 2000) .................................................23

*Singer v. Bank of Palestine*,
    2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021) ..................................20

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018)..............................................................13

*In re SSA Bonds Antitrust Litig.*,
    420 F. Supp. 3d 219 (S.D.N.Y. 2019)...............................................24

*Starostenko v. UBS AG*,
    2023 WL 34947 (S.D.N.Y. Jan. 4, 2023) .........................................19

*Stengel v. Black*,
    2003 WL 1961638 (S.D.N.Y. Apr. 25, 2003).....................................15

*Stuart v. Spademan*,
    772 F.2d 1185 (5th Cir. 1985) .........................................................16

*Sunward Elecs., Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004)................................................................12

*In re Telesphere Commc'ns, Inc.*,
    229 B.R. 173 (Bankr. N.D. Ill. 1999) ..........................................38, 40

Page(s)

*In re Terrorist Attacks on Sept. 11, 2011,*
714 F.3d 659 (2d Cir. 2013)....................................................12, 13, 23

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.,*
916 F.3d 143 (2d Cir. 2019).................................................................24

*Union Bank v. Wolas,*
502 U.S. 151 (1991) ............................................................................39

*Vetrotex CertainTeed Corp. v. Consol. Fiber Glass Prods. Co.,*
75 F.3d 147 (3d Cir. 1996)...................................................................17

*Walden v. Fiore,*
571 U.S. 277 (2014) ...................................................................... *passim*

*Zanotti v. Invention Submission Corp.,*
2020 WL 2857304 (S.D.N.Y. June 2, 2020) ........................................12

*In re Zetta Jet USA, Inc.,*
2024 WL 3198826 (C.D. Cal. Mar. 26, 2024) .....................................34

*In re Zetta Jet USA, Inc.,*
624 B.R. 461 (Bankr. C.D. Cal. 2020)....................................32, 34, 35

**Statutes and Rules**

11 U.S.C. § 541.............................................................................32, 33

11 U.S.C. § 547........................................................................ *passim*

11 U.S.C. § 548.....................................................................................32

Fed. R. Bankr. P. 9017 ..........................................................................25

Fed. R. Civ. P. 8 ....................................................................................12

Fed. R. Civ. P. 12 .....................................................................13, 14, 43

Fed. R. Civ. P. 44 ..................................................................................25

**Other Authorities**

5 Collier on Bankruptcy (16th ed. 2017) ..............................................45

Lorena Yashira Gely-Rojas, *Cryptocurrencies and the Uniform Commercial
Code: The Curious Case of Bitcoin*, 2 U. Puerto Rico Bus. L.J. 129 (2017) .........................20

**Page(s)**

Roee Sarel, *Property Rights in Cryptocurrencies: A Law and Economics Perspective*, 22 N.C. J. L. & Tech. 389 (2021)........................................................................20

**INTRODUCTION**

Celsius's reckless actions brought harm to tens of thousands of its customers across the globe. Against that background, it is scarcely surprising that Plaintiffs—representatives of the Celsius estates—would see Tether, a well-capitalized oversecured creditor, as a convenient scapegoat for Celsius's wrongdoing. Their Complaint[1] thus spins an incredible yarn in which Tether is a principal antagonist in Celsius's downfall. As Plaintiffs tell it, Tether began to "dismember the Debtors during their slide into bankruptcy" (AC ¶ 1) by "demand[ing]" (*id*. ¶ 48) that Celsius make to it a series of preferential transfers totaling ~16,737.27 bitcoin ("BTC"). Those transfers and others, they say, enabled Tether to close out secured stablecoin loans to Celsius worth ~$812 million at no loss to Tether—when, it is alleged, Tether would instead have been undersecured on the Petition Date had the transfers not been made.

Not content with recovering the purported deficiency in Tether's security, however, Plaintiffs seek the return of *all* of the collateral that Tether held when it closed out Celsius's position—39,542.42 BTC, allegedly "worth in excess of *$4 billion*" as of the filing of the Amended Complaint. AC ¶ 6 (emphasis added). That is a headline-grabbing number seemingly asserted only to make later demands to Tether seem reasonable by comparison. But it also distracts from the Complaint's fundamental flaw: It downplays and ignores inconvenient facts in aid of claims that are inconsistent with the Bankruptcy Code and binding legal precedent.

*First* and foremost, this Court lacks personal jurisdiction over each of the four Defendants. Indeed, the Complaint alleges literally no action by two of them. A third, Tether International Limited ("TIL"), was, at all relevant times, an entity organized under the laws of the British Virgin Islands ("BVI"). The only potentially relevant allegation against TIL is that it received transfers

---

[1] Unless otherwise specified, the "Complaint" refers to the Amended Complaint ("AC") (Dkt. 25).

from the fourth Defendant, Tether Limited ("TLTD"), which is a Hong Kong entity. Plaintiffs do not allege that TLTD had any U.S. connections related to the claims against it: The only entity that TLTD allegedly interacted with is Plaintiff Celsius Network Limited ("CNL"), a U.K. entity, and the contract between them—the "Token Agreement"—is governed by BVI law. Failing to identify relevant U.S. connections, the Complaint instead alleges (¶¶ 43, 45) that certain of *Plaintiffs'* agents negotiated the Token Agreement and, "at times," took other actions in the United States. But actions by *Plaintiffs* do not suffice to establish personal jurisdiction over Defendant TLTD. *Walden v. Fiore*, 571 U.S. 277, 285 (2014). No doubt cognizant of this fatal flaw, the Complaint also claims (¶ 23) that Tether *intended* its foreign conduct to have U.S. effects. But nothing supports that conclusory assertion.

*Second*, the Complaint fails to state a breach-of-contract claim. Plaintiffs assert that TLTD could not liquidate CNL's collateral until ten hours after a margin call. But the Token Agreement (as amended) only required a ten-hour wait before TLTD could liquidate collateral *in its "sole and absolute discretion."* AC, Ex. A, at 3, § 1.1(b)(4). As Plaintiffs concede, TLTD did not act in its sole and absolute discretion. Rather, CNL's CEO "gave . . . permission to liquidate Celsius's collateral," and CNL personnel evaluated and determined whether to accept price quotes that TLTD provided for tranches of collateral. AC ¶¶ 71, 75. In Plaintiffs' own words, these price quotes constituted "Tether's *offer*," which were, at points, "declined." *Id.* ¶ 75 (emphasis added). TLTD's "offer[s]" that CNL could (and did) evaluate and choose to accept or "decline[]" do not, by any stretch, constitute TLTD acting in its "sole and absolute discretion." AC ¶¶ 71, 75; AC, Ex. A, at 3, § 1.1(b)(4). But even if that had not been the case, TLTD would have been within its rights to immediately liquidate—in its sole and absolute discretion—pursuant to the Token Agreement. The Token Agreement expressly provided TLTD the right to do so in its sole and

absolute discretion if CNL's solvency representations—which were deemed made every time CNL sent collateral—were false.  AC, Ex. A, at 5, § 4; *id.* at 4, § 14.  And the Complaint itself alleges that CNL was "in fact" insolvent at the time of each of those transfers.  AC ¶¶ 59, 93, 101, 109.

*Third*, Plaintiffs' preference and fraudulent transfer claims fail because they would require an impermissible extraterritorial application of the Bankruptcy Code.  As numerous courts in this district have held, Congress has not "affirmatively and unmistakably instructed" (*RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016)) that the Code's avoidance provisions apply to foreign conduct.  The transfers sought to be avoided here—between U.K. and Hong Kong entities under a BVI-law agreement—indisputably occurred abroad.

*Fourth*, Plaintiffs' preference claims fail for other reasons as well.  Foremost among them, the Complaint does not show that the challenged transfers made TLTD better off than it would have been without them because Plaintiffs do not allege that TLTD was undersecured at the time of the transfers.  As myriad courts in this district—including this one—have long held, "a transfer to a fully secured creditor is immunized from preference attack because the creditor would have been paid in full in a hypothetical Chapter 7 liquidation by virtue of its realization on its collateral." *Off. Comm. of Unsecured Creditors v. AAF-McQuay, Inc. (In re 360networks (USA) Inc.)*, 327 B.R. 187, 190 (Bankr. S.D.N.Y. 2005); *Off. Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Cap., LLC)*, 501 B.R. 549, 619 (Bankr. S.D.N.Y. 2013) (Glenn, J.) (same). Plaintiffs' preference claims also fail because certain challenged transfers (a) are not even alleged to have been made "for or on account of an antecedent debt" (11 U.S.C. § 547(b)(2)) or (b) were made in a contemporaneous exchange for new value—an affirmative defense whose elements are plain from the face of the Complaint.

The Complaint should be dismissed.

**BACKGROUND**

**A. The Parties**

Tether is the issuer of the U.S. dollar-pegged Tether token ("Tokens" or "USDT")—"[t]he world's most popular stablecoin." AC ¶ 2. USDT can be purchased or redeemed on a 1:1 basis with the U.S. dollar, and it is backed by reserves including cash, gold, and marketable securities. *Id.* ¶¶ 2, 27. All four Defendants in this case are foreign entities. At all times relevant to the Complaint, TLTD was a citizen of Hong Kong and the other three Defendants were citizens of the BVI. None of the Defendants had a U.S. office or U.S. principal place of business, and all of their respective principal decisionmakers resided and worked outside of the United States. AC ¶¶ 14-17; Amended Declaration of Michael Hilliard ("Hilliard Decl.") ¶¶ 5-6.

Plaintiffs are two distinct entities: Celsius Network Limited (CNL) and Celsius Network LLC ("CNLLC"). They differ in important respects—including that CNL is a U.K. entity with its principal place of business in London (AC ¶ 12), while CNLLC is a Delaware entity with its principal place of business in New Jersey (*id.* ¶ 13). Nevertheless, the Complaint conspicuously—and without explanation—defines them collectively as simply "Celsius." *See* AC p.1.

**B. The Token Agreement Between Celsius Network Limited And Tether Limited**

The Complaint ignores the separateness of CNL and CNLLC to distract from another critical difference between them: *only CNL (U.K.)* was party to the Token Agreement that gave rise to every transfer and claim alleged in the Complaint. AC ¶ 32; *see* AC, Ex. A. The Token Agreement, which is governed by BVI law, set the terms on which TLTD "agree[d] to make available [USDT] tokens . . . to [CNL] from time to time." AC, Ex. A, at 12, § 2. The "Initial Token Agreement" was effective from February 1, 2020 until February 1, 2021, subject to annual

4

renewal. *Id.* at 14, § 14. During that period, the "main business activity and headquarters" of CNL and the broader Celsius business were located in the United Kingdom. AC ¶ 35.

Nearly 16 months later, in June 2021, Celsius announced that was "migrating customer relationships from the United Kingdom to [the] United States." *Id.* But that migration was limited: As Plaintiffs previously represented to this Court, Celsius moved certain "customer obligations to [CNLLC], but it did not move many, if any, crypto assets as part of the migration." Complaint, *Meghji v. Mashinsky, et al.*, 24-ap-03667-mg, Dkt. 1 ¶ 137. And Celsius retained operations outside the United States; indeed, CNL's principal place of business *is still in London*. AC ¶ 12.

In response to that announcement, TLTD asked CNL to explain how the "migration" would impact the existing Token Agreement. CNL responded that "[a]ll deployment, including our credit facilities, will remain in the UK entity" and that the "activities that are moving out of the UK are the client facing activities." Declaration of Christopher Sanz ("Sanz Decl.") ¶ 8, Ex. A at 4.

