**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin I. Finestone
Anil Makhijani
Mario O. Gazzola
Arman Cuneo
295 5th Avenue
New York, New York
Telephone: (212) 849-7000

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Matthew Scheck
300 West 6th St., Suite 200
Austin, TX 78701
Telephone: (737) 667-6102

*Counsel to Blockchain Recovery Investment Consortium, LLC, Litigation Administrator and Complex Asset Recovery Manager, as Representative for the Post-Effective Date Celsius Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : |
| | : |
| CELSIUS NETWORK LLC, et al.,[1] | : |
| | : |
| Debtors. | : |
| | : |
| CELSIUS NETWORK LIMITED and | : |
| CELSIU S NETWORK LLC (POST-EFFECTIVE DATE DEBTORS) | : Chapter 11 |
| | : |
| | : Case No. 22-10964 (MG) |
| Plaintiffs. | : |
| | : (Jointly Administered) |
| against | : |
| | : Adv. Proc. No. 24-04018 (MG) |
| TETHER LIMITED; | : |
| TETHER HOLDINGS LIMITED; | : |
| TETHER INTERNATIONAL LIMITED; and | : |
| TETHER OPERATIONS LIMITED | : |
| | : |
| Defendants. | : |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

---

[1] The reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ....................................................................................1

II. FACTUAL BACKGROUND.......................................................................................3

    A. Plaintiffs' Business And Reliance On Loans From Tether To Operate................................................................................................................3

    B. The Token Agreement ........................................................................................4

    C. The Preferential Top-Up And Cross-Collateralization Transfers ................6

    D. The Improper Application of Collateral ..........................................................7

    E. Tether's Secret Retention of Collateral..........................................................9

III. LEGAL STANDARD...................................................................................................11

IV. ARGUMENT ...............................................................................................................12

    A. This Court Has Personal Jurisdiction Over All Defendants .....................12

        1. Tether's Scheme To Exploit The U.S. Crypto Market Justifies Jurisdiction. ..................................................................................13

        2. The Parties' Agreement And Course Of Dealing Independently Establish Jurisdiction ...........................................................18

    B. The Complaint Alleges Domestic Transfers That The Trustee Is Entitled To Avoid ..............................................................................................23

        1. Celsius's Avoidance Claims Are Predicated On Domestic Transfers To Tether......................................................................23

            (a) The Top-Up And Cross-Collateralization Transfers Were Domestic Transfers Of Property .......................................23

            (b) The Application Transfer Was A Domestic Transfer Of A Property Interest From Celsius ........................................26

        2. The Code's Avoidance Provisions Apply Extraterritorially......................27

    C. Celsius Network LLC and Each Of The Tether Entities Are Proper Parties.........29

    D. The Complaint Alleges Avoidable Preferential Transfers....................................32

        1. The Challenged Transfers Enabled Tether To Receive More Than It Would Have Otherwise Received In A Chapter 7 Liquidation..............32

            (a) The Hypothetical Liquidation Test, Including Tether's Secured Status, Is Measured As Of The Petition Date, Not The Transfer Date ........................................................................33

            (b) Tether's Cited Cases Are Inapposite And Do Not Support Its Position ...................................................................35

           (c)      Tether's Policy Arguments Are Meritless And Do Not Support Its Arguments ......................................................................39

    2.     Tether's Other Arguments As To The Cross-Collateralization And Application Transfers Are Meritless............................................40

E.     The Complaint Alleges Tether's Breach Of Contract............................................42

    1.     The Token Agreement's Ten Hour Waiting Period Was Not Modifiable By Alleged Oral Waiver............................................42

    2.     Celsius's Insolvency Does Not Excuse Tether's Breach ........................43

F.     The Complaint Alleges Tether's Breach Of The Duty Of Good Faith And Fair Dealing ..................................................................................44

V. CONCLUSION..............................................................................................................45

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re 360networks*,
327 B.R. 187 (Bankr. S.D.N.Y. 2005)..................................................................36

*In re Adler*,
494 B.R. 43 (Bankr. E.D.N.Y. 2013), *aff'd*, 518 B.R. 228 (E.D.N.Y. 2014).........................31

*Al Rushaid v. Pictet & Cie*,
28 N.Y.3d 316 (2016).................................................................................20

*Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*,
2018 WL 5118638 (S.D.N.Y. Oct. 22, 2018).............................................................13

*In re Aramid Ent. Fund Ltd.*,
664 B.R. 9 (Bankr. S.D.N.Y. 2024)....................................................................13

*In re Arcapita Bank, B.S.C.*,
575 B.R. 229 (Bankr. S.D.N.Y. 2017), *aff'd*, 640 B.R. 604 (S.D.N.Y. 2022) .................24, 28

*ARP Films, Inc. v. Marvel Ent. Grp.*,
952 F.2d 643 (2d Cir. 1991)..........................................................................44

*In re Auto-Train Corp.*,
49 B.R. 605 (D.D.C. 1985), *aff'd*, 800 F.2d 1153 (D.C. Cir. 1986).....................................34

*Avery v. Fischer*,
360 F.2d 719 (5th Cir. 1966) .........................................................................33

*In re Bankers Tr. Co.*,
450 F.3d 121 (2d Cir. 2006) ..........................................................................44

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
305 F.3d 120 (2d Cir. 2002)......................................................................14, 21

*Bascunan v. Elsaca*,
927 F.3d 108 (2d Cir. 2019)..........................................................................24

*Benjamin v. Consol. Edison Co. of N.Y.*,
2018 WL 1406620 (S.D.N.Y. Mar. 20, 2018).............................................................12

*BFP v. Resol. Tr. Corp.*,
511 U.S. 531 (1994)..................................................................................27

*BMW of N. Am. LLC v. M/V Courage*,
254 F. Supp. 3d 591 (S.D.N.Y. 2017)..................................................................12

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985).................................................................................................15

*In re Buyer's Club Markets, Inc.*,
  123 B.R. 895 (Bankr. D. Colo. 1991) .....................................................................34

*In re Cavalier Indus., Inc.*,
  2002 WL 975868 (Bankr. E.D. Pa. Apr. 16, 2002) ................................................34

*In re Celsius Network LLC*,
  2022 WL 17541051 (S.D.N.Y. Dec. 8, 2022) .........................................................32

*CFPB v. NDG Fin. Corp.*,
  2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ...........................................................22

*CFTC v. TFS-ICAP, LLC*,
  415 F. Supp. 3d 371 (S.D.N.Y. 2019)......................................................................16

*Chatwal Hotels & Resorts LLC v. Dollywood Co.*,
  90 F. Supp. 3d 97 (S.D.N.Y. 2015)..........................................................................17

*In re Colonial Realty Co.*,
  980 F.2d 125 (2d Cir. 1992).....................................................................................29

*In re Conard Corp.*,
  806 F.2d 610 (5th Cir. 1986) ...................................................................................40

*Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*,
  24 F.4th 491 (5th Cir. 2022) ....................................................................................21

*Diversapack LLC v. Elite Staffing, Inc.*,
  2012 WL 1032687 (E.D.N.Y. Mar. 20, 2012) .........................................................19

*Eades v. Kennedy, PC Law Offices*,
  799 F.3d 161 (2d Cir. 2015)......................................................................................22

*EMI Christian Music Grp. v. MP3tunes, LLC*,
  844 F.3d 79 (2d Cir. 2016).......................................................................................13

*In re Extended Stay, Inc.*,
  2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020) .............................................30

*In re FAH Liquidating Corp.*,
  572 B.R. 117 (Bankr. D. Del. 2017) ........................................................................29

*In re Fair Fin. Co.*,
  834 F.3d 651 (6th Cir. 2016) ...................................................................................42

*In re Falcon Prods., Inc.*,
381 B.R. 543 (B.A.P. 8th Cir. 2008)................................................................34

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017)...............................................................................25

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021).........................................................................................14

*In re Frankum*,
453 B.R. 352 (Bankr. E.D. Ark. 2011) .............................................................34

*French v. Liebmann (In re French)*,
440 F.3d 145 (4th Cir. 2006) ...........................................................................29

*Golden Archer Invs., LLC v. Skynet Fin. Sys.*,
2012 WL 123989 (S.D.N.Y. Jan. 3, 2012) .......................................................21

*In re Hellas Telecom. (Lux.) II SCA*,
547 B.R. 80 (Bankr. S.D.N.Y. 2016) ................................................................12

*In re JR Palmenberg Sons*,
76 F. 2d 935 (2d Cir. 1935)..............................................................................33

*Kalaj v. Kay*,
2023 WL 4564795 (E.D.N.Y. July 17, 2023)...................................................17

*Kashef v. BNP Paribas SA*,
2021 WL 1614406 (S.D.N.Y. Apr. 26, 2021)...................................................31

*Knox v. MetalForming, Inc.*,
914 F.3d 685 (1st Cir. 2019)............................................................................14

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013).......................................................................12, 15

*Liu Jo S.P.A. v. Jenner*,
630 F. Supp. 3d 501 (S.D.N.Y. 2022)..............................................................20

*In re Howland*,
674 F. App'x 482 (6th Cir. 2017) .....................................................................30

*In re Lyondell Chem. Co.*,
543 B.R. 127 (Bankr. S.D.N.Y 2016)..........................................................28, 29

*In re Maxus Energy Corp.*,
641 B.R. 467 (Bankr. D. Del. 2022) .................................................................26

*McDermott v. This Dog's Life Corp.*,
730 F. Supp. 3d 73 (S.D.N.Y. 2024)...............................................................................12

*McQueen v. Huddleston*,
17 F. Supp. 3d 248 (W.D.N.Y. 2014)..............................................................................22

*In re Moran*,
188 B.R. 492 (Bankr. E.D.N.Y. 1995).............................................................................41

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010).........................................................................................................25

*Myun-Uk Choi v. Tower Rsch. Cap., LLC*,
890 F.3d 60 (2d Cir. 2018)...............................................................................................24

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
631 F.3d 29 (2d Cir. 2010)...............................................................................................25

*Okla. Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico), S.A.*,
92 F.4th 450 (2d Cir. 2024) ........................................................................................13, 15

*Palmer Clay Prods. Co. v. Brown*,
297 U.S. 227 (1936)....................................................................................................33, 37

*In re Paris Indus. Corp.*,
130 B.R. 1 (Bankr. D. Me. 1991)....................................................................................34

*Parke-Bernet Galleries, Inc. v. Franklyn*,
256 N.Y.2d 13 (1970) .....................................................................................................20

*In re Picard*,
917 F.3d 85 (2d Cir. 2019).........................................................................23, 24, 27, 28

*Plusgrade L.P. v. Endava Inc.*,
2023 WL 2402879 (S.D.N.Y. Mar. 8, 2023) ..................................................................31

*In re Prop. Leasing & Mgmt., Inc.*,
46 B.R. 903 (Bankr. E.D. Tenn. 1985) ...........................................................................34

*In re Randall's Island Fam. Golf Ctrs., Inc.*,
261 B.R. 96 (Bankr. S.D.N.Y. 2001)..............................................................................44

*In re Residential Cap., LLC*,
501 B.R. 549 (Bankr. S.D.N.Y. 2013).............................................................................37

*Ricotta v. Burns Coal & Building Supply Co.*,
264 F.2d 749 (2d Cir. 1959).............................................................................................36

*RJR Nabisco v. European Cmty.*,
579 U.S. 325 (2016)......................................................................................28

*Roxx Allison Ltd. v. Jewelers Inc.*,
385 F. Supp. 3d 377 (S.D.N.Y. 2019)............................................17, 18, 19, 20

*Sawtelle v. Farrell*,
70 F.3d 1381 (1st Cir. 1995)............................................................................14

*In re Saypol*,
31 B.R. 796 (Bankr. S.D.N.Y. 1983).................................................................40

*In re Schwinn Bicycle Co.*,
182 B.R. 514 (Bankr. N.D. Ill. 1995) ...............................................................34

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
647 B.R. 42 (Bankr. S.D.N.Y. 2022)..........................................................17, 28

*In re Simplexity, LLC*,
578 B.R. 255 (Bankr. D. Del. 2017) .................................................................37

*SmartPros, Ltd. v. Staub*,
24 A.D.3d 653 (2d Dep't 2005) ........................................................................22

*In re Smith's Home Furnishings, Inc.*,
265 F.3d 959 (9th Cir. 2001) .....................................................................34, 35

*Somnia, Inc. v. Change Healthcare Tech. Enabled Servs.*,
2021 WL 639529 (S.D.N.Y. Feb. 16, 2021).....................................................44

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
277 F. Supp. 3d 521 (S.D.N.Y. 2017)...............................................................15

*State v. Vayu, Inc.*,
39 N.Y.3d 330 (2023) ..........................................................................18, 19, 20

*Stengel v. Black*,
2003 WL 1961638 (S.D.N.Y. Apr. 25, 2003)....................................................19

