**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, et al,<br><br>        Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>(Jointly Administered) |
| CELSIUS NETWORK LIMITED and CELSIUS NETWORK LLC, (POST-EFFECTIVE DATE DEBTORS),<br><br>        Plaintiffs,<br>against<br><br>TETHER LIMITED;<br>TETHER HOLDINGS LIMITED;<br>TETHER INTERNATIONAL LIMITED; and<br>TETHER OPERATIONS LIMITED,<br><br>        Defendants. | Adv. Proc. NO. 24-04018 (MG) |

## DECLARATION OF PAUL ANTHONY WEBSTER, KC

I, **PAUL ANTHONY WEBSTER, K.C.**, residing in the Territory of the Virgin Islands (BVI) over the age of 18 years, hereby declare as follows:

1.    I am instructed by Quinn Emmanuel Urquhart & Sullivan LLP of New York, United Sates of America, attorneys at law for Celsius Network Limited and Celsius Network LLC, the Plaintiffs in Case No. 22-10964 (MG) in United States Bankruptcy Court for the Southern District of New York (the "District Court") to provide the District Court with a report of issues arising in the District Court proceedings that are governed by the laws of the British Virgin Islands (BVI).

**PROFESSIONAL AND EDUCATIONAL BACKGROUND**

2.    I hold a Bachelor of Laws Degree from the University of the West Indies (1978), and I graduated from the Norman Manley Law School, Jamaica, in 1980.

3. In October 1980 I was admitted to practise as a barrister of the Eastern Caribbean Supreme Court, Virgin Islands Court. I am also admitted to practice in Anguilla and the Turks and Caicos Islands. I practised in the BVI from October 1980 to August, 2015. During this period I made numerous appearances in the courts of the Eastern Caribbean at all levels up to the Privy Council. I also held several temporary appointments as a judge of the High Court and Court of Appeal between 2001 and 2014. In March 2003, I was appointed one of Her Majesty's Counsel (now Kings Counsel).

4. In September 2015 I was appointed as an acting judge of the Court of Appeal of the Eastern Caribbean Supreme Court. I held that position until my retirement in July 2023. I also acted as a temporary judge in the Commercial Court of the BVI from January to August 2024.

5. In February 2025 I returned to private practice as a consultant in the firm of O'Neal Webster, the firm that I founded with my then partner, Colin O'Neal, in 1990.

6. I have produced expert reports on various aspects of BVI law for several overseas courts including the High Court of Hong Kong SAR, the United States District Court for New York, the United States District Court for Florida, the Ontario Supreme Court and The Arbitration Institute of the International Chamber of Commerce, Sweden and London. The majority of the reports I have produced are in the area of shareholder disputes, derivative actions and corporate insolvencies. In 2000 I attended the High Court of Hong Kong and gave oral evidence on BVI law relating to the appointment and removal of directors of a BVI company. In 2010 I provided expert evidence to the High Court of Hong Kong in the case of East Asia v New Cotai and others (HCA 2189/2009) regarding the availability of multiple derivative actions in the BVI. I travelled to Hong Kong in 2013 to give expert evidence in the same case.

7. Throughout my professional career I have served on the boards of various public and private bodies in the BVI. I am a two-term past president of the BVI Bar Association. I was the chairman of the BVI Social Security Board before my elevation to the bench in 2015. In 2023 I was appointed co-chair of the Rules Review Committee of the Eastern Caribbean Supreme Court. The Committee reviewed and revised the rules of court of the Eastern Caribbean Supreme Court resulting in the passage of the Civil Procedure Rules (Revised Edition) 2023 in July 2023.

8. I understand my duty to the Court and I have complied with and will continue to comply with that duty. I am not connected in any way with the substance of this dispute and have no interest in its outcome. Payment of my fees is not contingent on the outcome of the case.

9.  While preparing this Declaration I have reviewed and considered the following documents:

    (a) The Amended Complaint filed by Celsius in the District Court on August 9, 2024 ("the Amended Complaint").

    (b) The Memorandum of Law in Support of the Defendants' Motion to Dismiss filed in the District Court on January 17, 2025 (the "Motion to Dismiss").

    (c) The Token Agreement and the Amended Token Agreement (together "the Token Agreements") made between Celsius Network Limited and Tether Limited, provided as Exhibit A to the Complaint.

    (d) The First Day Declaration of Alex Mashinsky dated July 14, 2022.

    (e) The Amended Declaration of John Carrington K.C. dated January 17, 2025.

**Factual background**

10. In the paragraphs below I provide a brief summary of some of the factual allegations included in the Amended Complaint.

11. The Plaintiffs (together "Celsius") carry on business as a customer-facing cryptocurrency platform (Amended Complaint ¶ 25). Celsius' primary product was a platform that allowed customers to purchase and deposit various crypto currencies (Ibid). Celsius paid interest on crypto deposited with them (Ibid ¶ 26).

12. The Defendants (together "Tether") control the market for the world's most popular stablecoin, USDT (Ibid ¶ 28). USDT is a digital cryptocurrency said to be backed by non-digital assets such as cash or marketable securities (Ibid). USDT's value is pegged to the value of the U.S. Dollar (Ibid). Celsius borrowed a substantial amount of USDT from Tether to finance its operations (Ibid ¶ 31). The loans were collateralised by crypto currencies (usually Bitcoin) placed by Celsius with Tether up to 140% of the amount of USDT borrowed ("the Collateral") (Ibid ¶ 32). The loan terms were memorialised in a series of written contracts (Ibid). The first agreement was made February 1, 2020 ("the Original Token Agreement") (Ibid).

