KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Daniel M. Eggermann
David E. Blabey, Jr.
Gabriel Eisenberger
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Ariel N. Lavinbuk
Brandon L. Arnold
Jane Jacobs (*pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC  20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>(Jointly Administered) |
| CELSIUS NETWORK LIMITED and CELSIUS NETWORK LLC (POST-EFFECTIVE DATE DEBTORS),<br><br>          Plaintiffs,<br><br>    against<br><br>TETHER LIMITED;<br>TETHER HOLDINGS LIMITED;<br>TETHER INTERNATIONAL LIMITED; and<br>TETHER OPERATIONS LIMITED,<br><br>          Defendants. | Adv. Proc. No. 24-04018 (MG) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

---

[1] The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.   The Only Relevant Debtor In This Case Is CNL—A U.K. Entity—And Plaintiffs' Characterization Of "Celsius" As A "U.S.-Based Entity" Should Not Be Credited ............. 2

II.  Plaintiffs Have Failed To Make A *Prima Facie* Showing Of Specific Jurisdiction ............. 4

    A.   Plaintiffs' Market Exploitation Theory Fails ................................................... 7

    B.   Plaintiffs' Course Of Performance Theory Fails ............................................. 10

III. Plaintiffs' Preference And Fraudulent Transfer Claims Rely On Impermissible Extraterritorial Applications Of The Bankruptcy Code (Counts I, II, V, IV) ..................... 14

    A.   Congress Did Not Express The Clear Intent Required To Apply The Avoidance Provisions Extraterritorially ......................................................... 14

    B.   Plaintiffs' Avoidance Claims Are Predicated On Foreign Transfers ........................... 15

        1.   The Top-Up And Cross-Collateralization Transfers Were Foreign ................... 15

        2.   The Application Transfer Was Foreign ............................................... 18

IV.  The Complaint Fails To State A Claim For Breach Of Contract (Count III) ...................... 19

V.   The Complaint Fails To State An Implied Duty Claim (Count IV) ................................... 21

VI.  The Complaint Fails To State Any Preference Claims (Counts I and II) ............................ 22

    A.   The Purported Application Transfer Is Not Independently Avoidable ....................... 22

    B.   The Purported Cross-Collateralization Transfers Are Not Avoidable Because They Were Not Made On Account Of Antecedent Debt ........................................... 23

    C.   The Purported Top-Up Transfers Are Not Avoidable Because TLTD Was Fully Secured At The Time Of Each Transfer ........................................... 23

CONCLUSION ................................................................................................................. 25

i

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AJ Ruiz Consultoria Empresarial S.A. v. Banco Bilbao Vizcaya Argentaria, S.A.*,
2024 WL 460482 (Bankr. S.D.N.Y. Feb. 6, 2024) ...................................................7

*Al Rushaid v. Pictet & Cie*,
28 N.Y.3d 316 (2016) ..............................................................................................6

*In re Ala. Aircraft Indus., Inc.*,
2013 WL 6332688 (Bankr. D. Del. Dec. 5, 2013)..................................................24

*Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*,
2018 WL 5118638 (S.D.N.Y. Oct. 22, 2018) ..........................................................6

*In re All Terrain, LLC*,
622 B.R. 770 (Bankr. D. Idaho 2020)......................................................................4

*In re Ampal-Am. Israel Corp.*,
562 B.R. 601 (Bankr. S.D.N.Y. 2017)..............................................................15, 16

*ARP Films, Inc. v. Marvel Ent. Grp., Inc.*,
952 F.2d 643 (2d Cir. 1991)...................................................................................21

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
480 U.S. 102 (1987)..................................................................................................9

*Bachner v. Robinson*,
107 F.2d 513 (2d Cir. 1939)....................................................................................25

*Banco de La Republica de Colombia v. Bank of N.Y. Mellon*,
2013 WL 3871419 (S.D.N.Y. July 26, 2013) ..........................................................3

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*,
526 U.S. 434 (1999)................................................................................................23

*In re Bankers Trust Co.*,
450 F.3d 121 (2d Cir. 2006)....................................................................................21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................17

*Bernhardt v. Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022)..................................................................................5

## TABLE OF AUTHORITIES—Continued

Page(s)

*Black v. Ganieva*,
   619 F. Supp. 3d 309 (S.D.N.Y. 2022),
   *aff'd*, 2023 WL 2317173 (2d Cir. Mar. 2, 2023) ....................................................21

*Bucephalus Alt. Energy Grp., LLC v. KCR Dev.*,
   2009 WL 5179091 (S.D.N.Y. Dec. 23, 2009) ........................................................11

*BYD Co. v. VICE Media LLC*,
   531 F. Supp. 3d 810 (S.D.N.Y. 2021).....................................................................20

*Cannella v. Intercontinental Hotels Grp., PLC*,
   2023 WL 2574759 (S.D.N.Y. Mar. 20, 2023) ........................................................12

*CFPB v. NDG Fin. Corp.*,
   2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ..........................................................13

*Charles Schwab Corp. v. Bank of America Corp.*,
   883 F.3d 68 (2d Cir. 2018)..................................................................................8, 9

*CHG Cos., Inc. v. Medina Mem'l Hosp.*,
   2017 WL 5712689 (D. Utah Nov. 27, 2017) ..........................................................13

*In re CIL Ltd.*,
   582 B.R. 46 (Bankr. S.D.N.Y. 2018).......................................................................15

*Dennis v. JPMorgan Chase & Co.*,
   343 F. Supp. 3d 122 (S.D.N.Y. 2018).......................................................................9

*Eades v. Kennedy, PC L. Offs.*,
   799 F.3d 161 (2d Cir. 2015)...................................................................................13

*Emiabata v. Seton Healthcare Fam.*,
   2021 WL 4256846 (2d Cir. Sept. 20, 2021) .............................................................8

*In re FAH Liquidating Corp.*,
   572 B.R. 117 (Bankr. D. Del. 2017) .......................................................................15

*In re Fairfield Sentry Ltd.*,
   657 B.R. 1 (Bankr. S.D.N.Y. 2024).........................................................................6

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   873 F.3d 85 (2d Cir. 2017)....................................................................................18

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   592 U.S. 351 (2021)...........................................................................................5, 6

## TABLE OF AUTHORITIES—Continued

Page(s)

*In re French*,
440 F.3d 145 (4th Cir. 2006) ...............................................15

*Giuliano v. Schnabel*,
574 B.R. 446 (Bankr. D. Del. 2017) ........................................4

*Golden Archer Invs., LLC v. Skynet Fin. Sys., LLC*,
2012 WL 123989 (S.D.N.Y. Jan. 3, 2012) ...............................11

*Great W. Ins. Co. v. Graham*,
2024 WL 3161747 (S.D.N.Y. June 25, 2024) ..........................12

*Hasson v. FullStory, Inc.*,
114 F.4th 181 (3d Cir. 2024) ..................................................5

*HDtracks.com, LLC v. 7digital Ltd.*,
2020 WL 582462 (S.D.N.Y. Feb. 6, 2020) ..............................10

*In re Howland*,
674 F. App'x 482 (6th Cir. 2017) .............................................4

*In re J.A. Jones*,
361 B.R. 94 (Bankr. W.D.N.C. 2007) .....................................25

*Johnson v. Root Mfg. Co.*,
241 U.S. 160 (1916).................................................................25

*Johnson v. TheHuffingtonPost.com, Inc.*,
21 F.4th 314 (5th Cir. 2021) ....................................................4

*Kalaj v. Kay*,
2023 WL 4564795 (E.D.N.Y. July 17, 2023) ..........................11

*Karim-Rashid v. NYS Dep't of Corrs. & Cmty. Supervision*,
2018 WL 524784 (W.D.N.Y. Jan. 24, 2018)...........................10

*Knox v. MetalForming, Inc.*,
914 F.3d 685 (1st Cir. 2019)....................................................5

*Leftridge v. Jud. Branch*,
2023 WL 4304792 (D. Conn. June 30, 2023)...........................8

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013).............................................6, 13

iv

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Lingley v. Contractors Grp., Inc.*,
　55 B.R. 574 (Bankr. D. Me. 1985)....................................................................25

*In re Lyondell Chem. Co.*,
　543 B.R. 127 (Bankr. S.D.N.Y. 2016)..............................................................15

*In re Maxus Energy Corp.*,
　641 B.R. 467 (Bankr. D. Del. 2022) .................................................................16

*McQueen v. Huddleston*,
　17 F. Supp. 3d 248 (W.D.N.Y. 2014) ...............................................................13

*Metro Bus. Sys., LLC v. PlanITROI, Inc.*,
　2022 WL 2802333 (D. Conn. July 18, 2022) ....................................................8

*Moncrief Oil Int'l Inc. v. OAO Gazprom*,
　481 F.3d 309 (5th Cir. 2007) ...........................................................................11

*In re Moran*,
　188 B.R. 492 (Bankr. E.D.N.Y. 1995)..............................................................23

*Morrill v. Scott Fin. Corp.*,
　873 F.3d 1136 (9th Cir. 2017) .........................................................................11