In September 2021, CNL provided written representations to TLTD confirming that CNL's actions pursuant to the Token Agreement would remain separate from any U.S. operations. CNL represented that any "transactions on and/or with Tether are not for the account of, or otherwise for the benefit of, any U.S. affiliates." Hilliard Decl. ¶ 20, Ex. H. It further represented that such transactions "will not be conducted on [CNL's] behalf by any personnel, representative or agent (a) that is a U.S. person or (b) located in the U.S., its territories, and possessions." *Id.* And CNL represented that its "business" and "day-to-day operations" related to TLTD would likewise be "directed, controlled, and co-ordinated" by non-U.S. persons located outside the United States. *Id.*

In reliance on those assurances, TLTD negotiated and ultimately agreed to amend the Token Agreement. Hilliard Decl. ¶ 21. Like the Initial Token Agreement, the amendment required CNL to post collateral as security for its USDT obligations and to remit such collateral "prior to

[TLTD] making available [] any Tokens." AC, Ex. A, at 12, § 3. And it required that CNL's obligations be *overcollateralized* at all times. Where CNL posted collateral in the form of BTC, the "Amended Token Agreement" required BTC with a value equal to 130% (the "Initial Margin") of the USDT made available to CNL. *Id*.; *id.* at 9, Schedule 1. The contract further specified what would happen if the value of the collateral declined. If the value fell below 120% of CNL's outstanding USDT obligation, the Amended Token Agreement required CNL to "provide additional amounts to TLTD's satisfaction to increase the Collateral to an amount equal to or greater than [130%]." *Id*., at 3, § 4. If CNL failed to provide such additional collateral within ten hours of a margin call, the contract provided that "TLTD shall have the right, in its sole and absolute discretion, and without further notice to [CNL] to sell, dispose of, and liquidate the Collateral." *Id*. These protections ensured that TLTD would always be comfortably oversecured.

As the Complaint notes, the Token Agreement placed certain parameters around TLTD's ability to *unilaterally* foreclose on CNL's collateral.[2] Whereas its predecessor empowered TLTD to foreclose immediately after the value fell below the Liquidation Point without notice to CNL, the amendment required TLTD to provide "notice of such occurrence" to CNL—after which CNL was required to post any requisite additional collateral "within ten (10) hours." AC, Ex. A, at 3, § 1.1(b)(4) (Amended); *id.* at 12, § 4 (Initial). If CNL did not and the value of the collateral dropped below the Liquidation Point, TLTD could dispose of CNL's collateral "in its sole and absolute discretion, and without further notice." *Id*. But that ten-hour waiting period after a margin call only restricted TLTD acting "in its sole and absolute discretion." By contrast, the Token Agreement placed no restriction on TLTD's ability to dispose of CNL's collateral *with its consent*.

_____

[2] Because the Amended Token Agreement was the operative agreement at all times relevant to Plaintiffs' claims, we refer to it as the "Token Agreement" for simplicity.

The Token Agreement also explicitly set forth circumstances under which TLTD could act unilaterally without waiting ten hours, including if CNL breached a representation, including a solvency representation. Unlike the Initial Token Agreement, the amendment included a representation by CNL that it was—on any date that TLTD provided USDT or received collateral—"(i) able to pay its debts as they fall due, and: (ii) not otherwise insolvent under the terms of the laws of its jurisdiction of incorporation or continuation." AC, Ex. A, at 5, § 4.2. The Token Agreement further provided that "[i]n the event that . . . any [such] representation . . . shall have been incorrect or misleading in any material respect when made or deemed repeated, then TLTD may . . . (c) sell, dispose of, and liquidate the Collateral." *Id*. at 4, § 1.1(e)(14). As the Token Agreement plainly provides, if CNL was insolvent when it provided BTC collateral (or received USDT), TLTD had the right to liquidate without notice to CNL—much less its consent.

### C. The Transfers At Issue In This Case

Every claim in the Complaint arises out of transfers that occurred in the ninety days preceding CNL's July 13, 2022 bankruptcy petition (the "Preference Period")—a period during which, the Complaint alleges (¶ 61), CNL was both balance sheet insolvent and unable to pay debts as they came due. The Complaint, however, *does not challenge* the propriety of any transfers of BTC from CNL to TLTD *prior to* April 14, 2022. And, as the Complaint admits (¶¶ 45-46), "as of the start of April 2022, Celsius had posted 16,505.17 [BTC] to Tether as collateral to secure the 512,330,000 USDT in [then] outstanding borrowing[s]." We refer herein to this 16,505.17 BTC as the "Pre-Existing Collateral."

   a. <u>During The Preference Period, CNL Both Provided And Received BTC Pursuant To The Terms Of The Token Agreement</u>

The Complaint alleges that CNL made numerous transfers of BTC to TLTD during the Preference Period, and it places them into three categories based on their purported purpose.

*First*, the Complaint alleges (¶¶ 57-58) that CNL obtained an additional 300,000,000 USDT from TLTD during the Preference Period. Pursuant to the terms of the Token Agreement, in order to obtain such additional USDT, CNL was first required to post collateral worth 1<u>30</u>% of its USDT obligation. Accordingly, CNL transferred 10,700 BTC to TLTD during the Preference Period. *Id*. ¶ 57. Because the BTC that CNL transferred was worth more than the USDT it obtained—a function of that required 30% margin—the Complaint alleges that those transfers included ~2,228.01 BTC of supposedly "excess collateral" that had the effect of "cross-collateraliz[ing]" CNL's prior USDT obligations. *Id.* The Complaint refers to these transfers of ~2,228.01 BTC as the "Preferential Cross-Collateralization Transfers."

*Second*, the Complaint alleges (¶ 47) that bitcoin's "price began a violent downward slide" during the Preference Period. When the value of CNL's collateral dipped below the 120% "Margin Call Point," the Token Agreement left CNL with a decision. CNL could send BTC sufficient to bring the value of the collateral back above 130%—and thereby maintain its contractual right to keep and use USDT. Or CNL could do nothing—which would enable TLTD to dispose of CNL's collateral and terminate the Token Agreement. Plaintiffs allege (¶¶ 48-56) that CNL made seven such transfers to TLTD during the Preference Period—totaling 16,737.27 BTC—to comply with the Token Agreement and keep the USDT that TLTD had provided. The Complaint also acknowledges (¶ 56) that the price of BTC rose at times during the Preference Period—and that TLTD, therefore, *returned* BTC to CNL. The Complaint refers to what it says (¶ 58) is the 15,658.21 BTC net of return as the "Preferential Top-Up Transfers."

*Third*, the Complaint alleges (¶ 57) that CNL made principal and interest payments to "Tether" during the Preference Period, but it does not seek to avoid or take issue with these transfers.

8

According to the Complaint (¶ 70), the value of CNL's collateral again fell below the 120%

Margin Call Point early on June 13, 2022. As required by the Token Agreement, TLTD informed

CNL of that occurrence. *Id*. The Complaint concedes (¶ 71) that, rather than (a) return TLTD's

USDT or (b) provide additional BTC collateral, "Celsius's CEO Alex Mashinsky allegedly gave

Tether permission to liquidate Celsius's collateral in an 'orderly' manner."[3]   Although the

Complaint spills considerable ink accusing TLTD of being deceptive about the manner in which

CNL's collateral was valued and liquidated, (AC ¶¶ 67-69, 83), it concedes that CNL negotiated

with TLTD about—and then ultimately approved or rejected—price quotes TLTD offered for

CNL's collateral. AC ¶ 75 (alleging one instance where CNL "declined Tether's [price] offer").

Of course, CNL could have sought to return TLTD's USDT and attempt to liquidate its BTC

itself—if it thought that it could sell the BTC at a better price. It chose not to.

In sum, with CNL's approval, "all of Celsius's collateral (39,542.42 [BTC]) [was] applied

by Tether against Celsius's outstanding indebtedness to Tether." AC ¶ 72. The Complaint alleges

that TLTD applied the collateral at an aggregate value of $816,822,948, satisfied CNL's then-

---

[3] Indeed, this is what Plaintiffs themselves have twice told this Court: First, in July 2022 when requesting first day relief in the bankruptcy case and, again, in their August 2023 Disclosure Statement. *See Declaration of Alex Mashinsky, CEO of Celsius Network LLC, In Support Of Chapter 11 Petitions And First Day Motions*, Dkt. 23 [Main Case] ¶ 123 ("In May and June 2022, Celsius made the difficult decision to forgo providing one of its lenders, Tether, issuer of USDT, a stablecoin, additional collateral and agreed to an orderly liquidation of its loan. During the market crash, Tether issued a margin call to Celsius with regard to an outstanding $841 million USDT loan. Although Celsius had always provided sufficient collateral to support its loan, and had never previously been liquidated by Tether, the Company agreed to an orderly liquidation and settlement of its loan with Tether to preserve the remaining collateral in excess of the value of the loan. This resulted in a loss of approximately $97 million."); *see also Fourth Revised Disclosure Statement for the Joint Chapter 11 Plan of Reorganization*, Dkt. 3332 [Main Case], at 158 ("Celsius decided to forgo providing . . . Tether . . . additional collateral . . . . and agreed to an orderly liquidation and settlement of its loan with Tether to preserve the remaining collateral in excess of the value of the loan.").

outstanding USDT obligation to TLTD (812,333,000), and sent the balance to CNL. *Id.* ¶ 78.

As described above, the Complaint challenges 2,228.01 BTC in "Cross-Collateralization Transfers" and 15,658.21 BTC in "Top-Up Transfers"—17,886.22 BTC in total. Indeed, Plaintiffs do *not* seek to avoid CNL's transfers to TLTD of the other 21,656.20 BTC of collateral in TLTD's possession as of June 13, 2022. Nevertheless, Plaintiffs allege (¶ 78) that because the collateral was "commingled" when applied against CNL's obligations, they are somehow entitled to *all* 39,542.42 BTC of collateral in TLTD's possession at the time of the application. The Complaint refers to that claim as the "Preferential Application Transfer." The practical effect of this claim is that Plaintiffs are seeking BTC "worth in excess of *$4 billion*," (*id.* ¶ 6 (emphasis added)), in respect of a secured obligation of ~812 *million* USDT.

### c. Subsequent Dispositions Of CNL's Collateral After The Application Transfer

The final alleged preference—the "Application Transfer"—was complete when TLTD applied CNL's collateral at agreed-upon prices to CNL's USDT obligations to TLTD. Plaintiffs accuse "Tether" of malfeasance because, they say, "Tether stealthily retained the *entirety* of Celsius's Bitcoin in undisclosed Bitfinex wallets" (AC ¶ 8)—though they never bother to explain the impropriety of a secured lender retaining collateral at agreed-upon prices. In any event, Plaintiffs' factual assertions are wrong too. The address that held CNL's BTC collateral is a matter of public record visible on the Bitcoin blockchain, and that blockchain shows exactly what happened to that BTC after the Application Transfer. Declaration of Greg Opalinski ("Opalinski Decl.") (Dkt. 22-4) ¶¶ 12-13, 20-21. As Plaintiffs acknowledge, on June 14 and 15, the BTC that had been CNL's collateral went to two addresses. *Id.* ¶¶ 20-21; *see also* AC ¶ 83. One is an address for Bitfinex, an exchange made available by entities organized under BVI law, where 7,000 BTC was held for the benefit of Defendant TIL (also a BVI entity). Hilliard Decl. ¶ 24; AC ¶ 83. The second is an address controlled by TIL that, at the time, held collateral securing the

obligations of a TIL customer who is a foreign national. Opalinski Decl. ¶ 21; Hilliard Decl. ¶ 25; AC ¶ 83. TLTD retained none (though, again, Plaintiffs do not explain why that would have been improper). Critically, neither subsequent disposition touched the United States.