*SUEZ Water N.Y., Inc. v. E.I. du Pont de Nemours & Co.*,
578 F. Supp. 3d 511 (S.D.N.Y. 2022)...............................................................23

*In re Sufolla, Inc.*,
2 F.3d 977 (9th Cir. 1993) .........................................................................33, 35

*In re Telesphere*,
229 B.R. 173 (Bankr. N.D. Ill. 1999) ...............................................................38

*In re Trappers Creek, LLC*,
2010 WL 797022 (Bankr. C.D. Ill. Mar. 5, 2010) ...................................................34

*In re Tusa-Expo Holdings, Inc.*,
811 F.3d 786 (5th Cir. 2016) ...................................................................................38

*Union Bank v. Wolas*,
502 U.S. 151 (1991)...................................................................................................1

*Universal Ent. Events, Inc. v. Classic Air Charter, Inc.*,
2016 WL 3064089 (E.D.N.Y. May 31, 2016) .........................................................19

*Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co.*,
2015 WL 4040882 (S.D.N.Y. July 2, 2015) ............................................................32

*Walden v. Fiore*,
571 U.S. 277 (2014).............................................................................................13, 17

*WesternGeco LLC v. ION Geophysical Corp.*,
585 U.S. 407 (2018).............................................................................................23, 24

*Williams v. Binance*,
96 F.4th 129 (2d Cir. 2024) ....................................................................................25

## Statutes

11 U.S.C. § 101............................................................................................................27

11 U.S.C. § 361............................................................................................................40

11 U.S.C. § 541............................................................................................................28

11 U.S.C. § 547............................................................................................... *passim*

11 U.S.C. § 550............................................................................................................34

Plaintiffs Celsius Network Limited and Celsius Network LLC ("Celsius"), respectfully submit this memorandum of law in opposition to the motion of Defendants Tether Limited, Tether Holdings Limited, Tether International Limited, and Tether Operations Limited ("Tether"), Dkt. 33 ("Mot."), to dismiss Plaintiffs' Amended Complaint, Dkt. 25 ("Compl." or "AC").

## I.      PRELIMINARY STATEMENT

In the ninety-day period prior to Celsius's bankruptcy, with the price of Bitcoin tumbling, Tether demanded, and received, a series of incremental collateral transfers in order to insulate itself from Celsius's bankruptcy—*i.e.*, to improve its position.  Upon receipt of the additional collateral—just days after Celsius froze its customers' accounts—Tether told Celsius that it "sold" the collateral, and used the proceeds from the alleged "sale" to pay itself off—just barely—in full. That is a preference: "a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate." *Union Bank v. Wolas*, 502 U.S. 151, 160-61 (1991) (quoting H.R. Rep. No. 95-595, at 177-78).

But the facts here are worse.  Tether did not sell the collateral like it told Celsius it did. Rather, Tether arranged to avail itself of the massive, subsequent appreciation of Bitcoin, which the estate, not Tether, should be entitled to.  Tether kept 7,000 Bitcoin—now valued at over $500 million—for itself.  Tether also claims to have transferred another approximately 32,500 Bitcoin— valued at over $2 billion—to a purported Tether customer in what appears to be, most charitably, a non-arm's length transfer, the economic substance of which Celsius still needs to discover.  That Tether obfuscated the nature of its supposed "sales" of Celsius's Bitcoin is not surprising given that Tether transferred the Bitcoin to itself and its supposed customer at prices substantially below fair market value.  This was a breach of the parties' contract and a breach of Tether's obligation

of good faith and fair dealing, as well as an additional manner in which Tether faired far better than Celsius's customers whose claims were valued at Petition Date Bitcoin prices.

Tether moves to dismiss on four primary bases: (1) lack of personal jurisdiction; (2) the transfers were extraterritorial; (3) Tether was oversecured on the dates of the transfers, and thus the transfers did not improve its position; and (4) under British Virgin Islands ("BVI") law, Celsius's contract and good faith and fair dealing claims do not state a claim.

Tether's arguments improperly ignore or mischaracterize well-pled allegations. For example, in asserting lack of personal jurisdiction, Tether entirely ignores allegations that the primary purpose of the Amended Token Agreement at the center of the parties' relationship was for Tether to solidify a relationship with Celsius as a vehicle to market Tether's USDT coin specifically to U.S. markets. Tether similarly ignores that its discussions (and misrepresentations) regarding the liquidation of Celsius's pledged Bitcoin were with Celsius executives and employees in the U.S. Indeed, under binding Second Circuit law, debt collection activities like those undertaken by Tether here subject creditors to personal jurisdiction in the United States.

Likewise, in arguing that the preferential transfers were extraterritorial, Tether disregards allegations that, at the time of those transfers: (a) Celsius was a U.S.-based entity; (b) senior management who approved and authorized the transfers worked in the U.S.; and (c) Celsius's interests in the collateral were owned by an entity incorporated in the U.S. and with its principal place of business in the U.S. Tether cannot dispute these allegations, so it ignores them. Moreover, because the allegations must be accepted as true, this Court need not resolve now whether chapter 5 of the Bankruptcy Code applies extraterritorially (it does).

Beyond ignoring and mischaracterizing Celsius's allegations, Tether submits over 70 pages of factual declarations to purportedly supplement the factual record. Obviously, Tether's

submission of more pages than Plaintiffs' entire Complaint is inappropriate; the affidavits should be ignored at this stage. In any event, Tether primarily uses these affidavits to try to demonstrate that Tether was an oversecured creditor on the date of the preferential transfers. But under longstanding Supreme Court precedent, even if true, that is irrelevant. Section 547(b)(5)'s hypothetical liquidation test is conducted as of the petition date (so that creditors can be considered in parity), and thus what matters is Tether's secured status on that date. Tether cannot dispute the allegations that it would have been undersecured as of the petition date (without the preferential transfers, which Tether utilized to pay itself off—just barely—in full), and thus the transfers dramatically improved Tether's position compared to how it would have fared in a Chapter 7.

Finally, Tether's arguments on Celsius's breach of contract and good faith and fair dealing claims fundamentally misstate and misapply BVI law. Tether claims that it received oral permission to liquidate its collateral prior to the expiration of the 10-hour notice window. The Amended Token Agreement, however, precludes oral modification of its terms to protect against this very scenario. Furthermore, under BVI law, when a contract gives one party discretion to act—as the Amended Token Agreement did here—it requires that party to act honestly and in good faith. Tether failed to do so when it purportedly liquidated Plaintiff's collateral, falsely representing to Celsius that it was selling the collateral in an arm's-length transaction when in reality Tether was actually transferring that collateral to itself and its insiders.

For all of the reasons set forth herein, Tether's motion to dismiss should be denied.

## II.     FACTUAL BACKGROUND[2]

### A.     Plaintiffs' Business And Reliance On Loans From Tether To Operate

---

[2]  Unless otherwise noted, all emphasis is added and all internal citations and quotation marks are omitted.

Celsius was a consumer-facing cryptocurrency company that was founded in 2017. AC ¶ 23. Like many other crypto companies, Celsius borrowed "stablecoins" to fund its day-to-day operations. AC ¶ 24. "Stablecoins" are digital tokens whose price is pegged to another asset (*e.g.*, the United States dollar or gold). AC ¶ 24. Tether controls and markets the world's most popular stablecoin, USDT. AC ¶ 25. Celsius relied on USDT to operate critical parts of its business. AC ¶ 25.

**B.      The Token Agreement**

On February 1, 2020, Plaintiff Celsius Network Limited and Defendant Tether Limited entered into a "Token Agreement" allowing Celsius to borrow USDT from Tether. AC ¶ 26. The Initial Token Agreement was signed on behalf of Celsius by its CFO, Harumi Urata-Thompson, an employee based in the United States. AC ¶ 33.

In the Initial Token Agreement, Celsius agreed to collateralize the borrowing by posting collateral to Tether in the form of cryptocurrency: Ether (ETH), Tether Gold (XAUt), Bitcoin (BTC) tokens. AC ¶ 26. Significantly, the Initial Token Agreement provided that no change or modification to the agreement would be valid unless made in writing and signed by the Parties—Celsius Network Limited and Tether Limited. AC ¶ 27.

The Initial Token Agreement was amended on January 20, 2022. AC ¶ 28. Like its predecessor, the Amended Token Agreement authorized Celsius to borrow USDT or EURT if Celsius posted collateral in the form of Ether, Tether Gold, or Bitcoin. AC ¶ 28.

Like the Initial Token Agreement, the Amended Token Agreement was negotiated between Tether's representatives and Celsius personnel located in the United States. AC ¶ 29. Many of the principal terms of the Amended Token Agreement, for example, were agreed to during an all-hands zoom meeting in December of 2021, just a few weeks before the amendment was signed. United States-based Celsius employees—such as Alex Mashinsky, Ron Deutsch, and Joseph

4

Golding-Ochsner (Celsius's lead negotiator)—were present during that meeting and negotiated with Tether's top executives, including Tether's CFO, Giancarlo Devasini, and its Chief Investment Officer, Silvano Di Stefano. AC ¶ 29.

Among the most important issues negotiated during the amendment was amount of time Tether was required to wait before it could start liquidating Celsius's pledged collateral following a demand for additional collateral. AC ¶ 30. Ultimately, the parties agreed to change the procedure by which Celsius would post additional collateral and the circumstances under which a liquidation could happen. AC ¶ 31. Unlike the Initial Token Agreement, the Amended Token Agreement required Tether to send notice of a collateral demand to Celsius if the value of Celsius's posted collateral dropped below a specified threshold. *Id*. After receiving such a notice, the Amended Token Agreement provided Celsius ten hours to satisfy the demand; accordingly, Tether had to wait ten hours before beginning any liquidation. *Id*. That was in stark contrast to the Initial Token Agreement, which entitled Tether to liquidate the collateral without such a notice period. *Id*. Celsius specifically negotiated for this 10-hour window, and regarded it as one of the "key changes in the amendment." *Id*. Specifically, the provision helped to ensure the stability of Celsius's business, and to protect Celsius's residual interest in its collateral by preventing an arbitrary and irrational liquidation like the one Tether would later purport to carry out.

The parties also extensively negotiated how Tether would deal with excess proceeds from collateral in the event of a liquidation. AC ¶ 31. The Amended Token Agreement reflects the agreement that they reached—an agreement expressly providing for and protecting Celsius's residual interest in collateral. AC ¶ 32. It was made clear that collateral pledged to secure loans under the agreement was to be held "for the benefit of" Celsius. AC ¶ 32. Moreover, the Amended

Token Agreement expressly provided that any "surplus" from an application of the collateral was to be returned to Celsius. AC ¶ 32.

By the start of April of 2022, Celsius had $512,330,000 in outstanding borrowings in USDT pursuant to the Amended Token Agreement, and Celsius had posted 16,505.17 Bitcoin to Tether as collateral to secure the outstanding borrowing. AC ¶ 35. Transactions under the Amended Token Agreement were all overseen by Celsius executives located in the United States, and were at times initiated and executed by Celsius employees based in the United States. *Id*.

**C.      The Preferential Top-Up And Cross-Collateralization Transfers**

Beginning at around the same time—April 2022—Bitcoin's price began a violent downward slide. AC ¶ 37. As Bitcoin's price started to fall, Tether became concerned that it, like all other creditors, would be exposed to Celsius's insolvency. AC ¶ 39. In response, Tether initiated a series of demands under the Amended Token Agreement to improve its collateral position on the antecedent debt owed to it by Celsius. AC ¶ 39. In each case, Celsius responded to these demands by promptly depositing additional collateral with Tether. AC ¶ 39. Between May 3 and June 12, 2022, Celsius made seven Preferential Top-Up Transfers totaling approximately 16,737.27 Bitcoin. AC ¶¶ 49-55. The Bitcoin transferred from Celsius to Tether pursuant to the Preferential Top-Up Transfers was not held in segregated wallets or accounts, and was commingled with the Bitcoin that Celsius had already transferred to Tether prior to the preference period. AC ¶ 56. These transfers were not made in connection with contemporaneous extensions of new USDT loans to Celsius. AC ¶ 56.

In addition to the Preferential Top-Up Transfers, Celsius borrowed additional USDT from Tether on three occasions during the preference period, borrowing a total of 300,000,000 USD and posting a total of 10,700.00 new Bitcoin. AC ¶ 57. This Bitcoin was commingled with Celsius's previous collateral postings and cross-collateralized Celsius's existing loan from Tether. AC ¶ 48.

6

Of this 10,700.00 new Bitcoin posted by Celsius, approximately 2,228.01 was excess collateral. AC ¶ 57. Celsius's transfer of this excess—approximately 2,228.01 Bitcoin—to Tether was, like the Preferential Top-Up Transfers, preferential and are subject to avoidance. AC ¶ 48.

These transfers dramatically improved Tether's position as a creditor—had it not received them, it would not have been able to come close to making itself whole on its loan. *See* AC ¶ 58. Celsius is presumed to be, and in fact was, insolvent at the time of each of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers. AC ¶ 59.