13. The Original Token Agreement contained the following clauses that are relevant to this opinion:
    (i) Clause 1.4: "Amendments: No change or modification of this Agreement is valid unless it is in writing and signed by the Parties." ("the No Oral Modification Clause");

(ii) Clause 3 deals with the minimum values of the tokens required as collateral. If Bitcoin was used as collateral, the value of the Bitcoin had to be 140% the value of the USDT stablecoins lent ("the Initial Margin");

(iii) Clause 4 deals with the situation where the value of the Collateral falls below the Initial Margin. The clause provides that where the value of the Collateral falls below the Margin Call Point CNL must immediately provide additional security to TLTD to TLTD's satisfaction to bring the value of the Collateral up to an amount equal to or greater than a certain percentage ("the Margin Recovery Point"). The clause further provides that if the value of the Collateral "...falls below a percentage of the number of tokens made available to [CNL] (the "Liquidation Point") at any time [TLTD] shall have the right, in its sole and absolute discretion, and without further notice to [CNL], to sell, dispose of, and liquidate the Collateral, and shall have all the right, title, and interest to the Collateral and all proceeds therefrom;"

(iv) Clause 6.1 provides that the Agreement shall be governed by and is to be construed and interpreted in accordance with the laws of the BVI.

14. On January 20, 2022 TLTD and CNL entered into a Deed of Amendment modifying certain terms of the Original Token Agreement ("the Amendment Agreement") (Ibid ¶ 36).

15. The amendments to the Original Token Agreement made by Clause 1.1(b)4 of the Amendment Agreement have a significant impact on the opinions expressed in this Declaration and I take the opportunity to set out the clause in full –

"**Fall in Value of Collateral**: Should the value of the Collateral fall below a percentage (the "**Margin Call Point**") of the number of Tokens made available to [CNL] at any time, TLTD shall provide [CNL] notice of such occurrence ("**Margin Call Notice**") and the CNL shall, within ten (10) hours of such Margin Call Notice, provide additional amounts to TLTD's satisfaction to increase the Collateral to an amount equal to or greater than a percentage, equal to the applicable Initial Margin, of the number of Tokens made available to [CNL]. The Margin Call Point shall be as set out in Schedule 1 to this Agreement. If [CNL] has not posted sufficient additional Collateral in accordance with the foregoing, should the value of the Collateral fall below a percentage (the "**Liquidation Point**") of the number of Tokens made available to [CNL] at any time following the time that is ten (10) hours from the delivery of the applicable Margin Call Notice, TLTD shall have the right, in its sole and absolute discretion, and without further notice to the Recipient, to sell, dispose of, and

4

liquidate the Collateral. The Liquidation Point shall be as set out in Schedule 1 to this Agreement."

16. The changes made by this clause are important and far-reaching. Under clause 4 of the Original Token Agreement TLTD had the right, once the Liquidation Point had been reached, to liquidate the Collateral "...in its sole and absolute discretion and without further notice to CNL." This clause was amended to place important restrictions on TLTD's right to liquidate the collateral. TLTD now had to issue a Margin Call Notice to CNL when the Margin Call Point was reached, and then wait 10 hours to give CNL an opportunity to provide "additional amounts to increase the Collateral to an amount equal to or greater than the Initial Margin" (as had been done with the margin calls during the preceding six weeks). Only then could TLTD liquidate assets forming the Collateral.

17. Celsius is relying on this clause to say that Tether breached the Amendment Agreement by liquidating the Collateral in less than 10 hours. I will deal with this issue below.

18. Another change made by the Amendment Agreement was to clause 1.14 of the Original Token Agreement. The original clause 1.14 was a straightforward provision dealing with voluntary termination and/or extensions of the Agreement. This clause was deleted and replaced by clause 1.1(e)14 of the Amendment Agreement. The first eight lines of the new clause essentially repeat what was in the original clause 1.14 and then there is an important addition by way of amendment. The addition reads -

> "...In the event that: (i) [CNL] fails to return any Tokens when due and/or fails to pay any interest payable hereunder (whether by scheduled maturity, demand or otherwise); (ii) [CNL] breaches any covenant or condition of this Agreement; or (iii) any representation or warranty made on behalf of [CNL] pursuant to, or in connection with, this Agreement, shall have been incorrect or misleading in any material respect when made or deemed repeated, then TLTD may: (a) demand return of all Tokens (and payment of all other amounts accrued and outstanding hereunder (including any interest accrued thereon) with immediate effect; (b) terminate this Agreement; and/or (c) sell, dispose of, and liquidate the Collateral. The provisions of paragraph 8 (*Confidentiality*) shall continue in force for a period of two years after the Termination Date. Termination of this Agreement shall not affect or prejudice any rights or obligations which have accrued or arisen under

19. Tether is relying on clause 1.(e)14 to say that Celsius made incorrect and misleading statements when redeeming some of the Collateral. Tether contends that this gave it a separate and independent right to liquidate the Collateral without having to wait 10 hours or any other amount of time. I will deal with this issue below.

20. In or about April 2022 Celsius had approximately $512,230,000.00 in USDT stablecoins in outstanding borrowings from Tether and posted 16,505.17 bitcoin to Tether as security (Amended Complaint ¶ 45). About this time the price of bitcoin started to fall. Ibid ¶ 47. Between May 3, 2022 and June 12, 2022 Tether made seven margin calls on Celsius and Celsius transferred approximately 16,737.27 bitcoin to Tether (Ibid ¶¶ 48-56). The seventh margin call was satisfied in the early hours of June 13, 2022 (Ibid ¶ 70). Later that same day, Tether made another margin call (Ibid). When pressed for payment Celsius advised Tether that it was preparing the bitcoin to satisfy the demand (Ibid ¶ 71). After some time, Celsius' CEO, Alex Mashinsky, allegedly gave permission to Tether to liquidate Celsius' Collateral "in an orderly manner" (Ibid).

21. Tether proceeded to liquidate the Collateral in less than the 10-hour waiting period mandated by clause 1.1(b)4 of the Amendment Agreement (Ibid ¶ 72). During this short period Tether tried to persuade Celsius to accept offers to buy the Collateral but Celsius declined. Ibid ¶ 72-75. The Amended Complaint states at paragraph 76 that the sale was completed by 11 am on June 13, 2022 (just five hours after it started).