*Multi Access Ltd. v. Guangzhou Baiyunshan Pharm. Holdings*,
　2024 WL 3498180 (S.D.N.Y. July 22, 2024) ...................................................10

*Okla. Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico) S.A.*,
　92 F. 4th 450 (2d Cir. 2024) .......................................................................6, 7, 8

*Palmer Clay Products Co. v. Brown*,
　297 U.S. 227 (1936)....................................................................................24, 25

*In re Picard*,
　917 F.3d 85 (2d Cir. 2019).......................................................................*passim*

*In re Residential Capital, LLC*,
　501 B.R. 549 (Bankr. S.D.N.Y. 2013) .............................................................24

*Ricotta v. Burns Coal & Bldg. Supply Co.*,
　264 F.2d 749 (2d Cir. 1959).............................................................................25

*RJR Nabisco v. Eur. Cmty.*,
　579 U.S. 325 (2016)...................................................................................14, 15

## TABLE OF AUTHORITIES—Continued

Page(s)

*Rousey v. Jacoway*,
    544 U.S. 320 (2005)............................................................................................23

*Roxx Allison Ltd. v. Jewelers Inc*.,
    385 F. Supp. 3d 377 (S.D.N.Y. 2019)..................................................................11

*Schwartz v. A.W. Chesterton Co.*,
    2021 WL 6284112 (N.D.N.Y. June 29, 2021)......................................................9

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) ................................................................18

*Sewell v. InBev*,
    2024 WL 4026201 (W.D.N.Y. Sept. 3, 2024) .......................................................8

*Singer v. Bank of Palestine*,
    2021 WL 4205176 (E.D.N,Y. Apr. 30, 2021) .....................................................13

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group. AG*,
    277 F. Supp. 3d 521 (S.D.N.Y. 2017)...................................................................9

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018)...........................................................................4, 5

*State v. Vayu Inc.*,
    39 N.Y.3d 330 (2023) ......................................................................................11

*In re Telesphere Commc'ns, Inc.*,
    229 B.R. 173 (Bankr. N.D. Ill. 1999) .................................................................24

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 659 (2d Cir. 2013)................................................................................5

*Travelers Ins. Co. v. Cambridge Meridian Group, Inc.*,
    980 F.2d 792 (1st Cir. 1992)..............................................................................24

*Union Savs. Bank v. Augie/Restivo Baking Co.*,
    860 F.2d 515 (2d Cir. 1988)................................................................................4

*Vapotherm, Inc. v. Santiago*,
    38 F.4th 252 (1st Cir. 2022)................................................................................5

*Walden v. Fiore*,
    571 U.S. 277 (2014)..................................................................................4, 5, 11

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Williams v. Binance*,
　　96 F.4th 129 (2d Cir. 2024) ....................................................................................18

*Wilson v. JPMorgan Chase Bank, N.A.*,
　　2021 WL 5179914 (S.D.N.Y. Nov. 8, 2021) ...........................................................4

*In re Zetta Jet USA, Inc.*,
　　2021 WL 3721477 (Bankr. C.D. Cal. Aug. 17, 2021) ............................................15

*In re Zetta Jet USA, Inc.*,
　　2024 WL 3198826 (C.D. Cal. Mar. 26, 2024) ...................................................16, 18

**Statutes**

11 U.S.C. § 541 ...........................................................................................................14

11 U.S.C. § 547 ...............................................................................................23, 24, 25

C.P.L.R. § 302 .............................................................................................................11

## INTRODUCTION

Plaintiffs ask this Court to avoid transfers made by CNL—an entity that their Complaint explicitly pleads was *and to this day remains* "incorporated under the laws of England and Wales with a principal place of business in London." AC ¶ 12.[1] The challenged transfers were made to Defendant TLTD, a Hong Kong entity (*id.* ¶ 15), to satisfy debts owed by CNL—and only CNL—under a Token Agreement governed by BVI law. *See* AC, Ex. A (agreement). And the transfers at issue involved only bitcoin and USDT—cryptocurrencies that exist only on intangible blockchains and that, as a matter of law, are considered to be "located" with their legal owner.

Those core factual allegations do not state even a *prima facie* case for personal jurisdiction in the United States—but even if they did, they establish that, as a matter of law, the alleged avoidance actions would be impermissibly extraterritorial anyway. In their Opposition ("Opp."), Plaintiffs run from these defining characteristics of their claims by accusing us of "improperly ignor[ing] or mischaracteriz[ing]" other purportedly "well-pled allegations" in their Complaint. Opp. 2. But much of what they call factual allegations are bare legal conclusions—and what remains does not legally suffice to establish jurisdiction or state a claim even if it was true.

Indeed, to complicate legal scrutiny of their claims, Plaintiffs obfuscate key elements of their factual narrative. There is no better example of this than Plaintiffs' insistence on referring to CNL only in combination with a different entity, U.S.-based CNLLC, which did not sign *any* agreement with, or transfer any assets to, TLTD or its affiliates. Time and again, Plaintiffs hide behind references to "Celsius" to make seemingly factual assertions—for example, that "[t]he preferential transfers at issue here were made by a domestic debtor" (Opp. 26)—that simply cannot be squared with the fact that, at all relevant times, CNL's principal place of business was London.

---

[1] Capitalized terms have the same meaning as defined in the Motion to Dismiss (the "Motion"). Unless otherwise noted, all emphasis is added and all internal citations and quotation marks are omitted.

There is no legal basis for Plaintiffs to treat every Celsius-affiliated entity as a single U.S. entity, and Plaintiffs should not be allowed to survive dismissal based on Janus-faced "factual" assertions.

That theme—of Plaintiffs ignoring their own allegations when they undermine their legal claims—runs throughout. Plaintiffs claim that TLTD breached a provision in the Token Agreement that limited its power to act in its "*sole* discretion"—but their Complaint *concedes* that TLTD did not act unilaterally here. *See* AC ¶ 71 (alleging that CNL's CEO *authorized* the challenged liquidation). Their Opposition offers no response. Plaintiffs' preference claims are similarly flawed for many reasons, including that they seek the recovery of nearly 40,000 BTC, even as they concede to having no basis whatsoever to avoid the liens on more than half of it, whose transfer they do not challenge. The Complaint should be dismissed.

## ARGUMENT

**I.    The Only Relevant Debtor In This Case Is CNL—A U.K. Entity—And Plaintiffs' Characterization Of "Celsius" As A "U.S.-Based Entity" Should Not Be Credited**

Plaintiffs' jurisdictional and extraterritoriality arguments are all premised on their assertion that "Celsius was a U.S.-based entity" and that its "interests in the collateral" at issue in this case "were owned by an entity incorporated in the U.S. and with its principal place of business in the U.S." *E.g.*, Opp. 2. But there is no legal entity called "Celsius." It does not exist and certainly does not have a principal place of business in the U.S. Rather, "Celsius" is merely a term *defined by Plaintiffs* to include two separate and distinct entities—CNL, a U.K. entity with its principal place of business in London, and CNLLC, a Delaware entity with its principal place of business in New Jersey. AC ¶¶ 12-13. By collectively defining them as "Celsius," Plaintiffs try to distract from the real distinctions between the two entities. This is not surprising, because, as we explain below, *CNL's* location is critically important to both personal jurisdiction and extraterritoriality.

CNL is the only entity that is actually relevant to Plaintiffs' claims and to the Court's

determination of personal jurisdiction and extraterritoriality. All of the claims in this case arise

out of a Token Agreement signed *only* by CNL. Because *only* CNL owed a debt to TLTD, *only*

CNL could have made the allegedly "preferential" transfers that Plaintiffs now seek to avoid. And,

as a matter of law, CNL is *not* a U.S. entity. *See Banco de La Republica de Colombia v. Bank of*

*N.Y. Mellon*, 2013 WL 3871419, at *8 (S.D.N.Y. July 26, 2013) ("Under federal law, a corporate

entity is located both where it is incorporated and where it has its principal place of business.").

Because clarifying their allegations to distinguish between CNL and CNLLC would spell

the end of their lawsuit, Plaintiffs instead make an untimely and half-hearted wave to substantive

consolidation. They contend, for example, that the Plan *already* consolidated CNL and CNLLC

such that they can be treated as a single entity. But, as this Court knows, that simply did not

happen. The Confirmation Order, which Plaintiffs quote only selectively (Opp. 30), is explicit:

"The substantive consolidation and deemed merger effected pursuant to the Plan shall not

affect . . . defenses to any Causes of Action." Dkt. 3972 at 84.[2] The Plan likewise provides that

"each Post-Effective Date Debtor shall continue to exist after the Effective Date as a separate

corporate entity" (at 41) and that "Causes of Action of the Debtors" may be pursued "exclusively"

by the "applicable" Post-Effective Date Debtor (at 66). Dkt. 4289.