## ARGUMENT

### I. The Complaint Does Not Allege Any Claims Held By Plaintiff CNLLC

Before turning to the myriad deficiencies in the claims asserted by Plaintiff CNL—the U.K. entity—we start with a critical point: The Complaint does not allege any claim entitling Plaintiff CNLLC—the U.S. entity—to relief from any Defendant. CNLLC is not a party to the Token Agreement and, therefore, does not have standing to sue for breach, under BVI law or otherwise. Amended Declaration of John Carrington K.C. ("Carrington Decl.") ¶¶ 109-11. For the same reason, CNLLC owed no "antecedent debt" to TLTD that could have been satisfied by any of the alleged preferential transfers and, hence, is not a proper plaintiff for those avoidance claims either. There are also no allegations making it a proper plaintiff for the fraudulent transfer claim, which challenges the liquidation of collateral provided by *CNL* under the Token Agreement.

The Complaint tries to mask these infirmities by simply grouping both Plaintiffs together as a single "Celsius" and proceeding as though they are a single legal entity. But it notably does not claim—nor allege facts to support—that the two entities should be treated as a single legal entity for purposes of this Complaint.[4] Not only is that sort of group pleading fatal to CNLLC's claims, it also renders unintelligible many of the Complaint's factual allegations, leaving the Court and Defendants to guess whether a fact is alleged as to both Plaintiffs or just one (and which one?). *See, e.g.*, *In re Extended Stay, Inc.*, 2020 WL 10762310, at *63 (Bankr. S.D.N.Y. Aug. 8, 2020)

---

[4] While Plaintiffs once argued that CNLLC's *customers'* understandings justified substantive consolidation of CNL and CNLLC as to certain issues, they expressly argued that sophisticated counterparties' understandings of corporate separateness are "better inferred from the agreements that [those parties] executed with [Celsius entities]." Dkt. 2563 [Main Case] ¶ 27.

("[A]t a minimum," Rule 8(a)(2) requires notice as to "which Debtor made each transfer.").

## II.    The Court Lacks Personal Jurisdiction Over Defendants

A plaintiff bears the burden of pleading a *prima facie* case of personal jurisdiction for "'*each* claim asserted.'" *In re Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472, at *7 (S.D.N.Y. Mar. 22, 2023) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)). Because CNL is the only proper plaintiff for these claims, the principal question here is whether the Complaint pleads facts sufficient to establish this Court's jurisdiction over claims asserted by a U.K. entity (CNL) against Defendants who were Hong Kong and BVI entities.

To assess whether a plaintiff has met its burden to plead jurisdiction, courts "can consider materials outside the pleadings, including affidavits and other written materials, submitted by either party." *Dicks v. Cooks Junction, Inc.*, 2023 WL 2775830, at *2 (S.D.N.Y. Apr. 4, 2023) (cleaned up). However, courts "will not draw argumentative inferences in the plaintiff's favor" nor "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2011*, 714 F.3d 659, 673 (2d Cir. 2013) (cleaned up); *see also, e.g.*, *Zanotti v. Invention Submission Corp.*, 2020 WL 2857304, at *16 (S.D.N.Y. June 2, 2020) (conclusory allegations, "particularly those stated only upon information and belief," are insufficient).

Here, Plaintiffs fail to satisfy their *prima facie* burden. There are three bases for personal jurisdiction: consent, general, and specific jurisdiction. *Fuld v. Palestine Liberation Org.,* 82 F.4th 74, 86 (2d Cir. 2023). The Complaint does not allege that Defendants voluntarily agreed to litigate this case in the United States.[5] *Fuld,* 82 F.4th at 87 (consent requirements). Nor does it

---

[5] Although Plaintiffs allege (¶ 23) that Defendants "have repeatedly submitted to the jurisdiction of courts in this District," those allegations provide no support for a consent argument. The Second Circuit has made clear that a "party's consent to jurisdiction in one case [] extends to that case alone" and "in no way opens that party up to other lawsuits in the same jurisdiction in which consent was given." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 50 n.5 (2d Cir. 1991).

allege any facts to suggest that Defendants—foreign entities without a principal place of business in the United States—could somehow be subject to general jurisdiction here. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (apart from a truly "exceptional case," an entity is only subject to general jurisdiction in its place of incorporation or principal place of business). And, as explained below, the Complaint's attempts to allege specific or *quasi in rem* jurisdiction (an alternative to personal jurisdiction) fall short too. The Complaint must, therefore, be dismissed in its entirety pursuant to Fed. R. Civ. P. 12(b)(2).

## A. Defendants Are Not Subject To Specific Jurisdiction

Specific jurisdiction is a narrow grant of jurisdiction that "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (cleaned up). To survive a motion to dismiss, a complaint must plead facts showing (1) that each Defendant "purposefully availed itself of the privilege of conducting activities within the forum [] thus invoking the benefits and protections of its laws" *and* (2) that each Defendant's "suit-related conduct . . . create[d] a *substantial* connection with the forum." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018) (quoting *Goodyear*, 564 U.S. at 919; *Walden*, 571 U.S. at 284) (emphasis added). Courts "evaluate the quality and nature of the defendant's contacts with the forum [] under a totality of the circumstances test." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (cleaned up). In the absence of sufficient *in-forum* contacts, a defendant may also be subject to personal jurisdiction where it "took 'intentional, and allegedly tortious, actions ... expressly aimed' at the forum." *In re Terrorist Attacks*, 714 F.3d at 674 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)). But such effects-based jurisdiction requires a plaintiff to allege facts that would show that the defendant's "conduct was intentional[ly] and expressly aimed at the forum state with the knowledge that substantial injury would be felt there."

*Quarmby v. Rexon Indus. Corp.*, 2022 WL 17812965, at *3 n.9 (W.D.N.Y. Nov. 28, 2022), *adopted*, 2022 WL 17812576 (W.D.N.Y. Dec. 19, 2022) (cleaned up). The Complaint fails to allege any of that here.

1. The Complaint Makes Insufficient Allegations Specific To Defendants Tether Holdings Limited, Tether Operations Limited, Or Tether International Limited

Defendants THL and TOL should be dismissed in their entirety because the Complaint alleges *nothing* specific to them—other than that they are *foreign* entities affiliated with TLTD. AC ¶¶ 14, 16 (sole allegations against them). By "lump[ing] all the defendants together in each claim and provid[ing] no factual basis to distinguish their conduct," the Complaint both "precludes a proper analysis of [] personal jurisdiction" and fails to state a claim under Rule 12(b)(6). *Plusgrade L.P. v. Endava Inc.*, 2023 WL 2402879, at *3 (S.D.N.Y. Mar. 8, 2023) (cleaned up).

TIL should also be dismissed because there are no factual allegations concerning it *other* than that it later received the BTC that had been transferred to TLTD in the Application Transfer. AC ¶¶ 17, 29, 75, 83-84 (sole allegations against TIL). In any event, the Court lacks personal jurisdiction over TIL, because those later transfers did not touch the United States. *Infra.* II.A.2.

2. The Complaint Fails To Plead That TLTD Purposefully Availed Itself Of Doing Business In The United States

Although the Complaint makes allegations against "Tether," without specifying the relevant entity, those allegations can only be sensibly read as relating to TLTD—the only Tether entity party to the Token Agreement. The allegations that TLTD purposefully availed itself of the privileges of conducting activities within the United States fall into four buckets: (i) the negotiation and execution of the Initial and Amended Token Agreements, (ii) the purported "purpose" of the Token Agreement, (iii) CNL's transfers of BTC pursuant to it, and (iv) the application of CNL's collateral to close out its USDT obligations under it. Because none of those allegations come close

to pleading that *TLTD* took actions to purposefully avail itself of doing business in the United States, Plaintiffs' claims should be dismissed for lack of personal jurisdiction.

***Negotiation and Execution of the Token Agreements.*** Plaintiffs allege that certain "Celsius" executives and employees were located in the United States when they negotiated and executed the Initial and Amended Token Agreements. *See* AC ¶¶ 37, 40, 43. But the locations of *Plaintiffs'* representatives "are not relevant to the issue of personal jurisdiction over defendant." *Diversapack LLC v. Elite Staffing, Inc.*, 2012 WL 1032687, at *5 (E.D.N.Y. Mar. 20, 2012) (analyzing "purposeful avail[ment]" under New York's long-arm statute).[6] The proper analysis is a "defendant-focused" inquiry. *Walden*, 571 U.S. at 284. And all of the TLTD personnel who negotiated or executed those agreements lived and worked outside the United States. Hilliard Decl. ¶¶ 9-12, 15, 17. Tellingly, the Complaint does not even allege that any TLTD personnel ever traveled to the United States in connection with those negotiations. And courts have consistently held that even "extensive negotiations" do not show purposeful availment where, as here (*id*.), "the defendant conducted those negotiations from outside the [forum] exclusively by telephone, facsimile transmissions, or mail." *Stengel v. Black*, 2003 WL 1961638, at *2 (S.D.N.Y. Apr. 25, 2003) (N.Y. long-arm statute) (citing cases); *see also Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007) ("exchange of communications in the course of developing and carrying out a contract" does not suffice to show purposeful availment).

***Purpose of the Token Agreement***. The Complaint asserts (¶¶ 31, 36, 41) that the "broader purpose" of CNL's and TLTD's "lending arrangement" was to "exploit[]" and "profit" from the

---

[6] Although the New York long-arm statute is not "co-extensive" with the due process analysis, the state standard "closely resemble[s] the analysis under the Due Process Clause of the Fourteenth Amendment." *Kogan L. Grp., P.C. v. Brace*, 2020 WL 5038764, at *7 n.2 (S.D.N.Y. Aug. 26, 2020) (finding the similarity between the state and federal standards to be "particularly evident with respect to" the transacts-business prong of the long-arm statute) (cleaned up).

"the United States market." But none of the alleged facts in the Complaint support this conclusion. For instance, the Complaint alleges (¶ 35) that "Celsius" began operating a consumer-facing business in the United States in 2021. But it admits (¶ 32) that the Initial Token Agreement was negotiated and executed in 2020—when Celsius's business was based in the U.K., and over a year *before* "Celsius" first announced its plans to "migrate" certain customer functions to the United States.[7] While Plaintiffs allege (¶¶ 34-37) that the amendment to the Token Agreement was negotiated when TLTD "kn[e]w Celsius" was "*mostly*" a U.S.-based company (whatever that means), they admit (¶12) that CNL—the only Celsius entity that negotiated and signed the Token Agreement—was (*and still is*) a U.K. entity with its principal place of business in London. And they tellingly omit that, prior to that amendment, CNL gave TLTD written assurance that its transactions with TLTD would be conducted by non-U.S. persons and would not be made "for the account of, or otherwise for the benefit of, any U.S. affiliates." Hilliard Decl. ¶ 20, Ex. H.

Unable to link the Token Agreement to any relevant U.S. contacts, Plaintiffs allege (¶ 41) that it was the "centerpiece" of a "broader relationship" between unspecified "Celsius" and "Tether" entities aimed at the United States. But that allegation provides no basis for jurisdiction either. While the Complaint is replete with conclusory statements about intent to "exploit" the U.S. market, none of the facts alleged show that the parties "contemplate[d] a long-term relationship with the kinds of continuing obligations and wide-reaching contacts" in the United States that would support a finding of jurisdiction. *Stuart v. Spademan*, 772 F.2d 1185, 1194 (5th Cir. 1985) (seven-year relationship with potential future in-forum obligations insufficient). Nor do the allegations show that TLTD ever actually "actively engaged in" any of Celsius's activities

---

[7] Plaintiffs previously represented to this Court that "Celsius moved all of its customer obligations to Celsius Network LLC, but did not move many, if any, crypto assets as part of the migration." *See* Complaint, *Meghji v. Mashinsky, et al.*, 24-ap-03667-mg, Dkt. 1, ¶ 137.

in the United States—related to the Token Agreement or otherwise. *See Lansing Trade Grp., LLC v. 3B Biofuels GmbH & Co., KG*, 612 F. Supp. 2d 813, 826-27 (S.D. Tex. 2009) (knowledge and approval of plaintiff's in-forum actions insufficient). And, like the Token Agreement, each of the alleged prior interactions involved only CNL, not *CNLLC* or any other U.S. affiliate. *See id.* at 823-26 (no personal jurisdiction because, *inter alia*, plaintiff was "not a [forum] resident," so defendant "did not contract with a [forum] resident").