### D. The Improper Application of Collateral

By June 2022, Bitcoin's dropping price had led to a dire situation for Celsius. AC ¶ 64. Celsius's customers began withdrawing deposits from Celsius at increasingly fast rates, putting it under immense financial distress. AC ¶ 64. Things became so bad for Celsius that on June 12, 2022, Celsius publicly announced that it was "pausing all withdrawals . . . [and] transfers between accounts." AC ¶ 64. This "pause" was never lifted before Celsius's bankruptcy filing, and, as a result, Celsius customers were never able to withdraw their assets. AC ¶ 64.

Tether, of course, knew of Celsius's vulnerable position—news of Celsius's "pause" was well known in the cryptocurrency market. AC ¶ 65. Moreover, on June 12, 2022, Celsius's CEO Alex Mashinsky reached out to Tether's CFO Giancarlo Devasini, asking for Tether's "help squeezing [Celsius] short sellers." AC ¶ 65. In the words of Rod Bolger—who served as Celsius's CFO at the time—Celsius was "desperate" for Tether's help. Mashinsky and Devasini agreed to talk at nine in the morning on Monday, June 13, 2022. AC ¶ 65.

But Tether had no interest in helping, and instead was solely focused on improving its own position. AC ¶ 66. With the benefit of having received the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether embarked on a plan to first ask for additional collateral, and then apply Celsius's pledged collateral to Celsius's entire outstanding loan balance.

AC ¶¶ 67-68.  This would ensure that Tether would extinguish its entire exposure to Celsius, at a time when other creditors (*e.g.*, customers) could not get access to any of their deposits.  AC ¶ 68.

Tether set its plan in motion late at night (Eastern time) on June 12, 2022, when it issued a collateral demand to Celsius.  AC ¶ 70.  As noted above, Celsius satisfied that collateral demand promptly, transferring 3,041.73 Bitcoin to Tether early in the morning of June 13.  AC ¶ 70. Several hours later, Tether made a second collateral demand to Celsius.  Celsius notified Tether that it was "working on preparing the BTC [Bitcoin]" to satisfy the collateral demand, and reminded Tether that it had ten hours to do so under the Amended Token Agreement.  AC ¶ 70. However, Tether's representatives demanded immediate payment notwithstanding expressly acknowledging that Celsius ***"have 10h in the [Agreement]...*"  AC ¶ 70.

Celsius continued to assure Tether that it was working on providing collateral as soon as possible.  AC ¶ 71.  But Tether decided to proceed with an immediate application of Celsius's pledged collateral anyway—regardless of the terms of the Amended Token Agreement, which required a 10-hour waiting period before Tether could initiate the application process.  AC ¶ 71. Amidst the chaos of June 13, 2022, Mashinsky, sitting in the U.S., allegedly gave Tether permission to liquidate the collateral in an "orderly" manner.  *Id*.  However, Tether never obtained a written agreement from Mashinsky (or anyone else) to amend the contractual waiting period.  *Id*.

Indeed, Celsius was never provided the full 10-hour period.  AC ¶ 72.  With more than half of Celsius's ten-hour period to post additional collateral remaining, Tether purported to begin a fire sale of Celsius's pledged collateral.  *Id*.  Tether performed this "fire sale" by purportedly selling Celsius's Bitcoin in tranches over several hours.  *Id*.  Within hours, all of Celsius's pledged collateral (39,542.42 Bitcoin) had been applied by Tether against Celsius's indebtedness—the "Preferential Application Transfer".  *Id*.

Tether represented to Celsius that it applied the entirety of the collateral, 39,542.42 Bitcoin, at a dollar value of $816,822,948. AC ¶ 78. Conveniently, Celsius's outstanding loan balance under the Amended Token Agreement was $812,333,000. *Id*. Without the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether would have had only 21,656.20 Bitcoin in collateral. *Id*. At the average price that Tether claims to have applied the 39,542.42 Bitcoin, Tether would have suffered a $364,980,517.43 deficiency. *Id*. The Preferential Top-Up, Cross-Collateralization, and Application Transfers clearly improved Tether's position as of the application date (and as of the Petition Date). *Id*.

Tether stripped Celsius of its 10-hour window to satisfy collateral demands. AC ¶ 79. At the time of Tether's last collateral demand on June 13, 2022, Celsius had sufficient Bitcoin on its balance sheet to post as collateral to Tether, including for, at least, the next 30 days. *Id*. This was especially true given that Celsius had instituted a "pause" on customer withdrawals, which Tether was well aware of, resulting in the retention of, and access to, a significant amount of Bitcoin. *Id*. If Celsius's contractual rights had been respected, it would have been able to avoid the disposition of its Bitcoin at near the bottom of the cryptocurrency market. *Id*. Instead, that disposition was carried out for the benefit of just one creditor: Tether. *Id*.

Tether applied the Bitcoin at an average price of $20,656.88—considerably less than Bitcoin's market closing price on June 13th, $22,487.39. AC ¶ 80. In fact, Tether applied Bitcoin at an average price considerably below Bitcoin's *low* price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent company. *Id*.

**E.      Tether's Secret Retention of Collateral**

Tether purported to liquidate Celsius's Bitcoin on June 13, 2022. At around 8:30 AM, Tether told Celsius it would "*liquidate* all [the] collateral to repay the USDT loan" in tranches "of

2k bitcoin at [a] time." AC ¶ 74. Tether claimed that the sale would be accomplished through its OTC desk, which would be responsible for obtaining a price for each tranche. AC ¶ 74.

Over the next two and a half hours, Tether claimed that it was proceeding with legitimate, arm's length sales of the Bitcoin through its OTC desk. AC ¶ 75. Tether presented supposed "quotes" received from the OTC desk for the sale of each tranche of Bitcoin. *Id*. Tether's "quotes" steadily decreased, dropping from $23,400, to $22,600, to $22,500, to $22,100, and so on—all the way down to $19,400. *Id*. The final purported sale was 20,542.44 Bitcoin at a price of $19,400. *Id*. Tether's representative stated that he did not think that the OTC desk would be "willing to do it," and that he would "need to contact the other counterparty." AC ¶ 76. After supposedly checking with the "counterparty", Tether offered to make the sale at a price of $19,400—more than $3,000 *lower* than the market price of Bitcoin on June 13 of $22,487.39—as long as Celsius was "quick." *Id*. The purported "liquidation" was over by 11:00 AM. *Id*.

Throughout it all, Tether pressed to liquidate as quickly as possible. AC ¶ 77. Tether repeatedly blamed poor market conditions for the low sale price of Celsius's Bitcoin, claiming, for example, that the market was "getting thinner," and that the prices were "getting ugly." *Id*. When Celsius asked for an accounting of how much balance was left on the loan, Tether refused to provide one until the entire collateral was supposedly liquidated. *Id*. In fact, despite repeated requests by Celsius, Tether declined to provide any accounting of the alleged "sale" proceeds until the next day, June 14. *Id*. When Tether did finally provide that accounting, it represented that "all the trades executed to *sell* [Celsius's] collateral for a total proceed of $816,822,948.00." *Id*.

In sum, Tether represented that it had "liquidated" the Bitcoin by selling it in tranches to legitimate, arm's length counterparties through its OTC desk at the current market price. Those representations were false, or, at a minimum, seriously misleading. AC ¶¶ 83-84.

Tether did not transfer any Bitcoin out of the Celsius Collateral Deposit Wallet until the next day—July 14, 2022. AC ¶¶ 83-84. Then, Tether transferred 7,000 Bitcoin to a new wallet which, on information and belief, is controlled by Bitfinex—Tether's affiliate. AC ¶¶ 83-84.

As of July 15, 2022—two days after Tether's purported liquidation—Tether still held 32,542.42 of Celsius' Bitcoin in the Celsius Collateral Deposit Wallet, representing approximately 82% of the Bitcoins preferentially transferred to Tether in the Preferential Application Transfer. AC ¶¶ 83-84. Tether then, after allegedly "liquidating" the collateral, transferred the entirety of this Bitcoin (32,542.42) from the Celsius Collateral Deposit Wallet into an empty, "cold" wallet with no transaction history. This second, empty wallet was also controlled either by Tether or Bitfinex. AC ¶¶ 83-84.

From July 15, 2022 to March 16, 2023, Tether held 32,542.42 of the Bitcoin in the Tether cold wallet. AC ¶¶ 83-84. There were no transfers out. *Id*. Between November 16, 2022 and March 16, 2023, approximately 14,000 Bitcoin was transferred into the Tether cold wallet from other wallets controlled by Bitfinex and associated with the Bitfinex exchange. *Id*.

Bitcoin appreciated substantially from July 15, 2022 to March 16, 2023. AC ¶ 85. The 32,542.42 Bitcoin held in the Tether cold wallet substantially increased in value. *Id*. Tether realized this appreciation only as a result of its receipt of preferential and fraudulent transfers of Celsius's property, its sham "liquidation," and its secret retention of Celsius's assets. *Id*.

### III.    LEGAL STANDARD

"[O]n a motion to dismiss pursuant to Rule 12(b)(6), the court must assume all facts alleged within the four corners of the complaint to be true, and draw all reasonable inferences in plaintiff's favor." *McDermott v. This Dog's Life Corp.*, 730 F. Supp. 3d 73, 75 n.1 (S.D.N.Y. 2024). "It is improper for the Court to consider extrinsic evidence attached to a motion to dismiss without

converting the motion" to one for summary judgment. *Benjamin v. Consol. Edison Co. of N.Y.*, 2018 WL 1406620, at *2 (S.D.N.Y. Mar. 20, 2018).

While affidavits and declarations can be used on a Rule 12(b)(2) motion contesting personal jurisdiction, "[w]hen the issue of personal jurisdiction is addressed, as it is here, on affidavits or declarations, 'all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party.'" *In re Hellas Telecom. (Lux.) II SCA*, 547 B.R. 80, 95-96 (Bankr. S.D.N.Y. 2016) (Glenn, J.). This Court should disregard the declarations attached to Tether's motion for any purpose other than personal jurisdiction.

## IV.     ARGUMENT

### A.     This Court Has Personal Jurisdiction Over All Defendants

The Complaint alleges a *prima facie* case of personal jurisdiction over each Defendant. To decide whether the exercise of jurisdiction is proper, the Court is to "ask whether the defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction." *BMW of N. Am. LLC v. M/V Courage*, 254 F. Supp. 3d 591, 599 (S.D.N.Y. 2017). The inquiry into the "totality of the circumstances" is to determine whether "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013). Here, the operative question is whether Tether had "minimum contacts with the United States as a whole." *In re Aramid Ent. Fund Ltd.*, 664 B.R. 9, 47 (Bankr. S.D.N.Y. 2024). Those standards are easily met here.

### 1. Tether's Scheme To Exploit The U.S. Crypto Market Justifies Jurisdiction.

A defendant that determines to deliberately "exploit[] a market in the forum state" is subject to jurisdiction there. *Okla. Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico), S.A.*, 92 F.4th 450, 456 (2d Cir. 2024); *Walden v. Fiore*, 571 U.S. 277, 285 (2014). In this case, the "fundamental purpose" of Celsius and Tether's Agreement was to "exploit[] the United States market"—more specifically, to "allow[] [Tether] to profit handsomely" by supplying Celsius and Tether's U.S. clients with Tether's stablecoin, USDT. AC ¶¶ 29-31, 41, 44. Although not required to, the Complaint supports those factual allegations with specific evidence: Celsius and Tether's communications, for example, show that Tether tried to lower the "borrow rates" charged to Celsius under the Agreement to further its purpose of "push[ing] [USDT] harder" to U.S. customers. *See id.* ¶¶ 30-31. This alone establishes jurisdiction. *See, e.g., Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, 2018 WL 5118638, at *4 (S.D.N.Y. Oct. 22, 2018) (single transaction made as "part of a larger business plan" to earn profits from "consumers" in the forum sufficient for jurisdiction); *EMI Christian Music Grp. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016) (jurisdiction proper when Defendant was "aware … that his company provided services to New York customers").

Tether mischaracterizes these allegations, pretending that they concern only a "broader relationship" between the parties, unrelated to the claims here. *See* Mot. 17. But the complaint explicitly pleads that the "fundamental purpose ***of the Amended Token Agreement***"—the specific contract at issue—"was to allow Tether to avail itself of the United States market." AC ¶ 44. Indeed, Tether admits that the Agreement "gave rise to" all of Celsius's claims. *See* Mot. 4. Thus, Celsius's claims directly arise out of Tether's deliberate choice to exploit the U.S. market through the Amended Token Agreement.