22. On August 9, 2024 Celsius filed a complaint in the District Court seeking, inter alia, to the return of the Bitcoin taken by Tether. The Amended Complaint was filed on December 5, 2024.

**Sources of BVI law and contractual interpretation**

23. I am in broad agreement with Mr. Carrington's opinions on the sources of BVI law and the rules of contractual interpretation. I will only emphasize the following points.

24. BVI courts apply the Common Law of England and in doing so follow the doctrine of stare decisis or binding precedent. Under this doctrine, decisions of the United Kingdom Supreme Court, the

UK's highest court, are highly persuasive and are generally followed unless they conflict with a local statute or are distinguishable. This will be particularly important when I come to consider the Supreme Court decision of **MWB Business Exchange Centres Ltd v Rock Advertising Ltd**[1]. Decisions of the Eastern Caribbean Court of Appeal are binding on the Court of Appeal and lower courts unless they fall into one of the recognized exceptions to this rule in **Young v Bristol Aeroplane Company Ltd**[2].

25. Under the rules of contractual interpretation the court will have regard to the words used by the parties in the contract and the relevant background, even if the proper construction of the words appear to be imprudent or lead to harsh consequences for one of the parties. This is apparent from the judgment of Lord Neuberger in **Arnold v Britton and others**[3] where he opined-

> "Fourthly, while commercial common sense is a very important factor to take into account when interpreting a contract, a court should be very slow to reject the natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of wisdom of hindsight. The purpose of interpretation is to identify what the parties have agreed, not what the court thinks that they should have agreed. Experience shows that it is by no means unknown for people to enter into arrangements which are ill-advised, even ignoring the benefit of wisdom of hindsight, and it is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice. Accordingly, when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party."

This passage was cited with approval by Baptiste JA in the Eastern Caribbean Court of Appeal decision of **Grenada Technical and Allied Workers Union v St Georges University Limited**[4] which was referred to by Mr. Carrington in his Declaration.

26. Another preliminary point is the procedure on a strike out application. The matter that is before the District Court is a Motion to Dismiss Celsius' claim. The procedure for dealing with this application is a matter of United States law and I make no attempt to say what United States

---

[1] [2018] UKSC 24
[2] [1944]KB 718
[3] [2015] UXSC 26 at paragraph 20
[4] GDAHCVAP 2014/0008

law is on this or any other point. That said, a Motion to Dismiss is similar to a strike out application in the BVI and would be considered and disposed of before the court considers the merits of the case. The court would not be concerned at this stage with resolving issues of fact. The allegations in the pleadings (the Amended Complaint) would be taken to be true and the court would only strike out the claim if the pleadings do not disclose a triable issue. This is trite law in the BVI. In **Baldwin Spencer v Attorney General of Antigua and Barbuda and others**[5] the Chief Justice Byron cautioned that "This summary procedure should only be used in clear and obvious cases, when it can clearly be seen, on the face of it, that a claim is obviously unsustainable, cannot succeed or in some other way is an abuse of the process of the court." The principle was restated by the Court of Appeal in 2016 **Martin Didier and others v Royal Caribbean Cruises Ltd**,[6] where the Chief Justice Pereira stated that once the pleadings disclose a triable issue it will be sent to trial to resolve disputes about the facts and/or the law. If similar principles apply in the District Court then it can accept the pleaded facts in the Amended Complaint and decide if there are issues that should go to trial. In the meantime, I can rely on the facts as pleaded in the Amended Complaint.

**Clause 1.1(b)4 (the "10-hour Clause")**

27. The overarching issue regarding the 10-hour Clause is whether Tether had to wait 10 hours after issuing the second margin call on June 13, 2022 before proceeding to liquidate the Collateral. This central issue gives rise to several sub-issues, including:

    (a) The proper construction of the 10-hour Clause;

    (b) The effect of Alex Mashinsky's alleged statement to Tether regarding an "orderly liquidation" – did it amend clause 1.1(b)4 of the Amendment Agreement;

    (c) Did Celsius waive the 10-hour waiting period;

    (d) Was Celsius estopped from relying on the 10-hour waiting period;

    (e) Implied terms; and

    (f) The situs of cryptocurrency;

---

[5] Civil Appeal No. 20A of 1997
[6] SLUHCVAP 2014/0024 and 2015/0004

**Construction of the 10-hour Clause**

28. The meaning of the 10-hour Clause is clear beyond peradventure. The parties had entered into the Original Token Agreement which provided that once a Liquidation Point was reached Tether could liquidate the Collateral without further notice to Celsius. This provision was amended by clause 1.1(b)4 of the Amendment Agreement to introduce conditions mandating Tether to issue a Margin Call Notice to Celsius when a Liquidation Point was reached and then waiting 10 hours before liquidating the Collateral. Applying the ordinary principles of contractual interpretation, where a provision in a commercial contract admits of only one meaning the court should not shrink from applying the meaning intended by the parties by the language used in the contract. The right to liquidate the Collateral was postponed by 10 hours and it was only after the expiration of the waiting period that Tether could, in its absolute discretion and without further notice to Celsius, liquidate the Collateral.

29. In one of the leading cases on contractual interpretation, **Rainy Sky SA and others v Kookmin Bank**,[7] Lord Clarke, under the heading "The correct approach to construction", reviewed the authorities and continued –

> "I agree with Lord Neuberger (also at [17]) that those cases show that the ultimate aim of interpreting a provision in a contract, especially a commercial contract, is to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant. As Lord Hoffmann made clear in the first of the principles he summarised in the *Investors Compensation Scheme* case [1998] 1 All ER 98 at 114–115, [1998] 1 WLR 896 at 912–913, the relevant reasonable person is one who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract."