Moreover, the Complaint—which does not even mention the words "substantive

consolidation"—pleads no facts that would support its application here. Plaintiffs belatedly argue

in their Opposition that (i) CNL and CNLLC "were both controlled by one set of executives that

Tether 'knew were based in the United States,'" and (ii) "Celsius commingled transfers under [the]

Token Agreement between entities." Opp. 29-30 (quoting AC ¶¶ 43-44). But even if true, those

---

[2] Plaintiffs say that Defendants "concede[] that there was factual support for substantive consolidation." Opp. 30. To the contrary, Defendants argued that the Amended Complaint "does not claim—nor allege facts to support—that the two entities should be treated as a single legal entity for purposes of this Complaint." Mot. 11.

assertions come nowhere close to justifying consolidation. *See Union Savs. Bank v. Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988) (consolidation appropriate only where (i) "creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit or (ii) . . . the affairs of the debtors are so entangled that consolidation will benefit all creditors").[3]  Indeed, the facts that Plaintiffs *actually pled* make clear that consolidation is not appropriate here.  The Complaint alleges that CNL and CNLLC are separate entities organized under different laws with distinct principal places of business.  AC ¶¶ 12-13.  And the paragraph cited in the Opposition (at 30) alleges only that CNL used the USDT that it received to "ultimately benefit" its U.S. affiliates—which just reiterates the *distinction* between the two entities.  AC ¶ 44.[4]

## II.    Plaintiffs Have Failed To Make A *Prima Facie* Showing Of Specific Jurisdiction

In their Opposition, Plaintiffs seek to justify their claims based on specific jurisdiction alone and abandon their *quasi in rem* theory.  Mot. 25; Opp. 12.  Therefore, to survive our Motion, Plaintiffs must allege facts showing that (i) each Defendant "*purposefully* availed itself of the privilege of conducting activities within the forum [] thus invoking the benefits and protections of its laws" *and* (ii) each Defendant's "*suit-related conduct* . . . create[d] a *substantial* connection with the forum."  *SPV Osus Ltd. v. UBS AG,* 882 F.3d 333, 344 (2d Cir. 2018); *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *see also Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 325 (5th Cir. 2021) ("The only relevant activities of the defendant are those that relate to the plaintiff's

---

[3] Plaintiffs' own authority stresses that consolidation is an "extreme measure" that should be denied where the complaint fails to plead facts to support it. *In re Howland*, 674 F. App'x 482, 489-90 (6th Cir. 2017) (affirming denial of consolidation because complaint was "devoid of any factual allegations that any creditor relied on the debtors' disregard of corporate formalities" or that the entities' "assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors") (cited Opp. 30).  Denial is also appropriate here given that Plaintiffs only raised consolidation in their opposition. *See In re All Terrain, LLC*, 622 B.R. 770, 778 n.9 (Bankr. D. Idaho 2020) (refusing request made by "mere mention" in briefing); *Giuliano v. Schnabel*, 574 B.R. 446, 481 (Bankr. D. Del. 2017) (similar).

[4] Plaintiffs also reference the Examiner's Report and other materials outside the pleadings (Opp. 30), but those documents are irrelevant to what Plaintiffs have actually pled. *See, e.g., Wilson v. JPMorgan Chase Bank, N.A.*, 2021 WL 5179914, at *2 n.2 (S.D.N.Y. Nov. 8, 2021) (complaint cannot be amended by an opposition brief).

suit.").[5]  In addition, jurisdiction "must arise out of contacts that the defendant *himself* create[d] with the forum" *itself*, not with persons residing there. *Walden*, 571 U.S. at 284, 286.

Plaintiffs admit that any jurisdictional contacts must relate to their claims, but argue that "relatedness" is an elastic and forgiving standard that requires only the slightest showing. *See* Opp. 14 (only a "logical relationship" is needed).  But the primary case on which they rely says otherwise. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021).[6]  *Ford* made clear that the relatedness test "incorporates *real limits*" and "does not mean anything goes."  *Id*.  It did not, as Plaintiffs claim (at 14), hold that any "sale of *other* Ford cars" in the forum was enough. Rather, the justices stressed Ford's veritable "truckload" of forum contacts, including, critically, that the plaintiffs lived and used Ford's products *in the forum*.  592 U.S. at 359, 365 (noting that Ford "conceded purposeful availment").  The cases applying *Ford* have likewise underscored the need for a tight relationship between the contacts and the claims asserted.  *See, e.g.*, *Hasson v. FullStory, Inc.*, 114 F.4th 181, 195 (3d Cir. 2024) ("Papa Johns' in-state restaurant sales and marketing activities" were "insufficiently related" to wiretapping claim based on computer code used on its website).[7]  Those limits are "necessary to preserve the distinction between specific and general jurisdiction since, as many a curbstone philosopher has observed, everything is related to everything else." *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 865 n.8 (D.C. Cir. 2022).

---

[5] A plaintiff can also sometimes establish specific jurisdiction by alleging that a defendant "expressly aimed intentional [] acts at residents of the United States" *and* that the plaintiff's "alleged injuries [] arise out of or relate to those activities." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013).  But Plaintiffs do not respond to our effects-test arguments (Mot. 23-25) and, therefore, concede that the effects test does not apply.

[6] It is ironic that Plaintiffs fault Defendants for relying on cases that predate *Ford* (Opp. 14 n.3), but then proceed to rely on a pre-*Ford* case themselves to argue for their watered-down understanding of relatedness. *See* Opp. 14 (citing *Knox v. MetalForming, Inc.*, 914 F.3d 685, 690-91 (1st Cir. 2019)).

[7] *See also, e.g.*, *Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 261 (1st Cir. 2022) (defendant's prior employment by New Hampshire-based plaintiff was not sufficiently "related to" claim that defendant breached non-compete by soliciting plaintiff's employees who lived in different states).  Moreover, nothing in *Ford* conflicts with—much less overrules— Second Circuit precedent holding that a tighter causal relationship is required when the defendant "had only limited contacts with the [forum]."  *See SPV*, 882 F.3d at 344; *see also, e.g.*, *Hasson*, 114 F.4th at 193 (applying similar sliding-scale test for relatedness post-*Ford*).

Moreover, *Ford* drew a sharp contrast with cases (like this one) brought by a foreign plaintiff. *Id.* 369-70 (distinguishing cases where plaintiffs were "not residents" in the forum). The Complaint concedes that CNL—the only Plaintiff entity with which any of the Defendants ever did business—is a foreign entity based abroad. AC ¶ 12. That alone makes this case unlike nearly every case cited in the Opposition—which concern *in-forum plaintiffs* that suffered *in-forum injuries*. And the few foreign-v.-foreign cases that Plaintiffs cite make clear that jurisdiction exists only where *a defendant* chooses to rely on an in-forum agent or otherwise *itself* takes some *action* in the forum related to the claims.[8] Plaintiffs do not allege anything of the sort here.

Judged under the proper standard, the Complaint fails to make a *prima facie* showing of personal jurisdiction.[9] All of Plaintiffs' claims arise out of specific transfers of cryptocurrency made from one *foreign* entity to another *foreign* entity, pursuant to a *foreign law* contract executed by two *foreign* counterparties that *neither contemplated nor required any performance or activity by either party in the United States* and contained both *foreign* forum-selection and *foreign* choice-of-law clauses. Mot. 15-21. Rather than identify purposeful actions *by TLTD*, the Complaint alleges the extent of CNL's *own* U.S. connections—namely that, despite being a U.K. entity with its principal place of business in London, some of its officers or employees were in the U.S. at times relevant to the negotiation or performance of the Token Agreement. *Id.* But those actions *by CNL* do not provide a basis to exercise personal jurisdiction over *Defendants*. *Id.*

---

[8] *See Okla. Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico) S.A.*, 92 F. 4th 450, 456 (2d Cir. 2024) (defendant chose to act through in-forum brokers that acted as its agent); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161,168-69 (2d Cir. 2013) (*defendant's* "deliberate" and "frequen[t]" use of in-forum bank account sufficient to establish specific jurisdiction where defendant's "culpable conduct stem[med] from this use of the . . . account."); *In re Fairfield Sentry Ltd.*, 657 B.R. 1, 21 (Bankr. S.D.N.Y. 2024) (similar); *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 328 (2016) (similar); *Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, 2018 WL 5118638, at *4 (S.D.N.Y. Oct. 22, 2018) (defendant used trademark to mislead New York customers).

[9] Defendants THL, TOL, and TIL should also be dismissed because Plaintiffs allege no action specific to THL or TOL and allege only that TIL was a subsequent transferee. Mot. 14. Plaintiffs respond (Opp. 31 n.17) that the "Complaint plainly alleges that all Defendants conspired throughout the entirety of the relevant period," but, tellingly, they cite no factual allegations to support that sweeping claim.

Plaintiffs proffer two arguments to salvage their claims. They argue that jurisdiction could be proper based on (i) Defendants' purported "plans" to "exploit" the U.S. market or (ii) the parties' "course of dealing" under the Token Agreement. Opp. 13-22. But, as we explain below, neither theory justifies jurisdiction based on the facts that Plaintiffs allege in their Complaint.