More importantly, Plaintiffs' allegations of a "broader relationship" are not a free ticket to personal jurisdiction. Courts have repeatedly held that specific jurisdiction is not appropriate "merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum." *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995). Here, as explained below, Plaintiffs' claims do not "directly arise" from any of the alleged prior dealings between "Tether" and "Celsius." Those contacts are, therefore, not relevant to the jurisdictional analysis. *See, e.g.*, *Le Bleu Corp. v. Standard Cap. Grp., Inc.*, 11 F. App'x 377, 380 (4th Cir. 2001) (per curiam) (affirming finding that prior contracts were irrelevant to specific jurisdiction analysis); *Vetrotex CertainTeed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 153 (3d Cir. 1996) (similar).

*First*, Plaintiffs allege (¶ 29) that "Tether was Celsius's lead investor" for "its Series A investment round in the summer of 2022." While TIL did purchase *CNL's* preferred stock in its Series A round, it did so in June *2020*. Hilliard Decl. ¶ 26. That investment was made at a point when CNLLC (the U.S. entity) did not even exist and long before any customer accounts were transferred to the United States. *See, e.g.*, Dkt. 1956 [Main Case] at 66-68 (summarizing chronology). The Complaint does not explain how an investment by a BVI entity (TIL) in a U.K. entity (CNL) could possibly demonstrate that a Hong Kong affiliate (TLTD) purposefully availed

itself of the United States in connection with an entirely unrelated foreign-law agreement to which TIL is not a party. *See e.g., Ecigrusa, LLC v. Silver State Trading LLC*, 2022 WL 1321573, at *4 (N.D. Tex. May 3, 2022) (rejecting argument that separate defendants' transactions with in-forum plaintiff should be "aggregated for purposes of a personal-jurisdiction analysis").

*Second*, the Complaint alleges (¶ 30) that, in July 2020, certain TLTD personnel told Mashinsky that "Tether" wanted "Celsius" to "service all their US clients," and that "Mashinsky" was "planning" for Silvano di Stefano to "intro[duce] [Celsius] to his top 5 US customers" and for "Bitfinex to provide [a] buy/sell order book to allow US clients to trade." The Complaint provides no explanation as to how these context-less quotations about "wants" or "plan[s]" from 2020 relate to any of Plaintiffs' claims in this case.[8] Indeed, so far as Defendants can tell, the allegation (¶ 30) that Mashinsky "plann[ed]" to receive "a buy/sell order book to allow US clients to trade" relates to preliminary discussions between *Bitfinex* (a third party) and CNL about an entirely unrelated proposed arrangement that never materialized. Sanz Decl. ¶¶ 6-7. And allegations that "Tether" considered introducing an unspecified Celsius entity to a handful of U.S. clients in 2020 does nothing to establish jurisdiction over TLTD for claims based on unrelated transfers years later.

Finally, Plaintiffs allege (¶¶ 31, 44) that "[t]hrough Tether, Celsius would receive the liquidity it needed to operate its business in the United States" and that the USDT that CNL obtained under the Token Agreement would, thus, "ultimately benefit" CNL's U.S.-based affiliates. But nothing in the Token Agreement required CNL to use the USDT it obtained from TLTD for any particular purpose—much less do anything in the United States. To the contrary, CNL itself represented that its transactions with TLTD were expressly "not for the account of, or

---

[8] The Complaint tellingly did not attach the documents that it purported to quote. And Plaintiffs repeatedly refused Defendants' requests that those documents be produced prior to the deadline for this motion.

otherwise for the benefit of, any U.S. affiliates." Hilliard Decl. ¶ 20, Ex. H. While CNL now alleges that it used the USDT it obtained from TLTD to benefit its U.S. affiliates, *CNL's* choice has no bearing on whether *TLTD* purposefully availed itself of the United States. *See, e.g.*, *Starostenko v. UBS AG*, 2023 WL 34947, at *8 (S.D.N.Y. Jan. 4, 2023) (no jurisdiction where plaintiffs gave money to defendants with the "inten[t]" that it be used to "trade on U.S. securities exchanges," because "the minimum contacts inquiry focuses on actions *by the defendant* targeted at the forum, not actions by the plaintiff"). Nor can Plaintiffs show purposeful availment by alleging (¶ 44) that TLTD "knew" that CNL might do so. "A plaintiff's or third party's unilateral activities cannot establish minimum contacts"—even where those actions are foreseeable. *See e.g., Moncrief Oil*, 481 F.3d at 311-13 (foreseeability that *plaintiff* would perform in forum does not establish jurisdiction where contract was centered outside forum and defendant was not contractually required to (and did not) perform any of *its* contractual obligations in forum).

**CNL's Transfers Under The Token Agreement.** Plaintiffs next allege that "[t]ransactions under the Amended Token Agreement were at times initiated and executed by Celsius employees based in the United States, and transfers under the agreement were often made from United States-based accounts." AC ¶ 45. The Complaint also alleges, "on information and belief," that "each of [the Top-Up and Cross-Collateralization] transfers was ultimately overseen and approved by Celsius CEO Alex Mashinsky, who was based in Hoboken, New Jersey." *Id.* ¶ 63. Plaintiffs do not explain how often their employees "initiated or executed" transfers from within the United States—though their use of "at times" concedes that some unspecified number of transfers had nothing to do with the United States. Nor do they plead any specific action by Mashinsky with respect to those transfers, apart from his "ultimate[]" oversight role as Celsius CEO. Such vague allegations without any "information as to dates, dollar amounts, number of transactions, senders

or recipients" leave the Court unable to assess the "quantity and quality" of the alleged contacts. *Singer v. Bank of Palestine*, 2021 WL 4205176, at *5-6 (E.D.N.Y. Apr. 30, 2021) (finding insufficient allegation that defendant made a "large volume" or "multiple" fund transfers through U.S. banks); *see also AJ Ruiz Consultoria Empresarial S.A. v. Banco Bilbao Vizcaya Argentaria, S.A.*, 2024 WL 460482, at *8 (Bankr. S.D.N.Y. Feb. 6, 2024) (isolated use of U.S. bank accounts insufficient to establish specific jurisdiction).

It is even less clear what Plaintiffs mean when they allege that the transfers "were often made from United States-based accounts." AC ¶ 45. The transfers of *cryptocurrency* here did not involve bank accounts. Opalinski Decl. ¶¶ 10-22. Nor were the transfers "United States-based" in any meaningful sense. The law treats cryptocurrencies as general intangibles.[9] And where cryptocurrencies are moved between foreign entities under a foreign-law contract, they are plainly always located outside the United States.[10] For the same reason, Plaintiffs' allegation (¶ 43) that "Celsius even told Tether that the Tether account created for [CNL] was associated with a bank account at Signature Bank in New York" is irrelevant to the transfers underlying Plaintiffs' claims.

In any event, these allegations again focus on actions taken by *Plaintiffs*, not TLTD or any other Defendant. *Walden*, 571 U.S. at 285; *see also, e.g.*, *Meeks+Partners Co. v. Amrit Dev., Inc.*, 2009 WL 10695108, at *6-7 (S.D. Tex. Jan. 26, 2009) (no jurisdiction even where "invoices were

---

[9] Lorena Yashira Gely-Rojas, *Cryptocurrencies and the Uniform Commercial Code: The Curious Case of Bitcoin*, 2 U. Puerto Rico Bus. L.J. 129, 138 (2017) (bitcoin considered general intangible under the U.C.C.); Roee Sarel, *Property Rights in Cryptocurrencies: A Law and Economics Perspective*, 22 N.C. J. L. & Tech. 389, 393 (2021) ("Notably, the U.S. Internal Revenue Service determined that cryptocurrencies are a 'general intangible' that should be taxed as property.").

[10] *See In re Berau Cap. Res. Pte Ltd*, 540 B.R. 80, 83 (Bankr. S.D.N.Y. 2015) (holding that, to determine the location of a general intangible, "[t]he locality selected is for some purposes, the domicile of the creditor; for others, the domicile or place of business of the debtor, the place, that is to say, where the obligation was created or was meant to be discharged; for others, any place where the debtor can be found."); *see also* Carrington Decl. ¶¶ 114-17 (under BVI law, situs of cryptocurrency is residence or place of business of its owner).

mailed from, and payments were mailed to" the forum and defendants solicited plaintiff in the forum). The TLTD personnel who approved the relevant transactions are all foreign nationals who lived and worked outside the United States. Hilliard Decl. ¶ 23.

Nor does CNL's purported outreach to TLTD from the United States provide a basis for personal jurisdiction over TLTD. "[T]he fact that Defendants *received* money from Plaintiff's United States bank account is not purposeful availment of an opportunity to act in the United States." *Gargano v. Cayman Nat'l. Corp.*, 2010 WL 2245034, at *6 (D. Mass. June 2, 2010). Nor is it enough for Plaintiffs to send commodities from the United States. *E.g.*, *Lehigh Coal & Navigation. Co. v. Geko-Mayo, GmbH*, 56 F. Supp. 2d 559, 567 (E.D. Pa. 1999) (plaintiff's "unilateral[] deci[sion]" to supply coal from Pennsylvania did not create jurisdiction over foreign purchaser). That is particularly true given that the Token Agreement did not require—or even contemplate—that U.K.-based CNL would initiate or execute any transfers from the United States. *See Moncrief Oil*, 481 F.3d at 313. To the contrary, CNL expressly represented that the transfers would be conducted *outside* the United States. *See* Hilliard Decl. ¶ 20, Ex. H. Moreover, the Token Agreement chose BVI law and selected the BVI as a non-exclusive forum (AC, Ex. A, at 5, § 6.1)—which further weigh against U.S. jurisdiction. *See Rosenblatt v. Coutts & Co. AG*, 750 F. App'x 7, 11 (2d Cir. 2018).

***Application of CNL's Collateral.*** Finally, Plaintiffs allege, again only on "information and belief," that "Tether's application of Celsius's collateral was accomplished through the use of United States intermediaries or counterparties, involved transactions routed through United States servers, involved contacts with Celsius's United States-based personnel, and/or involved the use of bank accounts, financial institutions, or cryptocurrency exchanges located in the United States." AC ¶ 81. The use of "and/or" in that list of potential contacts leaves Defendants unable to even

identify the contacts that they are alleged to have had with the United States. Such empty allegations are insufficient. *See, e.g.*, *AJ Ruiz Consultoria Empresarial S.A.,* 2024 WL 460482, at *25 (allegation that defendants "exploited the New York financing market" is insufficient); *Guo Jin v. EBI, Inc.*, 2008 WL 896192, at *2 (E.D.N.Y. Mar. 31, 2008) (same for allegation that defendants "maintained an office, a bank account, property and/or agents in New York").

Far from identifying any specific U.S. counterparties or intermediaries involved in the "application," Plaintiffs now allege that TLTD "did not sell the collateral" and that the Application Transfer occurred when TLTD applied "Celsius's collateral to Celsius's entire outstanding loan balance." AC ¶¶ 68, 82. In other words, the alleged preference was complete the moment that TLTD applied CNL's collateral to satisfy CNL's USDT obligations to TLTD. Nothing about that Application Transfer involved any jurisdictionally-significant contact with the United States. TLTD's principal decisionmakers all reside and work abroad, and its systems, including its servers, are all located overseas. Hilliard Decl. ¶¶ 5, 7. The BTC that TLTD held on CNL's behalf was likewise located outside the United States. *See supra* n.10 (analyzing situs of cryptocurrencies).