Tether is wrong on the law in any event. Personal jurisdiction does ***not*** require that the defendant's contacts "directly give[] rise to the plaintiff's cause of action"—only that the suit "relate to" the defendant's forum contacts. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002); *accord Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (similar); *but see* Mot. 17 (arguing that claims must "directly arise" from contacts). "[R]elatedness" is "a flexible, relaxed standard" that requires only a logical relationship—some "demonstrable nexus"—between the claim and the "defendant's forum contacts." *Knox v. MetalForming, Inc.*, 914 F.3d 685, 690-91 (1st Cir. 2019).[3] So, for example, a claim for injuries suffered while riding in a Ford car in Minnesota is sufficiently "relate[d] to" Ford's marketing and sale of *other* Ford cars in Minnesota—even though without Ford's Minnesota contacts "the plaintiffs' claims would be just the same." *Ford*, 592 U.S. at 365-67.

The Complaint clears that bar, pleading that the Amended Token Agreement at the heart of this case was "the centerpiece of [a] broader relationship" aimed at "exploiting the United States [cryptocurrency] market." AC ¶¶ 31-41. The Agreement's purpose was to "allow both parties to profit from Celsius supplying USDT" (and, eventually, "other Tether products") to the U.S. market "on behalf of Tether." *Id.* ¶ 41. The parties used the Agreement to accomplish that goal: Tether would lend "its cryptocurrency token, USDT" to Celsius, thereby allowing it to provide that USDT "to Celsius and Tether's customers in the United States"; in exchange Celsius would provide those "customers' BTC" as collateral to Tether. *Id.* ¶¶ 31-32. Allegations that defendants "committed

---

[3]  Unsurprisingly, Tether's cited cases, Mot. 17, long predate the Supreme Court's clarification that personal jurisdiction does not demand "a strict causal relationship between the defendant's in-state activity and the litigation"—only a sufficient "affiliation between the forum and the underlying controversy." *Compare Ford*, 592 U.S. at 361-62, *with, e.g.*, *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995) (requiring claim to "directly arise out of the [defendant's] specific contacts" with the forum).

14

… wrongful conduct abroad in part to profit from their activities" in the United States demonstrate "a substantial connection between the forum and the harm." *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 594 (S.D.N.Y. 2017). That is enough to show that the suit "arise[s] out of or relate[s] to the defendant's contacts with the forum." *See In re Fairfield Sentry Ltd.*, 657 B.R. 1, 21 (Bankr. S.D.N.Y. 2024).[4]

Tether also emphasizes various formal aspects of the parties' written contract, such as that the relevant Celsius party is a UK entity, Mot. 15-17, and that the contract does not require that it be performed in the U.S., Mot. 18-19. But, "for personal jurisdiction" analysis, courts "look through form to substance." *Oklahoma Firefighters*, 92 F.4th at 456-57. Accordingly, the Supreme Court "long ago rejected" such "mechanical tests"—rather, personal jurisdiction turns on a "highly realistic" evaluation of the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478-79 (1985). Tether and Celsius intended joint action to profit from the United States. In so doing, they purposefully availed themselves of the privilege of doing business here—regardless of the precise form of their dealings. *See Benitez-Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 30 (1st Cir. 1988) (Breyer, J.) ("[I]f *International Shoe* stands for anything, however, it is that a truly interstate business may not shield itself from suit by a careful but formalistic structuring of its business dealings.").

---

[4] The Complaint's allegations about Celsius and Tether's broader relationship are likewise relevant. Tether leveraged its multi-faceted relationship with Celsius to "insulate itself from the impact of Celsius's impending bankruptcy" while its other creditors remained exposed. *See* Compl. ¶¶ 66-69. Tether was able to carry out that scheme to advantage itself over Celsius's other creditors only because of its intimate knowledge of Celsius's U.S. operations—including, for example, the fact it knew Celsius was "desperate" for help in the hours before the liquidation. *See id.* ¶¶ 64-65. Tether cannot claim the parties' close relationship is unrelated to this case when it weaponized that relationship to keep Celsius's pledged collateral for itself, thereby using it "as an instrument to achieve the very wrong alleged." *Licci*, 732 F.3d at 171; *see* Compl. ¶¶ 64-69.

Moreover, communications exchanged in July 2020—around the time Celsius and Tether negotiated the Initial Token Agreement—establish that the primary objective of their relationship was to make money from providing cryptocurrency in the United States. Silvano di Stefano, Tether's Chief Investment Officer, "told Alex Mashinsky that Tether 'want[s] [Celsius] to service all their US clients.'" AC ¶ 30.[5] Just two days later, Mashinsky was planning to "intro[duce] [Tether] to his top 5 US customers," and for "Bitfinex to provide [a] buy/sell order book to allow US clients to trade." *Id.*[6] Those same communications link the parties broader goal of profiting from the U.S. with the specific lending relationship at issue here: as noted, Tether took steps to "lower borrow rates for USDT so [Celsius] [could] push it harder" to the parties' U.S. clients. *Id.* ¶ 31. All of this evidence gives substance to Celsius's broader point that Tether planned, through the Amended Token Agreement, to exploit the U.S. market; moreover, it strongly suggests that discovery will reveal additional links between Tether and the United States.

Tether's deliberate exploitation of the U.S. market cannot be dismissed as Celsius's "unilateral activity." *Cf.* Mot. 18-19. As explained above, the parties' contract facilitated their

---

[5]  Tether argues its clear plans to build a business relationship with Celsius's "top 5 US clients" in July 2020 do not relate to this case because the relevant preferential transfers occurred "years later," Mot. 18, (that is, less than two years later, in April 2022). But jurisdictional contacts do not have an twenty-month shelf life: "there is no set time period for which [a defendant's] contacts with the forum can be used to support" personal jurisdiction. *CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 384 (S.D.N.Y. 2019) (collecting cases). "[T]he time period is irrelevant"; contacts that logically relate to the plaintiff's case should be considered, even if they "pre-date the conduct that forms the basis of the cause of action." *Id.*

[6]  Tether suggests that this contact should not count because Bitfinex ("a third party") was involved in this plan. *See* Mot. 18. But the Complaint's allegations, and the underlying evidence, reflect discussions between Celsius and Tether to "allow US clients to trade." That is plainly relevant to establishing the parties' plan to profit from the U.S. market, regardless of whether Bitfinex was also involved. In any event, Tether's self-serving claim (from its own in-house counsel, no less) that it had nothing to do with the proposed transaction—a transaction that Mashinsky discussed with Tether's Chief Investment Officer—cannot be credited in light of the clearly contrary facts pled in the Complaint. *Cf.* Sanz Decl. ¶¶ 6-7.

16

*joint* plan to profit from the promotion and sale of Tether's U.S.-dollar denominated cryptocurrency token, USDT, in the U.S. market.[7] Tether repeatedly invokes *Walden*, *e.g.*, Mot. 2, 13, 15, 20, 24, but ignores its admonition that "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff." *Walden*, 571 U.S. at 286. Tether sought to profit from the U.S. market, and so, through its agreement with Celsius, availed itself of the privilege of doing business here. As such, Tether's "contacts with New York are not random, isolated, or fortuitous"—rather, they establish that Tether "purposefully directed [its] wrongdoings" at Celsius in the United States. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 647 B.R. 42, 58-59 (Bankr. S.D.N.Y. 2022) (defendant subject to jurisdiction when it took actions abroad with the intent of profiting from investments in New York); *see also, e.g.*, *Kalaj v. Kay*, 2023 WL 4564795, at *3 (E.D.N.Y. July 17, 2023) ("Even where a party has no offices in New York, conducted no meetings with the plaintiff here, and its agents purportedly have not visited the State, that party's transaction may have a 'center of gravity' in New York.").[8]

---

[7] Venturing far outside the pleadings, Tether submits another self-serving affidavit from a different in-house lawyer to support Tether's claim that it did not know Celsius would take action within the United States. *See* Mot. 21 (citing Hilliard Decl. ¶ 20, Ex. H). But the Complaint's well-pleaded allegations say just the opposite: Tether "knew that its real counterparties under the Agreement were based in the United States." Compl. ¶ 43; *see also, e.g.*, *id.* ¶¶ 30-31, 34, 37, 41-44, 48. "Because all factual disputes are resolved in the plaintiff's favor at this early stage," this Court should presume, as alleged in the Complaint, that Tether knew that Celsius was based in, and would make transfers from, the United States. *Roxx Allison Ltd. v. Jewelers Inc.*, 385 F. Supp. 3d 377, 382 (S.D.N.Y. 2019).

[8] "Because the New York long-arm statute is more restrictive than the federal due process requirements" for personal jurisdiction, cases sustaining jurisdiction under the long-arm statute are instructive here: "by virtue of satisfying the long-arm statute the minimum contacts and reasonableness requirements of due process have similarly been met." *Chatwal Hotels & Resorts LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 108 (S.D.N.Y. 2015).

### 2. The Parties' Agreement And Course Of Dealing Independently Establish Jurisdiction

Jurisdiction is also proper on a second, independent ground: Tether's extensive contact with the United States in the context of its contractual relationship with Celsius. To negotiate and perform the Initial and Amended Token Agreements, Tether projected itself into the United States. For years, the parties' principals engaged in near-constant contact to carry out a joint arrangement to profit from the U.S. cryptocurrency market. As part of that relationship, Tether routinely sent communications to Celsius in the United States—including the collateral demands that prompted the preferential transfers Celsius seeks to avoid.

Many of these contacts are independently sufficient to establish jurisdiction; taken together, they make jurisdiction an inescapable conclusion. Tether tries to isolate these facts, declaring that a particular contact, taken by itself, is not sufficient to establish jurisdiction. But that is error: "a court evaluating whether a defendant purposefully availed itself of" a particular forum "must look at the totality of the circumstances"—not a particular contact in isolation. *Fairfield Sentry*, 662 B.R. at 95-96. Properly considered, Tether's contractual contacts subject it to personal jurisdiction.

***Negotiation of the Token Agreement.*** "New York law is clear that a party is subject to personal jurisdiction when that party makes repeated, purposeful telephone calls"—or sends "emails"—"into the state for the purpose of transacting business." *Roxx Allison*, 385 F. Supp. 3d at 381-82; *see also, e.g.*, *State v. Vayu, Inc.*, 39 N.Y.3d 330, 334 (2023) ("[J]urisdiction is appropriately exercised over commercial actors who have … used electronic and telephonic means to project themselves into New York to conduct business transactions."). The Complaint pleads precisely that: to negotiate and perform under the Amended Token Agreement, Tether projected

itself into New York to conduct extensive negotiations—by phone, email, and other means—with Celsius's employees in the United States. AC ¶¶ 37-40.

The key terms of the Amended Token Agreement were negotiated and finalized in meetings between "Tether's top executives" and Celsius personnel located in the United States. *See id.* ¶ 37. To carry out those negotiations, Tether's principals reached into New York to transact business with Celsius. *See, e.g., id.* ¶¶ 37-40. Tether's "participat[ion] in" and "facilitat[ion]" of those negotiations by "electronic means" is sufficient to show jurisdiction. *Universal Ent. Events, Inc. v. Classic Air Charter, Inc.*, 2016 WL 3064089, at *3 (E.D.N.Y. May 31, 2016); *see also Fairfield Sentry*, 658 B.R. at 273 (regular emails with counterparty in New York "demonstrate … continuous and systematic contacts with the forum"). The negotiations were not mere incidental contacts between low-level employees: rather, the parties engaged in "active dialogue between principals based on earlier personal contact" to enter into a contract that "furthered [the parties'] shared vision." *Vayu*, 39 N.Y.3d at 335; *see* AC ¶¶ 29-31. Furthermore, the negotiations contemplated a "continuing relationship" that "spanned multiple years" and substantial transfers. *Roxx Allison*, 385 F. Supp. 3d at 381-82; *see* AC ¶¶ 29-34. That too shows "the purposeful creation of a continuing relationship," and so "confer[s] jurisdiction, even though defendants never entered New York." *Id.*; *see also, e.g., Vayu*, 39 N.Y.3d at 336 (finding jurisdiction when "meeting was part of a far reaching and long-standing relationship").[9]

---

[9] Tether argues that even "extensive negotiations" by phone, fax, or email do not support jurisdiction. Opp. 15. But the cases it cites address that question from the perspective of New York's long-arm statute—not more lenient constitutional due process standards applicable to this case. *See Stengel v. Black*, 2003 WL 1961638, at *2 (S.D.N.Y. Apr. 25, 2003); *Diversapack LLC v. Elite Staffing, Inc.*, 2012 WL 1032687, at *5 (E.D.N.Y. Mar. 20, 2012). Regardless, those interpretations of the long-arm statute have now been overruled by the Court of Appeals' decision that "electronic and telephonic" contacts with New York suffice to show jurisdiction. *See Vayu*, 39 N.Y.3d at 334.