30. Applying these basic interpretation principles, I have no doubt that the 10-hour Clause mandated Tether to comply with the requirements of issuing a Margin Call Notice and waiting 10 hours before proceeding to liquidation. This is not seriously disputed by Tether. Tether's position is that Celsius waived the 10-hour waiting period when Mr. Mashinsky allegedly orally permitted Tether to proceed with the liquidation in an orderly manner (before the expiry of the 10-hour waiting period).

---

[7] [2011] UKSC 50

31. While we do not know what Mr. Mashinsky actually told Tether as I understand fact discovery is still ongoing, I have reviewed a declaration from Mr. Mashinsky where he says that he and Tether "agreed to an orderly liquidation of its loan." My first position on the effect of Mr. Mashinsky's purported words is that, if he stated that he was amenable to an "orderly liquidation" he did not waive the requirement to wait 10 hours before proceeding to liquidation. If Mr. Mashinsky discussed a potential liquidation of collateral "in an orderly manner" this would mean, or certainly could mean, to proceed in accordance with the terms of the Token Agreements which contemplate an orderly liquidation as agreed by the parties in clause 1.1(b)4 of the Amendment Agreement. There is no suggestion in Mr. Mashinsky's alleged words that he or Celsius agreed to or authorised a liquidation of the Collateral in breach of the clear provisions of the Amended Agreement. In short, based on the allegations in the Amended Complaint, there was no agreement to modify the terms of the Amendment Agreement by dispensing with the mandatory requirement for Tether to wait 10 hours after the time of the delivery of the Margin Call Notice before starting the liquidation of the Collateral.

**Amendment of the 10-hour Clause**

32. Count 3 of the Amended Complaint alleges that Tether breached the Amended Agreement by liquidating the Collateral in less than the mandated 10-hour waiting period. This raises issues of whether the 10-hour Clause was amended, and even if it was not, whether Celsius waived its right to rely on the 10-hour waiting period.

33. Mr. Carrington did not address directly whether there was an amendment of the 10-hour Clause, but I think I should address the issue as it is an important issue in the Amended Complaint. Any purported amendment would be based on the words of Mr. Mashinsky and the conduct of Celsius.

34. As stated above, clause 1.4 of the Original Token Agreement provides that-
> "Amendments: No change or modification of this Agreement is valid unless it is in writing and signed by the Parties."

The clause speaks for itself – it prohibits oral modifications to the Agreement. Any modification or amendment must be in writing and signed by both parties. These clauses have been described in the cases as "No Oral Modification Clauses".

10

35. Historically, No Oral Modification Clauses have had mixed results in the courts. The traditional view was that there are no formal requirements for making a simple contract and the parties who make a contract can make a second contract modifying the terms of the first contract, including a No Oral Modification Clause in the first contract. On this interpretation No Oral Modification Clauses are generally ineffective, and a subsequent oral agreement can be effective in amending the written contract.

36. The modern view is that where the parties to a written contract stipulate the procedure for amending the contract, the procedure must be followed. An oral modification of the contract will be ineffective for failure to comply with the procedure in the No Oral Modification Clause.

37. The validity of No Oral Modification Clauses was considered by the Supreme Court in 2018 in **MWB Exchange Centres Ltd v Rock Advertising Ltd**[8]. The relevant facts are that the respondent occupied premises in the appellant's building on terms of a written licence agreement. The licence agreement stipulated that "all variations to this licence must be agreed, set out in writing and signed on behalf of both parties before they take effect." Representatives of the parties discussed and apparently agreed on an oral agreement to vary the terms of payment under the licence. After the first payment under the modified licence was tendered the manager of the respondent disputed the variation and locked the respondent out of the premises. The trial judge found that there was an oral agreement to vary the payments, but the oral agreement was ineffective because it was not in writing signed by the parties as required by the No Oral Modification Clause in the licence. The appellant's appeal to the Court of Appeal was successful but the Supreme Court overturned the Court of Appeal's decision and restored the trial judge's decision to invalidate the oral agreement.

38. The majority judgment (Baroness Hale of Richmond PSC, Lord Wilson, Lord Sumption and Lord Lloyd-Jones) was delivered by Lord Sumption. Lord Briggs dissented from the reasons given by the majority but came to the same conclusion. The appeal was allowed and the oral agreement (which the High Judge found was proved) declared ineffective to vary the terms of the licence. Their Lordships carried out a detailed examination of the law relating to No Oral Modification Clauses and analysed both competing views. At paragraph 7 of his judgment Lord Sumption set out the reasons that are usually given for treating No Modification Clauses as ineffective -

---

[8] [2018] UKSC 24

"The reasons which are almost invariably given for treating No Oral Modification clauses as ineffective are (i) that a variation of an existing contract is itself a contract; (ii) that precisely because the common law imposes no requirements of form on the making of contracts, the parties may agree informally to dispense with an existing clause which imposes requirements of form; and (iii) they must be taken to have intended to do this by the mere act of agreeing a variation informally when the principal agreement required writing."

39. Lord Sumption then reviewed the cases for and against the effectiveness of No Oral Modification Clauses and concluded at paragraph 10 that "In my opinion the law should and does give effect to a contractual provision requiring specified formalities to be observed for a variation." Having found that No Oral Modification Clauses are generally effective Lord Sumption continued in paragraph 12 of his judgment to give reasons why such clauses are included in written contracts:

"There are at least three reasons for including such clauses. The first is that it prevents attempts to undermine written agreements by informal means, a possibility which is open to abuse, for example in raising defences to summary judgment. Secondly, in circumstances where oral discussions can easily give rise to misunderstandings and crossed purposes, it avoids disputes not just about whether a variation was intended but also about its exact terms. Thirdly, a measure of formality in recording variations makes it easier for corporations to police internal rules restricting the authority to agree them. These are all legitimate commercial reasons for agreeing a clause like clause 7.6. I make these points because the law of contract does not normally obstruct the legitimate intentions of businessmen, except for overriding reasons of public policy. Yet there is no mischief in No Oral Modification clauses, nor do they frustrate or contravene any policy of the law."