A.    **Plaintiffs' Market Exploitation Theory Fails**

Throughout their Opposition, Plaintiffs repeatedly rely on an assertion that the "fundamental purpose" of the Token Agreement was to "exploit[] the United States market." *E.g.*, Opp. 13 (quoting AC ¶¶ 30, 44). But merely alleging that a defendant's *purpose* was to exploit a market is not enough; that just restates the purposeful availment test in different words. *AJ Ruiz Consultoria Empresarial S.A. v. Banco Bilbao Vizcaya Argentaria, S.A.*, 2024 WL 460482, at *25 (Bankr. S.D.N.Y. Feb. 6, 2024) (rejecting as "conclusory" allegation that defendants "exploited the New York financing market").

Plaintiffs' own authority illustrates the point. In *Oklahoma Firefighters*, the Second Circuit did not establish a bright-line rule that an allegation that the defendant "determine[d] to deliberately 'exploit a market in the forum state'" is enough to "subject [it] to jurisdiction there," as Plaintiffs suggest. Opp. 13. Far from relying on conclusory allegations about "purpose" or "intent," the Second Circuit looked to the *actions* that the *defendants* allegedly took in the forum. 92 F. 4th at 456. It held that the "key considerations" driving its finding of jurisdiction were the allegations that the foreign defendants "were in charge" of *domestic* brokers that functioned as its "agents" and "mere pass-throughs" for the foreign defendants to sell to domestic buyers. *Id.* at 456-459. The Second Circuit stressed that an "affiliate's in-forum marketing, sales, and distribution" would *not* always be attributable to an out-of-forum defendant and that "sparse" and "conclusory" allegations of control or benefit would not suffice. *Id.* at 457, 459. Indeed, it reaffirmed its prior precedent making clear that a "bare allegation" that defendants "controlled or

7

otherwise directed or materially participated" in operations of domestic brokers is ***not*** enough.  *Id*. (quoting *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 79, 86 (2d Cir. 2018)).

All of the "key considerations" from *Oklahoma Firefighters* are missing here.  The Complaint acknowledges that CNL used the USDT obtained from TLTD "to operate certain critical aspects" of its *own* business (AC ¶ 2)—not to act as an "affiliate[]" or "agent" of TLTD. *Oklahoma Firefighters*, 92 F.4th at 458.  And Plaintiffs never allege (nor could they) that TLTD (or any other Tether entity) was somehow "in charge" of what CNL did with the USDT that it obtained under the Token Agreement.  *Id*. at 459.  To the contrary, Plaintiffs concede that "the contract [did] ***not*** require that it be performed in the U.S."  Opp. 15.  Plaintiffs also ignore their own allegations that—when the Token Agreement was signed in June 2020—Celsius's "main business activity," "headquarters," and "customer relationships" were all based in the *United Kingdom*, not the U.S.  *See* AC ¶ 35 (alleging that certain aspects of the overall Celsius business later moved "from the UK" in June 2021).[10]  And they likewise have no response to the fact that, in connection with the migration, CNL specifically assured TLTD in writing that transactions under the Token Agreement would ***not*** be made "for the account of, or otherwise for the benefit of, any U.S. affiliates."  Hilliard Decl. ¶ 20, Ex. H.  Although Plaintiffs smear the declaration as "self-serving" (Opp. 16 n.6), they do not actually dispute it—so the Court may rely on it.[11]

---

[10] Plaintiffs allege that "Tether 'knew that its real counterparties under the Agreement were based in the United States.'"  Opp. 17 n.7 (quoting AC ¶ 43).  But *the individual CNL employees* who signed the Agreement certainly were not themselves "counterparties."  The Complaint—and the Token Agreement itself—make unmistakably clear that *CNL* (a U.K. entity with its principal place of business in London) was the only actual counterparty.  *See supra* § I; AC, Ex. A; *see also* AC ¶ 32.  While Plaintiffs allege that CNL had a New York bank account and management in the United States, those U.S. connections (if true) still would not transform CNL into a U.S. entity.  AC ¶¶ 37, 43.

[11] *See Emiabata v. Seton Healthcare Fam.*, 2021 WL 4256846, at *2 (2d Cir. Sept. 20, 2021) (affirming dismissal where plaintiff "failed to controvert the defendants' affidavits showing that the court lacked personal jurisdiction"); *see also Sewell v. InBev*, 2024 WL 4026201, at *5 (W.D.N.Y. Sept. 3, 2024) (conclusory assertions that defendant "manufactured" or "sold" beer in the forum were insufficient to establish jurisdiction where defendant's affidavits provided specific facts to the contrary); *Metro Bus. Sys., LLC v. PlanITROI, Inc.*, 2022 WL 2802333, at 3 n.4 (D. Conn. July 18, 2022) ("[W]here the factual assertions in Defendant[s'] affidavit are unopposed, the Court will assume their veracity."); *Leftridge v. Jud. Branch*, 2023 WL 4304792, at *10 (D. Conn. June 30, 2023) (similar).

Plaintiffs allege, in the most general terms, that "Tether *could* provide access to" USDT to "Celsius and Tether's customers in the United States." AC ¶ 31; *see* Opp. 14 (same). But that is even more conclusory than the "sparse" allegations that the Second Circuit rejected in *Schwab*.[12] At most, Plaintiffs have alleged that TLTD placed USDT into the stream of commerce by providing it to CNL with knowledge that it *could* end up in the United States—just as it *could* end up in any other market where CNL chose to use it. Unfortunately for Plaintiffs, "[t]he placement of a product in the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum." *Schwartz v. A.W. Chesterton Co.*, 2021 WL 6284112, at *4 (N.D.N.Y. June 29, 2021) (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 112 (1987) (plurality opinion of O'Connor, J.). Plaintiffs plead none of the facts that would support jurisdiction, such as allegations that USDT was "designed" for the U.S. market, that TLTD "advertis[es]" or "established channels for providing regular advice to [U.S.] customers," or that CNL or any other entity had agreed to act as TLTD's U.S. "agent." *Id.* at *2, *4.

Finally, Plaintiffs contend that "communications exchanged in July 2020 . . . establish that the primary objective of [the CNL-TLTD] relationship was to make money from providing cryptocurrency in the United States." Opp. 16. That misleading wording might cause one to believe that Plaintiffs were quoting emails or other communications *between CNL and TLTD*. But that is not the case—the Complaint actually quotes *CNL's own internal emails*. *See* Decl. of Brandon Arnold, Ex. A-B.[13] Plaintiffs misrepresent the substance of those emails, too. They contend that "those same communications link the parties['] broader goal of profiting from the

---

[12] *Sonterra Capital Master Fund Ltd. v. Credit Suisse Group. AG*, 277 F. Supp. 3d 521, 594 (S.D.N.Y. 2017), upon which Plaintiffs rely (Opp. 15), was abrogated by the Second Circuit's decision in *Schwab*, which "precludes" a finding of personal jurisdiction based on allegations of in-forum "financial incentives" tied to out-of-forum conduct. *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 205–06 (S.D.N.Y. 2018).

[13] Perhaps that is why Plaintiffs initially refused to produce the emails that they quoted in the Complaint. Mot. 18 n.8.

U.S. with the specific lending relationship at issue here" because the emails supposedly say that Tether would "'lower borrow rates for USDT so [Celsius] [could] push it harder' to the parties' U.S. clients." Opp. 16 (quoting AC ¶ 31). But the actual emails say *nothing* about pushing USDT to "*U.S. clients*"—only that CNL's goal was to "███████████████████████████ ██████." Ex. A. Moreover, the Complaint only alleges that those emails reflect what was being "plan[ned]" in July 2020. AC ¶ 30 (alleging acts that Tether "began planning" and that "Mashinsky was planning"). Plaintiffs tellingly do not allege that those plans ever came to fruition. Nor do they dispute that many of those alleged efforts never even made it beyond the initial planning stage. *See* Sanz Decl. ¶¶ 6-7. Such "[a]spirations and hopes, however, are not a sufficient basis for exercising personal jurisdiction over a foreign defendant." *Multi Access Ltd. v. Guangzhou Baiyunshan Pharm. Holdings*, 2024 WL 3498180, at *9 (S.D.N.Y. July 22, 2024).[14]

**B.    Plaintiffs' Course Of Performance Theory Fails**

Plaintiffs next argue that, taken together, the negotiation of the Token Agreement, the parties' course of performance, and requests for additional collateral provide some basis for jurisdiction in the United States. Opp. 18. But those arguments miss the mark, too.