After the Application Transfer was complete, TLTD made subsequent transfers, but those transfers were entirely foreign too. As Plaintiffs concede, the BTC retained by TLTD was transferred in two transactions—(i) a transfer of 7,000 BTC to a Bitfinex address, where it was allocated to a Bitfinex account held by Defendant TIL and (ii) a transfer of the remaining 32,542.42 BTC to a TIL address holding collateral for a foreign national residing overseas. AC ¶ 83; *see also* Opalinski Decl. ¶ 21; Hilliard Decl. ¶¶ 24-25. Neither transaction touched the United States or involved U.S. persons or dollars. Opalinski Decl. ¶¶ 20-22; Hilliard Decl. ¶¶ 24-25. And Bitfinex—the only third party alleged (¶ 83-84) to have any involvement in those transfers—is itself foreign. Hilliard Decl. ¶ 8.

Additionally, Plaintiffs now allege (¶¶ 70, 72) that the collateral demand and communications related to the liquidation were made to "Celsius employees in the United States." But Plaintiffs allege no facts that suggest that the location of those Celsius employees was at all relevant to the liquidation and application, and the due process clause does not allow "communications" that "rest[] on nothing but the mere fortuity" that a plaintiff "happens to be a resident of the forum" to establish minimum contacts.[11] *Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 502 (5th Cir. 2022) (cleaned up). In any event, Plaintiffs themselves have previously represented to this Court that Cameron Drummond-Rey—the CNL representative with whom TLTD primarily communicated in connection with the challenged collateral demands and liquidation resides in the United Kingdom. *See* Dkt. 1 [24-02828] ¶ 12.

3. Plaintiffs Fail To Plead Effects-Based Specific Personal Jurisdiction

As noted, personal jurisdiction can sometimes "exist[] where the defendant took intentional, and allegedly tortious, actions . . . expressly aimed at the forum"). *In re Terrorist Attacks*, 714 F.3d at 674 (cleaned up). But an inquiry into effects generally applies only to claims of "deliberate wrongdoing" and there is no basis to apply this test to the avoidance and contract claims here—none of which require any showing of intentionally tortious or fraudulent conduct. *Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 128 (E.D.N.Y. 2000).

But even if an effects theory were applicable, none of the alleged facts show that the "conduct that forms the basis for the controversy" was expressly and intentionally aimed at the United States. *Licci*, 732 F.3d at 173. Plaintiffs allege (¶ 44) that TLTD knew that the USDT it "transferred to [CNL] . . . would ultimately benefit" CNL's U.S. affiliates. But TLTD's supposed

---

[11] For the same reason, Plaintiffs' allegation (¶ 45) that "Tether" had "monthly" meetings with "Celsius's United States-based representatives" during which the Token Agreement was sometimes discussed do not suffice to establish purposeful availment on the part of TLTD.

knowledge of how CNL *might* choose to use what it obtained under the Token Agreement does not transform actions taken by TLTD under that foreign-law contract with a U.K. entity into actions *targeted* at the United States. *See In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 235 (S.D.N.Y. 2019) (allegation that defendants knew trades it priced and approved were for U.S. investor did not provide "factual support" to show that defendants directed actions at the forum).

Likewise, to the extent that Plaintiffs are alleging that the transfers underlying their claims resulted in some attenuated harm to CNL's U.S. affiliates or customers of those affiliates, that also fails to establish effects-based jurisdiction. Not a single one of the challenged transfers was made by a U.S. entity or otherwise touched the United States, *supra* II.A.2, and "[i]t is bedrock law that merely foreseeable effects of defendants' conduct do not support personal jurisdiction." *In re Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541, at *27 (S.D.N.Y. Aug. 4, 2015), *amended*, 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015). Neither in-forum "[h]armful effects," *Schentag v. Nebgen*, 2018 WL 3104092, at *16 (S.D.N.Y. June 21, 2018), nor "mere injury to a forum resident," *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019) (cleaned up), can suffice to establish jurisdiction. Emphasizing CNL's purported U.S. contacts and affiliations does not change this result—irrespective of the fact that Plaintiffs have not sufficiently alleged how these supposed U.S.-connections relate to the claims in this case. Rather, the Supreme Court has made clear that a defendant's out-of-forum conduct does not constitute sufficient contacts "simply because [the defendant] allegedly directed [its] conduct at plaintiffs whom [it] knew had [in-forum] connections." *Walden*, 571 U.S. at 289.

Nor can Plaintiffs salvage their effects-based theory of jurisdiction by alleging (¶¶ 70, 72) that collateral demands and communications related to the liquidation were made to "Celsius employees in the United States." To the contrary, "[t]he fact that electronic communications were

routed through U.S.-wires or servers, or that recipients of those communications were located in the United States, is insufficient to establish minimum contacts with the United States" under the effects test. *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2017 WL 1113080, at *3 (S.D.N.Y. Mar. 10, 2017) (finding no effects-based jurisdiction where defendants allegedly "conspired" with traders in the U.S. over "electronic chats routed through servers in New York").

### B. The Complaint Does Not Allege A Basis For *Quasi In Rem* Jurisdiction

As a final fallback, Plaintiffs contend that the Court "has quasi in-rem jurisdiction because of Defendants' maintenance of one or more bank accounts in New York." AC ¶ 24. *Quasi in rem* jurisdiction can sometimes permit courts to "establish jurisdiction over a party based upon its power over property within its territory." *Raad v. Bank Audi S.A.L.*, 2024 WL 967172, at *7 (S.D.N.Y. Mar. 5, 2024). But "the presence of the property alone is not enough." *Id.* "[T]he property [serving] as the basis for jurisdiction must be *related* to the plaintiff's cause of action." *Id.* Because the Complaint alleges no link whatsoever between the alleged bank account(s) and Plaintiffs' claims, those accounts provide no basis for *quasi in rem* jurisdiction. *Id.* at 8. Moreover, those bank accounts have not been attached or otherwise seized—which is yet another reason why *quasi in rem* jurisdiction is not proper here. *Id.* (collecting authorities).

### III. The Complaint Fails To State A Claim For Breach Of Contract (Count III)

Plaintiffs allege that Defendants breached the Token Agreement by applying CNL's collateral "prior to the contractually required ten-hour waiting period." AC ¶ 121; *see also id.* ¶ 71.[12] That claim fails as a matter of law for at least three reasons. *First*, Section 1.1(b)(4) of the Token Agreement gave TLTD the power to act *unilaterally* after ten hours, but nothing in that

---

[12] The parties agree that BVI law governs Plaintiffs' breach-of-contract and good-faith-and-fair-dealing claims (Counts III-IV). AC at 32 n.6. Defendants submit the Carrington Decl. on issues of BVI law pursuant to Federal Rule of Civil Procedure 44.1 and Federal Rule of Bankruptcy Procedure 9017.

provision required a ten-hour standstill before TLTD could act at CNL's direction. Because Plaintiffs concede that Celsius's then-CEO "gave [TLTD] permission to liquidate" (AC ¶ 71), the ten-hour period is inapplicable and nothing else in the Token Agreement prohibited TLTD's actions. *Second*, Section 1.1(e)(14) separately provided TLTD with an absolute right to dispose of CNL's collateral if CNL was insolvent when it provided BTC to TLTD, and the Complaint alleges (¶¶ 59-61) that CNL, "in fact was, insolvent." *See* AC, Ex. A, at 4-5, § 1.1(e)(14) (right to liquidate based on false representation); § 4.2 (deemed solvency representation at time of each collateral transfer). *Finally*, Plaintiffs' theory of causation rests on their allegation that CNL would have continued providing TLTD with allegedly preferential transfers of BTC—in violation of the Token Agreement—and BVI law does not permit Plaintiffs to benefit from their own breach.

### A. Because CNL Gave TLTD "Permission To Liquidate," The Token Agreement Did Not Require TLTD To Wait Ten Hours To Start The Application Transfer

In relevant part, the Token Agreement provided that, if CNL does not provide sufficient collateral within ten hours of receiving a "Margin Call Notice," then "following the time that is ten (10) hours from the delivery of the applicable Margin Call Notice, *TLTD shall have the right, in its sole and absolute discretion, and without further notice* to [CNL], to sell, dispose of, and liquidate the Collateral." AC, Ex. A, at 3, § 1.1(b)(4) (emphasis added). Although Plaintiffs concede that "Celsius's CEO Alex Mashinsky allegedly gave [TLTD] permission to liquidate [CNL's] collateral," they contend that Section 1.1(b)(4) still required TLTD to wait ten hours before it "could initiate the application process." AC ¶ 71.

Plaintiffs misread the contract. Under BVI law, courts must consider the ordinary meaning of the words in the context of the contract as a whole. Carrington Decl. ¶¶ 24-28. By using the terms "right," "sole and absolute discretion," and "without further notice," Section 1.1(b)(4) makes unmistakably clear that it is imposing restrictions on TLTD's ability to take *unilateral* action. *See*

26

Carrington Decl. ¶¶ 38-57. Reading that provision as restricting TLTD from taking unilateral action also aligns with Plaintiffs' allegation (¶ 39) that the provision was meant to ensure "the stability of Celsius's business and to protect Celsius's residual interest in its collateral."

By contrast, Plaintiffs read that provision to force TLTD and CNL to wait ten hours after receiving CNL's "permission to liquidate." AC ¶ 71 (alleging that, notwithstanding Mashinsky's instruction, TLTD had to wait ten hours "before [it] could initiate the application process"). That reading would transform Section 1.1(b)(4) from a restriction on TLTD's discretion into a bilateral, mandatory cooling-off period after a margin call. But nothing in that provision's text restricts *CNL's* ability to request or consent to liquidation. Far from *protecting* CNL's "residual interest," AC ¶ 39, such a reading would require CNL to sit idle for ten hours even as the value of its own collateral rapidly evaporated. Nothing in the text or common sense hints at or even permits such an expansive (and self-defeating) reading of Section 1.1(b)(4). *See* Carrington Decl. ¶¶ 38-57.

Plaintiffs' admission (¶ 71) that TLTD acted with CNL's "permission to liquidate" is therefore fatal to their breach-of-contract claim. In a last-ditch effort to avoid that outcome, Plaintiffs argue that the Court should disregard Mashinsky's instruction, because he did not purport to amend away the "10-hour waiting period" in Section 1.1(b)(4). AC ¶ 71. That is a red herring. Section 1.1(b)(4)'s restrictions on TLTD's unilateral "right" to liquidate are inapplicable because TLTD acted with CNL's agreement. Accordingly, no amendment was required and, given the volatile market conditions, it would have been unreasonable for TLTD to force CNL to risk further erosion of the collateral's value by waiting ten hours after CNL gave the instruction.

## B.     CNL's Insolvency Provided An Independent Basis For Liquidation

Plaintiffs' breach-of-contract claim should also be dismissed, because Section 1.1(e)(14) gave TLTD the absolute right to dispose of the collateral based on CNL's inaccurate solvency representations. *See* Carrington Decl. ¶¶ 59-67. Section 4.1 of the Token Agreement provides

that CNL is deemed to make certain representations on "any date upon which Collateral is provided to TLTD." AC, Ex. A, at 5, § 4.1. By providing collateral, CNL represented that it was "(i) able to pay its debts as they fall due, and: (ii) not otherwise insolvent under the terms of [U.K. law]." *Id.* § 4.2. If those representations were "incorrect or misleading in any material respect," then Section 1.1(e)(14)(iii) authorized TLTD to immediately "sell, dispose of, and liquidate the Collateral." AC, Ex. A, at 4, § 1.1(e)(14)(iii); Carrington Decl. ¶¶ 64-67.