Tether repeats its erroneous refrain that all of these contacts are nothing more than Celsius's "unilateral" activity. *See* Mot. 15. But a negotiation is a *bilateral* contact—Tether, through telephone and Zoom meetings, projected itself into the United States to meet with Celsius's representatives. A defendant need not "initiat[e] … contact with New York" to be subject to jurisdiction here. *See Vayu*, 39 N.Y.3d at 335; *Roxx Allison*, 385 F. Supp. 3d at 382. Moreover, given the parties' joint plan to profit from activity in New York, Celsius's activity "was precisely part of defendants' design," and so "not a 'unilateral' decision at all." *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 328 (2016). In any event, Tether plainly *did* initiate contact with Celsius in the United States. *See, e.g.*, AC ¶¶ 30-31. None of this was Celsius's "unilateral" activity.

Tether points out that the Agreement has connections to other jurisdictions as well—that it, for example, "chose BVI law and selected the BVI as a non-exclusive forum." Mot. 21. "But personal jurisdiction does not exist only in the 'best' forum, or the one with the closest relationship to the transaction at issue. As long ago as 1970, the New York Court of Appeals observed that 'in this day of instant long-range communications, one can engage in extensive purposeful activity here without ever actually setting foot in [New York].'" *Roxx Allison*, 385 F. Supp. 3d at 383 (quoting *Parke-Bernet Galleries, Inc. v. Franklyn*, 256 N.Y.2d 13, 17 (1970)). The Complaint alleges that is precisely what Tether did; its allegations are entitled to the presumption of truth. *See Liu Jo S.P.A. v. Jenner*, 630 F. Supp. 3d 501, 512 (S.D.N.Y. 2022) ("To determine that the agreements were not at least partially negotiated and executed in New York is to draw inferences in defendants' favor."). Those allegations conclusively make out a prima facie case of jurisdiction.

***Performance Of The Token Agreement.*** The parties' course of performance under the Agreement independently supports jurisdiction. "After entering the contract, [Tether] regularly

communicated with [Celsius] in New York through e-mails, phone calls, and online video conferences to discuss the [lending agreement]." *Golden Archer Invs., LLC v. Skynet Fin. Sys.*, 2012 WL 123989, at *5 (S.D.N.Y. Jan. 3, 2012); *see* AC ¶ 45. These communications went to "the heart of the commercial transaction between the parties"—that is, the performance of the contract that was the "centerpiece" of their relationship. *Id.*; *see* AC ¶ 41. "Therefore, [Tether] is subject to personal jurisdiction." *Id.*

In response, Tether can only contend that its deliberate outreach to Celsius in the United States resulted from the "mere fortuity" that Celsius "happene[d] to be a resident of the forum." Mot. 23. But that claim cannot withstand the Complaint's detailed allegations that the purpose of the parties' Agreement was to profit from exploiting the U.S. market. AC ¶¶ 41-44. Tether's contacts with the United States were no mere fortuity—rather, they sprang from Tether's deliberate effort to "promote" its products in the United States market, and "profit[] substantially therefrom." *See Bank Brussels Lambert*, 305 F.3d at 128-29. Or, as Tether's own case puts it, when (as here) the plaintiff's United States presence is "strategically advantageous to the defendant[s]," that strongly "suggest[s] that the defendant[s] … purposefully availed" themselves of the forum. *See Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 501-52 (5th Cir. 2022).

***Tether's Demands For Collateral.*** Throughout the parties' relationship, Tether regularly directed demands for additional collateral to Celsius representatives that it knew were located in the United States. *See* AC ¶¶ 43, 48. Those deliberate contacts with individuals in the United States—attempts to collect on the antecedent debt Celsius owed Tether—likewise established personal jurisdiction. "Even minimal active efforts to collect debts" in the forum, "such as mailing a debt collection letter or contacting a debtor by phone," "can be sufficient to establish personal jurisdiction." *CFPB v. NDG Fin. Corp.*, 2016 WL 7188792, at *7 (S.D.N.Y. Dec. 2, 2016); *Eades*

*v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) ("mailing one debt collection notice to [plaintiff], engaging in one debt collection phone call with [plaintiff who was in New York], and mailing a summons and complaint to [plaintiffs in New York]" was sufficient to "establish personal jurisdiction"). Tether did far more than that, sending at least seven debt collection notices over the course of several months. *See* AC ¶¶ 48-55. "In each case, Celsius responded to these demands by promptly depositing additional collateral with Tether." *Id.* ¶ 48. And it would be difficult to conceive of a fact more closely related to Celsius's claims—here, each payment made pursuant to Tether's demands is directly challenged as a preferential transfer. *See id.* ¶¶ 88-95. That is enough to show jurisdiction by itself. *See, e.g.*, *McQueen v. Huddleston*, 17 F. Supp. 3d 248, 252 (W.D.N.Y. 2014) (finding personal jurisdiction where defendant "sen[t] a collection letter into the state" and made "at least two telephone calls to plaintiff and le[ft] voicemails related to his debt collection efforts"); *NDG Fin. Corp.*, 2016 WL 7188792, at *7 (similar).

Finally, the transfers made in response to Tether's demands were likewise closely connected to the United States. The Complaint pleads that those transfers "were at times initiated and executed by Celsius employees based in the United States," and "often made from United States-based accounts." AC ¶ 45. It also indicates that the specific preferential transfers at issue here were each "overseen and approved by Celsius CEO Alex Mashinsky" from "Hoboken, New Jersey." *Id.* ¶ 63. These allegations support jurisdiction too. *See, e.g.*, *SmartPros, Ltd. v. Staub*, 24 A.D.3d 653, 654 (2d Dep't 2005) (finding jurisdiction where "defendant was paid from the plaintiff's New York accounts").[10]

---

[10] Tether objects that these allegations are too vague, demanding that Celsius specify the precise "dates," "dollar amounts," "senders," and "recipients" of the transactions at issue. Mot. 18-20. A near-identical objection was raised in *SUEZ Water*, where the defendants challenged allegations that they "continuously sold raw PFAS" to "industrial manufacturers" as too vague to support

22

**B.** **The Complaint Alleges Domestic Transfers That The Trustee Is Entitled To Avoid**

Tether's motion argues that Plaintiffs' avoidance claims should be dismissed on the grounds of extraterritoriality. Mot. 31-36. That argument fails for two independent reasons. First, the transfers at issue here were "domestic" in nature, and so raise no extraterritoriality concerns. *See In re Picard*, 917 F.3d 85, 95 (2d Cir. 2019). Second, Congress has "indicat[ed]" that the relevant provisions of the bankruptcy code have "extraterritorial reach." *See id.* Tether had to refute both points for its argument to succeed; it can refute neither.

**1.** **Celsius's Avoidance Claims Are Predicated On Domestic Transfers To Tether**

**(a)** *The Top-Up And Cross-Collateralization Transfers Were Domestic Transfers Of Property*

Plaintiffs' avoidance claims challenge domestic transfers of property, and so do not involve any extraterritorial application of federal law. To decide whether a claim is foreign or domestic, courts analyze "the conduct relevant to the statute's focus." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413-14 (2018). "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application of the statute, even if other conduct occurred abroad." *Id.* at 414. Here—as Tether concedes (Mot. 34)—the relevant conduct is Celsius's conduct, *i.e.*, the "fraudulent [or preferential] transfer of property." *In re Picard*, 917

---

jurisdiction because they failed to "point to a single discrete transaction" or a "specific sale." *SUEZ Water N.Y., Inc. v. E.I. du Pont de Nemours & Co.*, 578 F. Supp. 3d 511, 532-33 & n.5 (S.D.N.Y. 2022). The court squarely rejected that argument, and found jurisdiction: "such specifics are [not] required" at the motion-to-dismiss stage. *Id.* at 533 n.5. Regardless, Celsius has pled the dates, amounts, sender, and recipient of every preferential transfer alleged in the complaint. *See* AC ¶¶ 46-63; 72.

F.3d at 99.[11]  Those transfers were plainly domestic: among many other things, the Complaint pleads that they were "made from United States-based accounts," AC ¶ 45, involved the property of a U.S.-based debtor, *id.* ¶ 35, were initiated, overseen, and executed by people in the United States, *id.* ¶¶ 43, 48, 63, and involved property that was located in the United States.  *See* Webster Decl. ¶¶ 74-76.  That is more than enough to "make it plausible" that the transfers occurred in the United States, "which is all that is required at this stage of the litigation."  *Myun-Uk Choi v. Tower Rsch. Cap., LLC*, 890 F.3d 60, 68 (2d Cir. 2018); *see, e.g.*, *Picard*, 917 F.3d at 99-100 (transfers were clearly domestic when made by a "domestic debtor" and "from the United States"); *Bascunan v. Elsaca*, 927 F.3d 108, 118 (2d Cir. 2019) (transfer of estate's funds from account in New York was domestic application of bank fraud statute).

Tether admits that the Complaint explicitly alleges a "nexus" to the United States by pleading that the transfers "were made from United States-based accounts."  Opp. 34 (quoting AC ¶ 45).  Tether tries to wish away this paragraph, Opp. 34-35, but a statement that a transfer was made from an account in the United States is a factual allegation entitled to the presumption of truth—not a legalzw conclusion.  *See, e.g.*, *Picard*, 917 F.3d at 100 (finding a domestic application because "Trustee allege[d] [debtor] fraudulently transferred property to the feeder funds from a U.S. bank account").[12]  Furthermore, Tether's contention that the "accounts" in question were not

---

[11]  This is not, as Tether suggests, a wooden, two-factor test.  *Cf.* Mot. 34.  The *Picard* court easily concluded that the transfers at issue there were domestic because—like the transfers here—they were both made by a "domestic debtor" and "from the United States."  *See Picard*, 917 F.3d at 99-100; *id.* at 99 n.9 (declining to decide whether "either" would be sufficient "alone").  There is no "numerosity requirement[] for activity to be considered sufficiently domestic for purposes of extraterritoriality," and accordingly even one nexus with the United States will suffice.  *In re Arcapita Bank*, 575 B.R. 229, 248 (Bankr. S.D.N.Y. 2017), *aff'd*, 640 B.R. 604 (S.D.N.Y. 2022).

[12]  Tether misreads *Norex Petroleum*, which was not discussing the level of detail a plaintiff must include in their complaint to properly allege that transfer took place in the United States.  *Norex* instead lays out only the basic principle that alleging "*some* domestic activity" is not sufficient;

"*bank* accounts," but instead cryptocurrency wallets holding "intangible BTC," Opp. 35, is beside the point. A transaction involving cryptocurrency connected to a U.S-based person or entity can be a domestic transaction just the same as a transfer of money from a U.S. bank account. *See, e.g.*, *Williams v. Binance*, 96 F.4th 129, 138-39 (2d Cir. 2024) (cryptocurrency transactions made by persons residing in the United States were domestic). And, contrary to Tether's claims, Celsius's cryptocurrency was located in the United States. *See* Webster Decl. ¶¶ 74-76.

In any event, the Complaint contains specific facts showing that the relevant transfers took place in the United States. The transfers themselves were "initiated," "executed," "overseen," and "approved" by Celsius employees and executives in the United States. *See* AC ¶¶ 43, 45, 48, 63. Those transfers involved constant communication between Tether and Celsius's representatives in the United States, and Tether directed its collateral demands to Celsius employees it knew to be located in the United States. *See, e.g.*, AC ¶¶ 48; 73; 81. These facts similarly support the conclusion that this is a domestic application of the statute. *See, e.g.*, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 157 (2d Cir. 2017) (transaction took place in D.C. where "emails were opened in D.C." and party sent "after-sale confirmations" to counterparty's "traders … in D.C."); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 480 B.R. 501, 524-25 (Bankr. S.D.N.Y. 2012) (transfers were "domestic because the depletion of the [] estate occurred in the United States" and the business "was operated in the United States").

Tether claims that "the transferor (CNL) is not a domestic entity." Opp. 34. But at the time of the transfer, *all* of Celsius's entities were functionally based in the United States, with the

---

rather, the "*conduct relevant to the statute's focus*" must have been domestic. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010); *see Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 33 (2d Cir. 2010) (quoting this portion of *Morrison*). As discussed above, that standard is easily met here.

company's senior management working from Celsius's offices in Hoboken, New Jersey. AC ¶¶ 34-35, 37, 63. Tether ignores the Complaint's allegations that Celsius was a United States-based company at the time of the transfers, having migrated main business operations, headquarters, and customer relationships from the U.K. to the United States several months after the Amended Token Agreement was signed. AC ¶ 35. Most fundamentally, Tether's claimed distinction cannot be reconciled with the fact that Celsius's executives viewed its cryptocurrency holdings "on a consolidated basis," without regard to any purported "corporate distinction" between the U.K. and U.S." entities. *See* Dkt. 1956 [Main Case] (Examiner's Report) at 365-66. The preferential transfers at issue here were made by a domestic debtor. *See, e.g.*, *In re Maxus Energy Corp.*, 641 B.R. 467, 559-62 & n.359 (Bankr. D. Del. 2022) (transfers were made by "domestic debtor" when "domestic entity" was their "former owner").