40. The essence of Lord Briggs' dissent is that the courts will uphold No Oral Modification Clauses except where all the parties expressly or by necessary implication, subsequently agree to dispense with it. His Lordship found that neither party had addressed the clause when agreeing the terms of the variation. As such, the oral agreement was invalid for want of compliance with the No Oral Modification Clause.

41. My understanding of the decision of the Supreme Court is that the modern attitude to No Oral Modification Clauses is that the court will uphold such clauses for the reasons given by Lord Sumption. And even if one goes to the dissenting judgment of Lord Briggs, the court will uphold

12

the clause unless the parties to the contract directed their minds to the clause and its effects when making the agreed variation.

42. Applying the decision in **Rock Advertising**, it is my opinion that No Oral Modification Clauses play an important role in the common law of the BVI. A BVI court would treat the No Oral Modification Clause in this case as effective and binding on the parties. I say this because there was no oral agreement or authorisation to proceed in less than 10 hours. Even if Mr. Mashinsky's words and Celsius' conduct can be construed as creating an oral agreement, it would not be effective in varying the clear contractual requirement not to proceed in less than 10 hours. Further, there is nothing in the material that I have reviewed that suggests that the parties had directed their minds to the requirements of the No Oral Modification Clause in clause 1.4 of the Original Token Agreement when the alleged oral agreement was made to proceed with the liquidation of the Collateral. Put another way, the parties did not address their minds to the requirement to put the oral agreement in writing and sign the document.

43. I conclude on this issue, based on the allegations in the Amended Complaint, that there was no oral modification or variation of the 10-hour Clause, and, in any event, any such oral modification or variation would be ineffective.

### Estoppel

44. **MWB Business Exchange** also gave helpful general guidance on No Oral Modification Clauses. Their Lordships addressed the situation where an oral agreement to vary the terms of a written agreement is made but not in accordance with the procedure stipulated in the No Oral Modification clause, and one or both parties modified their position based on the oral agreement. This is what happened in the case. The court's answer to situations like this is that the party who acted on the oral agreement may be able to plead an estoppel against the party seeking to deny the No Oral Modification Clause. This issue was dealt with by the Supreme Court in paragraph 16 of the majority judgment. Lord Sumption opined that -

> "The enforcement of No Oral Modification clauses carries with it the risk that a party may act on the contract as varied, for example by performing it, and then find itself unable to enforce it... In England, the safeguard against injustice lies in the various doctrines of estoppel. This is not the place to explore the circumstances in which a person can be estopped from relying on a contractual provision laying down conditions for the formal validity of a variation. The courts below rightly held that the minimal steps taken by Rock Advertising were not enough to support any

estoppel defences. I would merely point out that the scope of estoppel cannot be so broad as to destroy the whole advantage of certainty for which the parties stipulated when they agreed upon terms including the No Oral Modification clause. At the very least, (i) there would have to be some words or conduct unequivocally representing that the variation was valid notwithstanding its informality; and (ii) something more would be required for this purpose than the informal promise itself: see Actionstrength Ltd v International Glass Engineering INGLEN SpA [2003] 2 AC 541, paras 9, 51, per Lord Bingham of Cornhill and Lord Walker of Gestingthorpe."

45. This passage applies *a fortiori* in this case. Based on the allegations in the Amended Complaint, there were no words or conduct suggesting that the Amendment Agreement had been modified to do away with the 10-hour waiting period. Further, there is no allegation that Mr. Mashinsky or Tether had any regard to the Amended Agreement, the 10-hour clause, and the No Oral Modification Clause. The alleged conduct and discussion did not come close to the level required to displace the advantages of certainty for which the parties had stipulated in the written terms of the Token Agreements.

46. I do not think that the BVI court would find that there was an estoppel pertaining to the No Oral Modification Clause in this case.

**Waiver**

47. Mr. Carrington opined in paragraphs 44 and 52 of his Declaration that the 10-hour period for Celsius to provide additional collateral following a Margin Call was entirely for Celsius' benefit and therefore Celsius could waive the requirement (and permit liquidation of the Collateral in a shorter period). Viewed in isolation it is possible that the principal of waiver could apply. But it must be viewed in the context of the law and the facts.

48. Based on the allegations in the Amended Complaint and my review of Mr. Mashinsky's declaration, I have already said that I do not think that Mr. Mashinsky agreed to waive the right to the 10-hour waiting period before Tether could liquidate. What he said was that Tether could

liquidate the Collateral in an orderly manner which means, or could mean, in accordance with the terms of the Amendment Agreement.[9]

49. Legally, the reliance on the case of **Hawkseley v Outram**[10] is an oversimplification of the situation. Mr. Carrington's treatment of the case ignores the recent developments in the law in **MWB Business Exchange**. The latter case made clear that No Oral Modification clauses provide certainty and should be honoured except in certain limited circumstances where the parties, by words or conduct, make it clear that they are not relying on a specific term of the written contract, in this case the 10-hour waiting period.

50. **Hawkseley,** and later cases such as **Heron Garage Properties Ltd v Moss**[11] and **Irvin v Wilson and others**[12], considered waivers by persons entitled to benefit from the terms of the contract. These cases were decided long before **MWB Business Exchange** and they do not deal with waivers in the context of contracts that contain No Oral Modification clauses. These decisions must now be viewed in the light of the decision in **MWB Business Exchange**, or not be applied to situations where the contract contains a No Oral Modification Clause.

51. I do not think that waiver applies to the 10-hour waiting period in this case. Mr. Mashinsky did not agree to the liquidation of the Collateral in less than the mandated 10-hour waiting period. Based on the allegations in the Amended Complaint and Mr. Mashinsky's declaration, if anything, Mr. Mashinsky requested the liquidation in an orderly manner. Even if his alleged words or Celsius' conduct can be construed as agreeing to a shorter period, it is not the kind of unequivocal statement that would allow a BVI court to emasculate the effect of the No Oral Modification Clause and find that the oral agreement was effective to allow liquidation of the collateral in less than 10 hours.