*Negotiation of the Token Agreement.* Plaintiffs allege that certain "Celsius" executives and employees were in the United States when they negotiated and executed the Token Agreement. Those bare allegations, even if true, are insufficient to establish specific jurisdiction, as "[d]ue process requires that a defendant be haled into court . . . based on his own affiliation with the

---

[14] Plaintiffs suggest that "discovery will reveal additional links between Tether and the United States." Opp. 16. But discovery is not an appropriate means to conduct a jurisdictional fishing expedition for possible "additional links" between a defendant and the forum. *See e.g., Karim-Rashid v. NYS Dep't of Corrs. & Cmty. Supervision,* 2018 WL 524784, at *4 (W.D.N.Y. Jan. 24, 2018). That is especially true in these circumstances, where Plaintiffs' market-exploitation theory turns on the existence of facts already in their possession. *HDtracks.com, LLC v. 7digital Ltd.*, 2020 WL 582462, at *5 (S.D.N.Y. Feb. 6, 2020). And given that Plaintiffs chose to stand on their pleadings—rather than seeking to rely on jurisdictional discovery or introducing any of the discovery that they have already received—they cannot now forestall dismissal by speculating that further discovery might reveal some new U.S. connection.

[forum], not based on . . . contacts he makes by interacting with other persons affiliated with the [forum]." *Walden*, 571 U.S. at 286; *see* Mot. 15. Accordingly, under *Walden*, the mere fortuity that certain "*Celsius*" personnel allegedly happened to be located in the United States when they interacted with TLTD about the Token Agreement is insufficient to establish jurisdiction. *See, e.g.*, *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1144 (9th Cir. 2017) (applying *Walden* and finding no personal jurisdiction where "[a]ny links" to the forum, including "communications with [p]laintiffs by telephone and email," occurred "only because *plaintiffs* were in the forum).

Plaintiffs contend that TLTD "projected itself into New York" because it used "phone, email, and other means" to negotiate the Token Agreement with "Celsius's employees in the United States." Opp. 18-20.[15] But, contrary to Plaintiffs' arguments, "[a]n exchange of communications in the course of developing and carrying out a contract" generally does ***not*** provide an independent basis for jurisdiction. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007) (due process analysis). Plaintiffs cite a host of cases under the New York long-arm statute, but none are on point because, in each of those cases, the defendants did business with *a New York plaintiff. See, e.g.*, *State v. Vayu Inc.*, 39 N.Y.3d 330 (2023) (sale of drones to SUNY Stony Brook).[16] But Plaintiffs cite *no* case finding jurisdiction in circumstances remotely like those here—where Defendants are merely alleged to have had emails or phone calls with employees of a *foreign entity* (CNL) who just happened to live or work in the United States.

Plaintiffs say that cases on "unilateral" action cannot matter because it takes two to

---

[15] Although it does not matter, the Complaint nowhere alleges that any of CNL's employees negotiated from *New York. Contra* AC ¶ 40 (alleging that Mashinsky "was in Hoboken, New Jersey").

[16] *See also Kalaj v. Kay*, 2023 WL 4564795, at *4 (E.D.N.Y. July 17, 2023) (plaintiff was "*a New York resident*"); *Roxx Allison Ltd. v. Jewelers Inc.*, 385 F. Supp. 3d 377, 380-82 (S.D.N.Y. 2019) (same); *Golden Archer Invs., LLC v. Skynet Fin. Sys., LLC*, 2012 WL 123989, at *4 (S.D.N.Y. Jan. 3, 2012) (same). This is not surprising because—under the relevant section of New York's long-arm statute, C.P.L.R. § 302(a)(1)—only relationships with entities *incorporated* in New York are relevant. *See Bucephalus Alt. Energy Grp., LLC v. KCR Dev.*, 2009 WL 5179091, at *5 (S.D.N.Y. Dec. 23, 2009) (no jurisdiction under that provision where plaintiff was "not a New York corporation"). And contrary to Plaintiffs' assertions (Opp. 19 n.9), nothing in *Vayu* purports to "overrule[]" any existing cases.

contract.  Opp. 20.  Defendants never argued that the "negotiation" was unilateral—of course that was not the case.  But the contract negotiation occurred between TLTD—a Hong Kong entity— and CNL—a U.K. entity with its principal place of business in London.  AC ¶ 12; *see also* AC, Ex. A (agreement).  It was CNL—and CNL alone—who made the unilateral decision to involve *its* employees in the U.S. in that negotiation.  *See* AC ¶¶ 34, 37.  That sort of "unilateral activity" by a plaintiff cannot create jurisdiction over a defendant.  *Great W. Ins. Co. v. Graham*, 2024 WL 3161747, at *8 (S.D.N.Y. June 25, 2024) (no jurisdiction where defendant negotiated and communicated with in-forum investment manager who had been unilaterally selected by plaintiff).

*Performance of the Agreement.*  The Opposition contends that Defendants "regularly communicated with [Celsius] in *New York* through e-mails, phone calls, and online video conferences to discuss the [lending arrangement]."  Opp. 20-21.  The Complaint, however, says nothing about anyone in New York.  And Plaintiffs' allegation that "Defendants had continuous and systematic contact with Celsius's United States-based personnel" (AC ¶ 45) is a textbook example of a conclusory statement.  *See, e.g.*, *Cannella v. Intercontinental Hotels Grp., PLC*, 2023 WL 2574759, at *3 (S.D.N.Y. Mar. 20, 2023) (no jurisdiction where allegations were "boilerplate language reciting general categories of contacts that could give rise to jurisdiction").  Plaintiffs also tellingly do not dispute that CNL made exactly the *opposite* representation to TLTD—stating in no uncertain terms that its performance under the Token Agreement would be "directed, controlled, and co-ordinated by [CNL] personnel (a) who are *not* U.S. citizens" or residents and (b) "are located ***outside of the U.S.***" Hilliard Decl. ¶ 20, Ex. H.  The Court can—and should— credit that undisputed fact in the jurisdictional analysis.  *See supra* n.11.

*Demands for Collateral.*  Finally, Plaintiffs argue that TLTD's requests for additional collateral provide jurisdiction because they were *received* by employees of CNL in the United

States.  Opp. 21-22.  But the cases that Plaintiffs cite are entirely inapposite.  Each concerns efforts

to collect from a person *in the forum who owed the debt*.[17]  Here, only CNL (the U.K. entity)—not

any of its affiliates and certainly not its employees personally—had any obligation (or right) to

post additional collateral.  The locations where those individual employees happened to be when

they received or responded to a margin call is exactly the sort of incidental contact that is

insufficient to sustain personal jurisdiction.  *See, e.g.*, *CHG Cos., Inc. v. Medina Mem'l Hosp.*,

2017 WL 5712689, at *3 (D. Utah Nov. 27, 2017) (plaintiff's "unilateral decision" to use in-forum

employees to facilitate contract performance provided no basis for specific jurisdiction).

Plaintiffs also contend that the transfers made in response to margin calls create a sufficient

nexus to the U.S., because they were, "at times," initiated by U.S.-based *CNL* personnel and were

made from "United States-based accounts." Opp. 22; AC ¶ 45.  But the location of CNL personnel

when they initiated actions under the Token Agreement improperly focuses, once again, on

*unilateral* actions taken by Plaintiffs.  Indeed, as the Second Circuit made clear in *Licci*, in order

for the use of an in-forum bank account to suffice to establish jurisdiction, a plaintiff must allege

facts showing that the *defendant* "frequen[tly]" and "deliberate[ly]" chose to use such account and

that the "defendant's allegedly culpable conduct stem[med] from" such use.  *Licci*, 732 F.3d at

168-69; *see supra* n.8.  For example, in *Singer v. Bank of Palestine*, the court specifically

distinguished cases like *Licci*, finding that the plaintiffs' complaint "lack[ed] key supporting facts"

necessary to determine whether *the defendant* had made "*frequent* and *deliberate* use of" an in-

forum bank account.  2021 WL 4205176, at *6 (E.D.N,Y. Apr. 30, 2021).  And, regardless, as

discussed in the Motion (at 19-21) and below (*infra* § III(B)(1)), as a matter of *law*, the

---

[17] *See Eades v. Kennedy, PC L. Offs*., 799 F.3d 161, 168 (2d Cir. 2015) (New York residents); *CFPB v. NDG Fin. Corp.*, 2016 WL 7188792, at *7-8 (S.D.N.Y. Dec. 2, 2016) (same); *McQueen v. Huddleston*, 17 F. Supp. 3d 248, 251 (W.D.N.Y. 2014) (same).

cryptocurrency at issue in this case was transferred from the U.K. to Hong Kong—and not from some U.S. account that Plaintiffs seem unable to identify or explain.

**III.    Plaintiffs' Preference And Fraudulent Transfer Claims Rely On Impermissible Extraterritorial Applications Of The Bankruptcy Code (Counts I, II, V, IV)**

The parties agree (Opp. 23) that the extraterritoriality analysis turns on two questions: (i) whether the strong presumption against extraterritorial application has been rebutted by "clearly expressed congressional intent to the contrary" and (ii) whether the transfers at issue are domestic in nature. *In re Picard*, 917 F.3d 85, 95-96, 99-100 (2d Cir. 2019). Because Congress has not acted to rebut the presumption and the transfers here were foreign, Plaintiffs' avoidance claims are impermissibly extraterritorial and must be dismissed.