Plaintiffs themselves allege that CNL's solvency representations were false. The Complaint alleges (¶ 59) that CNL "in fact was[] insolvent at the time of each of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers." Plaintiffs further allege that "in April, May, and June of 2022, the value of Celsius liabilities far exceeded the value of its assets" and "Celsius also was unable to pay its debts when they came due[,] and did not have adequate capital to operate its business." *Id.* ¶¶ 60-61; ¶ 9 ("Celsius was insolvent"); ¶¶ 93, 101, 109, 129, 136 (same). That leaves Plaintiffs on the horns of a dilemma. If CNL was insolvent at the time of each challenged transfer—as alleged—then its solvency representations were false and TLTD had an absolute right to dispose of its collateral. Carrington Decl. ¶ 67; AC, Ex. A, at 4, § 1.1(e)(14)(iii). But if CNL was solvent, Plaintiffs' preference claims fail. Because the Court must credit Plaintiffs' allegations at this stage, the breach-of-contract claim should be dismissed.

## C. Plaintiffs' Causation Theory Fails As A Matter Of Law Because It Would Itself Violate The Token Agreement

To link the supposed violation of the ten-hour period with "billions of dollars in harm," Plaintiffs allege that CNL could have continued to post additional BTC as collateral for the next month until it filed for bankruptcy. AC ¶¶ 79, 122. Recall, however, that the Complaint separately challenges every Top-Up Transfer made in the ninety days before CNL's bankruptcy as voidable preferences. Plaintiffs' breach-of-contract claim, therefore, rests on the theory that CNL should

have had the "opportunity" to continue supplying such allegedly preferential collateral transfers "through the Petition Date, at which point the automatic stay would have intervened, stopping any attempt by Tether to apply collateral against its claim." *Id*. ¶ 79.

Nothing in the Token Agreement supports that "heads I win, tails you lose" theory. Contrary to Plaintiffs' allegations (¶ 122), the Token Agreement did not promise CNL an "opportunity" to keep transferring collateral when it was allegedly deeply insolvent and in a "dire situation." *See* AC ¶¶ 59-61, 64 (alleging insolvency under various tests). To the contrary, the Token Agreement required CNL to represent that it remained solvent each and every time that it transferred collateral. AC, Ex. A, at 5, §§ 4.1-4.2. If CNL was insolvent, as Plaintiffs now allege, then additional transfers of collateral would have breached the Token Agreement—and empowered TLTD to dispose of the collateral immediately. *See supra* III.B.[13]

That theory also fails as a matter of BVI law. It is "well established by a long line of authority that a contracting party will not in normal circumstances be entitled to take advantage of [its] own breach as against the other party." *See* Carrington Decl. ¶ 33. Because CNL cannot rest its contract claim on its own breaches of the Token Agreement, *see id.* ¶¶ 31-33, it fails to plead any cognizable theory of causation or damages. The breach-of-contract claim should be dismissed.

## IV. The Complaint Fails To State A Claim For Breach Of The Covenant Of Good Faith And Fair Dealing (Count IV)

Plaintiffs allege (¶ 126) that, under BVI law, the liquidation of CNL's collateral breached a duty of good faith and fair dealing implied into the Token Agreement. As a threshold matter,

---

[13] Moreover, Plaintiffs fail to plead any facts that hint at—much less plausibly plead—any reason to believe that CNL would have continued supplying additional collateral. It is not nearly enough to note (as Plaintiffs do) that "Celsius had sufficient [b]itcoin on its balance sheet." AC ¶¶ 79, 122. Even if CNL still had some BTC available to it, there is no reason to believe that it would have used its limited resources to provide more collateral to TLTD. Indeed, Plaintiffs have previously represented to this Court, twice, that "Celsius" made the decision to "*forgo* providing [TLTD] . . . additional collateral." *See supra* n.3 (emphasis added).

there is no general duty of good faith in commercial contracts under BVI law. Carrington Decl. ¶¶ 71-72. BVI law implies two potentially relevant duties: (i) the duty not to exercise a discretionary power in an arbitrary or irrational way (often called a *Braganza* duty) and (ii) the duty for equitable mortgagees to seek the best price reasonably obtainable at the time that the mortgagee decides to sell. Carrington Decl. ¶ 87. Plaintiffs fail to plead a violation of either duty.

*First*, while Plaintiffs tack on the words "arbitrary" and "irrational" to their allegations (¶ 80) that it was "commercially unreasonable" for TLTD to liquidate the collateral "over a period [of] several hours," they allege no facts to support this conclusory language. *See* Carrington Decl. ¶¶ 75-83. Plaintiffs' own allegations (¶¶ 4, 59) that the market was in "steep[] decline[]" with BTC prices "drastically dropping" effectively rebut any charge of irrationality. In the midst of a market freefall, it is entirely rational for a creditor to take prompt action to preserve collateral value, rather than dithering and risking further erosion of collateral value. *See* Carrington Decl. ¶¶ 82-83. Indeed, Plaintiffs themselves previously told the Court that is precisely why CNL instructed TLTD to liquidate, rather than providing more collateral. *See supra* n.3.

*Second*, even if the Token Agreement constitutes an equitable mortgage under BVI law (which Defendants do not concede), Plaintiffs' violation-of-duty claim still fails. BVI law makes clear that an equitable mortgagee has absolute discretion to set the time and circumstances of a sale, absent fraud or subjective bad faith. Carrington Decl. ¶ 74. While Plaintiffs allege (¶ 80) that TLTD could have realized a higher price liquidating more slowly or at a different time, those allegations are insufficient as a matter of law. Carrington Decl. ¶ 94. Because Plaintiffs do not allege that the sale was done for a purpose other than repaying amounts owed or at an improper price under the actual circumstances of the sale, they fail to plead a violation of this duty. *Id*. ¶¶ 87-94. Plaintiffs' allegation (¶ 69) that "Tether" kept the collateral "for itself" does not change

this, as an equitable mortgagee's duty under BVI law does not require an arm's-length sale. Carrington Decl. ¶ 95.

## V. Plaintiffs' Avoidance Claims Rely On Impermissible Extraterritorial Applications Of The Bankruptcy Code (Counts I, II, V, VI)

Plaintiffs' avoidance claims seek to use the Code to avoid transfers of intangible property between U.K. and Hong Kong entities under a foreign-law agreement. But it is a "longstanding principle of American law" that an Act of Congress is presumed "to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). To determine whether that presumption forecloses a claim, courts apply a two-step inquiry. *Id*. The first asks whether the presumption is rebutted by a "clear, affirmative indication" in the statute that it applies extraterritorially. *Nabisco*, 579 U.S. at 337. Absent such a clear indication, the second assesses whether the case "involves a domestic application of the statute . . . by looking to the statute's 'focus.'" *Id*. Because Plaintiffs' preference and fraudulent transfer claims are impermissible extraterritorial applications of the avoidance provisions, they should be dismissed.

### A. The Code's Avoidance Provisions Do Not Apply Extraterritorially

"The question is not whether we think 'Congress would have wanted' a statute to apply to foreign conduct 'if it had thought of the situation before the court,' but whether Congress has affirmatively and unmistakably instructed that the statute will do so." *Nabisco*, 579 U.S. at 335 (quoting *Morrison*, 561 U.S. at 261). "If the legislative purpose is not unmistakably clear, any ambiguity in the statute must be resolved in favor of refusing to apply the law to events occurring outside U.S. territory." *In re Maxwell Commc'n Corp. plc*, 186 B.R. 807, 818 (S.D.N.Y. 1995).

The Code's avoidance provisions have no such "unmistakably clear" indication of extraterritorial application.[14]  "[N]othing in the language or legislative history of [those provisions] expresses Congress' intent to apply [them] to foreign transfers." *Maxwell*, 186 B.R. at 819 (§ 547); *see In re CIL Ltd.*, 582 B.R. 46, 84 (Bankr. S.D.N.Y. 2018) (§§ 544, 548, 550) (collecting authorities).  Because the avoidance provisions "give[] no clear indication of an extraterritorial application, [they] have none." *Morrison*, 561 U.S. at 255.  The fact that *other* provisions of the Code "do contain clear statements that they apply extraterritorially" further confirms that the avoidance provisions do not.  *Ampal-Am. Israel*, 562 B.R. at 612 (reasoning that those other provisions of the Code—and only those provisions—should be given extraterritorial application).  Indeed, a "majority of cases" to address the issue have concluded that the avoidance provisions "do not have extraterritorial application."  *In re Zetta Jet USA, Inc.*, 624 B.R. 461, 476 (Bankr. C.D. Cal. 2020).  This Court should join that majority.

Admittedly, a handful of non-binding and non-persuasive cases have reached the contrary conclusion.  Those cases start from the premise that Section 541(a)(1) of the Code defines "property of the estate" to include "all 'interests of the debtor in property'" and the avoidance provisions "allow[] the avoidance of certain transfers of such 'interest[s] of the debtor in property.'"  *In re French*, 440 F.3d 145, 151-52 (4th Cir. 2006) (quoting 11 U.S.C. §§ 541(a)(1), 548).  Because the avoidance provisions "allow[] a trustee to avoid any transfer of property that *would have been* 'property of the estate,'" those courts reason that Section 541(a)(1)'s inclusion of interests in property "wherever located" indicates an "affirmative intention to allow avoidance of transfers of foreign property."  *Id*. at 152.

---

[14] "For the purposes of the presumption against extraterritoriality, there is no distinction between sections 547(b) and 548," so we analyze those provisions together.  *In re Ampal-Am. Israel Corp.*, 562 B.R. 601, 612 n.11 (Bankr. S.D.N.Y. 2017).

But that analysis is at odds with the Code's text and Second Circuit precedent. Far from sweeping in any historical "interest" in property, Section 541(a)(1) includes only those interests "*as of the commencement of the case*." Section 541(a)(3) separately provides that the estate includes property that the "trustee recovers" pursuant to the avoidance provisions. The Second Circuit has, therefore, held that transferred property is *not* property of the estate unless and "until it is recovered." *In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992) (cleaned up). Based on that reasoning, most courts in the Second Circuit (and elsewhere) that have addressed the issue have properly concluded that Section 541 "does not indicate that Congress intended § 547 to govern extraterritorial transfers." *Maxwell*, 186 B.R. at 820; *see, e.g.*, *CIL*, 582 B.R. at 91-92 (holding that "in assessing the scope of the Bankruptcy Code's avoidance provision[,] section 541(a)(1) is irrelevant"); *Ampal-Am. Israel*, 562 B.R. at 607 (similar); *see also, e.g.*, *In re Midland Euro Exch. Inc.*, 347 B.R. 708, 719 (Bankr. C.D. Cal. 2006) ("*In re French* totally ignores § 541(a)(3) and uses an unclear and convoluted method to reach its conclusion."). To the contrary, those courts correctly found, the inclusion of express extraterritorial language in Section 541(a)— but not the avoidance provisions—"operates to limit [the avoidance provisions] to [their] terms." *CIL*, 582 B.R. at 92; *see also, e.g.*, *Maxwell*, 186 B.R. at 820 ("[W]hen it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute.") (cleaned up).

To be sure, there are arguments that some policy considerations point in the opposite direction. *French* stressed that its permissive application of extraterritoriality "accords with the purpose of the Code's avoidance provisions." 440 F.3d at 152. *In re Lyondell Chemical Co.* cautioned that the majority view may create a "timing" problem and could lead to results "inconsistent" with what Congress would have "intended." 543 B.R. 127, 153-55 (Bankr. S.D.N.Y. 2016) (reasoning that extraterritorial application was necessary "to protect the *in rem*

jurisdiction of the bankruptcy courts over assets that Congress has declared become property of the estate when recovered"). But the presumption against extraterritoriality does not permit courts to predict what "Congress would have wanted." *Nabisco*, 579 U.S. at 335 (quoting *Morrison*, 561 U.S. at 261). Nor can such "policy considerations" overcome that presumption. *Zetta Jet*, 624 B.R. at 479; *CIL*, 582 B.R. at 92-93 (recognizing potential policy "problem" raised by *Lyondell* but nevertheless holding that avoidance provisions cannot apply overseas).