### (b) *The Application Transfer Was A Domestic Transfer Of A Property Interest From Celsius*

The Application Transfer was also a domestic transaction. As described in detail in the Amended Complaint, the Application Transfer refers to Tether's claimed liquidation of Celsius's BTC to pay itself ahead of other creditors, at a time when Tether was undersecured.[13] AC ¶¶ 68, 71. Contrary to Tether's arguments, this transfer was initiated from the United States.

As alleged, the Application Transfer was carried out through conversations between Tether personnel and Celsius personnel that were located in (or overseen by personnel located in) the United States. AC ¶¶ 70-72, 81. While Celsius disputes that CEO Alex Mashinsky had the authority to orally modify the Amended Token Agreement, or that Mashinsky gave Tether

---

[13] Tether does not dispute that it would have been undersecured at the time of the Application Transfer without the benefit of the other avoidable transfers (*i.e.,* the Top-Up Transfers and the Cross-Collateralization Transfers).

permission to conduct a fire sale of Celsius's pledged collateral (as opposed to conducting an "orderly liquidation" of Tether's collateral), there is no debate that the Application Transfer arose out of discussions between Tether and United States-based Celsius personnel. Mot. 9. And of course any interest held by Celsius in the collateral just prior to the Application Transfer was held by Celsius' United States-based entity.[14] *See* AC ¶¶ 6, 35. Thus, the Application Transfer was a transfer of a U.S.-based entity's property interest from the United States, and so was "domestic."

Tether incorrectly implies that the Application Transfer refers to Tether's subsequent internal transfers of Celsius's pledged collateral, which it argues "did not touch the United States." Mot. 35. This is a red herring: "§ 550(a) focuses on the debtor's initial transfer of property [such that] a domestic debtor's allegedly fraudulent, hindersome, or delay-causing transfer of property from the United States is domestic activity for the purposes of §§ 548(a)(1)(A) and 550(a)." *Picard*, 917 F.3d at 98-99. Accordingly, Tether's internal, subsequent transfers of Celsius's pledged collateral is irrelevant to the extraterritoriality analysis.

### 2.    The Code's Avoidance Provisions Apply Extraterritorially

Even if Celsius's avoidable transfers were extraterritorial, dismissal would not be warranted because the Bankruptcy Code's avoidance provisions apply extraterritorially. Tether's contrary arguments are belied by a wide range of authority, including Judge Gerber's opinion in *Lyondell* and *In re French*—the only Circuit Court decision on the issue. This Court should reject

---

[14]    After Celsius migrated its business to the United States, Celsius Network LLC "accepted and assumed substantially all assets and liabilities related to transactions on the Celsius app." *See* Dkt. 1956 [Main Case] (Examiner's Report) at 364. Celsius Network LLC thereafter accounted for the cryptocurrency deployed by CNL to Tether as a large intercompany "demand loan." *See id.* at 364-65 (observing that after migrating the business to the U.S., Celsius Network LLC "*lent*—or more accurately, permitted [CNL] to retain—billions of dollars of customer-related assets that were being deployed on exchanges or for institutional lending.")

Tether's "non-binding and non-persuasive" cases, Mot. 32, and recognize that Congress intended for the Code's avoidance provisions to apply extraterritorially.

A statute applies beyond the United States when Congress gives "a clear indication of extraterritorial effect." *RJR Nabisco v. European Cmty.*, 579 U.S. 325, 340 (2016). Tether argues that the Code's avoidance provisions do not contain an "unmistakably clear" indication of extraterritorial application, and encourages the Court to analyze these provisions in a vacuum. *See* Mot. 32. But "[a]n express statement of extraterritoriality is not essential"; "[a]ssuredly context can be consulted as well." *RJR Nabisco*, 579 U.S. at 340. Here, the relevant "context" comes from "surrounding provisions of the Bankruptcy Code." *Arcapita*, 575 B.R. at 243. More specifically, the Code's avoidance provisions "must be read in conjunction" with its "recovery provisions," because the two are designed to "work in tandem to further the Code's policy of maximizing the value of the bankruptcy estate." *Sec. Inv. Prot. Corp*, 480 B.R. at 524 (Bankr. S.D.N.Y. 2012); *accord In re Picard*, 917 F.3d at 97 (similar).

When properly read in conjunction, the recovery provisions of the Code "support[] a finding that Congress intended" the avoidance provisions "to extend extraterritorially."[15] *In re Lyondell Chem. Co.*, 543 B.R. 127, 151, 154-55 (Bankr. S.D.N.Y 2016). As Judge Gerber explained:

> "Section 541(a)(3) provides that any interest in property that the trustee recovers under section 550 becomes property of the estate. Section 550 authorizes a trustee to recover transferred property to the extent that the transfer is avoided under either section 544 or section 548. It would be inconsistent (such that **Congress could not have intended) that property located anywhere in the world**

---

[15] Section 541, which defines "property of the estate," provides, in relevant part: "(a) ... Such estate is comprised of all the following property, *wherever located* and by whomever held: (1) ... [A]ll legal or equitable interests of the debtor in property as of the commencement of the case. ... (3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title." 11 U.S.C. § 541.

> **could be property of the estate** once recovered under section 550,
> **but that a trustee could not avoid the fraudulent transfer and**
> **recover that property** if the center of gravity of the fraudulent
> transfer were outside of the United States."

*Id.* at 154-55; *accord French v. Liebmann (In re French)*, 440 F.3d 145, 151–52 (4th Cir. 2006);

*In re FAH Liquidating Corp.*, 572 B.R. 117, 126 (Bankr. D. Del. 2017).

To get around this authority, Tether argues that section 541(a)(3) applies to property *only*

*after* the trustee recovers it. *See* Mot. 33 (citing *In re Colonial Realty Co.*, 980 F.2d 125 (2d Cir.

1992)). But *Colonial Realty*'s holding that conveyed property does not become property of the

estate until it has been recovered "falls far short of holding that property not in the estate as of the

commencement of the case cannot be brought into the estate because it is in a foreign locale."

*Lyondell*, B.R. 543 at 153-54. "[I]t is hard to believe that Congress intended for the Code to apply

extraterritorially with respect to property of the estate, but not to apply extraterritorially with

respect to what would have been property of the estate but for a fraudulent transfer." *Id.* The cases

declining to adopt the court's reasoning in *Lyondell* do not provide a coherent argument as to how

Congress could have intended for property to be subject to the Code's avoidance and recovery

provisions, "wherever located," but only after the trustee had already recovered it. The Court

should adopt this same textual and common sense reading of the Bankruptcy Code, and find that

the Code's avoidance provisions apply extraterritorially.

**C.      Celsius Network LLC and Each Of The Tether Entities Are Proper Parties.**

Tether next argues that that Plaintiff Celsius Network LLC is not a proper plaintiff. Mot.

11. However, as alleged in the Amended Complaint, Celsius Network LLC and Celsius Network

Limited were both controlled by one set of executives that Tether "knew were based in the United

States," AC ¶ 43. As has become clear during these Chapter 11 cases, those executives observed

no "corporate distinction in their decision-making processes and deliberations," freely

commingling assets and treating Celsius's crypto as available "on a consolidated basis." Dkt. 1956 [Main Case] (Examiner's Report) at 365-66; *see also* AC ¶ 44 (Celsius commingled transfers under Token Agreement between entities). Indeed, this Court substantively consolidated those entities, ruling that "all assets and all liabilities … shall be treated as though they were merged" for purposes of the Plan. Dkt. 3972 [Main Case] at 84-85.[16] The Litigation Administration Agreement that govern Plaintiffs' actions in this case even provides that claims are to be brought on behalf of Post-Effective Date Debtors. Dkt. 4297 [Main Case]. Thus, Celsius Network LLC is a proper plaintiff. *See, e.g., In re Howland,* 674 F. App'x 482, 488 (6th Cir. 2017) ("substantive consolidation allows a trustee to bring avoidance claims involving transfers by the consolidated non-debtor entity—exactly what the trustee seeks to do here").

Tether concedes that there was factual support for substantive consolidation, but claims that those facts somehow do not apply to a "sophisticated counterpart[y]" such as itself. *See* Mot. 11 n.4. But that is contradicted by the very motion it cites, which argued that substantive consolidation was appropriate with respect to both sophisticated and unsophisticated counterparties. *See* Dkt. 2563 [Main Case] ¶¶ 26-29. In fact, the Debtors expressly argued that "stakeholders' expectations" could be ignored because "the intercompany relationship between LLC and CNL present a textbook case for substantive consolidation on 'hopeless entanglement' grounds." *Id.* ¶ 5; *see also* Dkt. 2565 [Main Case] ¶ 33 ("In sum, there is *zero* distinction in CNL and LLC's accounting, a complete failure to observe corporate formalities, and a complete failure

---

[16] Tether's own authority rejects its argument, refusing to dismiss preference claims where the plaintiff "identifie[d] every Transfer by date, recipient, and amount"—even though they did not always identify the "source." *In re Extended Stay, Inc.*, 2020 WL 10762310, at *66 (Bankr. S.D.N.Y. Aug. 8, 2020). Here, Plaintiffs identified every transfer by date, recipient, amount, *and* source. *See* AC ¶¶ 46-63; 72. "Those allegations provide sufficient notice to the Defendants of the nature of the claims asserted against them and the basic facts underlying those claims." *In re Extended Stay*, 2020 WL 10762310, at *66.

of CNL and LLC to act independently."). Regardless, Tether's distinction between "customers" and "sophisticated counterparties" is irrelevant because the various Celsius companies "lacked any individuality," and "cannot be regarded as anything but a single true entity." *In re Adler*, 494 B.R. 43, 58-59 (Bankr. E.D.N.Y. 2013), *aff'd*, 518 B.R. 228 (E.D.N.Y. 2014). That determination "does not rest upon a particular creditor's dealings with or reliance on the control entity." *Id.*

Tether then turns its attention to the other side of the *v.*, complaining that Plaintiffs refer to the Tether entities collectively. *See* Mot. 14. But "[t]he Tether entities acted in concert in carrying out the wrongdoing" described in the Complaint, "and each participated in carrying out [Tether's] scheme … to extract value from Celsius's estate." AC ¶ 18. "[I]f a group of entities"—particularly a group of "related corporate entities," as here—"is accused of acting jointly," Plaintiffs need not "plead specific details as to which entity did what during the alleged course of misconduct." *Kashef v. BNP Paribas SA*, 2021 WL 1614406, at *2 (S.D.N.Y. Apr. 26, 2021) (collecting cases).[17] As this Court recognized, "[t]his proposition seems uncontroversial, simply given the number of multi-defendant cases filed around the country in federal courts, and that there are no explicit authorities that would require particularity in the manner suggested by Defendants." *In re Celsius Network LLC*, 2022 WL 17541051, at *9 (S.D.N.Y. Dec. 8, 2022) (Glenn, J.). The Complaint alleges a unified course of conduct by three wholly-owned subsidiaries and their common parent directed at appropriating Plaintiffs' Bitcoin for their own benefit, and so "gives the defendants notice of the claims asserted against them." *Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co.*, 2015 WL 4040882, at *4 (S.D.N.Y. July 2, 2015). Rule 8 requires no more. *Id.*

---

[17] In Tether's authority, there were no allegations of joint action among all defendants throughout the entire relevant period, and the context made clear that some of the defendants *could not have* participated in the underlying misconduct. *See Plusgrade L.P. v. Endava Inc.*, 2023 WL 2402879, at *4 (S.D.N.Y. Mar. 8, 2023). That is a far cry from this case, where the Complaint plainly alleges that all Defendants conspired throughout the entirety of the relevant period.

**D. The Complaint Alleges Avoidable Preferential Transfers**

**1. The Challenged Transfers Enabled Tether To Receive More Than It Would Have Otherwise Received In A Chapter 7 Liquidation**

Tether asserts that the Amended Complaint fails to allege that the challenged transfers enabled Tether to receive more than it would have received in a chapter 7 liquidation had those transfers not been made—the "greater percentage" or "hypothetical liquidation" test of Bankruptcy Code section 547(b)(5). Tether is wrong.

The Amended Complaint alleges that the challenged transfers "dramatically improved Tether's position as a creditor." AC ¶ 58. As set forth in the Amended Complaint, Tether received nearly 18,000 Bitcoin as *additional* collateral during the preference period. *Id.* Tether then used that additional collateral to pay itself in full, also during the preference period. As alleged in the complaint, without the preferential transfers of additional collateral, Tether "would not have been able to come close to making itself whole" on its loan to Celsius. *Id.* The challenged transfers thus handed to Tether assets that were otherwise free-and-clear and available to unsecured creditors, and the transfers "allow[ed] Defendant Tether Limited to receive more than it would have" in a chapter 7 liquidation if the transfers had not been made. *Id.* ¶¶ 95, 103, 111. Thus, the Amended Complaint properly alleges a preference claim under § 547.