### Implied term

52. Mr. Carrington made the point that the Amendment Agreement is silent on the issue of what happens if Celsius had in fact authorised Tether to proceed with the liquidation. As an initial matter, and as I note above, this is not completely accurate because the Amendment Agreement

---

[9] See paragraph 31 above
[10] [1892] 3 Ch 35A
[11] 11[1974] 1 All ER 421
[12] [2011] EWHC 326

had a No Oral Modification Clause which precludes oral amendments to the agreement. Mr. Carrington's opinion appears to be that the alleged permission granted by Mr. Mashinsky was an authorisation to proceed with the liquidation of the Collateral without reference to the 10-hour waiting period in clause 1.1(b)4. The Amendment Agreement did not say this, but Mr. Carrington formed the view that this is what it must mean. He relied on the well-known Privy Council decision of **Attorney General of Belize v Belize Telecom Ltd and another**[13] which is the leading case on implied terms in the Eastern Caribbean. However, I do not agree that this is an appropriate case for the BVI courts to imply a term into the Amendment Agreement for the following reasons:

(i)     The meaning of the 10-hour Clause is clear and does not require the implication of a term to determine its proper meaning;

(ii)    As a matter of fact, there was no authorisation to proceed with the liquidation in less than the 10-hour waiting period mandated by the 10-hour Clause;

(iii)   As a matter of mixed fact and law, implying the suggested term into the Amendment Agreement would have the effect of varying the terms of the 10-hour Clause which, as I have already stated, would not be appropriate following the very clear guidance from the Supreme Court decision of **MWB Exchange** (as discussed above in paragraphs 37-43). The mischief of uncertainty in commercial contracts that the Supreme Court sought avoid would be lost if the alleged oral agreement were to find its way into the Amendment Agreement through the back door of an implied term; and

(iv)    Even if there was an oral agreement to forego the 10-hour waiting period it would still not be effective to vary the express terms of the Amendment Agreement (see paragraph 42 above).

53.   For the reasons set out in the preceding paragraph, I do not think that this is an appropriate case to imply a term into the Amendment Agreement, especially one that would have the effect of varying the terms of the Agreement in which the parties stipulated the procedure for variations.

---

[13] [2009] UKPC 10

**Clause 1.1(e)14**

54.     Count 4 of the Amended Complaint alleges that Tether breached the duty of good faith and fair dealing with Celsius by disposing of the Collateral in the way that it did. Paragraph 126 of the Amended Complaint pleads that Tether breached its duty of good faith and fair dealing by improperly liquidating the Collateral "... by arbitrarily and irrationally exercising its discretion under the Amendment Agreement, resulting in the minimization of the amounts due to [Celsius], and by unfairly interfering with [Celsius's] right to receive the benefits of the Agreement."

55.     I have already opined that Tether breached the Amendment Agreement by liquidating the Collateral in less than 10 hours. This is also relevant to the issue of good faith and fair dealing in relation to clause 1.1(e)14 and the 10-hour Clause.  In other words, the issue of good faith is relevant to both the alleged breaches of the 10-hour Clause and clause 1.1(e)14. The amended Clause 1.1(e)14 is set out in paragraph 18 above.

56.     Tether alleged in the Motion to Dismiss that Celsius, by its own admission, breached clause 1.1(e)14 by allegedly giving incorrect or misleading information to Tether on each occasion that it transferred bitcoins to Tether in response to margin calls during the period leading up June 13, 2022. The allegedly incorrect information was that Celsius was solvent when it made the transfers when in fact it was insolvent.

57.     Tether says that this breach gave them an independent and free-standing right, shorn of the restrictions imposed by the amended 10-hour Clause, which empowered Tether to "sell, dispose of, and liquidate the Collateral." It is noteworthy that clause 1.1(e)14 does not give Tether the right to sell and dispose of the Collateral "in its absolute discretion and without notice" as in the 10-hour Clause.  As such, Tether did not have an absolute right to liquidate the Collateral. Tether's exercise of its discretion to proceed to liquidation bring into play the principles in **Braganza** (which I deal with below).

58.     Further, there are factual questions whether, even if Tether was insolvent, Tether would be able to assert rights under clause 1.1(e)14 of the Amended Token Agreement.  For example, if Tether was aware of Celsius's financial distress (as the Amended Complaint alleges), and chose to continue to request (and accept) collateral from Celsius under the Amended Token Agreement (as it did), Tether may be barred from asserting a breach under the principals of estoppel.

17

59. Celsius pleaded in paragraph 125 of the Amended Complaint that the law of the BVI implies a duty of good faith and fair dealing in the performance of the Amendment Agreement. I agree with Mr. Carrington that the duty of good faith and fair dealing that BVI law imposes in contractual situations is not a general duty of good faith. However, the duty applies in two recognized categories.

60. Before dealing with the categories I make the point that there is a general requirement of honesty in all commercial contracts. This is based on the presumed intention of the parties. A breach of this requirement can give rise to a claim for damages for breach of contract and/or recission of the contract. In **Yam Seng Pte Ltd v International Trade Corporation Ltd**[14] Leggatt J described this duty as "A paradigm example of a general norm which underlies all contractual relationships is an expectation of honesty"[15]; and "such a requirement is also necessary to give business efficacy to commercial transactions"[16]; and "A key aspect of good faith, as I see it, is the observance of such standards."

61. Turning now to the two primary situations when the court will imply a term of good faith into the contract. These are:
   (i) When one party to the contract has to make a decision or exercise a discretion that affects the rights of the parties. This is known as the Braganza duty from the eponymous case of **Braganza v BP Shipping Ltd**[17].
   (ii) When an equitable mortgagee is exercising a power of sale of mortgaged property.