**A.    Congress Did Not Express The Clear Intent Required To Apply The Avoidance Provisions Extraterritorially**

"When a statute gives no clear indication of an extraterritorial application, it has none." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335, 136 (2016). As the majority of cases that have addressed the issue have held, the Bankruptcy Code's avoidance provisions do not apply extraterritorially because nothing in them expresses a clear congressional intent that they do. Mot. 31-32 (collecting authorities). The handful of cases that have found otherwise reason that policy concerns require an expansive reading of § 541(a)(1)'s definition of "property of the estate" to include any property that may *later* be recovered—but Second Circuit precedent makes clear that such property does not come into the estate until it actually is clawed back. *Id.*

Plaintiffs double-down on those policy arguments—contending that worldwide avoidance powers are needed to "further the Code's policy of maximizing the value of the bankruptcy estate." Opp. 28-29. But the Supreme Court has rejected such outcome-driven reasoning—stressing that courts may not "attempt to divine what Congress *would have* wanted had it considered the question of extraterritoriality." *RJR*, 579 U.S. at 353 (rejecting similar "concern" about "defeat[ing] the

purposes of the antitrust laws" and finding that "even statutes that expressly refer to *foreign* commerce do not apply abroad"). The cases on which Plaintiffs principally rely were both decided *before* the Supreme Court's decision in *RJR*.[18] And nearly every case to decide the issue since has held that the "policy considerations" raised by Plaintiffs "are insufficient to overcome the presumption against extraterritoriality." *In re Zetta Jet USA, Inc.*, 2021 WL 3721477, at \*25 (Bankr. C.D. Cal. Aug. 17, 2021), *aff'd*, 2024 WL 3198826 (C.D. Cal. Mar. 26, 2024); *see also In re CIL Ltd.*, 582 B.R. 46, 91-92 (Bankr. S.D.N.Y. 2018) (same and expressly rejecting *Lyondell*); *In re Ampal-Am. Israel Corp.*, 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017) (same).

### B.    Plaintiffs' Avoidance Claims Are Predicated On Foreign Transfers

To determine whether an avoidance claim is domestic, courts look *only* to the "debtor's initial transfer." *Picard*, 917 F.3d at 99. Such a transfer is domestic if (i) the *transferor* "is a domestic entity" that (ii) "transferred property . . . from a U.S. bank account." *Id*. at 100 (rejecting use of a balancing test). Neither is true for any of the challenged transfers here.

#### 1.    *The Top-Up And Cross-Collateralization Transfers Were Foreign*

*The Transfers Were Made by a Foreign Debtor.* Plaintiffs argue (Opp. 25-26) that the Top-Up and Cross-Collateralization Transfers were made by a "domestic debtor" because (they now claim) "*all of* Celsius's entities were functionally based in the United States." But the Complaint is crystal clear that CNL, specifically, is "incorporated under the laws of England and Wales with a principal place of business in London." AC ¶ 12. Plaintiffs never even acknowledge their own allegation that CNL was and remains in the U.K.—much less explain how that fact can be squared with the argument in their Opposition that CNL is somehow actually "domestic."

---

[18] *In re French*, 440 F.3d 145 (4th Cir. 2006); *In re Lyondell Chem. Co.*, 543 B.R. 127 (Bankr. S.D.N.Y. 2016). The third case that Plaintiffs cite (Opp. 29) merely "adopts the reasoning of . . . *Lyondell*" without ever considering the Supreme Court's then-recent decision in *RJR*. *In re FAH Liquidating Corp.*, 572 B.R. 117, 124 (Bankr. D. Del. 2017).

Regardless, the existence of U.S. connections such as "customer relationships" (AC ¶ 35), would not make CNL a "domestic debtor." Were it otherwise, extraterritoriality would be a veritable dead letter in cases with a foreign defendant, because courts only get to that analysis *after* they confirm that a defendant has sufficient U.S. contacts to justify personal jurisdiction. *See, e.g.*, *Ampal-Am. Israel*, 562 B.R. at 613 & n.14 (holding that "U.S. connections" did not make a transfer domestic and stressing that "the tests for personal jurisdiction and extraterritoriality are not the same"). That is all the more true post-*Picard*, which rejected the use of a multi-factor "balancing test" for determining extraterritoriality in favor of a straightforward analysis that looks only at the location of the transferor and the location of the transferred assets. *Picard*, 917 F.3d at 99-100.

*Zetta Jet* is instructive. The transfers there were made by a "Singapore corporation" with deep connections to the U.S. *In re Zetta Jet USA, Inc.*, 2024 WL 3198826, at *5 (C.D. Cal. Mar. 26, 2024). Two of that entity's principal officers and directors—who were also its majority shareholders—were Americans "based in [its] Burbank, California office." *Id*. A U.S. subsidiary also guaranteed certain related financial arrangements, held U.S. certificates for the foreign parent, and was an integral part of the overall business plan. *Id*. at *9-12. But despite those U.S. contacts, the *Zetta Jet* court easily concluded it was foreign because it was a "Singapore entity." *Id*. at *30.

Plaintiffs cite *In re Maxus Energy Corp.* for the proposition that a transfer is domestic whenever a "'domestic entity' was the[] 'former owner'" of the property. Opp. 26 (quoting 641 B.R. 467, 559-62 & n. 359 (Bankr. D. Del. 2022)). But *Maxus* said no such thing. To the contrary, it is a straightforward application of *Picard*—finding a transfer is domestic because Maxus (a Delaware entity) was the "initial transferor." *Maxus*, 641 B.R. at 562; *see also id*. at 521 ("Delaware [is] Maxus's state of incorporation").

Plaintiffs do not cite a *single case* where a transferor like CNL—an entity legally organized

under foreign law with its principal place of business alleged to be overseas—was considered a "domestic" entity for *Picard* purposes. Nor are Defendants aware of any such case. Not one. This issue is open and shut. CNL, *the only possible transferor in this case*, was indisputably foreign.

*No Domestic Accounts*. The assets transferred were foreign, too. No bank accounts were involved in these transfers—the Complaint alleges none and Plaintiffs all but concede that point. *See* Opp. 25. And it is undisputed that, under BVI or New York law, cryptocurrency owned by an entity is located with its entity owner. *See* Mot. 20 n.10 (New York looks to "domicile or place of business" of the owner); *see also* Carrington Decl. ¶¶ 114-17 (similar under BVI law); Webster Decl. ¶ 74 (same). Here, that location is indisputably abroad because CNL is a U.K. entity with its principal place of business in London. AC ¶ 12.[19] Because that cryptocurrency was transferred from one foreign entity (CNL) to another (TLTD), it never touched the United States. Mot. 35.

Plaintiffs try to avoid that conclusion by arguing that they pled that "transfers 'were made from United States-based accounts.'" Opp. 24 (quoting AC ¶ 45). But that is nothing more than a legal conclusion—it literally just recites one of the *Picard* factors. It is, therefore, entirely insufficient. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, even in Opposition, Plaintiffs make no attempt to identify which of *their* "accounts" they are talking about.

Plaintiffs fall back to arguing that the transferred cryptocurrency was supposedly "*connected* to a U.S-based person or entity." Opp. 25. In doing so, Plaintiffs again seek to recycle the same insufficient allegations that they attempted to use to establish personal jurisdiction—namely that transfers were supposedly sometimes "initiated, executed, overseen, and approved by"

---

[19] Plaintiffs do not dispute that CNL's crypto assets were owned by CNL. *See* Mot. 5 (discussing Plaintiffs' prior representations to the Court regarding CNL maintaining ownership of its crypto assets). Instead, Plaintiffs assert (once again relying on facts not alleged in the Complaint) that CNLLC accounted for cryptocurrency "deployed by CNL to Tether as a large intercompany demand loan" and that CNLLC "permitted [CNL] to *retain*" crypto that was "deployed . . . for institutional lending" Opp. 27 n.14. If anything, those "allegations" only further underscore (i) that CNL and CNLLC observed corporate formalities with respect to the ownership of cryptocurrency, (ii) that the *owner*, at all relevant times, was CNL, and (iii) that the challenged transfers between CNL and TLTD occurred abroad.

CNL's employees in the U.S. *Id.* Even putting aside the fact that the Complaint alleges no actual facts on those points, the existence of such contacts does not make a transfer domestic. *See, e.g.*, *Zetta Jet*, 2024 WL 3198826 at *10, 30 (execution and closing of deal documents in the United States and use of "American professionals" did not make transfer domestic). The extraterritoriality analysis simply does not ask whether the transfers had U.S. contacts—indeed, such contacts will almost always exist in an avoidance action against a foreign defendant because specific jurisdiction *requires* that, at minimum, there be U.S. contacts "related to" the challenged transfers.