### B. Plaintiffs' Fraudulent Transfer And Preference Claims Would Be Impermissible Extraterritorial Applications Of The Avoidance Provisions

In assessing whether an application is foreign or domestic, "the relevant transfer is the debtor's initial transfer." *In re Picard*, 917 F.3d 85, 100, 105 (2d Cir. 2019) (the analysis looks only to the debtor's "*transfer* of property, not the transferee's *receipt* of property). In evaluating whether a transfer is domestic, the Second Circuit directs courts to look for "'two nexuses' between the relevant transactions and 'the United States: (1) [whether] the debtor is a domestic entity, and (2) [whether] the alleged fraud occurred when the debtor transferred property from U.S. bank accounts.'" *In re Zetta Jet USA, Inc.*, 2024 WL 3198826, at *29 (C.D. Cal. Mar. 26, 2024) (quoting *Picard*, 917 F.3d at 99 n.9). Because Plaintiffs cannot plead either nexus here, their avoidance claims must be dismissed.

#### 1. The Top-Up And Cross-Collateralization Transfers Were Foreign Transactions

The Top-Up and Cross-Collateralization Transfers were entirely foreign. In each, CNL— a U.K. Debtor—transferred BTC to a Hong Kong entity (TLTD) under a contract governed by BVI law. *See supra* II.A.2. Because the transferor (CNL) is not a domestic entity, the first *Picard* nexus is absent here. While the Complaint recites the second nexus by pleading that at least *some* of the transfers were "made from United States-based accounts" (AC ¶ 45), that conclusory allegation is entitled to no weight. It is black-letter law that "simply alleging that some domestic

conduct occurred cannot support a claim of domestic application." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 33 (2d Cir. 2010) (per curiam). Moreover, the BTC transfers in question—movements between addresses on the Bitcoin blockchain—did not involve bank "accounts" at all. *See supra* II.A.2; *see also* Opalinski Decl. ¶¶ 16-17 & Exs. A-P (public records showing blockchain movements). And the ownership of that intangible BTC moved between foreign entities under a foreign-law agreement. Regardless of whether the Court applies U.S. or BVI law, the result is the same—those transfers were decidedly *not* made within the United States. *See supra* II.A.2 & n.10. Whatever Plaintiffs mean by a "United States-based account," that allegation is far too "slim" to plead a domestic transaction. *See Norex*, 631 F.3d at 33 (alleged RICO violations).

### 2. The Application Transfer Was A Foreign Transaction

Plaintiffs' avoidance claims based on the application of CNL's collateral fare no better. As a threshold matter, the Complaint alleges (¶ 69) that "Tether" kept the BTC collateral it applied to CNL's obligations "for itself." Crediting those allegations, it cannot be disputed that the Application Transfer was purely foreign. If the collateral did not leave TLTD, it did not touch the United States. While the Complaint lists (¶ 81) categories of U.S. intermediaries that, it says, may have somehow been involved in that transfer, that conclusory allegation—made only on information and belief—is entitled to no weight. *Supra* II.A.2. And Plaintiffs' allegations (¶¶ 70, 72) that TLTD directed communications to "Celsius employees in the United States" are irrelevant to the *Picard* nexuses and, therefore, cannot transform a foreign transaction into a domestic one.

In any event, the mere use of "intermediar[ies]" does not render a transaction domestic. *Zetta Jet, Inc.*, 624 B.R. at 495, 499 (use of American professionals or intermediaries did not render a transfer domestic). That is particularly true here, given that the Complaint leaves open the allegation that the U.S. contact might be nothing more than routing information "through United

States servers" or stray contacts with "Celsius's United States-based personnel." AC ¶ 81. Even if the application did somehow touch the United States—and none of the facts alleged support that—those limited domestic connections lack "sufficient force to displace the presumption against extraterritorial application." *Ampal-Am. Israel*, 562 B.R. at 603, 613 (transfer from U.S. company to foreign firm was "not domestic," even though company was "organized under New York law" and firm provided "services [that] had some U.S. connections").

## VI. The Complaint Fails To State Any Preference Claims (Counts I and II)

### A. TLTD Was Fully Secured At The Time Of Each Allegedly Preferential Transfer And So None Of Them Resulted In TLTD Receiving More Than It Would Have In A Chapter 7 Liquidation

Section 547(b) of the Code enables a trustee, upon satisfaction of the various elements of the statute, to avoid certain prepetition transfers made by a debtor "for or on account of an antecedent debt." 11 U.S.C. § 547(b)(2). But "[u]nless the trustee proves"—and thus first pleads—"each and every one of these elements, a transfer is not avoidable as a preference." *Residential Cap.*, 501 B.R. at 618; *see Off. Comm. of Unsecured Creditors Hydrogen, LLC. v. Blomen (In re Hydrogen, LLC)*, 431 B.R. 337, 354-56 (Bankr. S.D.N.Y. 2010) (dismissing complaint for failure to sufficiently plead each "element[] of section 547(b)" claim). Among the required elements, Section 547(b)(5) provides that a transfer to a creditor is avoidable *only if* it "enables such creditor to receive more than such creditor would receive if—

> (A) the case were a case under chapter 7 of this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title."

Plaintiffs cannot allege this critical element of a preference as to any of the challenged transfers—be they the so-called Top-Up or Cross-Collateralization Transfers or the later application of CNL's collateral to close out CNL's obligations. As courts in this district have

repeatedly held, a transfer to a fully secured creditor is *not* a preference. *See, e.g.*, *Savage &
Assocs., P.C. v. A.I. Credit Corp. (In re Teligent, Inc.)*, 337 B.R. 39, 45 (Bankr. S.D.N.Y. 2005)
("Payments to an oversecured creditor are not preferential because the creditor would receive the
full value of its collateral in a chapter 7 liquidation."); *360networks*, 327 B.R. at 190 ("[A] transfer
to a fully secured creditor is immunized from preference attack because the creditor would have
been paid in full in a hypothetical Chapter 7 liquidation by virtue of its realization on its
collateral."). Thus, in *Residential Capital*, this Court rejected a preference claim against certain
secured noteholders because the plaintiffs had not refuted defendants' assertion that they were
"oversecured at the time of the alleged preferential transfer." 501 B.R. at 619.

Here, the Complaint does not allege that TLTD was undersecured at the time of any of the
challenged transfers. To the contrary, Plaintiffs allege that (i) TLTD was entitled under the Initial
Token Agreement to BTC collateral with a value "initially required to be 140% of the value of the
amount borrowed" (AC ¶ 32) (later amended to 130%); (ii) upon BTC's "downward slide" during
the Preference Period, Celsius was repeatedly asked to—and "promptly" did—post more collateral
(AC ¶¶ 47-56); and (iii) the entirety of the BTC collateral was applied on June 13, 2022 "at a dollar
value of $816,822,948" in satisfaction of an "outstanding loan balance under the Amended Token
Agreement [of] $812,333,000 [in USDT]" (AC ¶ 78). Conspicuously absent is any allegation that
TLTD ever became undersecured, much less when.

Market data confirms that TLTD was, in fact, oversecured at the time of every challenged
transfer. At the start of the Preference Period, the Complaint alleges (¶ 46) that "Celsius had a
balance of 512,330,000 USDT on its loan with Tether," which was "collateralized by
approximately 16,505.17 [BTC]." Based even on the average daily *low* price across the "Basket
Exchanges" referenced on Schedule 1 of the Amended Token Agreement (AC, Ex. A, at 9), the

BTC collateral was then worth approximately 653.2 million USDT—or 127.5% of the outstanding USDT. *See* Amended Declaration of Gabriel Eisenberger ¶ 6 & Ex. D.[15]  Using the same metric, TLTD was never undersecured during the Preference Period—including on the date of each alleged Top-Up, Cross-Collateralization, and Application Transfer. *Id.* ¶ 7 & Ex. E.

No doubt recognizing that TLTD was oversecured on the date of each Top-Up and Cross-Collateralization Transfer—and constrained to concede that TLTD was oversecured at the time of the Application Transfer (unless the prior transfers are avoided)—Plaintiffs allege instead that TLTD would have been undersecured as of the *Petition Date* had those transfers not been made. *See* AC ¶ 58.  But, as this Court recognized in *Residential Capital*, it is the value of collateral on the *transfer date*, not the petition date, that matters.  *See* 501 B.R. at 619 ("Where a creditor asserts that it was oversecured at the time of the alleged preferential transfer, it is the plaintiff's burden to refute that assertion."); *see also Teligent*, 337 B.R. at 47 (granting summary judgment to creditor where "calculations confirmed its oversecured position at the time of each Transfer"); *Telesphere Liquidating Tr. Galesi (In re Telesphere Commc'ns, Inc.)*, 229 B.R. 173, 180 (Bankr. N.D. Ill. 1999) ("It is the value of the collateral at the time of payment, not the time of bankruptcy filing, that determines the impact on the estate.").

Certain out-of-district cases have rejected the transfer-date valuation approach adopted in *Residential Capital*, in favor of a test "conducted as of the petition date." *See, e.g., Falcon Creditor*

---

[15] The Court can take judicial notice of publicly available market price information without converting the motion into one for summary judgment. *See, e.g., Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) (court "may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment"); *LCM XXII v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *5 (S.D.N.Y Mar. 29, 2022) (taking judicial notice of IHS Markit pricing data for syndicated loans on a motion to dismiss); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 52 (S.D.N.Y. 2012) (noting that "the Court can take judicial notice of publicized commodities prices on a motion to dismiss").

*Tr. v. First Ins. Funding (In re Falcon Prods., Inc.)*, 381 B.R. 543, 547 (B.A.P. 8th Cir. 2008). But because the actual text of Section 547(b)(5) "does not specifically indicate" whether the transfer date or petition date controls, those courts have sidestepped the question by holding that the Supreme Court's 90-year-old decision in *Palmer Clay Products Co. v. Brown*, 297 U.S. 227 (1936) is "precedent [that] requires that the hypothetical liquidation test be conducted as of the petition date." *Falcon Prods.*, 381 B.R. at 547. It does not.

*Palmer Clay* addressed only how a court should evaluate whether a transfer improved an *unsecured creditor's* position *relative to creditors in its class*—and it did so interpreting a materially different preference statute.[16] Section 60(a) of the Bankruptcy Act required courts to consider whether the effect of a transfer "'will be to enable any one of [the debtor's] creditors to obtain a greater percentage of his debt than any other of such creditors *of the same class*.'" *See Palmer*, 297 U.S. at 228 n.2 (quoting former statute) (emphasis added). The Act gave the Court no occasion to evaluate whether a transfer to a *fully secured* creditor—generally in a class of its own—is preferential as against creditors *of a different class*. Indeed, the Court's reasoning, the example of a potential preference it discussed, and the "actual result" that it thought concerned Congress simply do not apply in the context of transfers to fully secured creditors. *Id*. at 229.[17]

The distinction is material—particularly given the modern Bankruptcy Code's treatment

---

[16] Though the court in *Falcon Products* asserted that Sections 60 of Act and 547 of the Code are "substantially similar," 381 B.R. at 548, a simple comparison of their text demonstrates they are not—as the Supreme Court itself has recognized. *See Union Bank v. Wolas*, 502 U.S. 151, 160 (1991) ("Congress carefully reexamined and entirely rewrote the preference provision in 1978.").