Tether, however, asserts that the Amended Complaint is insufficient because Plaintiffs do not specifically "allege that Defendants were undersecured at the time of any of the challenged transfers." Mot. 36-37. But Plaintiffs were not required to so allege, because Tether's purported secured status at the time of the challenged transfers is irrelevant.

**(a)** *The Hypothetical Liquidation Test, Including Tether's Secured Status, Is Measured As Of The Petition Date, Not The Transfer Date*

The Supreme Court has disposed of this issue, holding that the hypothetical liquidation test is measured as of the date of the bankruptcy filing, not on the date of the challenged transfer:

> [w]hether a creditor has received a preference is to be determined, ***not*** by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors ***at the time the alleged preferential payment was made***, ***but*** by the actual effect of the payment ***as determined when bankruptcy results***.

*Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 229 (1936); *see also Avery v. Fischer*, 360 F.2d 719, 726 n.19 (5th Cir. 1966) ("[T]he date of the original bankruptcy petition is the date of cleavage for the determination of such questions as the avoidance of preferences, the validity of liens and the like."); *In re JR Palmenberg Sons*, 76 F. 2d 935, 937 (2d Cir. 1935) ("Whether a creditor of an insolvent has received an unlawful preference is not to be determined by what the situation would have been if the estate had been completely liquidated and distributed among all the creditors at the time when the alleged preferential payment was made….").

Unsurprisingly therefore, applying *Palmer Clay*, courts have ***overwhelmingly*** held that the hypothetical liquidation test in section 547(b)(5), and thus the value of a creditors' collateral for purposes of that test, are determined as of the petition date. *See*, *e.g.*, *In re Sufolla, Inc.*, 2 F.3d 977, 985 (9th Cir. 1993) ("a hypothetical liquidation … is constructed as of the date of petition," and thus payment to a bank was preferential because, "[a]lthough the Bank was fully secured at the time of Sufolla's payment, it was only partially secured on the date of the bankruptcy petition");[18] *In re Smith's Home Furnishings, Inc.*, 265 F.3d 959, 964 (9th Cir. 2001) ("a transfer

---

[18] The preferential payment in *Sufolla* took place during the extended, one-year lookback for transfers that are to or for the benefit of insiders. Although this aspect of *Sufolla* was partially superseded through Congress' subsequent enactment of 11 U.S.C. §§ 547(i) & 550(c), the court's holding as to the creditor's secured status was unaffected.

may be avoided when the creditor is fully secured at the time of payment, but is undersecured on the petition date"); *In re Schwinn Bicycle Co.*, 182 B.R. 514, 523 (Bankr. N.D. Ill. 1995) ("As a matter of well-settled law, collateral should be valued for purposes of a hypothetical liquidation under § 547(b)(5) as of the date the bankruptcy petition was filed."); *In re Trappers Creek, LLC*, 2010 WL 797022, at *3 (Bankr. C.D. Ill. Mar. 5, 2010) ("A clear majority of courts use the filing date as the proper time to determine a creditor-defendant's secured status. This result is consistent with the language of Section 547(b)(5) ....").[19]

Accordingly, it does not matter whether Tether was fully secured when it received substantial, additional collateral during the preference period. Rather, what matters is whether, absent this transfer, Tether would have been fully secured as of the petition date, and thus would have been paid in full in a hypothetical chapter 7 case.

Here, the Amended Complaint alleges that the challenged transfers granted Tether liens on otherwise free-and-clear assets, thus greatly increasing Tether's collateral pool at the expense of unsecured creditors and enabling Tether to receive more than it would have in a hypothetical chapter 7—precisely what section 547(b)(5) requires. Tether received substantial, additional

---

[19] *See also In re Paris Indus. Corp.*, 130 B.R. 1, 3 (Bankr. D. Me. 1991) ("The dispositive question therefore is: at what point in time should the collateral be valued, to determine whether the creditor is fully secured, for § 547(b)(5) avoidance purposes? We have considered this issue previously, and restate herein that the date of the petition is controlling."); *In re Auto-Train Corp.*, 49 B.R. 605, 609–10 (D.D.C. 1985), *aff'd*, 800 F.2d 1153 (D.C. Cir. 1986) (under § 547(b)(5), what matters is "the value of a creditor's secured interest at the date of bankruptcy, coupled with the transfers, enabled the creditor to obtain more funds than if no transfer had occurred"); *In re Prop. Leasing & Mgmt., Inc.*, 46 B.R. 903, 912 (Bankr. E.D. Tenn. 1985) ("[T]he only relevant question is what the secured status of the claim would have been on the date of the petition since that alone would determine the distribution to which [the creditor] would have been entitled in a chapter 7 liquidation."); *In re Falcon Prods., Inc.*, 381 B.R. 543, 547 (B.A.P. 8th Cir. 2008) ("[T]he hypothetical liquidation test must be conducted as of the petition date."); *In re Buyer's Club Markets, Inc.*, 123 B.R. 895, 896–97 (Bankr. D. Colo. 1991) (same); *In re Cavalier Indus., Inc.*, 2002 WL 975868, at *4 (Bankr. E.D. Pa. Apr. 16, 2002) (same); *In re Frankum*, 453 B.R. 352, 369 (Bankr. E.D. Ark. 2011) (same).

collateral during the preference period. Tether then used that additional, preferential collateral to pay itself in full. Had Tether not received the preferential collateral, then as of the petition date it would have been undersecured, and thus would not have been paid in full in a hypothetical chapter 7. Thus, the additional collateral dramatically improved Tether's position at the expense of unsecured creditors and the estate. The transfer to Tether may be avoided even if Tether was fully secured as of the transfer date, because it would not have been fully secured as of the Petition Date. *See Smith's Home Furnishings*, 265 F.3d at 964 ("[A] transfer may be avoided when the creditor is fully secured at the time of payment, but is undersecured on the petition date."); *Sufolla*, 2 F.3d at 985 ("[a]lthough the Bank was fully secured at the time of Sufolla's payment, it was only partially secured on the date of the bankruptcy petition")

Tether argues that the preference rules should be different for secured creditors. But, although secured status often effects the *results* of the hypothetical liquidation test, it does not alter the basic *rule* itself set forth in *Palmer Clay* and carried forward in section 547(b)—as of the petition date, if the transfer enabled the creditor to receive more than it would have in a chapter 7 liquidation, then it is preferential. Nothing in section 547(b) exempts secured creditors from this rule simply because they have collateral. Indeed, section 547(c)'s express inclusion of limited defenses for secured creditors confirms that they are subject to the *prima facia* preference rules in section 547(b). *See, e.g.,* §§ 547(c)(3) & (c)(5). Congress clearly knew how to limit sections of the Bankruptcy Code to unsecured creditors. *See, e.g.*, § 702(a) (election of trustee), § 1102 (committee membership). Congress did not so limit section 547(b).

**(b)** *Tether's Cited Cases Are Inapposite And Do Not Support Its Position*

Tether's cited cases, Mot. 36-37, do not directly address the timing question for measuring a secured creditor's collateral for the hypothetical liquidation test. For example, Tether cites *In re*

*Teligent, Inc.*, for the proposition that "[p]ayments to an oversecured creditor are not preferential because the creditor would receive the full value of its collateral in a chapter 7 liquidation." 337 B.R. 39, 45 (Bankr. S.D.N.Y. 2005). But there was no discussion in *Teligent* as to *when* the creditor's oversecured status should be measured, or any indication that the parties litigated that issue. Indeed, as the court noted, given the nature of the collateral at issue (unearned insurance premiums), "the amount of the [collateral] would ***always*** exceed the amount of the debt," and thus the creditor "did not face the risk that the value of its collateral would drop at a faster rate than its debt, leaving it less secured or even undersecured." *Id.* at 46.

Tether's reliance on *In re 360networks*, 327 B.R. 187 (Bankr. S.D.N.Y. 2005), is similarly misplaced. In that case, the court narrowly held that a statutory lien would not be treated as unperfected simply because the debtor paid off the lien while the lienholder still had the right to timely perfect under state law. *Id.* at 190-91 (following *Ricotta v. Burns Coal & Building Supply Co.*, 264 F.2d 749 (2d Cir. 1959)). The court expressly declined to decide any other issue, including "whether perfection of those liens would otherwise have been unavoidable," *id.* at 193, and in so doing rejected the lienholder's contention that it had a "complete defense" to avoidance. *Id.* at 188. The court noted in *dicta* that "a transfer to a fully secured creditor is immunized from preference attack," but did so based on the premise that "the creditor would have been paid in full in a hypothetical Chapter 7 liquidation by virtue of its realization on its collateral." *Id.* at 190. The court said nothing about ***when*** the hypothetical liquidation should be considered—as of the transfer date or petition date—or what would happen if, as here, the creditor would have been undersecured as of the petition date.

Tether's reliance on this Court's decision in *In re Residential Cap., LLC*, 501 B.R. 549 (Bankr. S.D.N.Y. 2013) ("*ResCap*"), is also misplaced. In *ResCap*, the plaintiffs "failed to prove

the identity and scope of the Alleged Preferential Transfers," and thus could not establish their preference claims regardless of the defendants' secured status and when that status was measured. *Id.* at 621. Moreover, in finding that plaintiffs also failed to show that defendants were undersecured, the timing of the inquiry ultimately would not have mattered in light of the "serious problems" the Court found with plaintiffs' "unsupportable" valuation methodology. *Id.* at 619 n.51 & 581. Indeed, the plaintiffs in *ResCap* barely briefed the timing of measuring defendants' secured status for purposes of the hypothetical liquidation test, and defendants even conceded that "the hypothetical liquidation should be performed *as of the Petition Date*." Defendants' Phase I Post-Trial Brief at 66, Case No. 13-01277, ECF No. 191 (noting that the Committee relied on a liquidation analysis performed "nearly one year after the Petition Date") (citing *Palmer Clay*, 297 U.S. 227 (1936)); Plaintiffs' Phase I Post-Trial Brief at 74, n. 50, No. 13-01277, ECF No. 186 (summarily concluding the plaintiffs met their prima facie burden of proof and relegating discussion of liquidation analysis timing to a single footnote in its 105-page brief).

At bottom, even assuming that *Palmer Clay* has not resolved the issue, *Teligent*, *360networks*, and *ResCap* do not support applying the hypothetical liquidation test (including measuring a secured creditor's collateral) as of the transfer date. *See In re Simplexity, LLC*, 578 B.R. 255, 265 (Bankr. D. Del. 2017) (distinguishing *360networks* and holding that it did not support a deviation from the general rule that even a secured creditor's status is examined as of the petition date).

Tether also relies on general statements in its cited cases that fully secured creditors do not receive preferences. That may be true under a set of facts not present here—when "a creditor receives a transfer which, by its very nature, would not have been available to any of the other secured or unsecured creditors." *In re Tusa-Expo Holdings, Inc.*, 811 F.3d 786, 793 (5th Cir.

2016).  Thus, neither payments that reduce the creditor's collateral (i.e., the creditor releases its claim to collateral), nor payments from the creditor's collateral itself (i.e., the creditor is paid from its own collateral) are preferential.  *Id.* at 793.  In both instances, the secured creditor is not receiving any new property that would otherwise be available to other creditors, but rather payments directly from (or which free up) its own pre-existing collateral.  *Id.* at 792–93 (holding that these examples are "premised on the truism that, if a creditor receives a transfer which, by its very nature, would not have been available to any of the other secured or unsecured creditors, it could never receive 'more' under the hypothetical Chapter 7 liquidation analysis.").  Tether's own cases are in accord.  *See, e.g.*, *In re Telesphere*, 229 B.R. 173, 180 (Bankr. N.D. Ill. 1999) ("[p]ayments that—at the time they are made—***merely return collateral to a secured creditor***, or ***result in a release of collateral to the debtor***, do not have a negative impact on unsecured creditors, and hence cannot be considered preferential").

By contrast, if the disputed transfer (1) did not reduce the creditor's collateral or (2) was not made from the creditor's own collateral, the transfer may be preferential when it enables the creditor to "receive[] 'more' under the hypothetical Chapter 7 liquidation analysis."  *Tusa-Expo Holdings, Inc.*, 811 F.3d at 793.  Here, Plaintiffs are not seeking to recover prepetition payments to Tether that reduced its collateral, nor distributions to Tether of or from its own, unavoidable collateral.  Rather, Plaintiffs are seeking to avoid the preferential transfer of ***additional, new collateral*** which, until the time it was posted to Tether during the preference period, was property available for all creditors.  Had Tether not received that additional collateral, it would have been undersecured as of the Petition Date, and would have received less in a hypothetical liquidation. The transfers to Tether thus were preferential.