**The Braganza duty**

62. **Braganza** involved the claim for death benefits that was disputed by the deceased's employers and insurers on the ground that it was suspected that he had committed suicide. The deceased's contract of employment provided that the death benefit would not be payable if in the opinion of the employer or the insurer the death was caused by the willful act, neglect or omission of the deceased employee. Thus, the employer had the discretion to decide on the facts whether

---

[14] [2013] I All ER (Comm) 1321
[15] Ibid paragraph 135
[16] Ibid paragraph 137
[17] [2015] UKSC17

the employee had committed suicide thereby disentitling his estate to a death benefit payment. The employer decided that the employee had committed suicide and refused the benefit.

63. On appeal, the Supreme Court dealt with the nature of a contractual discretion where one party has the discretion to make a decision that affects the rights of the parties to the contract. The leading judgment of the Court was delivered by Lady Hale (with whom Lord Kerr agreed). Lady Hale opined at paragraph 18 that -

> "Contractual terms in which one party to the contract is given the power to exercise a discretion, or to form an opinion as to relevant facts, are extremely common. It is not for the courts to re-write the parties' bargain for them, still less to substitute themselves for the contractually agreed decision-maker. Nevertheless, the party who is charged with making decisions which affect the rights of both parties to the contract has a clear conflict of interest. That conflict is heightened where there is a significant imbalance of power between the contracting parties as there often will be in an employment contract. The courts have therefore sought to ensure that such contractual powers are not abused. They have done so by implying a term as to the manner in which such powers may be exercised, a term which may vary according to the terms of the contract and the context in which the decision-making power is given."

64. Lady Hale also referred to the judgment of **Abu Dhabi National Tanker Co v Product Star Shipping Ltd (The "Product Star") (No 2)**[18] where Lord Leggatt explained

> "The essential question is always whether the relevant power has been abused. Where A and B contract with each other to confer a discretion upon A, that does not render B subject to A's uninhibited whim. In my judgment, the authorities show that not only must the discretion be exercised honestly and in good faith, but, having regard to the provisions of the contract by which it is conferred, it must not be exercised arbitrarily, capriciously or unreasonably."

65. **Braganza** was applied by the Court of Appeal of Eastern Caribbean in **Sonia Johnny v The Attorney General of Saint Lucia**[19] where the Court allowed a claim by an employee whose entitlement to payment in lieu of vacation was denied by the decision of her employer, the State. The Court noted the imbalance between the parties and the State's conflict of interest,

---

[18] [1993] 1 Lloyd's Rep 397, 404
[19] SLUHCVAP 2017/0036

and implied a term of good faith that the State should exercise in making its decision to deny the employee the unpaid vacation benefits. In delivering the unanimous judgment of the Court Baptiste JA described the duty or term to be implied into the contract as –

> "In seeking to ensure that power is not abused, the Court will imply a term of good faith as to how it should be exercised. It is presumed to be the reasonable expectation of the parties that 'there should be a genuine and rational, as opposed to an empty and irrational, exercise of discretion'"[20]

66. It is apparent from the cases that where one party to the contract has to make a decision or exercise a discretion that affects the rights of the parties to the contract, the court will impose restrictions on the exercise of that power to ensure that the decision maker acts in good faith, and the court will imply a term into the contract that the decision maker must not make his decision in an unreasonable, irrational or arbitrary manner. Unreasonableness and irrationality in this context are judged by the high standards analogous to the test of what has become known as "Wednesbury unreasonableness". How this test is applied depends on the facts of the case being considered.

67. Based on the allegations in the Amended Complaint, I think that in deciding to liquidate the Collateral in less than 10 hours in breach of the 10-hour Clause, and then holding on to at least some of the Collateral in its related entities, Tether was not acting in good faith and the liquidation was unreasonable and irrational. This would accord with treatment of similar breaches in the test in **Braganza** and **Abu Dhabi National Tankers** and **Sonia Johnny** referred to above. The liquidation of the Collateral was, as alleged in paragraph 80 of the Amended Complaint "arbitrary, irrational and commercially unreasonable".

**Duty of equitable mortgagee**

68. I have already outlined the facts relating to the sale of the Collateral, but I would repeat the following salient points: the purported sale of assets worth more than $800 million was completed in just a few hours in breach of the 10-hour Clause mandating a waiting period of 10 hours after the Margin Call Notice was delivered; the market for crypto was falling at the time; it appears based on the Amended Complaint that no attempt was made to get an independent or any other valuation of the Collateral before conducting the sale; and the Collateral was

---

[20] Ibid paragraph 18

transferred to entities in which Tether had an interest and/or transferred to individuals in a non-arms length transaction. The Collateral was held by those entities and/or individuals, presumably waiting for an upturn in the market which in fact happened.

69. The fact that the market for cryptocurrencies was falling rapidly on June 13, 2022, does not justify an amendment or variation of clause 1.1(b)4 of the Amendment Agreement. It is this type of eventuality that Tether should have considered when negotiating the variation of the Original Token Agreement to include the 10-hour waiting period. No provision had been made in the Amendment Agreement to allow Tether to bypass the 10-hour waiting period where the market was falling rapidly. If this was an imprudent decision by Tether, the court should not, according to Lord Neuberger in **Arnold**,[21] assist by re-writing the terms of the Token Agreement by implying a right to bypass the 10-hour waiting period.