Indeed, the authority that Plaintiffs rely on their "connected to" theory of extraterritoriality—*Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024)—does not support their position. *Williams* does not consider *Picard* or the Bankruptcy Code at all. And it certainly does not hold that a transfer "connected to a U.S.-based person or entity" is "the same as a transfer of money from a U.S. bank account" under *Picard*. Instead, it considers when a transfer is domestic under a different statute (the securities laws) with a different focus (purchases and sales). *Williams*, 96 F.4th at 136 (looking to location of trade). It is, therefore, irrelevant to the initial-transfer question that *Picard* requires courts to consider in avoidance actions. *See, e.g.*, *Zetta Jet*, 2024 WL 3198826, at *29 (finding unpersuasive cases analyzing a statute with "a different focus").[20]

### 2. *The Application Transfer Was Foreign*

The "Application Transfer"—which is framed as both a preference and a fraudulent transfer claim—is even more plainly foreign. The Complaint alleges that TLTD "ke[pt]" CNL's collateral "for itself." AC ¶ 69. In other words, the interest in the collateral of one foreign entity

---

[20] Plaintiffs' remaining cases do not support their position either. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* addressed the same factual scenario as *Picard*—a domestic transferor (BLMIS) sending money from U.S. bank accounts. 480 B.R. 501, 524-25 (Bankr. S.D.N.Y. 2012) (finding that "transfers at issue originated from BLMIS's New York JPMorgan Account"). *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.* is plainly inapposite as it does not consider extraterritoriality at all. 873 F.3d 85 (2d Cir. 2017) (analyzing state-law securities claims).

(CNL) was transferred to another foreign entity (TLTD) when the liens on it were released.

Plaintiffs argue that this foreign-to-foreign transfer was domestic because it involved conversations with CNL personnel located in (or overseen by personnel located in) the United States. Opp. 26. But, again, Plaintiffs cite no authority whatsoever to support the theory that a conversation with a foreign entity's U.S. employee—or an employee "overseen" by a U.S. employee—somehow transforms a foreign transfer into a domestic one.

Even more unavailing is Plaintiffs' assertion that, at some point, some sort of interest in the collateral was "held by Celsius' United States-based entity." Opp. 27. The plain language of the Token Agreement makes clear that *CNL* (U.K.) was the sole owner of that residual interest. AC, Ex. A. § 1.1(d)(10B)(c) (directing "the payment of the surplus (if any) to the Recipient"); *see also id*. at 1 (defining "Recipient" as CNL). Indeed, Plaintiffs admit that *this cryptocurrency* was "retain[ed]" and "deployed *by CNL* to [TLTD]." Opp. 27 n.14. Plaintiffs now claim that CNL had a "large intercompany demand loan" from the Delaware entity (CNLLC). *Id*. But a debt that CNL supposedly owed to CNLLC is wholly irrelevant. The alleged existence of that separate obligation does not change the fact that *only CNL* owned the bitcoin that was transferred to TLTD to secure *CNL's* obligation, and that Plaintiffs now seek to recover. *See Picard*, 917 F.3d at 99.

## IV.    The Complaint Fails To State A Claim For Breach Of Contract (Count III)

Plaintiffs rest their contract claim on the faulty premise that the Token Agreement required the parties to wait ten hours before liquidating—no matter what. But the contract's plain language says otherwise. The relevant provision says that TLTD must wait ten hours before it can liquidate CNL's collateral in its *sole discretion*. But nothing in that provision limits the ability of the parties to *mutually agree* to a liquidation. Mot. 26-27; *see also* Carrington Decl. ¶¶ 38-43. Because there is no dispute that CNL's CEO expressly directed TLTD to liquidate (*see* AC ¶ 71), there was no contractual requirement for TLTD to wait ten minutes—much less ten hours.

Rather than engaging with that argument, Plaintiffs attack a strawman. They argue (Opp. 42-43) that Mashinsky's "oral permission to liquidate" could not amend the Token Agreement because the contract had a "No Oral Modification" clause. But Defendants have never argued that CNL's agreement to liquidate *amended* the contract. Defendants' Motion specifically explains that "no amendment was required" because the contractual restriction on TLTD taking *unilateral* action was simply inapposite given that the parties *agreed* to liquidate. Mot. 27. Plaintiffs' failure to engage with that basic point should be the end of the matter. *See, e.g.*, *BYD Co. v. VICE Media LLC*, 531 F. Supp. 3d 810, 819 (S.D.N.Y. 2021) ("failure to oppose [d]efendants' specific argument in a motion to dismiss is deemed waiver of that issue").

The contract claim would fail in any event because CNL's insolvency provided an independent basis for liquidation. Mot. 27-28 (citing AC, Ex. A, § 1.1(e)(14)(iii)). Plaintiffs respond that "Tether knew of Celsius's insolvency throughout the [preference] period" and therefore "cannot now justify its non-performance based on that very same alleged breach." Opp. 43 (citing AC ¶¶ 48, 65, 67). That sentence is doubly wrong. First, the cited portions of the Complaint do not allege *facts* showing that Defendants knew that CNL (or any Celsius entity) was insolvent—much less that they knew it for the entire three-month period. *See, e.g.*, AC ¶ 65 (only alleging Defendants "knew of Celsius's *vulnerable position*" *the day before the liquidation*).[21] Second, even if they did, knowledge alone would not justify estoppel under BVI law. *See* Reply Decl. of John Carrington ("Carrington Reply Decl.") ¶¶ 10-12. And Plaintiffs' non-performance cases are inapposite, as Defendants are not arguing that some failure to perform was excused—the point is that CNL's breach of its solvency representation gave TLTD the power to liquidate.[22]

---

[21] Plaintiffs also argue (Opp. 43 n.20) that Section 1.1(e)(14)(iii) also required "advance notice before any liquidation." But nothing in the Token Agreement's text says anything about a waiting period for that provision.

[22] Plaintiffs' cases are nonresponsive. *ARP Films, Inc. v. Marvel Ent. Grp., Inc.* concerned whether a defendants' earlier repudiation of the contract justified plaintiffs' non-performance. 952 F.2d 643, 649 (2d Cir. 1991). And *In re*

Finally, the contract claim should be dismissed because Plaintiffs have articulated no cognizable theory of causation. Plaintiffs' contract claim rests on the theory that CNL should have had the "opportunity" to continue providing TLTD with the same transfers that Plaintiffs now say are voidable preferences. Mot. 28-29 (explaining that theory fails as a matter of BVI law). While Plaintiffs downplay that flaw as merely going to "one particular type of damages" (Opp. 44 n.21), the "failure to plead any element of a claim, of course, requires its dismissal." *Black v. Ganieva*, 619 F. Supp. 3d 309, 330 (S.D.N.Y. 2022), *aff'd*, 2023 WL 2317173 (2d Cir. Mar. 2, 2023).

## V.    The Complaint Fails To State An Implied Duty Claim (Count IV)

Under BVI law, there is no general duty of good faith and fair dealing implied in contracts, but there are two potentially relevant duties that *could* apply: (i) a duty to not exercise a discretionary power in an arbitrary or irrational way (a *Braganza* duty); and (ii) a duty for equitable mortgagees to seek the best reasonably obtainable price at the time that the mortgagee decides to sell. Mot. 29-30; Carrington Decl. ¶¶ 71-72, 87. Plaintiffs argue (Opp. 44-45) that TLTD breached those duties by (i) failing to disclose that it kept collateral itself and (ii) "appl[ying] arbitrary prices." Neither theory suffices under BVI law, so the implied duty claim should be dismissed.

*First*, the Complaint is devoid of any factual allegations that would suggest that the prices that CNL received for its collateral were "arbitrary." Although Plaintiffs allege that the prices— to which CNL agreed—were below the prevailing spot price, their own Complaint alleges that was the result of selling "such a large block of Bitcoin" over a few hours, not any "arbitrary" price-setting by TLTD. AC ¶ 80. Now, armed with the benefit of hindsight, Plaintiffs argue that the collateral should have been liquidated more slowly. *Id*. But that Monday-morning quarterbacking does nothing to suggest that TLTD, *with CNL's consent*, acted "arbitrarily" or "irrationally."

---

*Bankers Trust Co.* considered whether the defendant's hindrance of a condition precedent waived the condition. 450 F.3d 121, 128 (2d Cir. 2006). We merely note that CNL's misrepresentations gave TLTD the right to liquidate.

*Second*, the argument (Opp. 1) that TLTD "kept" 7,000 bitcoin falls short. BVI law is clear that a party does not violate the implied duty simply because it sells the collateral to itself or its affiliates. Carrington Decl. ¶¶ 74, 95; Carrington Reply Decl. ¶ 15. Plaintiffs offer no contrary authority and allege no facts to suggest that TLTD violated the limited duty implied by BVI law.

## VI.    The Complaint Fails To State Any Preference Claims (Counts I and II)

### A.    The Purported Application Transfer Is Not Independently Avoidable

In the Application Transfer, Plaintiffs allege that TLTD applied the entirety of CNL's collateral—39,542.42 BTC—in satisfaction of CNL's USDT obligation to TLTD. AC ¶ 72. But it is black-letter law that, to the extent that a lien is not otherwise avoidable, its release is a contemporaneous exchange for new value—not a preference. Mot. 43-44. Plaintiffs concede the point. *See* Opp. at 38 (acknowledging that "payments from the creditor's collateral itself" are not preferential). Instead, they claim that we argue that, because TLTD "had a lien on the Top-Up collateral and the Cross-Collateralization collateral, any application of *that* collateral cannot be a preference." Opp. 41. That gets our argument exactly backwards. There was no preference in TLTD applying the *other* 21,656.20 BTC that TLTD allegedly "received in transfers that are not challenged." Mot. 45. Plaintiffs offer no response to that because there is none.