[17] This is not the only material respect in which the Act and the Code differ. *Cf. Matter of Park N. Partners, Ltd.*, 85 B.R. 916, 918 (Bankr. N.D. Ga. 1988) ("In discussing the fifth element of a preference, the legislative history states that the transfer must enable the creditor to or for whose benefit it was made to receive a greater percentage of his claim than he would receive under the *distributive provisions of the bankruptcy code.* As a *secured* creditor receives *no* distribution under chapter 7, it is not logical to attempt to apply the fifth element of a preference to its claim. To do so is like comparing apples to oranges.") (cleaned up).

of secured creditors.  Consider a creditor, like TLTD, with a lien on collateral that fluctuates in value.  Before the preference period, its property rights in collateral are protected—unaffected by the Code:  it can foreclose or insist upon payment in a manner consistent with its contractual rights.  After the petition date, the secured creditor's property rights are *protected* by the Code:  the debtor can use or keep the collateral *only if* it provides the creditor with adequate protection against any diminution in value.  But what of the 90-day preference period?  Under the *Falcon Products* (and Plaintiffs') view, the secured creditor is entirely exposed to the risk of diminution in value of its collateral, because during that period—*and that period alone*—the creditor could not receive a transfer on its then-fully secured claim without risking disgorgement if the value of its collateral falls prior to the petition date.  Worse still, the secured creditor would not even know when this period had begun (as that is known only in retrospect), creating significant disincentive to work with borrowers in distress.  It defies common sense to believe that the same Congress that insisted upon adequate protection for secured creditors during the bankruptcy—mindful of the Fifth Amendment's protection of property interests (*LNC Invs., Inc. v. First Fidelity Bank*, 247 B.R. 38, 44 (S.D.N.Y. 2000))—would have supported or countenanced such a result during the 90-day period immediately before the bankruptcy.[18]

Indeed, it would be particularly odd to apply a petition date test here, given the terms of the Token Agreement.  Section 547(b)(5) asks the Court to consider what would have happened if

---

[18] *Falcon Products* seems to recognize the absurdity of this result, calling it "almost illogical to find that a payment on a claim fully secured at the time of the transfer might be preferential under § 547(b)."  381 B.R. at 548; *see also Telesphere*, 229 B.R. at 180 (holding that a petition date valuation rule "would produce intolerable results for secured creditors whenever they received payments on debts secured by assets subject to depreciation or depletion").  Yet rather than construe the statute in a manner that harmonizes Congress's priorities in the modern Bankruptcy Code, *Falcon Products* concluded, erroneously, that it was bound by the rule of *Palmer Clay*.  But, as noted, *Palmer Clay* interpreted a different, pre-Code version of the preference statute to answer a question about unsecured creditors that is not present here.  It, therefore, does not control.

the challenged "transfer[s] had not been made." But under the Token Agreement, if CNL had not made the Top-Up Transfers, for example, TLTD could have foreclosed immediately and—because TLTD was oversecured at all such times—would have been paid in full. The Top-Up Transfers thus did not "allow" TLTD "to receive more than it would have [received]" without them. AC ¶ 95. Those transfers merely maintained the status quo between the parties.

In sum, there is no reason for this Court to depart from its prior holding that a secured creditor does not receive a preference if it is fully secured at the time of an alleged transfer. *Residential Cap.*, 501 B.R. at 619; *see also Teligent*, 337 B.R. at 47. Because the Complaint does not allege that TLTD was undersecured at the time of any challenged transfer—and because market data shows that it was not—Counts I and II should be dismissed.

### B. The Complaint Fails To State A Claim As To Certain Of The Alleged Preferences For Additional, Independent Reasons

#### 1. Plaintiffs Fail To Plead That The Cross-Collateralization Transfers Were Made "For Or On Account Of An Antecedent Debt"

In seeking to avoid the so-called Cross-Collateralization Transfers, Plaintiffs fail to plead another *prima facie* element of a preference claim: that those transfers were made "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2). Because the Token Agreement makes clear that they were not, that is yet another independent reason to dismiss those claims.

The Complaint alleges that the Cross-Collateralization Transfers were transfers of "2,228.01 [BTC] of excess collateral to Defendants *in connection with* $300,000,000 [in USDT] of *new borrowings*." AC ¶ 5 (emphases added). By alleging (¶ 5) that those transfers were made "in connection with … *new borrowings*," Plaintiffs effectively concede that they were not made "for or on account of an *antecedent* debt"—and certainly not "for or on account of" the antecedent debt on which they base this preference claim (*i.e.*, the allegedly cross-collateralized obligations).

11 U.S.C. § 547 (b)(2); *see, e.g.*, *Off. Comm. of Unsecured Creditors of Enron Corp. v. Whalen (In re Enron Corp.)*, 357 B.R. 32, 47-48 (Bankr. S.D.N.Y. 2006) ("contemporaneous transactions are payments on a 'debt,'" but "are not made 'for or on account of an antecedent debt'").

Indeed, in Count One of the Complaint, Plaintiffs cannot bring themselves to even recite in boilerplate this basic element of their cause of action. Rather than describe the Cross-Collateralization Transfers as being "for or on account of an antecedent debt" (as they do with the Top-Up and Application Transfers), Plaintiffs only allege that the "Cross-Collateralization Transfers *related to* that antecedent debt." AC ¶ 100 (emphasis added). But "related to" does not satisfy the statutory element's causal requirement that the transfer be "on account of"—or, as the Supreme Court has interpreted that phrase, "because of"—that debt. *Rousey v. Jacoway*, 544 U.S. 320, 326 (2005) ("We have interpreted the phrase "on account of" elsewhere within the [] Code to mean 'because of.'"); *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 435 (1999) ("on account of" in § 547(b)(2) requires a causal relationship between the challenged transfer and the antecedent debt); *In re Johnston Indus., Inc.*, 2006 WL 4899910, at *3 (Bankr. M.D. Ga. Nov. 21, 2006) ("the phrase 'on account of' in § 547(b)(2) means 'because of,'" and holding that incidental benefit to pre-existing debt—which was not the purpose of the transfer—does not establish that the transfer was "on account of antecedent debt").

The Token Agreement makes clear that Plaintiffs cannot plead the "for or on account of" element. It required that, with each new provision of USDT, bitcoin be posted "*in consideration for*" that new USDT—not in consideration for (*i.e.*, "for or on account of") extant prior obligations. *See* AC, Ex. A, at 2, § 1.1(b)(3) ("The collateral to be posted *in consideration for* making the Tokens available . . . shall be equal to a percentage . . . of the number of Tokens made available to [] [CNL] . . .") (emphasis added). CNL would have been required to provide the same number of

42

BTC to obtain more USDT, regardless of any outstanding USDT obligations. That same point is further underscored by the contractual language requiring that "the Collateral shall be remitted to TLTD *prior to* the making available of any [USDT.]" *Id.* (emphasis added). Finally, to the extent that the value of the collateral exceeded the required margin, CNL had the right to request the excess collateral be released. *See* AC, Ex. A, at 3, §1.1(b)(5) (Rise in Value of Collateral). Accordingly, there is no basis to allege that those transfers were on account of the existing debt.

Put simply, the Token Agreement expressly required CNL to provide the full amount of the transfers—including "excess collateral"—in order to obtain new USDT. Those contractually required transfers were not payments "for or on account of" CNL's outstanding USDT obligations.

## 2. The Application Transfer Was A Contemporaneous Exchange For New Value

Section 547(c)(1) of the Code prevents a trustee from avoiding a transfer "to the extent that such transfer was—(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange." Although this provision is an affirmative defense, it is well-settled that "a complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense if the defense appears on the face of the complaint." *Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (cleaned up); *see Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*, 453 B.R. 499, 515 (Bankr. S.D.N.Y. 2011) (granting motion to dismiss based on new value defense). Although Plaintiffs make a perfunctory allegation that they considered "known or reasonably knowable affirmative defenses" (AC ¶ 87), the "contemporaneous new value defense" is nonetheless facially applicable to the Application Transfer from the Complaint.

Section 547(a)(2) of the Code defines "new value" to include a "release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable."

11 U.S.C. § 547(a)(2). Consistent with this plain language, courts have recognized that the release of a lien is new value. *See, e.g.*, *In re Phoenix Steel Corp.*, 76 B.R. 373, 376 (Bankr. D. Del. 1987) (where creditor "released . . . equipment in exchange for the final payment, it released a lien right which was a contemporaneous exchange for new value"); *Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc.*, 837 F.2d 224, 228 (5th Cir. 1988) ("[W]here a creditor takes a perfected security interest in a debtor's collateral and, within the ninety-day period preceding bankruptcy, releases that security interest upon the debtor's performance of its obligation to the secured creditor, § 547(c)(1) protects the transfer to the creditor from the trustee's voidance powers.").

That is precisely what happened in the Application Transfer. The Complaint alleges that TLTD was fully secured at the time of the Application Transfer (¶ 78), and that the transfer allowed TLTD to "cover its exposure in full" (¶ 6). The only conclusion to be drawn from these allegations is that the application resulted in the release of TLTD's lien, providing the requisite "new value."

To be sure, Plaintiffs have challenged *certain* of the transfers that led to TLTD accruing the 39,542.42 BTC that it applied in the Application Transfer (namely, the Top-Up and Cross-Collateralization Transfers). Defendants dispute Plaintiffs' assertions that these transfers were preferential. But even if they were, this would not *completely* preclude Defendants' reliance on the 547(c)(1) defense nor its plain applicability from the face of the Complaint.

That section, as noted, provides a defense "*to the extent that*" a transfer was made for contemporaneous new value. This means that a transfer can be protected in part—*to the extent of* new value—even if it is otherwise avoidable in part. *See, e.g.*, *In re Foxmeyer Corp.*, 286 B.R. 546, 562 (Bankr. D. Del. 2002) ("Section 547(c)(1) does not require, as a condition to its applicability, that a transferee have given equal value in return for a transfer; instead, § 547(c)(1) operates to shield from preference avoidance transfers *to the extent* that new value is given."); *In*

*re Robinson Bros. Drilling, Inc.*, 877 F.2d 32, 34 (10th Cir. 1989) (transfer supported in part by undisputed new value in the form of release of valid liens was protected under § 547(c)(1) from avoidance "to the extent of the liens, and the remaining $32,115.03 must be treated as a preference"); 5 Collier on Bankruptcy ¶ 547.04[1], (16th ed. 2017) ("Section 547(c)(1) protects transfers only to the extent of the new value given. Thus, if the debtor transfers $50,000 to the creditor in exchange for the release of a lien on collateral worth $30,000, the difference of $20,000 is not protected from avoidance under the contemporaneous exchange exception.").

Here, Plaintiffs concede that, at the time of the Application Transfer, TLTD held 21,656.20 BTC of collateral received in transfers that are not challenged. AC ¶ 78 ("Without the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether would have had only 21,656.20 [BTC] in collateral."). The Complaint does not challenge TLTD's liens on such collateral, and it makes no case that CNL's transfers of such collateral are "void []or voidable." Thus, at a minimum, the preference claim based on the Application Transfer should be narrowed. *Even if* the application of the 15,658.21 BTC acquired in the Top-Up Transfers and/or the 2,228.01 BTC acquired in the Cross-Collateralization Transfers is not subject to a Section 547(c)(1) defense, *at the very least*, the application of the 21,656.20 BTC—the bulk of which was transferred to TLTD *before* the Preference Period—should be.

To the extent the Court does not dismiss the preference claims in their entirety, it can and should clarify the scope of what could, at most, be at stake between the parties here—which is very much not the $4 billion headline number claimed by Plaintiffs (AC ¶ 6).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in full.

Dated: January 17, 2025
Washington, D.C.

/**s**/ *Ariel Lavinbuk*
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Ariel N. Lavinbuk
Brandon L. Arnold
Jane Jacobs (*pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

/**s**/ *Daniel Eggermann*
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Daniel M. Eggermann
David E. Blabey, Jr.
Gabriel Eisenberger
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Attorneys for Defendants*

## Certificate of Service

I hereby certify that a copy of the *Memorandum of Law in Support of Defendants' Motion to Dismiss* and the documents submitted in support thereto were served electronically on the date of filing through the Court's ECF System on all ECF participants registered in this case at the email addresses registered with the Court.


Dated:  January 17, 2025
Washington, D.C.

/s/  *Ariel Lavinbuk*
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Ariel N. Lavinbuk
Brandon L. Arnold
Jane Jacobs (*pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC  20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510