38

**(c)** *Tether's Policy Arguments Are Meritless And Do Not Support Its Arguments*

Tether's purported policy arguments fare no better. Congress has already set all of the policy needed, and the Supreme Court interpreted it in *Palmer Clay*. Tether's arguments are no replacement for either. Tether bemoans that if its secured status is measured on the petition date, then it is "entirely exposed to the risk of diminution in value of its collateral" during the preference period. Mot. 40. But that is a risk all creditors face, and nothing in the Bankruptcy Code guaranties defendants that they will receive just as much in a bankruptcy filed on the petition date as in one that might have been filed ninety days earlier. The same problem befalls Tether's argument, Mot. 41, that under the Token Agreement Tether could have foreclosed immediately (and been paid in full) absent Plaintiffs' preferential transfers. There is only one hypothetical liquidation test under the Bankruptcy Code, and that test already assumes that the transfer was not made and that the distribution to the creditor is made in the chapter 7, not upon an immediate pre-bankruptcy foreclosure. 11 U.S.C. § 547(b)(5)(B), (C). Tether cannot make up its own hypothetical test to suit its arguments.

Tether's complaint about the diminution in value of its collateral misses the point. The issue here is that Tether received *additional* collateral that would have been available to all creditors before such collateral was transferred. Had Tether been paid out of its own existing collateral, or been paid and simultaneously released collateral on account of that payment, that would be different. But that is not what happened. Tether instead took additional, free-and-clear property from the Debtors to shore up its position, and in so doing, it received an avoidable preference.

Tether's discussion of adequate protection following the petition date is also unhelpful to its arguments. The reason the Bankruptcy Code provides adequate protection to secured creditors

39

is "due to the imposition of the [automatic] stay." *In re Saypol*, 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983); *see* 11 U.S.C. § 361. There is no automatic stay prepetition, and thus no adequate protection. Secured creditors are free to negotiate for whatever protections may be lawful under non-bankruptcy law. But to the extent secured creditors are granted incremental security interests on the eve of bankruptcy, Congress has determined to avoid those transfers and spread the pain of bankruptcy amongst all creditors. *See*, *e.g.*, *In re Conard Corp.*, 806 F.2d 610, 612 (5th Cir. 1986) ("The very purpose of the preference law . . . is to restore equity among creditors of the debtor's estate by limiting the debtor's ability to prefer the interests of some creditors over others as he slides into bankruptcy."). There is nothing inequitable about that.

In any event, what Tether appears to be complaining about is that Plaintiffs complied with their obligations under the agreement. Any lender could argue that its contract gave them the right to foreclose if a debtor did not make a contractually required payment. But that does not protect the payment from being a preference. Moreover, if Plaintiffs had failed to make the additional transfers of collateral and Tether had thus foreclosed, unsecured creditors would have been better off. The additional collateral would then be available for distribution to unsecured creditors— which is the very result these claims seek to deliver.

### 2. Tether's Other Arguments As To The Cross-Collateralization And Application Transfers Are Meritless

Tether asserts that solely as to the Cross-Collateralization Transfers, Plaintiffs fail to plead that the transfers were made on account of antecedent debt. Mot. 41-42. Not so. In the Amended Complaint, Plaintiffs allege that "[e]ach of the Preferential Cross-Collateralization Transfers *cross-collateralized antecedent debt* owed by Celsius to Defendant Tether Limited." AC ¶ 100. A transfer that secures antecedent debt is "on account of" that antecedent debt under section 547(b)(2). *See*, *e.g.*, *In re Moran*, 188 B.R. 492, 497 (Bankr. E.D.N.Y. 1995) ("[T]he transfer of

40

the Mortgage was for or on account of antecedent debt within the meaning of section 547(b)(2) of the Bankruptcy Code to the extent that it secured prior advances in the amount of $15,000.00."). Thus, contrary to Tether's contentions, Plaintiffs allege that the Cross-Collateralization Transfers were on account of antecedent debt.

Tether further argues that the Token Agreement required Plaintiffs to post the same amount of collateral regardless of any outstanding obligations, and thus the Cross-Collateralization Transfers cannot be "for or on account of an antecedent debt." Mot. 42-43. Tether is again incorrect. As just described, it is the cross collateralization of existing debt that renders the collateral "for or on account of" the antecedent debt under section 547. The fact that the new collateral secured pre-existing debt is not changed merely because the Token Agreement calls for that collateral to be provided in connection with new borrowings.

Tether's argument regarding the Preferential Application Transfer fares no better. Tether argues that at least part of the Preferential Application Transfer is subject to a "new value" defense under section 547(c)(1). Mot. 43-45. Tether's argument is that because it had a lien on the Top-Up collateral and the Cross-Collateralization collateral, any application of that collateral cannot be a preference. However, as alleged in the Amended Complaint and as discussed above, Tether's liens on that collateral were themselves preferential. In essence, Tether is attempting to use its preferential liens as a defense to the satisfaction of those liens. That it cannot do. *See*, *e.g.*, *In re Fair Fin. Co.*, 834 F.3d 651, 670 n.13 (6th Cir. 2016) ("[Creditor] cannot use the creation of a lien that the Trustee has plausibly alleged is itself avoidable as a fraudulent transfer as a shield from application of the Ohio UFTA."). Moreover, even if the transfers were not preferential—they were—the transfers clearly were fraudulent conveyances as alleged in the Complaint, because Tether took far more value in collateral than it was owed. AC ¶¶ 128-140.

**E. The Complaint Alleges Tether's Breach Of Contract**

    **1. The Token Agreement's Ten Hour Waiting Period Was Not Modifiable By Alleged Oral Waiver**

Tether asserts, Mot. 26, that Tether did not breach the Token Agreement's mandatory ten-hour waiting period because Celsius's CEO, Alex Mashinsky, purportedly waived the ten-hour waiting period by giving Tether oral permission to liquidate Celsius's pledged collateral in an "orderly" manner. Tether's arguments misinterpret BVI law and misconstrue the Complaint's allegations.

As initial matter, even if Mashinsky had the power to orally modify or waive the contractually guaranteed 10-hour waiting period under BVI law, his alleged statement to Tether to liquidate the collateral "in an orderly manner" would not have accomplished such a modification. Webster Decl. ¶¶ 30-31, 42-43, 51. In light of the Token Agreement's clear language mandating a ten-hour waiting period, the most plausible interpretation of Mashinsky's statement is that he wanted a commercially reasonable sale process that would maximize the value for Celsius, not a rushed transfer of the collateral at levels well below fair market value. AC ¶ 37; Webster Decl. ¶¶ 31, 48. Second, even if Mr. Mashinsky had intended to give Tether oral permission to liquidate immediately (and without any benefit of a ten-hour window), he could not have done so without a signed writing between the parties. Section 1.1(b)(4) of the Amended Token Agreement expressly and unambiguously provided Celsius with a ten-hour waiting period, without exception. As a result, any alleged change in this waiting period would necessarily require modifying the terms of the Token Agreement, which was subject to Section 1.4's restriction on oral amendments. AC, Ex. A, at 11, § 1.4 (proving that "[n]o change or modification of this Agreement is valid unless it is in writing and signed by the parties). Under BVI law, these so-called "No Oral Modification" clauses are enforced by the courts, especially where (as here) the parties did not expressly discuss

overriding the contract's prohibitions on oral modifications. Webster Decl. ¶¶ 34-43. Accordingly, Mashinsky's alleged *oral* permission to liquidate could not have amended the clear terms of the Token Agreement, which only allowed Tether to "sell, dispose of, and liquidate" only after the mandatory waiting period. AC, Ex. A, at 11, § 1.1(b)(4).

### 2. Celsius's Insolvency Does Not Excuse Tether's Breach

As a fallback, Tether asserts that it had an independent basis for liquidation under Section 1.1(e)(14)(iii), which Tether contends permitted it to liquidate Celsius's pledged collateral if Celsius made an incorrect or misleading representation or warranty in connection with the Token Agreement. AC, Ex. A, at 3, § 1.1(e)(14). Tether is mistaken.[20]

The Amended Complaint alleges that Tether knew of Celsius's insolvency throughout the period, but continued to perform under and receive benefits from the Amended Token Agreement, in the form of additional collateral. *See* AC ¶¶ 48, 65, 67. Because Tether made a "decision to continue receiving benefits pursuant to the [Agreement]" notwithstanding its knowledge of an alleged breach (i.e., the solvency representation), it cannot now justify its non-performance based on that very same alleged breach. *ARP Films, Inc. v. Marvel Ent. Grp.*, 952 F.2d 643, 649 (2d Cir. 1991); *accord* Webster Decl. ¶ 58.

Tether also invokes the principle that "[a] man cannot be permitted to take advantage of his own wrong." Dkt. 33-1 (Carrington Decl.) ¶ 32; Opp. 27-28. That principle is reflected in the well-established rule that a party who "unjustly prevents" the performance of a contractual duty

---

[20] Tether also claims misleadingly that the Agreement gave it any right to "immediately" liquidate the collateral without advance notice. See Opp. 27-28. The relevant portion of the Agreement does not say the word "immediately"; that is purely Tether's invention. Compare AC, Ex. A § 1.1(e)(14)(iii) with Opp. 27 (inserting the word "immediately"). In fact, as the Complaint makes clear, Celsius secured amendments to the Initial Token Agreement to require advance notice before any liquidation. AC ¶¶ 38-39.

cannot invoke that non-performance as a defense. *In re Bankers Tr. Co.*, 450 F.3d 121, 127 (2d Cir. 2006); *accord* Carrington Decl. ¶ 32. Thus, to the extent Tether materially contributed to Celsius's insolvency, *see, e.g.*, Dkt. 1956 [Main Case] (Examiner's Report) at 183 n.640 (Celsius's risk committee understood that Tether was an "existential risk to Celsius"), Tether cannot rely on that insolvency to excuse its continued performance under the contract.

Regardless, as the above discussion makes clear, this defense presents factual questions about Tether's knowledge of, and contribution to, Celsius's insolvency, and so is not a proper basis for dismissing Plaintiffs' breach of contract claim.[21]

### F.     The Complaint Alleges Tether's Breach Of The Duty Of Good Faith And Fair Dealing

Tether argues, Mot. 29-30, there is "no general duty of good faith" in commercial contracts under BVI law, but it concedes that closely analogous duties apply, namely that contract parties cannot exert "discretionary power in an arbitrary or irrational way . . . and (ii) the duty for equitable mortgagees to seek the best price reasonably obtainable at the time that the mortgagee decides to sell." The Complaint states a claim under both of these duties.

The Amended Token Agreement gave Tether discretion to liquidate Celsius's pledged collateral after a 10-hour waiting period. However, as Tether recognizes, this discretion is not unlimited. In such circumstances, under BVI law, Tether must exercise its discretion honestly, in good faith, and not in an arbitrary way. Webster Decl. ¶¶ 60-73. The Amended Complaint pleads

---

[21] Tether also asserts a purported defense to "causation," arguing that Celsius recover damages from its inability "to post additional BTC as collateral" before the petition date. Opp. 28-29. That argument is irrelevant at this stage because it does not negate any element of Celsius's breach of contract claim—rather, it is, at most, an argument that Celsius cannot recover one particular type of damages. *See, e.g.*, *Somnia, Inc. v. Change Healthcare Tech. Enabled Servs.*, 2021 WL 639529, at *3 n.5 (S.D.N.Y. Feb. 16, 2021) ("[A] motion to dismiss is addressed to a 'claim'—not a form of damages."). Celsius will explain why Tether is wrong at the appropriate juncture.

exactly that: in liquidating Tether's collateral, Tether outright lied to Celsius, telling it that it was selling its collateral when it was really transferred 7,000 Bitcoin to itself and the remaining over 30,000 in a non-arms length transfer. AC ¶¶ 82-85. Furthermore, Tether applied arbitrary prices to Celsius's pledged collateral and at a significant discount to the true, fair market value of Bitcoin. AC ¶¶ 79-80. These dishonest and arbitrary actions breach Tether's duties under well-established BVI law. Webster Decl. ¶ 67. Likewise, the Amended Complaint's allegation that Tether held Celsius' Bitcoin in one of Tether's wallets as collateral sufficiently pleads an equitable mortgage under BVI law. Webster Decl. ¶¶ 68-73. As a result, Tether had an obligation under BVI law to obtain the "true market value" or "best price reasonably obtainable" when it sold Celsius's pledged collateral during the Application Transfer. *Id.* Celsius has thus adequately stated a claim.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Tether's Motion in its entirety.

Dated: March 11, 2025

Respectfully submitted,

/s/ *Benjamin I. Finestone*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Benjamin I. Finestone
Anil Makhjiani
Mario O. Gazzola
Arman Cuneo
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000
benjaminfinestone@quinnemanuel.com
anilmakhjiani@quinnemanuel.com
mariogazzola@quinnemanuel.com
armancuneo@quinnemanuel.com

Matthew Scheck
300 West 6th St., Suite 200
Austin, TX 78701
Telephone: (737) 667-6102
matthewscheck@quinnemanuel.com

*Counsel to Blockchain Recovery Investment
Consortium, LLC, Litigation Administrator and
Complex Asset Recovery Manager, as
Representative for the Post-Effective Date Celsius
Debtor*