70. I am in broad agreement with Mr. Carrington that the lending agreement between Tether and Celsius can create an equitable mortgage for the reasons outlined in his Declaration. The general duty on a mortgagee exercising a power of sale over the mortgaged property is set out in the leading case of **Cuckmere Brick Co Ltd v Mutual Finance Ltd**[22] where Salmon LJ stated the well-known principle that

> "Both on principle and authority, the mortgagee in exercising his power of sale owes a duty to take reasonable precautions to obtain the true market value of the mortgaged property at the date on which he decides to sell it."[23]

The principles in **Cuckmere** have been followed by the courts of the Eastern Caribbean in several cases.[24]

71. Similar principles were applied by the Privy Council in **Tse Kwong Lam v Wong Chit Sen**[25] with the added point that a mortgagee can only sell a mortgaged property to himself if he has obtained the best price reasonably obtainable at the time -

> "In the view of this Board on authority and on principle there is no hard and fast rule that a mortgagee may not sell to a company in which he is interested. The mortgagee and the company seeking to uphold the transaction must show that the

---

[21] Supra note 2 at paragraph 24 above
[22] [1971] 2 All ER 633

[24] For example, **The Bank of Nova Scotia v Delano Gibbs and Christina Gibbs** HCVAP 2009/009 per Baptiste JA
[25] [1983] 3 All ER 54

sale was in good faith and that the mortgagee took reasonable precautions to obtain the best price reasonably obtainable at the time. The mortgagee is not however bound to postpone the sale in the hope of obtaining a better price or to adopt a piecemeal method of sale which could only be carried out over a substantial period of time or at some risk of loss."[26]

72. In **Meftah v Lloyds TSB Bank pls**[27] Lawrence Collins J set out some of the principles to guide mortgagees and I will repeat just five of them (using his numbering) -

"For present purposes the relevant principles are these:

(a) A mortgagee owes a duty of care to the mortgagor in respect of the manner in which the power of sale is exercised.

(b) The duty is to obtain what has been described as the true market value or the best price reasonably obtainable at the time.

(e) In deciding whether the mortgagee has taken reasonable precautions to obtain the true market value 'the facts must be looked at broadly, and he will not be adjudged to be in default unless he is plainly on the wrong side of the line'.

(g) The mortgagee can sell when it likes, even though a better price might be obtained if it waits, and even if the result of an immediate sale may be that instead of there being a surplus for the mortgagor the purchase price is only sufficient to discharge the mortgage debt.

(h) The fact that the mortgagee can sell when it likes does not mean that it can ignore the consequence that a short delay might result in a higher price, and the bank and the receivers must fairly and properly expose the property in the market (c) the Cuckmere Brick Co Ltd case [1971] 2 All ER 633 at 654, [1971] Ch 949 at 979; the Standard Chartered Bank Ltd case [1982] 3 All ER 938, [1982] 1 WLR 1410); it has been suggested that this is subject to qualification where there is a need for an urgent sale. But it is probable that all that this means is that in the case of urgency the necessary degree of exposure to the market must be evaluated in the light of the circumstances."

---

[26] Ibid at page 59(c) per Lord Templeman
[27] [2001] 2 All ER (Comm) 741

These are not hard and fast rules but matters that the court will take into consideration when reviewing a mortgagee's exercise of its power of sale.

73. Pulling the principles together and applying them to the allegations in the Amended Complaint, including the matters set out in paragraph 68 above; the trial court will have to decide if it was reasonable in all the circumstances for Tether to have proceeded and disposed of the Collateral in the way that it did. I consider that Celsius has a good argument that Tether breached its duties as an equitable mortgagee if, as alleged in the Amended Complaint, it executed a fire sale of the Collateral either to itself or for its own benefit. In doing so, Tether did not properly and fairly expose the Collateral to the market so as to ensure the fair market value of the Collateral being obtained. Celsius has a good argument that no reasonable person would have sold the Collateral in the manner that Tether allegedly did. This is a triable issue that will have to be resolved by the trial court on evidence and pleadings after full disclosure. As a matter of BVI law, and applying BVI procedural principles, the claim should not be struck out on a motion to dismiss.

**Situs of crypto currency**

74. I have also been asked to comment on BVI law dealing with the situs of crypto currency. The law relating to crypto currency in the BVI is still in its infancy. Mr. Carrington referred to the decision of Wallbank J in **Smith and Kardachi v Torque Group Hotels Limited and others**[28]. The respondent company held crypto assets in its account in two ways: User Trading Wallets which the company controlled and User Personal Wallets which were controlled by the owners/users of the wallets. The company did not have access to or control of the User Personal Wallets. On an ex parte application by the liquidators of the company for directions in the liquidation, Wallbank J found that the crypto currency in the company's account was an asset of the company (for the purposes of the liquidation of the company), but the cryptocurrency that was held in the User Personal Wallets was not controlled by the company and was not owned by the company. It was likely owned by the users of the User Personal Wallets.[29] Wallbank J was not called upon and did not express a view on the situs of the crypto in the User Personal Wallets, but his opinion could be read to imply that the situs of the crypto currency is the place from where the crypto is controlled.

---

[28] BVIHCVComm 2012/ 0003
[29] Ibid paragraph 32

75. Mangatal J came to similar conclusion in **AQF v AXI and others**[30], noting that that in determining the situs of crypto assets regard should be had to where the assets are "centrally controlled." The comment was made obiter in an ex parte judgment.

76. The situs of crypto assets has not been authoritatively determined by a BVI court, but the opinions of Wallbank J and Mangatal J suggest that a key factor in deciding the situs of a crypto asset is the location of the person or entity that controls the crypto asset.

**Conclusions**

77. My conclusions in relation to the counts of the Amended Complaint that are governed by BVI law are;

**Count 3** - Tether breached the terms of the Amended Token Agreement by liquidating the Collateral in less than the mandated 10-hour waiting period in clause 1.1(b)4 of the Agreement.

**Count 4** - Tether owed a duty of good faith and fair dealing to Celsius to act in a manner that was not unreasonable, irrational or arbitrary in liquidating the Collateral. It failed to discharge that duty when it sold the Collateral in less than the mandated 10 hours and then held on to the assets through entities in which it had an interest.

**General**

78. I confirm that insofar as the facts stated in my report are within my own knowledge, I have made clear what they are and I believe them to be correct, and that the opinions I have expressed represent my accurate and complete professional opinion.

---

[30] BVIHCVCOM 2023/0239

79. I declare on March 11, 2025, under the penalties of perjury under the laws of the United States, which may include a fine or imprisonment, that the foregoing is true and correct, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated March 11, 2025
British Virgin Islands

PAUL ANTHONY WEBSTER, K.C.