The Court should, therefore, at a minimum, narrow Plaintiffs' preference claims to remove the 21,656.20 BTC that TLTD received in transfers that the Complaint does not challenge.[23] But Plaintiffs' response also confirms that the Application Transfer does no work at all. The Top-Up and Cross-Collateralization Transfers were either preferential or they were not. If they were, then the Application Transfer is entirely duplicative. If not, then new value precludes the Application Transfer *in toto*. In either event, the Application Transfer should be dismissed.

---

[23] Defendants accept Plaintiffs' calculation of the uncontested bitcoin for the purpose of this Motion only.

**B.    The Purported Cross-Collateralization Transfers Are Not Avoidable Because They Were Not Made On Account Of Antecedent Debt**

Section 547 allows avoidance of a transfer only if it was made "for or on account of an antecedent debt." 11 U.S.C. § 547(b)(2). The phrase "on account of" means "'because of,' thereby requiring a causal connection between the term that the phrase 'on account of' modifies and the factor specified in the statute." *Rousey v. Jacoway*, 544 U.S. 320, 326 (2005); *see Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 435 (1999). Unless a transfer was made *because of* an antecedent debt, Section 547(b)(2) is not satisfied. Here, as explained in our Motion (at 41-43), the Cross-Collateralization Transfers were not made *because* of any antecedent debt, but rather because the Token Agreement required the posting of specified collateral in connection with each *new* provision of 100,000,000 USDT to CNL.

Plaintiffs have little response beyond their citation of a bankruptcy court decision that predates *Rousey*—the controlling Supreme Court case—by a decade. Opp. 40-41 (citing *In re Moran*, 188 B.R. 492, 497 (Bankr. E.D.N.Y. 1995)). And, even if it still carried any weight, *Moran* is of no help to Plaintiffs anyway. There, the court held that a mortgage given with the admitted intent "[t]o secure the repayment of the amounts advanced" earlier (*Moran*, 188 B.R. at 494) was a transfer for or on account of that *already advanced—i.e.*, antecedent—debt (*id*. at 497). However, it said nothing about the quite different scenario where (as here) collateral is given prior to and "in connection with . . . *new borrowings*," as the Complaint concedes. AC ¶ 5.

**C.    The Purported Top-Up Transfers Are Not Avoidable Because TLTD Was Fully Secured At The Time Of Each Transfer**

TLTD was fully secured at the time of each challenged Top-Up Transfer. Mot. 36-38. Plaintiffs do not dispute that fact (nor does the Complaint allege otherwise). Because transfers to a fully secured creditor are not preferential, those preference claims must be dismissed.

*In re Residential Capital, LLC*, which Plaintiffs fail to distinguish, is squarely on point.

501 B.R. 549 (Bankr. S.D.N.Y. 2013). There, like here, the plaintiffs contended that transfers of collateral to secured creditors were avoidable preferences. *Id.* at 556. Addressing these transfers, this Court wrote that "[w]here a creditor asserts that it was oversecured at the time of the alleged preferential transfer, it is the plaintiff's burden to refute that assertion." *Id.* at 619. Because the *ResCap* plaintiffs failed to do so, the Court dismissed the claim. *Id.* Plaintiffs suggest that the valuation date was irrelevant to the Court's decision, but that is flatly contradicted by the opinion itself, which faulted the plaintiffs for relying (as Plaintiffs do here) on a petition-date valuation of collateral. *See id.* (attributing failure of proof to the fact that plaintiffs' expert "provided a proposed valuation of the [collateral] as of the Petition Date," but not "as of the start of the Modified Preference Period").[24]

Moreover, as Plaintiffs implicitly concede, nothing in the *text* of Section 547(b)(5) compels a petition-date valuation. Plaintiffs' reliance (at 33) on *Palmer Clay Products Co. v. Brown*, 297 U.S. 227 (1936), to do so is misplaced. That case—which addresses a preference claim (i) against an *unsecured* creditor (ii) under a materially *different* statute—simply does not control. *See* Mot. 39.[25] Plaintiffs outright ignore the latter distinction; as to the former, they claim there is no reason for secured and unsecured creditors to be treated differently. Opp. 35. But there are many differences between fully secured and unsecured creditors, including the special solicitude that the

---

[24] Plaintiffs cite several out-of-Circuit decisions in support of their contention that courts have "overwhelmingly" adopted their petition-date proposal. Opp. 33. But *ResCap* and the other cases cited in the Motion are hardly outliers— other courts have likewise embraced a transfer-date rule. *See, e.g.*, *Travelers Ins. Co. v. Cambridge Meridian Group, Inc.*, 980 F.2d 792, 801 n.15 (1st Cir. 1992) (noting that "the test turns on the value of the collateral in existence *at the time of the challenged transfer*, and does not take into account future contingencies which might increase or decrease its value"); *In re Ala. Aircraft Indus., Inc.*, 2013 WL 6332688, at *3 (Bankr. D. Del. Dec. 5, 2013) (accepting defendant's suggestion to "follow the lead of the Southern District of New York and the Northern District of Illinois where the courts have ruled that the Defendant's secured status is determined as of the date of the transfers").

[25] *See In re Telesphere Commc'ns, Inc.*, 229 B.R. 173, 179 (Bankr. N.D. Ill. 1999) ("*Palmer Clay Products* dealt only with allegedly preferential payments of unsecured claims, and so had no need to consider the treatment of collateral. In fact, there is little support in the case law for the proposition that payment of a secured claim prior to a bankruptcy should be compared, for purposes of the Chapter 7 liquidation test, to the extent of the collateral that would have existed on the date of the bankruptcy filing."); *In re Ala. Aircraft*, 2013 WL 6332688, at *3 (collecting cases).

Code affords to secured creditors—and the logic of *Palmer Clay* makes no sense in the context of fully secured creditors.  *See* Mot. 39-40.  Indeed, at the time of *Palmer Clay*, the Supreme Court had already held that the payment of a secured claim is not a preference notwithstanding that "[t]he sum was a larger percentage than will be received by the unsecured creditors."  *Johnson v. Root Mfg. Co.*, 241 U.S. 160, 164 (1916); *see Bachner v. Robinson*, 107 F.2d 513, 515 (2d Cir. 1939) ("The payment of a secured claim is not a preference.") (citing *Johnson*).  Thus, in the absence of statutory language compelling (or even suggesting) a petition-date valuation rule, the Court should construe the provisions of Section 547(b) in view of these differences.

Finally, Plaintiffs' hypothetical simply assumes that TLTD would have sat on its hands for months as it became more and more undersecured and, as a result, TLTD "*would have* been undersecured as of the Petition Date."  Opp. 38-39.  But any fair counterfactual must also account for what TLTD *would have* done absent the first (or any) Top-Up Transfer.  *See Ricotta v. Burns Coal & Bldg. Supply Co.*, 264 F.2d 749, 750 (2d Cir. 1959) (no preference to the extent creditor, "at the time each payment was made," "could have filed a materialman's lien for the same debt").[26] The answer to that is clear:  TLTD would have exercised its contractual right to foreclose while it was fully secured—indeed, the Token Agreement gave it the right to liquidate when it was *110%* secured.  AC, Ex. A § 1.1(b)(4).  Because TLTD would have been paid in full in either event, it is clear that it did not receive more by virtue of the transfers than it otherwise would have.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in full.

---

[26] *See also In re J.A. Jones,* 361 B.R. 94, 103 (Bankr. W.D.N.C. 2007) (a court "cannot fairly assess how the [creditor] would have fared [absent the payment] without projecting how it would have reacted to nonpayment"); *Lingley v. Contractors Grp., Inc.*, 55 B.R. 574, 576 (Bankr. D. Me. 1985) (no preference where creditor would have exercised setoff right for payment in full had it not been paid).

Dated:  April 10, 2025
Washington, D.C.

/s/  *Ariel Lavinbuk*
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Ariel N. Lavinbuk
Brandon L. Arnold
Jane Jacobs (*pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC  20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

/s/ *Daniel Eggermann*
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Daniel M. Eggermann
David E. Blabey, Jr.
Gabriel Eisenberger
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Attorneys for Defendants*

**<u>Certificate of Service</u>**

I hereby certify that a copy of the *Reply Memorandum of Law in Support of Defendants'*

*Motion to Dismiss* and the documents submitted in support thereto were served electronically on

the date of filing through the Court's ECF System on all ECF participants registered in this case

at the email addresses registered with the Court.

Dated:  April 10, 2025
Washington, D.C.

/s/  *Ariel Lavinbuk*
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Ariel N. Lavinbuk
Brandon L. Arnold
Jane Jacobs (*pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC  20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510