**PUNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| CELSIUS NETWORK LLC, *et al.,* | Case No. 22-10964 (MG) |
| Post-Effective Date Debtors. | Chapter 11 |
| CELSIUS NETWORK LIMITED and CELSIUS NETWORK LLC (POST-EFFECTIVE DATE DEBTORS) | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 24-04018 (MG) |
| TETHER LIMITED, TETHER HOLDINGS LIMITED, TETHER INTERNATIONAL LIMITED, and TETHER OPERATIONS LIMITED | |
| Defendants. | |

<u>**MEMORANDUM OPINION AND ORDER GRANTING IN PART**</u>
<u>**AND DENYING IN PART THE DEFENDANTS' MOTION TO DISMISS**</u>

*A P P E A R A N C E S :*

HERBERT SMITH FREEHILLS KRAMER (US) LLP
*Attorneys for Tether Limited, Tether Holdings Limited, Tether International Limited, and Tether Operations Limited*
1177 Avenue of the Americas
New York, New York 10036
By:    Daniel M. Eggerman, Esq.
    David E. Blabey Jr., Esq.
    Gabriel Eisenberger, Esq.

2000 K Street NW
Fourth Floor
Washington, D.C. 20006
By:    Ariel N. Lavinbuk, Esq.
    Brandon L. Arnold, Esq.
    Jane Jacobs, Esq.

QUINN EMANUEL, URQUHART & SULLIVAN, LLP
*Attorneys for Blockchain Recovery Investment Consortium, LLC, Litigation Administrator, and Complex Asset Recovery Manager, as Representative for the Post-Effective Date Celsius Debtors*
295 Fifth Avenue
New York, New York, 10016
By:    Benjamin I. Finestone, Esq.
        Anil Makhijani, Esq.
        Mario O. Gazzola, Esq.
        Arman Cuneo, Esq.

300 West Sixth Street
Suite 200
Austin, Texas 78701
By:    Matthew Scheck, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the contested motion (the "Motion," ECF Doc. # 32) of

defendants Tether Limited ("TLTD"), Tether Holdings Limited ("THL"), Tether International

Limited ("TIL"), and Tether Operations Limited ("TOL" and, together with TLTD, THL, and

TIL, the "Defendants" or "Tether").  The Motion seeks dismissal of all counts asserted in the

amended adversary complaint (the "Amended Complaint" or "AC," ECF Doc. # 25) filed by

Celsius Network Limited ("CNL"), and Celsius Network LLC (Post-Effective Date Debtors)

("CNLLC" and, together with CNL, the "Plaintiffs" or "Celsius")[1] (i) without prejudice for lack

of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, or (ii)

in the alternative, with prejudice for failure to state a claim upon which relief can be granted

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (*See* Motion at 2.)  In

---

[1]      The Plaintiffs indicate that, in prosecuting this action, they are "directed by the Blockchain Recovery Investment Consortium ("BRIC"), serving as Litigation Administrator (Complex Asset Recovery Manager)."  (AC at 7 n.3.)

connection with the Motion, the Defendants filed a supporting memorandum of law (the "MOL," ECF Doc. # 33).[2]

On March 11, 2025, the Plaintiffs filed an opposition to the Motion (the "Opposition," ECF Doc. # 38), to which the Defendants filed a reply (the "Reply," ECF Doc. # 39).[3]

For the reasons discussed below, the Court **GRANTS** in part and **DENIES** in part the Motion.

## I.    BACKGROUND

### A.  Relevant Background[4]

#### 1.   The Parties

##### a.  Celsius

Founded in 2017 by Alex Mashinsky, Shlomi "Daniel" Leon, and Nuke Goldstein, Celsius operated as a "consumer-facing cryptocurrency company" that maintained, as its primary

---

[2]       Annexed to the MOL are (i) the amended declaration of John Carrington K.C., a legal practitioner in the British Virgin Islands (the "Carrington Decl.," ECF Doc. # 33-1); (ii) the amended declaration of Gabriel Eisenberger, an associate at Herbert Smith Freehills Kramer (US) LLP and counsel to the Defendants (the "Eisenberger Decl.," ECF Doc. # 33-2); (iii) the amended declaration of Michael Hilliard, an individual licensed to provide legal services in Ontario, Canada (the "Hilliard Decl.," ECF Doc. # 33-3); and (iv) the declaration of Christopher Sanz, an individual licensed to provide legal services in Ontario, Canada (the "Sanz Decl.," ECF Doc. # 33-4).

[3]       Annexed to the Opposition is the declaration of Paul Anthony Webster, KC, a barrister of the Eastern Caribbean Supreme Court, Virgin Islands Court (the "Webster Decl.," ECF Doc. # 38-1). Meanwhile, annexed to the Reply is (i) the declaration of Brandon L. Arnold, a partner at Herbert Smith Freehills Kramer (US) LLP (the "Redacted Arnold Decl.," ECF Doc. # 39-1) as Exhibit A and (ii) the reply declaration of John Carrington K.C. (the "Carrington Reply Decl." ECF Doc. # 39-2). An unredacted version of the Redacted Arnold Decl. was subsequently filed on April 23, 2025 (the "Arnold Decl.," ECF Doc. # 42-1).

[4]       The facts underlying this Opinion are derived from the Amended Complaint, the well-pleaded allegations of which are taken as true for purposes of addressing the Motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (stating that, in considering a motion to dismiss for failure to state a claim, a court may consider "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint" (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)); *V&A Collection, LLC v. Guzzini Properties Ltd.*, 46 F.4th 127, 131 (2d Cir. 2022) (stating that in addressing a motion to dismiss on personal jurisdiction grounds solely on pleadings and affidavits, a court will "construe the pleadings and affidavits in the light most favorable to [the plaintiff], resolving all doubts in [its] favor") (quoting *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (alterations in original)); *In re Motors Liquidation Co.*, 565

product, a platform that allowed customers to purchase and deposit various cryptocurrencies.
(AC ¶ 25.)  Akin to a traditional bank, Celsius paid interest to depositors of cryptocurrency on its
platform at rates known to be the highest in the market.  (*Id.*)  To generate revenue to pay such
interest, Celsius loaned customer-deposited cryptocurrencies to third parties who would, in turn,
pay Celsius interest.  (*Id.* ¶ 26.)  In addition to the foregoing, Celsius also operated a Bitcoin
mining operation, and borrowed "stablecoins" to fund its day-to-day operations.[5]  (*Id.* ¶¶ 26–27.)

The Plaintiffs to this adversary proceeding are comprised of CNL and CNLLC.  Plaintiff
CNL is a private limited company incorporated under the laws of England and Wales with a
principal place of business in London, United Kingdom.  (*Id.* ¶ 12.)  Meanwhile, plaintiff
CNLLC is a Delaware limited liability company with a principal place of business in Hoboken,
New Jersey.  (*Id.* ¶ 13.)

> *b.  Tether*

Tether controls and markets USDT, the "world's most popular stablecoin," as well as the
EURT token.  (*Id.* ¶ 28.)  Each USDT and EURT token is purportedly backed by assets that
allow such tokens to hold values equivalent to one U.S. dollar and one Euro, respectively.  (*Id.*)
At the time of Celsius's founding, billions of Tether's USDT tokens were in circulation, and
Celsius indicates that it relied on both USDT and EURT to "operate critical parts of its
business."  (*Id.* ¶¶ 28–29.)

The Defendants to this adversary proceeding are comprised of four entities: TLTD, THL,
TIL, and TOL.  THL, along with TOL and TIL, is incorporated in, and is a citizen of, the British

---

B.R. 275, 284 (Bankr. S.D.N.Y. 2017) (stating that a court is "not confined to the complaint's allegations and may
consider affidavits and documentary evidence").

[5]     "Stablecoins" are defined to be digital tokens whose prices are pegged to other assets such as the U.S.
dollar or gold and are "typically backed by reserves of *non*-digital assets (such as cash or marketable securities) to
achieve price stability."  (AC ¶ 27 (emphasis in original).)

Virgin Islands ("BVI"). (*Id.* ¶¶ 14, 16–17.) Meanwhile, TLTD is incorporated in, and is a citizen of, Hong Kong. (*Id.* ¶ 15.) THL owns defendants TLTD, TOL, and TIL. (*Id.* ¶ 14.)

### 2. The Initial Token Agreement

The Amended Complaint alleges that the relationship between Celsius and Tether, the lead investor for Celsius's Series A investment round, was premised on a "basic bargain." (*Id.* ¶ 29.) Pursuant to this bargain, "Tether would provide Celsius with the funding and connections it would need to grow" in the crypto space while Celsius would provide Tether with access to the United States cryptocurrency market. (*Id.*; *see also id.* ¶ 30 (discussing instances showing how Celsius and Tether put this "bargain into practice").)

The Plaintiffs argue that, in connection with the foregoing, Celsius and Tether entered into a lending arrangement to "pursue their joint objectives." (*Id.* ¶¶ 31–32.) Specifically, the Amended Complaint alleges that these joint objectives include the provision of (i) access for Celsius and Tether's U.S. customers to Tether's USDT (and later, Tether Gold ("XAUt") and EURT) through Celsius, and (ii) liquidity to Celsius to operate its U.S. business through Tether. (*Id.* ¶ 31.) This, the Amended Complaint contends, reflects the parties' recognition of the "centrality of their lending arrangement to their broader purpose of exploiting the United States market." (*Id.*)

On February 1, 2020, CNL entered into the Token Agreement (the "Initial Token Agreement," ECF Doc. # 1-1, Schedule 2) with TLTD that allowed CNL to borrow USDT from TLTD, which CNL would collateralize by posting collateral equal to a percentage of the number of USDT made available to CNL and pay certain interest. (*Id.* ¶ 32; *see* Initial Token Agreement §§ 3, 7.) To the extent collateral was provided in Ether (ETH), XAUt tokens, or Bitcoin (BTC), the Initial Token Agreement specified certain percentages for the collateral as well as interest rates to be used. (*See, e.g.*, *id.* § 3 (indicating that if ETH were posted as collateral, the

percentage would be equal to 170% of the USDT made available to CNL); *id.* § 7 (establishing 0.55% as the interest rate if collateral was provided in ETH).)

Among other things, the Initial Token Agreement made clear that its terms could not be changed or modified unless it was in writing and signed by CNL and TLTD. (*Id.* § 1.4.) Section 1.5 of the Initial Token Agreement also provided that the agreement and its terms are governed by the laws of BVI. (*Id.* § 1.5.)

Harumi Urata-Thompson, Celsius's Chief Financial Officer, executed the Initial Token Agreement on behalf of CNL. (*Id.* at 5.) The Plaintiffs indicate that CNL's signatory was an employee based in the United States at the time. (AC ¶ 43.)

### 3. The Amended Token Agreement and Related Borrowings

On January 20, 2022, CNL and TLTD entered into an amendment of the Initial Token Agreement (as amended, the "Amended Token Agreement," ECF Doc. # 1-1). The Amended Token Agreement, the Plaintiffs state, was the "centerpiece of the parties' broader relationship" that served as the basis for a "long-term collaborative relationship" between Celsius and Tether. (AC ¶ 41.) Specifically, the Plaintiffs allege that the fundamental purpose of the Amended Token Agreement was to "allow Tether to avail itself of the United States market." (*Id.* ¶ 44.) Like the Initial Token Agreement, the Amended Token Agreement allowed CNL to borrow USDT or EURT to the extent Celsius posted the requisite collateral. (*Id.* ¶ 42.) The Plaintiffs indicate that the signatories to the Amended Token Agreement on behalf of CNL were Alexander Mashinsky and Shlomi "Daniel" Leon, directors at Celsius, both of whom were based in the United States. (*Id.* ¶ 43.)

Among other things, the Amended Token Agreement provided that, in the event of a decrease in the value of the collateral below a certain percentage threshold, "TLTD shall provide [CNL] notice of such occurrence . . . and [CNL] shall, within ten (10) hours of such Margin Call

Notice," post additional collateral subject to the requirements set forth therein.  (Amended Token

Agreement § 4.)  The provision further provides that if CNL fails to post sufficient additional

collateral and the value of the collateral falls below a certain percentage "at any time" following

10 hours from the Margin Call Notice, "TLTD shall have the right, in its sole and absolute

discretion, and without further notice to [CNL], to sell, dispose of, and liquidate the Collateral."

(*Id.*)  This stands in contrast to the Initial Token Agreement, which originally provided that

TLTD possessed such right when the value of the collateral fell below a certain percentage "at

any time."  (Initial Token Agreement § 4.)

The Amended Token Agreement also contained other notable provisions.  First, the

Amended Token Agreement provided for the return of excess proceeds from CNL's collateral to

CNL in the event of liquidation.  (Amended Token Agreement § 10B (providing that, in the

event of liquidation of the Collateral, any surplus was to be paid to CNL after payment of certain

fees, costs, expenses of TLTD and amounts CNL owed to TLTD); *see also* AC ¶ 40 (stating that

the parties resolved this issue in favor of Celsius).)  Second, the Amended Token Agreement

indicated that the Collateral pledged was to be held "for the benefit of" CNL.  (*See* Amended

Token Agreement § 3 ("TLTD shall hold the Collateral in a segregated account . . . for the

benefit of [CNL].")

Pursuant to the Amended Token Agreement, Celsius borrowed USDT and posted

collateral in the form of BTC or ETH.  (*Id.* ¶ 45.)  As of April 14, 2022, the date the section

547(b) period commenced in this case, Celsius had $512,330,000 in outstanding borrowings in

USDT (*i.e.*, 512,330,000 USDT) pursuant to the Amended Token Agreement.[6]  (*Id.* ¶¶ 45–46.)

---

[6]    The Plaintiffs indicate that Celsius also borrowed a "small amount of EURT," which are not subject to the
Amended Complaint.  (AC at 14 n.4.)

To secure the USDT borrowing, Celsius posted 16,505.17 BTC to Tether.  (*Id.*)  The Plaintiffs

allege that the Defendants, in connection with the Amended Token Agreement, had "continuous

and systematic contact" with Celsius's U.S.-based personnel.  (*Id.* ¶ 45.)  Specifically, the

transactions made under the Amended Token Agreement were, at times, initiated and executed

by Celsius employees based in the United States.  (*Id.*)  Moreover, transfers under the agreement

were also often made from U.S.-based accounts.  (*Id.*)

### 4.   The Top-Up and Cross-Collateralization Transfers

Beginning in April 2022, BTC pricing began a "violent downward slide" that continued

through early July 2022, around the time Celsius filed for chapter 11 on July 13, 2022 (the

"Petition Date").  (*Id.* ¶ 47.)  In response to the fall in BTC prices, Tether initiated a series of

demands under the Amended Token Agreement, which the Plaintiffs allege were to improve its

security on the antecedent debt Celsius owed to it.  (*Id.* ¶ 48.)  Each of these demands, the

Amended Complaint alleges, was directed at Celsius employees located in the United States.

(*Id.*)  In response, Celsius made the following BTC transfers to Tether as additional collateral on

account of alleged antecedent debt during the relevant preference period:

- approximately 1,633.35 BTC on or about May 3, 2022;

- approximately 2,044.00 BTC on or about May 7, 2022;

- approximately 2,214.00 BTC on or about May 9, 2022;

- approximately 2,398.29 BTC on or about May 11, 2022;

- approximately 2,598.15 BTC on or about May 12, 2022;

- approximately 2,807.75 BTC on or about June 10, 2022; and

- approximately 3,041.73 BTC on or about June 12, 2022.

(*Id.* ¶¶ 49–55.)  The Plaintiffs indicate that, in sum, Celsius transferred a total of approximately

16,737.27 BTC across these seven transfers to Tether during the preference period.  Less the

approximately 1,079.06 BTC released to Celsius on June 6, 2022, the Plaintiffs contend that

15,658.21 BTC are avoidable as preferences (collectively, the "Top-Up Transfers"). (*Id.* ¶ 56.)

The Plaintiffs note further that the BTC transferred was not held in segregated wallets or

accounts, was commingled with BTC Celsius already transferred to Tether prior to the

preference period, and were not made in connection with contemporaneous extensions of USDT

loans to Celsius. (*Id.*)

        In addition to the Top-Up Transfers, Celsius also borrowed additional USDT from Tether

on three occasions during the preference period:

- 100,000,000 USDT from Tether on or about April 20, 2022 secured by a transfer of 3,095.00 BTC from Celsius;

- 100,000,000 USDT from Tether on or about May 5, 2022 secured by a transfer of 3,288.00 BTC from Celsius; and

- 100,000,000 USDT from Tether on or about June 9, 2022 secured by a transfer of 4,317.00 BTC from Celsius.

(*Id.* ¶ 57.) In total, Celsius made transfers of 10,700.00 BTC, which like the Top-Up Transfers,

was commingled with Celsius's prior collateral postings. (*Id.*) This BTC cross-collateralized

Celsius's existing loan from Tether. (*Id.*) Approximately 2,228.01 of this BTC was excess

collateral and Celsius's transfer of this excess to Tether (the "Cross-Collateralization Transfers"),

the Plaintiffs assert, was preferential and subject to avoidance. (*Id.*)

        The Top-Up and Cross-Collateralization Transfers, the Plaintiffs indicate, are separate

and distinct from the principal and interest payments Celsius made to Tether during the

preference period, the former of which the Plaintiffs argue were made on account of antecedent

debt. (*Id.*) The Amended Complaint alleges that these transfers "dramatically improved

Tether's position as a creditor" as absent receipt of such, Tether would not have been able to

"come close to making itself whole on its $812,330,000 USDT loan to Celsius." (*Id.* ¶ 58.) Specifically, Tether, they argue, would have over $350 million less in collateral. (*Id.*)

As of March 2022, the Amended Complaint indicates that Celsius had a negative net capital position of $60 million and was insolvent at the time these transfers were made. (*Id.* ¶ 59.) Additionally, as a result of the precipitous decrease in value of Celsius's assets—which was comprised of various cryptocurrencies, including BTC, ETH, and the CEL token, Celsius's own cryptocurrency token—the value of Celsius's liabilities far exceeded the value of its assets during April through June of 2002. (*Id.* ¶¶ 59–60.)

Aside from being balance sheet insolvent, the Amended Complaint further alleges that Celsius was unable to pay its debts when they came due and lacked sufficient capital to operate its business. (*Id.* ¶ 61.) Moreover, the Plaintiffs contend that each Top-Up and Cross-Collateralization Transfer constituted a transfer of Celsius's own interest in property to Tether on account of antecedent debt while Tether provided no contemporaneous value to Celsius in exchange. (*Id.* ¶ 62.)

Relevant here, the Amended Complaint alleges that several of these transfers were initiated from the United States by U.S.-based Celsius employees, and U.S.-based Celsius employees gave notice of these transfers to Tether. (*Id.* ¶ 63.) It further alleges that each of these transfers was ultimately overseen and approved by Alexander Mashinsky, Celsius's Chief Executive Officer, who was based in Hoboken, New Jersey at the time of the transfers. (*Id.*)

5.  The Application Transfer and Alleged Retention of Collateral

Celsius alleges that Tether embarked on a three-part plan to improve its position during the "run on the bank" situation Celsius faced in July 2022 when its customers began withdrawing deposits at an alarming rate, placing the company under "immense financial distress." (*Id.* ¶¶ 64–69.)

10

On June 12, 2022, Tether issued a collateral demand on Celsius that was directed at Celsius employees in the United States.  (*Id.* ¶ 70.)  Celsius satisfied this collateral demand, transferring 3,041.73 BTC on June 13, 2022.  (*Id.*)  Several hours later, Tether made a second collateral demand, seeking immediate payment despite acknowledgment of the 10-hour window for Celsius to post additional collateral as provided for in the Amended Token Agreement.  (*Id.*)  The Amended Complaint alleges that Tether proceeded with an immediate application of Celsius's collateral prior to the expiration of the 10-hour waiting period in contravention of the Amended Token Agreement's terms.  (*Id.* ¶ 71.)  While the Plaintiffs acknowledge that Celsius's Chief Executive Officer allegedly gave Tether permission to liquidate its collateral on June 13, 2022, they assert that Tether did not obtain written agreement from Celsius to amend the 10-hour waiting period it was contractually entitled to, which was required under the Amended Token Agreement.  (*Id.*)  Thus, prior to the expiration of the 10-hour period, the Plaintiffs allege that Tether began a "fire sale" of Celsius's collateral, selling Celsius's BTC in a series of tranches over a period of several hours.  (*Id.* ¶ 72.)  At the close of this "fire sale," the entirety of Celsius's collateral, which amounted to 39,542.42 BTC, had been applied by Tether to Celsius's outstanding debt to Tether (the "Application Transfer").  (*Id.*)  Throughout the sale process, the Amended Complaint alleges that Tether directed all communications to Celsius employees in the United States.  (*Id.*)

Tether, the Plaintiffs assert, made misrepresentations to Celsius throughout the "fire sale," which they believe were designed as a "ruse" to allow Tether to appropriate Celsius's collateral for itself below prevailing market prices.  (*Id.* ¶ 73; *see also id.* ¶¶ 74–78 (detailing statements Tether made suggesting that it was proceeding with legitimate, arm's-length sales of Celsius's collateral through its OTC desk and that it sold the entirety of Celsius's collateral (*i.e.*,

11

39,542.42 BTC at a dollar value of $816,822,948) when in fact the sales were to Tether itself or its affiliates); *id.* ¶ 83 (alleging that Tether conceded it made two transfers for its own benefit: (i) a transfer of 7,000 BTC on June 14, 2022 to a Bitfinex deposit account in the name of TIL, and (ii) a transfer of 32,542.42 BTC on June 15, 2022 to a different Bitfinex account controlled by TIL).)  The Plaintiffs maintain that Tether's application of Celsius's collateral was accomplished through use of U.S. intermediaries or counterparties and involved transactions routed through U.S. servers, contacts with Celsius's U.S.-based personnel, and use of U.S.-based bank accounts, financial institutions, or cryptocurrency exchanges.  (*Id.* ¶ 81.)

The Amended Complaint contends that the Top-Up Transfers, Cross-Collateralization Transfers, and Application Transfers improved Tether's position as of the application date.  (*Id.* ¶ 78 (stating also that without the benefit of the Top-Up and Cross-Collateralization Transfers, Tether would have only had 21,656.20 BTC in collateral and faced a $364,980,5 17.43 deficiency at the prices it claims to have applied).)  Tether applied Celsius's BTC against obligations owed to it for an average price of $20,656.88 each, which was considerably less than the $22,487.39 market price at the time on Bitfinex, a crypto exchange controlled by Tether's parent company at around the time the collateral was allegedly liquidated.  (*Id.* ¶ 80.)

Moreover, Tether's failure to comply with the Amended Token Agreement's 10-hour waiting period requirement prevented Celsius from "avoid[ing] the disposition of its [BTC] at near the bottom of the cryptocurrency market."  (*Id.* ¶ 79.)  Rather, the Plaintiffs contend that Celsius could have retained the pledged BTC that would have been worth more than $4 billion today.  (*Id.*)  The Amended Complaint further alleges that Tether's disposition of Celsius's collateral was "arbitrary, irrational, and commercially unreasonable."  (*Id.* ¶ 80.)

The Amended Complaint alleges that Tether's actions amounted to false representations. (*Id.* ¶ 84.)  Specifically, instead of selling all of Celsius's BTC, Tether retained and transferred all of Celsius's BTC to its own Bitfinex accounts.  (*Id.* (detailing how Tether "continuously held" at least 32,542.42 BTC in a Bitfinex account controlled by TIL from July 15, 2022 to March 16, 2023, which were subsequently transferred in a series of transactions between March 17, 2023 and November 10, 2023, to another wallet held by Bitfinex, Tether's sister affiliate, and associated with the Bitfinex exchange).)  The Plaintiffs contend that, after this transfer, Bitfinex and Tether continued to use this BTC to "support their ongoing operations" and, as the value of BTC increased from July 15, 2022 through March 16, 2023, Tether realized this appreciation. (*Id.* ¶¶ 84–85.)

### B.  The Amended Adversary Complaint

On December 5, 2024, the Plaintiffs filed the Amended Complaint, which asserts six causes of action relating to the Amended Token Agreement, Top-Up Transfers, Cross-Collateralization Transfers, and the Application Transfer.  The causes of action are as follows:

- <u>Count I</u> – A claim asserted against all Defendants that seeks avoidance of the Top-Up Transfers totaling 15,658.21 BTC, Cross-Collateralization Transfers totaling 2,228.01 BTC, and Application Transfer totaling 39,542.42 BTC as preferential transfers pursuant to 11 U.S.C. § 547 (*Id.* ¶¶ 86–113.)

- <u>Count II</u> – A claim asserted against all Defendants that seeks, without duplication, the return of the 15,658.21 BTC (Top-Up Transfers), 2,228.01 BTC (Cross-Collateralization Transfers), and 39,542.42 BTC (Application Transfer) or its equivalent value as Plaintiffs' property pursuant to 11 U.S.C. § 550 plus interest and costs.  (*Id.* ¶¶ 114–17.)

- <u>Count III</u> – A breach of contract claim under BVI law asserted against TLTD in connection with the Amended Token Agreement and TLTD's alleged improper application of Plaintiffs' collateral to their antecedent debt prior to the expiration of the 10-hour waiting period, resulting in an alleged $100 million or more in damages as well as expectation, reliance, and consequential damages in an amount to be proven at trial. (*Id.* ¶¶ 118–23.)

- <u>Count IV</u> – A claim under BVI law alleging breach of the covenant of good faith and fair dealing against TLTD as a result of the improper liquidation of Plaintiffs' collateral and

the manner with which TLTD exercised its discretion under the Amended Token Agreement, resulting in an alleged $100 million or more in damages as well as expectation, reliance, and consequential damages in an amount to be proven at trial. (*Id.* ¶¶ 124–27.)

- Count V – A claim against all Defendants for (i) avoidance of the Application Transfer in the amount of 39,542.42 BTC as a constructive fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B), and (ii) the return of the BTC or, in the alternative, the value of such property pursuant to 11 U.S.C. § 550 plus interest and costs. (*Id.* ¶¶ 128–33; *id.* at 37.)

- Count VI – A claim against all Defendants for (i) avoidance of the Application Transfer in the amount of 39,542.42 BTC as a constructive fraudulent or otherwise avoidable transfer pursuant to 11 U.S.C. § 544(b) and other applicable law, including the laws of New York, New Jersey, and Delaware, and (ii) the return of the BTC or, in the alternative, the value of such property pursuant to 11 U.S.C. § 550 plus interest and costs. (*Id.* ¶¶ 134–40; *id.* at 37.)

**C. The Motion**

The Defendants seek dismissal of the Amended Complaint on several grounds.

    1.  The Amended Complaint Fails to Allege Claims Held by CNLLC

As an initial matter, they contend that the Amended Complaint fails to allege any claim entitling CNLLC, a U.S. entity that is not a party to the Amended Token Agreement, to any relief from the Defendants. (MOL at 11.) This, they believe, puts CNLLC's standing to sue for breach into question. (*Id.*) The Plaintiffs' grouping of CNLLC with CNL, a U.K. entity, does not remedy this deficiency, they argue and, at most, CNL is the only proper plaintiff for the claims asserted. (*Id.* at 11–12.)

    2.  The Court Lacks Personal Jurisdiction Over the Defendants

The Defendants further argue that dismissal of the Amended Complaint in its entirety is appropriate as the Court lacks personal jurisdiction over the Defendants who are Hong Kong and BVI entities. (*See id.* at 1, 13.) In support, they contend that the Plaintiffs have failed to satisfy their requisite *prima facie* burden to establish the existence of personal jurisdiction over each claim asserted. (*Id.* at 12.) Specifically, the Defendants maintain that the Amended Complaint

14

does not allege that the Defendants have explicitly consented to litigate this particular case in the

United States.  (*Id.*)  Moreover, they assert that no specific jurisdiction exists as the Amended

Complaint does not allege anything about THL and TOL other than their affiliation with TLTD

nor does it allege anything about TIL other than TIL having received the transferred BTC that, in

any event, did not touch the United States.  (*Id.* at 12–14.)  Also, in connection with specific

jurisdiction, the Defendants further argue that the Amended Complaint fails to adequately plead

that TLTD purposefully availed itself of doing business in the United States.  (*Id.* at 14–15

(asserting that the proper focus is on the Defendants' representatives and, in the negotiation and

execution of the Initial and Amended Token Agreements, all TLTD personnel who negotiated or

executed the agreements lived and worked outside the U.S.); *id.* at 15–19 (contending that there

are no allegations in the Amended Complaint that would support a link to the United States,

including that the Amended Token Agreement was intended to "exploit" and "profit" from the

U.S. market or served as the "centerpiece" of a broader relationship, or that the claims arose

from alleged prior dealings between Tether and Celsius); *id.* at 19–21 (arguing that the Amended

Complaint contains vague allegations regarding CNL's transfers under the Amended Token

Agreement that prevent the Court from assessing the "quantity and quality" of alleged contacts,

the transfers were not "United States-based" since crypto is considered a "general intangible[]","

the allegations center on Plaintiffs' actions and not any Defendant, and the Amended Token

Agreement is governed by BVI law); *id.* at 21–23 (stating that Plaintiffs have only offered vague

allegations with respect to the Application Transfer that are sufficient to establish a finding of

personal jurisdiction).)  Finally, they also maintain that the Plaintiffs have failed to sufficiently

plead an effects-based specific personal jurisdiction.  (*See id.* at 23–25 (arguing that the

allegations fail to establish a link to the United States that would support a finding of jurisdiction pursuant to an effects theory).)

Personal jurisdiction also does not exist, the Defendants contend, because the Amended Complaint fails to allege any basis for *quasi in rem* jurisdiction. Specifically, the Plaintiffs do not offer any link between the Defendants' bank accounts in New York to their claims, which the Defendants indicate, have not been attached or otherwise seized. (*Id.* at 25.)

### 3. The Complaint Fails to State a Claim for Which Relief May be Granted

Turning to the individual claims, the Defendants further argue that dismissal is appropriate because the Plaintiffs have failed to state claims upon which relief may granted.

#### a. *Breach of Contract Claim (Count III)*

With respect to Count III, the Plaintiffs' breach of contract claim under BVI law, the Defendants believe that claim fails for the following reasons: (i) section 1.1(b)(4) of the Amended Token Agreement, by its plain language, did not "require[] a ten-hour standstill before TLTD could act at CNL's direction" and, in any event, the Plaintiffs concede that Celsius gave TLTD permission to liquidate; (ii) CNL's insolvency, as pled in the Amended Complaint, provided TLTD with an independent basis for liquidation pursuant to section 1.1(e)(4) of the Amended Token Agreement; and (iii) the Plaintiffs' theory of causation would violate the terms of the Amended Complaint and, in any event, also fails as a matter of BVI law that does not permit a party to rest a contract claim on its own breach of an agreement. (*Id.* at 25–28.)

#### b. *Breach of the Covenant of Good Faith and Fair Dealing (Count IV)*

As for Count IV, which alleges breach of the covenant of good faith and fair dealing under BVI law, the Defendants argue such claim must be dismissed since BVI law does not recognize any general duty of good faith in commercial contracts. (*Id.* at 30.) Rather, only two possible duties under BVI law are relevant here, neither of which, they believe, the Amended

16

Complaint pleads a violation of: (i) a duty to not exercise discretionary power in an arbitrary or irrational manner, and (ii) a duty for equitable mortgagees to seek the best price reasonably obtainable at the time a mortgagee decides to sell.  (*Id.* at 30–31.)

### c.  All Avoidance Claims (Counts I, II, V, and VI)

The avoidance claims asserted in the Amended Complaint (Counts I, II, V, and VI) may also be separately dismissed as they pertain to the avoidance of transfers of intangible property between U.K. and Hong Kong entities pursuant to a foreign law agreement.  (*Id.* at 31.)  This, the Defendants maintain, constitutes an "impermissible extraterritorial application[]" of the avoidance provisions.  (*Id.*)  In support, the Defendants state that the Bankruptcy Code's avoidance provisions lack any indication of extraterritorial application notwithstanding policy considerations that might suggest otherwise.  (*Id.* at 31–34 (arguing that policy considerations cannot overcome the presumption against extraterritoriality).)  Moreover, the Top-Up and Cross-Collateralization Transfers and the Application Transfer were all foreign.  (*Id.* at 34–35.)

### d.  Preference Claims Only (Counts I and II)

As for the preference claims in particular (Counts I and II), such claims may also be dismissed since TLTD was fully secured at the time of each alleged preferential transfer, a fact supported by market data.  (*Id.* at 36–37.)  None, therefore, would have resulted in TLTD receiving more than it would have in a chapter 7 liquidation, and the Amended Complaint lacks any allegation that TLTD ever became undersecured.  (*Id.* at 37; *see also id.* at 38–41 (arguing also that the focus should be on the value of the collateral as of the transfer date as opposed to the petition date and that there is no reason for the Court to deviate from prior rulings holding otherwise).)

Moreover, the Defendants argue that the Plaintiffs have otherwise failed to properly plead that the Cross-Collateralization Transfers were made "for or on account of antecedent debt."  (*Id.*

at 41.)  Indeed, the Amended Token Agreement itself makes clear that, with each new provision

of USDT, BTC must be posted "in consideration for" that new USDT as opposed to prior

obligations.  (*Id.* at 42–43.)  Therefore, the Defendants do not believe there is any basis to allege

that the transfers were on account of existing debt.  (*Id.* at 43.)  As for the Application Transfer,

the Defendants argue that this transfer was a contemporaneous exchange for new value and also

supports dismissal.  (*See id.* at 44 (stating that the Amended Complaint alleged that TLTD was

fully secured at the time of the Application Transfer, which allowed TLTD to cover its

"exposure" in full, such that application resulted in the release of TLTD's lien and the provision

of "new value").)  Indeed, the Amended Complaint, they contend, does not challenge the

21,656.20 BTC of collateral TLTD held at the time of the Application Transfer or the liens on

such collateral.  (*Id.* at 45.)  Therefore, the Plaintiffs argue that, at minimum, the preference

claim based on the Application Transfer should be narrowed.  (*Id.* (asserting that, at the very

least, the application of the 21,656.20 BTC should be deemed subject to a section 547(c)(1)

defense).)

### D.  The Opposition

The Plaintiffs oppose the Motion and the dismissal of their Amended Complaint,

asserting that the Defendants have improperly "ignore[d] or mischaracterize[d]" their "well-pled

allegations."  (Opposition at 2.)  Each of their arguments is summarized in turn.

### 1.  The Court Has Personal Jurisdiction Over All Defendants

The Plaintiffs contest the Defendants' contention that the Court lacks personal

jurisdiction over the Defendants, arguing instead that the Amended Complaint alleges a *prima*

*facie* case of personal jurisdiction over each Defendant.  (*Id.* at 12.)  Based on a totality of the

circumstances, the Plaintiffs believe that Tether maintained sufficient minimum contacts with the

United States to justify a finding that such jurisdiction exists.  (*Id.*)  In support, they highlight the

Amended Complaint's allegations of (i) Tether's scheme to exploit the U.S. crypto market as reflected in the purpose underlying the Amended Token Agreement and other circumstantial facts alleged, and (ii) the parties' course of dealing in the negotiation and performance under the Initial and Amended Token Agreements and Tether's demands for collateral, which they believe serve as an independent ground for a finding of jurisdiction.  (*Id.* at 13–22.)

### 2.    The Defendants' Extraterritoriality Arguments Fail

The Plaintiffs also argue that the Defendants' extraterritoriality arguments fail for two independent reasons: (i) the avoidance claims are predicated on transfers that are "domestic" and do not raise any extraterritoriality concerns, and (ii) Congress has made clear that the relevant provisions of the Bankruptcy Code do have "extraterritorial reach."  (*Id.* at 23.)

As to the former, the Plaintiffs maintain that the Top Up and Cross-Collateralization Transfers were domestic because the relevant conduct here, Celsius's conduct (*i.e.*, the alleged fraudulent or preferential transfer of property), was "plainly domestic."  (*Id.* at 24 (indicating also that the focus is on whether it was plausible that the transfers occurred in the United States and the Amended Complaint's statement that transfers were made from a U.S.-based account is a factual allegation entitled to the presumption of truth).)  The Opposition adopts the position that transactions involving cryptocurrency connected to a U.S.-based person or entity can be considered a domestic transaction and notes, in any event, that Celsius's cryptocurrency was located in the United States.  (*Id.* at 25.)  The Amended Complaint, the Plaintiffs state, contains specific facts that show that the relevant transfers took place domestically.  (*Id.*)  Moreover, despite Tether's contention that CNL is not a domestic entity, the Plaintiffs indicate that, at the time of the transfers, all of Celsius's entities were "functionally based in the United States," rendering it a U.S.-based company at the time of the transfers.  (*Id.* at 25–26.)

The same, the Plaintiffs argue, holds true for the Application Transfer, which they believe is also a domestic transaction as it was initiated from the U.S. and arose out of discussions between Tether and U.S.-based Celsius personnel.  (*Id.* at 26–27.)  Therefore, the Application Transfer, they maintain, constituted a transfer of a U.S.-based entity's property interest from the U.S., rendering it "domestic" for purposes of this adversary proceeding.  (*Id.* at 27.)  Moreover, Tether's subsequent and internal transfers of Celsius's pledged collateral is irrelevant to the Court's extraterritoriality analysis.  (*Id.*)

The Plaintiffs further argue that the Bankruptcy Code's avoidance provisions apply extraterritorially in line with Congress's clear intent.  (*Id.* at 27–28.)  Specifically, when the Code's avoidance provisions are read in "context" with its corresponding "recovery provisions," the Plaintiffs believe that it is evident that Congress intended the avoidance provisions to extend extraterritorially.  (*Id.* at 28–29 (urging the Court to adopt a "common sense" reading of the Bankruptcy Code and find that its avoidance provisions apply extraterritorially).)

3.  The Parties Are Properly Named

The Opposition also contests the Defendants' contention that the Amended Complaint has improperly named CNLLC as a plaintiff and the Tether entities as defendants.  With respect to CNLLC, the Plaintiffs make clear that CNLLC and CNL were both controlled by one set of executives that were based in the United States.  (*Id.* at 29.)  As further support, the Plaintiffs cite to the Court's substantive consolidation for purposes of the Plan.  (*Id.* at 30.)  CNLLC, therefore, was a proper plaintiff, they contend.  (*Id.*)  As for the Tether entities, the Amended Complaint, the Plaintiffs indicate, properly alleges a "unified course of conduct by three wholly owned subsidiaries and their common parent," providing sufficient notice to the Defendants of claims asserted against them as required under Rule 8 of the Federal Rules of Civil Procedure.  (*Id.* at 31.)

20

4. <u>The Amended Complaint Properly Alleges Avoidable Preferential Transfers
(Counts I and II)</u>

The Plaintiffs also contest the Defendants' assertion that the Amended Complaint fails to
properly allege preferential transfers.  As an initial matter, they indicate that the Amended
Complaint has adequately alleged that the Defendants received more than they would otherwise
have in a chapter 7 liquidation and, therefore, a preference claim.  (*Id.* at 32 (indicating that the
Amended Complaint alleged that the challenged transfers improved the Defendants' position as a
creditor).)  Specifically, the Defendants' receipt of additional, new collateral that, absent such,
would have rendered them undersecured as of the Petition Date they argue, resulted in them
receiving less than they would in a hypothetical liquidation.  (*Id.* at 38.)

Tether's secured status at the time of the transfers, they maintain, is irrelevant, and the
"hypothetical liquidation" test is measured as of the Petition Date as opposed to the transfer date.
(*Id.* at 32–34; *see also id.* at 35–38 (arguing also that section 547(b) of the Bankruptcy Code is
not limited to unsecured creditors and that the Defendants' cited cases do not address the timing
question for measuring a secured creditor's collateral for purposes of the hypothetical liquidation
test); *id.* at 39–40 (asserting that the Defendants' policy arguments and discussion of adequate
protection are unavailing as the Petition Date is the proper date for measurement).)

As for the Cross-Collateralization Transfers specifically, the Plaintiffs maintain that the
Amended Complaint clearly alleges they are on account of antecedent debt.  (*Id.* at 41.)  Indeed,
it is the cross collateralization, they argue, that "renders the collateral 'for or on account of' the
antecedent debt," something unaltered by the fact that the new collateral was to be provided in
connection with new borrowings.  (*Id.*)

Similarly, with respect to the Application Transfer, the Plaintiffs argue that because the
Defendants' liens on the collateral were themselves preferential, the "new value" defense fails as

21

Tether cannot use its alleged preferential liens as a defense to the satisfaction of such liens.  (*Id.*)

Even if not preferential, the Application were clearly fraudulent conveyances, they contend,

because, at the end of the day, the Defendants took "far more value in collateral than it was

owed."  (*Id.*)

     5.   <u>The Amended Complaint Adequately Alleges a Claim for Breach of Contract
(Count III)</u>

With respect to Count III, the Plaintiffs argue that the 10-hour waiting period set forth in

the Amended Token Agreement could not, by the agreement's own terms, be modified by an

alleged oral waiver from Alexander Mashinsky.  (*Id.* at 42.)  Rather, only a signed writing

between the parties could modify the Amended Token Agreement, and the agreement makes

clear that the 10-hour waiting period was to be provided to Celsius "without exception."  (*Id.*)

The Plaintiffs contend that the Defendants "misinterpret BVI law" and "misconstrue" the

allegations set forth in the Amended Complaint.  (*Id.* (suggesting that the most plausible

interpretation of the alleged oral waiver was that he wanted a "commercially reasonable sale

process" that would maximize value for Celsius).)

In addition, the Opposition further asserts that Celsius's insolvency did not provide

Tether an "independent basis" for liquidation as the Defendants elected to continue receiving

benefits under the Amended Token Agreement notwithstanding that their knowledge of Celsius's

financial state.  (*Id.* at 43.)  In any event, the Plaintiffs believe that factual questions surround the

Defendants' knowledge of and potential contribution to Celsius's insolvency and, therefore,

cannot be a basis to dismiss the breach of contract claim.  (*Id.* at 44.)

     6.   <u>The Amended Complaint Adequately Alleges a Claim for Breach of the
Covenant of Good Faith and Fair Dealing (Count IV)</u>

As for Count IV, the Plaintiffs argue that the Amended Complaint states a claim under

both of the duties under BVI law that the Defendants have highlighted as being analogous to a

general duty of good faith and fair dealing.  (*Id.* at 44.)  Specifically, the Amended Complaint

has properly alleged that the Defendants engaged in dishonest and arbitrary practices that

breached their duty to exercise what discretion they had to liquidate Celsius's collateral in an

honest manner and in good faith.  (*Id.* at 45.)  The Amended Complaint also sufficiently pleads

that the Defendants failed to obtain the "true market value" of Celsius's BTC when they sold the

collateral during the Application Transfer.  (*Id.*)  Thus, the Plaintiffs believe that the Amended

Complaint has adequately stated a claim.  (*Id.*)

### E.  The Reply

The Reply reiterates arguments asserted in the Motion, including arguing, as an initial

matter again, that CNL is the only entity relevant to the Plaintiffs' claims and, as a U.K. entity,

renders the Plaintiffs' characterization of Celsius collectively as a U.S.-based entity to be without

merit.  (Reply at 2–4 (indicating that the Plaintiffs' appeal to substantive consolidation does not

help them in this instance).)

They further assert that the Plaintiffs have failed to establish a *prima facie* case of

personal jurisdiction.  (*Id.* at 4–6 (distinguishing cases the Defendants have relied on).)

Specifically, they argue that all of the Plaintiffs' claims arise out of specific transfers of

cryptocurrency from one foreign entity to another, pursuant to a foreign law contract that neither

contemplated nor required any performance or activity by either party in the United States and

contained both foreign forum-selection and choice-of-law clauses.  (*Id.* at 6.)  In addition, the

Plaintiffs' reliance on actions taken by CNL do not provide, in their mind, a basis to exercise

personal jurisdiction over the Defendants.  (*Id.*)  Lastly, neither of the Plaintiffs' proffered

arguments—the Defendants' alleged plans to "exploit" the U.S. market or the parties' course of

dealing under the Amended Token Agreement—supports a finding of jurisdiction, the Reply

maintains.  (*Id.* at 7–10 (asserting that a mere allegation that a defendant's purpose was to exploit

a market is insufficient); *id.* at 10–14 (reiterating that the negotiations surrounding the Amended

Token Agreement, the parties' course of performance, and requests for additional collateral do

not provide a basis for personal jurisdiction).)

As for the individual claims, the Reply argues that the Plaintiffs' preference and

fraudulent transfer claims—Counts I, II, V, and VI—are predicated on impermissible

extraterritorial applications of the Bankruptcy Code.  (*Id.* at 14.)  The Defendants state that

Congress did not express any clear intent to apply the Code's avoidance provisions

extraterritorially.  (*Id.* at 14–15.)  Additionally, the avoidance claims, the Defendants indicate,

are predicated on foreign transfers only; none are domestic.  (*Id.* at 15–18 (asserting that the Top-

Up and Cross-Collateralization Transfers were foreign as they were made by a foreign debtor

and no domestic bank accounts were involved in these transfers); *id.* at 18–19 (arguing,

similarly, that the Application Transfer was foreign since it involved the transfer of an interest in

the collateral of one foreign entity to another foreign entity).)

The Amended Complaint, the Defendants indicate, also fails to state a claim with respect

to Counts I, II, III, and IV.  With respect to the Plaintiffs' preference claims comprising Counts I

and II in particular, they contend that none of the Top-Up and Cross-Collateralization Transfers

and Application Transfer are voidable.  (*See id.* at 22 (indicating that the Application Transfer is

not independently voidable since it was predicated on "new value"); *id.* at 23 (asserting that the

Cross-Collateralization Transfers were made on account of antecedent debt); *id.* at 23–24

(arguing that, because TLTD was fully secured at the time of each transfer, the Top-Up Transfers

are also not voidable as the proper time to measure valuation is not the Petition Date but rather,

the time each transfer was made).)

## II.   <u>LEGAL STANDARD</u>

### A.  Rule 12(b)(2) of the Federal Rules of Civil Procedure

On motions to dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, made applicable here by Rule 7012 of the Federal Rules of Bankruptcy Procedure, plaintiffs generally bear the burden of establishing a *prima facie* showing of personal jurisdiction over a defendant. *See Motors Liquidation*, 565 B.R. at 284 (citing *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)); *see also SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010))).  Establishment of jurisdiction is on a claim-by-claim basis.  *See Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) ("A plaintiff must establish the court's jurisdiction with respect to each claim asserted.").

In addressing a pretrial motion to dismiss, the Second Circuit has made clear that "a district court has considerable procedural leeway" and "may determine the motion on the basis of affidavits alone; . . . permit discovery in aid of the motion; or . . . conduct an evidentiary hearing on the merits of the motion." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). However, determination of the sufficiency of a plaintiff's showing is a "sliding scale" that will "var[y] depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

Relevant here, prior to discovery, "a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction."[7] *Ball*, 902 F.2d at 197 (citations omitted). In other words, a *prima facie* showing may be established "solely by allegations." *Id.* Regardless, a court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010); *Fairfield Sentry Ltd. v. Schwiez (In re Fairfield Sentry Ltd.)*, 669 B.R. 124, 138 (Bankr. S.D.N.Y. 2025) (indicating that this holds true before or after jurisdictional discovery has taken place).

In deciding whether a court can exercise personal jurisdiction over a foreign defendant, it must first be determined whether a defendant has the "requisite minimum contacts with the United States at large." *Motors Liquidation*, 565 B.R. at 286; *see also Fairfield Sentry*, 669 B.R. at 137 ("In adversary proceedings, courts must determine whether the defendant has minimum contacts with the United States, rather than with the forum state.") (citations omitted).

In turn, determination whether a defendant has the necessary "minimum contacts" requires a finding of either specific personal or general personal jurisdiction.[8] *In re Terrorist*

---

[7] On April 24, 2025, the Court so-ordered the *Joint Stipulation and Agreed Order to Extend Discovery Schedule* (ECF Doc. # 43) that extended fact discovery to November 21, 2025, and expert discovery to February 19, 2026.

[8] In addition to general or specific jurisdiction, consent can also serve as a basis for exercising personal jurisdiction over a foreign defendant. *See Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 86 (2d Cir. 2023) (stating that the "three distinct bases for exercising personal jurisdiction over an out-of-forum defendant in accordance with the dictates of due process" are general jurisdiction, specific jurisdiction, and consent). "Consent to personal jurisdiction is a voluntary agreement on the part of a defendant to proceed in a particular forum." *Id.* at 87.

Here, the Amended Complaint alleges that the Court has "personal jurisdiction over the Defendants pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure because Plaintiffs' claims arise from and relate to Defendants' continuous and systematic contacts with the United States." (AC ¶ 23.) Moreover, it further states that the Defendants have "repeatedly submitted to the jurisdiction of courts in this District." (*Id.*) The Defendants, however, dispute that they have consented to personal jurisdiction. (*See* MOL at 12 (asserting that the Amended Complaint fails to allege that the Defendants voluntarily agreed to litigate in the United States).) The Plaintiffs have also not argued otherwise. (*See generally* Opposition.) In light of the foregoing, the Court will not address the issue of consent. *See Piuggi v. Good for You Prods. LLC*, 739 F. Supp. 3d 143, 168 (S.D.N.Y. 2024)

*Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "Specific [personal] jurisdiction exists when 'a [forum] exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum'; a court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum . . . and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Id.* at 673–74 (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir. 1996)) (alterations in original). Specifically, the contacts required for specific jurisdiction are often referred to as "purposeful availment" (*i.e.*, acts by which a defendant "purposefully avails itself of the privilege of conducting activities within the forum State"). *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021). By contrast, because general personal jurisdiction is unrelated to events giving rise to a lawsuit, a plaintiff needs to demonstrate instead a defendant's "continuous and systematic general business contacts." *Metro. Life*, 84 F.3d at 568 (indicating that courts will impose a "more stringent" minimum contacts test for general personal jurisdiction) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)).

Following the "minimum contacts" inquiry, a court then needs to determine whether the "assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Reasonableness requires consideration of five factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest

---

(quoting *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 318 n.10 (S.D.N.Y. 2021)) ("Numerous courts in this District have held that a party's failure to address an issue in its response to a Rule 12(b)(6) motion 'amounts to a concession or waiver of the argument.'").

in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting *Metro. Life*, 84 F.3d at 568). "Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant must present 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (citation omitted). This "reasonableness" inquiry "varies inversely with the strength of the 'minimum contacts' showing" in that a strong showing by a plaintiff on "minimum contacts" will reduce the weight given to "reasonableness" and vice versa. *Id.* (citation omitted).

### B. Rule 12(b)(6) of the Federal Rules of Civil Procedure

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, also made applicable to adversary proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure, a complaint need only allege "enough facts to state a claim for relief that is ***plausible*** on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (emphasis in original) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A party need only plead "a short and plain statement of the claim" with sufficient factual "heft to sho[w] that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007) (internal quotation marks and citations omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id*. at 555, and present claims that are "plausible on [their] face," *id*. at 570.

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Off. Comm. of Unsecured Creditors of Vivaro Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*, 524 B.R.

536, 547 (Bankr. S.D.N.Y. 2015) (quoting *Iqbal*, 556 U.S. at 678). Plausibility "is not akin to a probability requirement," but rather requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citations omitted); *see also Twombly*, 550 U.S. at 555 (stating that a pleading that offers "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Rather, pleadings "must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).

Generally, courts use a two-pronged approach when considering a motion to dismiss. *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (stating that motion to dismiss standard "creates a 'two-pronged approach' . . . based on '[t]wo working principles'") (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79)); *McHale v. Citibank, N.A.* (*In re 1031 Tax Grp., LLC*), 420 B.R. 178, 189–90) (Bankr. S.D.N.Y. 2009) (stating that courts use a two-prong approach when considering a motion to dismiss). *First*, a court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in factual garb. *See, e.g.*, *Iqbal*, 556 U.S. at 677–78; *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true") (citing *Iqbal*, 556 U.S. at 678). *Second*, a court must determine if these well-pleaded factual allegations state a plausible claim for relief—"a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). "Dismissal is only warranted where it appears beyond doubt that the plaintiff can prove no sets of facts in support of her claim which would entitle her to relief." *Geron v. Central Park Realty Holding Corp. (In re Nanobeak Biotech Inc.)*, 656 B.R. 350, 361 (Bankr. S.D.N.Y. 2024) (citation omitted).

Courts deciding motions to dismiss must draw all reasonable inferences in favor of the nonmoving party and must limit their review to facts and allegations contained in (i) the complaint; (ii) documents either incorporated into the complaint by reference or attached as exhibits; and (iii) matters of which the court may take judicial notice—such as public records, including complaints filed in state courts. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (citations omitted).

### III.    DISCUSSION

### A.  Determination as to CNLLC's Standing Cannot Be Made at This Time

As an initial matter, the Defendants contend that the Amended Complaint fails to allege any claim entitling Plaintiff CNLLC, the U.S. entity, to relief from the Defendants since CNLLC is not a party to the Initial or Amended Token Agreement that serves as the basis for the Amended Complaint. (MOL at 11.) Accordingly, they maintain that CNLLC lacks standing to sue and cannot be a proper plaintiff. (*Id.*)

#### a.  Standing in Bankruptcy Court

Generally, to have standing in bankruptcy court, a party must possess: (i) constitutional standing; (ii) prudential standing; and (iii) standing under section 1109 of the Bankruptcy Code. *In re Motors Liquidation Co.*, 580 B.R. 319, 340 (Bankr. S.D.N.Y. 2018); *see In re Old Carco LLC*, 500 B.R. 683, 690 (Bankr. S.D.N.Y. 2013) (indicating that a party invoking federal jurisdiction bears the burden to establish that it meets "(1) Article III's constitutional requirements, (2) federal court prudential standing requirements, and (3) the 'party in interest'

requirements under Bankruptcy Code 1109(b).").  "All three standing requirements must be met
to have standing." *Motors Liquidation*, 580 B.R. at 340.

Constitutional standing, also commonly referred to as Article III standing, generally
requires that a plaintiff have "suffered an injury in fact that is fairly traceable to the challenged
conduct of defendant and is likely to be redressed by a favorable court decision in order to bring
suit in the federal courts." *Astra Oil Trading v. PRSI Trading Co. LP*, 794 F. Supp. 2d 462, 471
(S.D.N.Y. 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).
Specifically, an injury in fact is "an invasion of a legally protected interest which is (a) concrete
and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504
U.S. at 560 (internal citations and quotation marks omitted).

Meanwhile, a plaintiff must also demonstrate prudential standing pursuant to which a
party must generally "assert his own legal rights and interests, and cannot rest his claim to relief
on the legal rights or interests of third parties." *In re Genesis Glob. Holdco, LLC*, 660 B.R. 439,
496 (Bankr. S.D.N.Y. 2024) (quoting *In re Quigley*, 391 B.R. 695, 702 (Bankr. S.D.N.Y. 2008).
In other words, "[c]ourts should therefore hesitate before resolving a controversy on the basis of
a third party's rights that are not involved in the litigation." *Id.*

Lastly, section 1109(b) of the Bankruptcy Code states, in relevant part, that "[a] party in
interest, including the debtor, the trustee, a creditors' committee, an equity security holders'
committee, a creditor, an equity security holder, or any indenture trustee may raise and may
appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b).  Generally,
courts have held that "a party in interest is one that has a sufficient interest in the outcome of the
case that would require representation, or a pecuniary interest that will be directly affected by the
case." *In re Innkeepers USA Trust, et al.*, 448 B.R. 131, 141 (Bankr. S.D.N.Y. 2011).  In other

words, "a party in interest must have a financial or legal stake in the outcome of the particular

matter." *Old Carco*, 500 B.R. at 691 (citation omitted).

  b.  *Determination as to CNLLC's Standing Cannot Be Made at This Time*

Here, the Amended Complaint is predicated on the Amended Token Agreement—which,

as the Defendants have indicated, CNLLC is not a party to—as well as certain related transfers.

(*See* Opposition at 13 (stating that the Defendants admit that the Amended Token Agreement

"'gave rise to' all of Celsius's claims"); Initial Token Agreement at 1 (reflecting that the parties

to the Initial Token Agreement are TLTD and CNL only); Amended Token Agreement at 1

(same).)  Therefore, at a minimum, a determination whether CNLLC could have suffered an

"injury in fact" and/or asserted its own legal rights and interests that would afford it standing is

required.  *See Astra Oil*, 794 F. Supp. 2d at 471 (indicating that constitutional standing requires a

plaintiff to suffer an injury in fact); *Genesis*, 660 B.R. at 496 (stating that a demonstration of

prudential standing requires the assertion of one's own legal rights and interests).

As a general matter, "[p]laintiffs bear the burden of establishing standing." *All. for Open

Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 227 (2d Cir. 2011).  Typically, "a

non-party to a contract that does not contain unambiguous language manifesting an intent to

make the non-party a beneficiary of that contract lacks prudential standing to litigate issues

related to that contract." *In re Motors Liquidation Co.*, 580 B.R. at 340.  (*See also* Carrington

Decl. ¶¶ 109–111 (indicating that BVI common law recognizes privity of contract and will not

"give relief in relation to contractual claims for or against entities or individuals related to those

entities because such persons are not parties to the contract in issue"; Webster Decl. ¶ 23 (stating

that he is in "broad agreement with Mr. Carrington's opinions on the sources of BVI law and the

rules of contractual interpretation").)  The language of the Initial and Amended Token

Agreements, in fact, limits the ability of CNL to "assign, delegate, or otherwise transfer, in

whole or in part, any or all of its rights or obligations under [the] Agreement without the express written consent of TLTD." (Initial Token Agreement § 17; *see also* Amended Token Agreement § 5 (indicating that, among other things, section 17 of the Initial Token Agreement is incorporated into the Amended Token Agreement "as if set out in full [t]herein").) There is no indication in the Amended Complaint that TLTD consented to CNL's assignment or transfer of its rights and obligations under the Amended Token Agreement.

The Plaintiffs argue that CNLLC is a proper plaintiff because CNLLC and CNL were "both controlled by one set of executives" and operated without "corporate distinction." (Opposition at 29.) Moreover, the Court, the Plaintiffs further indicate, had substantively consolidated CNLLC and CNL in connection with confirmation of the Plan that would permit it to be a proper plaintiff for purposes of this proceeding. (*Id.* at 29–30 (citing *Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates*, ECF Doc. # 3972 (the "Confirmation Order") at 84–85).)

As to the first argument, the Plaintiffs cite to *In re Adler*, 494 B.R. 43 (Bankr. E.D.N.Y. 2013), as support for the notion that CNLLC and CNL's lack of "individuality" warrants the treatment of the two entities as a "single true entity." (Opposition at 31.) The *Adler* court reached this conclusion, however, after it pierced the corporate veil with respect to the defendants and applied the doctrine of alter ego under New York law. *See Adler*, 494 B.R. at 58 (applying the remedy of alter ego to deem the various corporation entities as one). Indeed, under New York's alter ego theory:

> [A]n entity may be liable for a breach of the contract even where it is not a formal party or signatory to the contract. For example, a contract may bind a party that did not sign the contract where the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the 'alter ego' of the party.

*Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 284 (S.D.N.Y. 2023)

(quoting *Malmsteen v. Univ. Music Grp., Inc.*, 940 F. Supp. 2d 123, 135 (S.D.N.Y. 2013))

(quotation marks omitted).  The Amended Complaint alleges that both the Initial and Amended

Token Agreements were "signed on behalf of [CNL] by employees based in the United States—

the Initial Token Agreement by Harumi Urata-Thompson, Celsius's CFO at the time, and the

Amended Token Agreement by Alexander Mashinsky and S. Daniel Leon, both directors of

Celsius."  (AC ¶ 43.)  Moreover, it further alleges that CNL was only "nominally an English

company" since (i) "Tether knew that its real counterparties under the Agreement were based in

the United States"; (ii) Tether had been notified that the Tether account created for CNL was

"associated with a bank account at Signature Bank in New York"; (iii) Tether "knew that the

USDT it nominally transferred to [CNL] would go to support Celsius's operations in the United

States" and "ultimately benefit United States persons and entities, including [CNLLC] and

[CNL]."  (*Id.* ¶¶ 43–44.)

Alter ego doctrine, however, is typically asserted by a plaintiff against a defendant.  *See,

e.g.*, *Emeraldian Ltd. P'ship v. Wellmix Shipping Ltd.*, No. 08 CIV. 2991 (RJH), 2009 WL

3076094, at *3 (S.D.N.Y. Sept. 28, 2009) ("To state a prima facie claim for alter ego liability,

plaintiffs must make specific factual allegations from which alter ego status can be inferred;

conclusory allegations are insufficient.").  It is unclear whether this doctrine is similarly

recognized under BVI law, which governs both the Initial and Amended Token Agreements, and

can be used by a plaintiff to support a finding of standing to assert claims on account of a

contract it was not a party.[9]  Instead, the Plaintiffs rely on the Court's substantive consolidation

---

[9]        Even if the Court applied New York law, the Plaintiffs likely have not alleged sufficient facts to establish
that CNL was the alter ego of CNLLC.  *See, e.g.*, *In re Lyondell Chem. Co.*, 543 B.R. 127, 143–44 (Bankr. S.D.N.Y.
2016) (providing that "[t]o determine whether the subsidiary is an 'alter ego' of the parent corporation, courts . . .

of CNLLC and CNL, as provided for in the Confirmation Order, as support for the inclusion of

CNLLC as a plaintiff for purposes of this proceeding.

The Confirmation Order provides, in relevant part, that CNLLC, CNL, Celsius Lending

LLC, and Celsius Networks Lending LLC (collectively, the "Consolidated Debtors") are

substantively consolidated only "***for purposes of the Plan***, including for purposes of voting,

confirmation, and Plan distributions."  (Confirmation Order ¶ 287 (emphasis added); *see also*

Plan, Art. IV(A) (providing for the substantive consolidation of CNLLC and CNL along with

Celsius Lending LLC and Celsius Networks Lending LLC as a means for implementation of the

Plan).)  This substantive consolidation includes, among other things, the treatment of "all assets

and all liabilities of the Consolidated Debtors . . . as though they were merged."  (Confirmation

Order ¶ 287.)  This substantive consolidation and the "deemed merger effected pursuant to the

Plan," however, "shall not affect . . . (x) the legal and organizational structure of the

Consolidated Debtors, except as provided in the Transaction Steps Memorandum" or "(y)

defenses to any Causes of Action."[10]  (*Id.*)  Moreover, the Post-Effective Date Debtors' rights to

commence and pursue "any and all Causes of Action of the Debtors, including, without

limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action" is

separately preserved.  (*Id.* ¶ 307.)  As set forth in the Plan, the "***applicable*** Post-Effective Date

---

[will] consider[]: (1) 'common ownership'; (2) 'financial dependency of the subsidiary on the parent corporation';
(3) 'the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's
executive personnel and fails to observe corporate formalities'; and (4) 'the degree of control over the marketing and
operational policies exercised by the parent.'").

[10]    The Transaction Steps Memorandum outlines how the MiningCo Transaction will be implemented and
effectuated.  (*See Eleventh Notice of Filing of Plan Supplement*, ECF Doc. # 4297, Ex. F.)

Debtors, through their authorized agents and representatives . . . shall retain and may exclusively enforce any and all such Causes of Action." (Plan, Art. IV.S (emphasis added).)[11]

Under the Plan, the Litigation Administrator is tasked with "prosecut[ing], settl[ing] or otherwise resolv[ing] any remaining Disputed Claims (including any related Causes of Action that are not released, waived, settled, or comprised pursuant to [the] Plan) [and] the Recovery Causes of Action." (*Id.*, Art. IV.L).) It is unclear whether substantive consolidation "for Plan purposes" would extend to the manner with which Causes of Action will be prosecuted and could confer CNLLC rights under an agreement it was not party to. Indeed, the Plaintiffs do not include the other Consolidated Debtors as plaintiffs in this present action, and the Amended Complaint itself makes no specific mention of substantive consolidation itself. The language of the Initial and Amended Token Agreements, in fact, limits the ability of CNL to "assign, delegate, or otherwise transfer, in whole or in part, any or all of its rights or obligations under [the] Agreement without the express written consent of TLTD." (Initial Token Agreement § 17; Amended Token Agreement § 5.) There is no indication in the Amended Complaint that TLTD consented to CNL's assignment or transfer of its rights and obligations under the Amended Token Agreement. Moreover, as with alter ego theory, it is also unclear whether substantive consolidation is generally recognized under BVI law and, if so, whether it would be sufficient to confer CNLLC standing under a contract that it was not a party to.

Accordingly, this issue cannot be resolved on the current record, and the Court declines to make a determination whether CNLLC is a proper plaintiff at this time. Further briefing,

---

[11]    Note that the Schedule of Retained Causes of Action lists, among other things, causes of action for CNL against Tether for breach of contract and liquidation of collateral at an improper discount to market; CNLLC was not included. (*See Tenth Notice of Filing of Plan Supplement*, ECF Doc. # 4285, Ex. B.) The Confirmation Order makes clear, however, that the absence of a specific reference to any Cause of Action does not serve as "any indication that the Debtors or the Post-Effective Date Debtors will not pursue any and all available Causes of Action against it." (Confirmation Order ¶ 308.)

motion practice, and, if necessary, a trial may be required to finally resolve the issue.  The parties

are permitted to provide additional briefing on the issues whether BVI recognizes the doctrines

of alter ego theory and substantive consolidation and, if so, whether either or both doctrines

could confer standing on CNLLC to bring the claims asserted in the Amended Complaint.

### B.  The Court Declines to Dismiss the Amended Complaint Against Defendants THL, TOL, and TIL on Rule 8 Grounds

In addition to CNLLC, the Defendants assert that the Amended Complaint should be

dismissed against THL, TOL, and TIL.  With respect to THL and TOL, the Defendants argue,

other than an assertion that these entities are affiliated with TLTD, the Amended Complaint

lacks allegations specific to them.  (MOL at 14.)   Therefore, they believe that the Plaintiffs have

improperly grouped the Defendants together, thereby precluding the Court from performing a

proper personal jurisdiction and Rule 12(b)(6) analysis.  (*Id.*)  Similarly, with respect to TIL, the

Defendants also argue that the Amended Complaint should be dismissed as it lacks factual

allegations concerning TIL other than it later "received the BTC that had been transferred to

TLTD in the Application Transfer."  (*Id.*)

"Whether Plaintiffs have 'lump[ed] all the defendants together in each claim and

provid[ed] no factual basis to distinguish their conduct' is a group-pleading issue under Rule 8."

*Han v. InterExchange, Inc.*, No. 1:23-CV-07786 (JLR), 2024 WL 3990770, at *11 (S.D.N.Y.

Aug. 28, 2024) (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001))

(alterations in original).  Among other things, Rule 8 of the Federal Rules of Civil Procedure

requires a complaint to contain, at a minimum, a "short and plain statement of the claim" that

would afford a "defendant fair notice of what the plaintiff's claim is and the ground upon which

it rests."  *Ferro v. Ry. Exp. Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961); FED R. CIV. P. 8(a)(2)

(requiring a "short and plain statement of the claim showing that the pleader is entitled to

relief"). Notice will be deemed fair when it will "enable the adverse party to answer and prepare for trial, allow the application of *res judicata*, and identify the nature of the case so that it may be assigned the proper form of trial." *Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co.*, No. 13CV7639-LTS-MHD, 2015 WL 4040882, at *3 (S.D.N.Y. July 2, 2015) (quoting *Wydner v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004)). Therefore, a complaint need not be a "model of clarity or exhaustively present the facts alleged." *Atuahene*, 10 F. App'x at 34. Rather, the proper inquiry is whether a defendant "can readily identify the nature of the case" brought against it. *Vantone*, 2015 WL 4040882, at *4.

Typically, dismissal pursuant to Rule 8 is appropriate when "a complaint is 'unintelligible' and fails to 'explain[] what conduct constituted the violations, which defendants violated which statutes . . . or how the alleged violations harmed [the plaintiff]." *Id.* (quoting *Strunk v. U.S. House of Representatives*, 68 F. App'x 233, 235 (2d Cir. 2003)) (alterations in original). That is not the case here. The Amended Complaint asserts six causes of action and plainly specifies the Defendants against whom each claim has been brought. (*See* AC ¶¶ 86–140 (asserting Counts I, II, V, and VI against the Defendants collectively and Counts III and IV against TLTD only).) Moreover, the Amended Complaint alleges that the "Tether entities acted in concert in carrying out the wrongdoing alleged herein, and each participated in carrying out a scheme described to extract value from Celsius's estate through their preferential and fraudulent transfers, breaches of contract, and improper retention of collateral." (AC ¶ 18.) "[N]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *InterExchange*, 2024 WL 3990770, at *11 (quoting *Vantone*, 2015 WL 4040882, at *3). As the Amended Complaint clearly identifies which Defendants each claim is asserted against and alleges both joint

participation and individual liability, the Court concludes that the Amended Complaint has

provided THL, TOL, and TIL with sufficient notice of the claims asserted against them.  *See

Vantone*, 2015 WL 4040882, at *4 (finding that a complaint that alleged joint activity among

certain defendants satisfied the requirements of Rule 8).  Indeed, a complaint "need not elaborate

extensively on the details with regard to each defendant to comply with Rule 8."  *Id.*

The Defendants cite to *Plusgrade L.P. v. Endava Inc.*, No. 1:21-CV-1530 (MKV), 2023

WL 2402879 (S.D.N.Y. Mar. 8, 2023) as support.  The court there, however, only concluded that

dismissal of a complaint was appropriate on group-pleading grounds because the complaint

failed to provide "fair notice of which claims pertain to which defendants."  *Plusgrade*, 2023 WL

2402879, at *4.  As already noted, in addition to alleging joint action and individual liability, the

Amended Complaint also clearly identifies the applicable Defendants for each claim, sufficiently

providing each with notice of claims asserted against them.

Accordingly, the Court concludes that there is no basis for dismissal of the Amended

Complaint against THL, TOL, and TIL pursuant to Rule 8.

### C.  Personal Jurisdiction Over the Defendants

The Defendants assert that the Court lacks personal jurisdiction over each of the four

Defendants, rejecting the Plaintiffs' position that the Court has specific personal and *quasi in-

rem* jurisdiction.  Specifically, the Amended Complaint states that the Court has personal

jurisdiction over the Defendants pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy

Procedure because the Plaintiffs' claims arise from and relate to the Defendants' "continuous and

systematic contacts with the United States."  (AC ¶ 23.)  Moreover, the Plaintiffs allege that each

Defendant (i) "transacted business in and maintained substantial contacts with the United States,

including by maintaining relationships with United States entities"; (ii) "purposefully availed

itself of the privilege of doing business in the United States," including invoking the "benefits

and protection of its laws"; (iii) took actions that were "directed at, and had the intended effect of, causing injury to persons located in the United States, including in this District"; and (iv) has repeatedly submitted to the jurisdiction of courts in this District.  (*Id.*)  Finally*,* the Amended Complaint argues that the Court has *quasi in-rem* jurisdiction because of the Defendants' maintenance of one or more bank accounts in New York.  (*Id.* ¶ 24.)

As the Plaintiffs do not address the Defendants' arguments with respect to *quasi in-rem* jurisdiction, the Court will focus solely on whether specific personal jurisdiction exists.  *See Piuggi*, 739 F. Supp. 3d at 168 (indicating that failure to address an issue in a response to a Rule 12(b)(6) motion amounts to a concession or waiver).

### 1.   In General

In determining whether a court can exercise specific personal jurisdiction over a foreign defendant, a determination must first be made that a defendant has the "requisite minimum contacts with the United States at large." *Motors Liquidation*, 565 B.R. at 286 (quoting *Off. Comm. of Unsecured Creditors of Arcapita Bank B.S.C. (c) et al. v. Bahrain Islamic Bank*, 549 B.R. 56, 63 (Bankr. S.D.N.Y. 2016)).  To exercise specific personal jurisdiction over a non-resident defendant, three requirements must be satisfied: (i) a defendant must have "purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State"; (ii) the plaintiff's claim raises out of or relates to the defendant's forum conduct; and (iii) the exercise of jurisdiction must be "reasonable under the circumstances." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (citations omitted).  The focus of the inquiry is on the "affiliation between the forum and the underlying controversy." *Arcapita*, 549 B.R. at 63 (quoting *Goodyear Dunlop Tires Operations S.A. v. Brown*, 564 U.S. 915 (2011)).

40

Here, the Plaintiffs, who are tasked with making a *prima facie* showing of personal

jurisdiction, have set forth what they have characterized as two "independent ground[s]" for such

a finding: (i) the Defendants' deliberate efforts to exploit the U.S. crypto markets that serves as

the "fundamental purpose" of the Amended Token Agreement, and (ii) the Defendants'

"extensive contact with the United States" in the negotiation of the Initial and Amended Token

Agreements and general course of dealing.  (Opposition at 13–22.)  For the reasons discussed in

greater detail below, the Court concludes that the Plaintiffs have satisfied their burden and made

the requisite showing.

        2.  <u>Purposeful Availment</u>

Turning to the first requirement, to establish minimum contacts necessary to support a

finding of specific personal jurisdiction, it must be that a defendant has "purposefully availed

itself of the privilege of doing business in the forum and could foresee being hauled into court

there."  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quoting

*Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013)).  "Although a

defendant's contacts with the forum state may be 'intertwined with [its] transactions or

interactions with the plaintiff or other parties . . . [,] a defendant's relationship with a . . . third

party, standing alone, is an insufficient basis for jurisdiction.'"  *Fairfield Sentry*, 669 B.R. at 139

(quoting *U.S. Bank*, 916 F.3d at 150).  Moreover, it is further insufficient to "rely on a

defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff

with the forum to establish specific jurisdiction."  *Id.* (citation omitted).  Rather, the contacts

"must be the defendant's own choice" and "show that the defendant deliberately reached out

beyond its home—by, for example, exploi[ting] a market in the forum State or entering a

contractual relationship centered there."  *Ford Motor*, 592 U.S. at 359 (citations and internal

quotation marks omitted) (alterations in original).

41

Evaluation of the "quality and nature of [a] defendant's contacts with the forum state" is typically conducted under a "totality of the circumstances test." *Licci*, 732 F.3d at 170 (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)). "Where the underlying dispute involves a contract, [a court will] use a 'highly realistic' approach and evaluate factors such as 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *U.S. Bank*, 916 F.3d at 151 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)). Courts will also "look through form to substance." *Oklahoma Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico) S.A. Institucion de Banca Multiple*, 92 F.4th 450, 457 (2d Cir. 2024).

Here, the Amended Complaint alleges that "Tether . . . began planning to use Celsius to exploit the United States cryptocurrency market," expressing a desire for Celsius to "service all their US clients." (AC ¶ 30; *see id.* (noting further that Mashinsky planned for Di Stefano to introduce Tether's top five U.S. customers and for Bitfinex to provide a buy/sell order book to allow U.S. clients to trade).) It further indicates that this desire to exploit ultimately served as the underlying basis for the Initial and Amended Token Agreements that governed the lending arrangement between the parties. (*See id.* ¶ 31 (stating that the lending arrangement was central to "their broader purpose of exploiting the United States market").) This arrangement, the Amended Complaint makes clear, was intended to be mutually beneficial and to specifically benefit Tether by making USDT available to Celsius and Tether's customers in the United States.[12] (*Id.*; *see also id.* ¶ 44 (alleging that Tether was aware that (i) the USDT transferred to

---

[12]     While there appears to be a dispute between the parties whether Tether knew that Celsius would take action in the United States, the Court notes that "factual disputes [on a motion to dismiss for a failure of personal jurisdiction] must be resolved in favor of the plaintiff." *CT Chem. (USA), Inc. v. Horizons Int'l, Inc.*, 106 F.R.D. 518, 520 (S.D.N.Y. 1985). Here, the Plaintiffs have asserted that Tether has submitted a "self-serving affidavit" to suggest Tether's lack of knowledge regarding Celsius's U.S. activities is directly contrary to what has been set forth

CNL would "ultimately benefit United States persons and entities, including CNLLC and Celsius

Network Inc.," and (ii) this relationship between the parties would "allow it to profit . . . by

supplying USDT (and later XAUt . . . and EURT . . . ) to the U.S. market").)

The Defendants argue that a mere allegation that a defendant's purpose was to exploit a

market is simply "conclusory" and not enough to establish purposeful availment.  (Reply at 7.)

However, the Defendants fail to note that the Amended Complaint also sets forth specific actions

that Tether took to carry out its alleged intent to exploit the U.S. market, including that Tether

"coordinated with Celsius to make introductions to Tether's U.S. clients" and notified "Celsius

that it was taking steps to 'lower borrow rates for USDT so [Celsius] can push it harder' to those

same U.S. clients."[13]  (AC ¶ 31 (alteration in original).)  These clearly arise to the level of

defendant conduct "that . . . form[s] the necessary connection with the forum State that is the

basis for its jurisdiction over him."  *Walden v. Fiore*, 571 U.S. 277, 285 (2014).  Such actions do

not appear "random, fortuitous, or attenuated or the unilateral activity of another party or a third

person" but rather intentional and directed at carrying out the parties' intended purpose.  *See*

*Burger King*, 471 B.R. at 475 (citations and quotation marks omitted).  This case is unlike *AJ*

*Ruiz Consultoria Empresarial S.A. v. Banco Bilbao Vizcaya Argentaria, S.A.*, 2024 WL 460482

(Bankr. S.D.N.Y. Feb. 6, 2024), where the court was "unpersuaded by [a] [p]laintiff's conclusory

statement" that the defendants had exploited a market.  *Consultoria*, 2024 WL 460482, at *25.

There, the court concluded such because the plaintiff offered nothing more than an allegation

---

in the Amended Complaint (*i.e.*, that Tether had full awareness of its actual counterparties under the Initial and
Amended Token Agreements).  (Opposition at 17 n.7.)  The Court considers this an expression of the Plaintiffs'
opposition to Tether's factual assertion and rejects the Defendants' contention that the Plaintiffs have failed to
dispute it.  (*See* Reply at 8.)

[13]       There is also a factual dispute between the Plaintiffs and Defendants over whether Tether was pushing
USDT to U.S. clients.  (*See* Reply at 10.)  The Defendants argue that internal emails they believe the Plaintiffs relied
on actually indicate, instead, that it was "CNL's goal . . . to 'promote Tether . . . as [a] form of payment *worldwide*"
as opposed to just the United States.  (*Id.* (quoting Arnold Decl., Ex. A) (emphasis in original).)

that defendants had isolated use of New York bank accounts, which alone was not enough. *See id.* (concluding that, without more than an allegation of isolated use of New York bank accounts, purposeful availment could not be established).

Aside from an intent to exploit the U.S. markets, the Amended Complaint further alleges that the Defendants had "continuous and systematic contact with Celsius's United States-based personnel." (AC ¶ 45.) Specifically, in performing under the Amended Token Agreement and to "execute on the parties' broader vision to allow Tether to get broader access to United States markets through Celsius," the parties, the Plaintiffs state, began meeting in 2020 "on a monthly basis with Celsius's United States-based representatives" where they discussed "many aspects of their business relationship, including the Amended Token Agreement." (*Id.*) Transactions under the Amended Token Agreement were "at times initiated and executed by Celsius employees based in the United States, and transfers under the agreement were often made from United States-based accounts." (*Id.*)

The Defendants' projection of themselves into the United States, the Amended Complaint alleges, also extends to the negotiation, execution and performance under the Amended Token Agreement. (*See id.* ¶ 37.) Indeed, much of the Amended Token Agreement's principal terms, the Amended Complaint notes, were "agreed to during an all-hands call in December of 2021" where U.S.-based Celsius employees—Alexander Mashinsky, Ron Deutsch, and Joseph Golding-Ochsner—were present. (*Id.*) Moreover, both the Initial and Amended Token Agreements, the Amended Complaint indicates, were signed on behalf of CNL by employees based in the United States. (*Id.* ¶ 43.) Indeed, the Amended Complaint makes clear that it was not unknown to Tether that these employees were based in the United States. Rather, Tether was aware, it alleges, that "Celsius's top decision-makers have been based in, and its central

44

functions have been controlled from, the United States" throughout the parties' relationship

under the Initial and Amended Token Agreements.  (*Id.* ¶ 34; *see also id.* ¶ 43 (indicating that

Tether "knew its real counterparties under the Agreement were based in the United States").)

Accordingly, the Court concludes that the Defendants had sufficient contacts with the

forum.

### 3.  Defendant's Forum Conduct

In addition to having contact with the forum, it must be the case that the underlying cause

of action "arise[s] out of or relate[s]" to that contact.  *Arcapita*, 549 B.R. at 63 (quoting *Burger

King*, 471 U.S. at 472).  "Courts typically require that the plaintiff show some sort of causal

relationship between a defendant's U.S. contacts and the episode in suit, and the plaintiff's claim

must in some way 'arise from the defendants' purposeful contacts with the forum.'"  *Schwab*,

883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir.

2016)) (quotation marks omitted).  Moreover, the Supreme Court has clarified that a suit that

"relate[s] to [a] defendant's contacts with the forum" may also suffice.  *See Ford Motor*, 592

U.S. at 362 (indicating that the specific jurisdiction inquiry has not been framed "as always

requiring proof of causation" and the "most common formulation of the rule demands that the

suit 'arises out of *or relates to* the defendants' contacts with the forum'" (internal citation

omitted) (emphasis added)); *see also Fairfield Sentry*, 592 B.R. at 149 (citing to *Ford Motor*).

As the Initial and Amended Token Agreements, which serve as the basis for the

Amended Complaint and all claims asserted, memorialize the parties' intent to exploit the U.S.

market, there appears to be "an affiliation between the forum and the underlying controversy."

*Ford Motor*, 592 U.S. at 359–60.  Indeed, it is only necessary for a nonresident's contacts to

"relate to" the forum state, and there is no need for proof of causation.  *Id.* at 362 (rejecting the

assertion that "only a strict causal relationship between [a] defendant's in-state activity and [a]

45

litigation will do" and noting that "some relationships will support jurisdiction without a causal

showing"). The Supreme Court has cautioned that this "does not mean anything goes," and in

the "sphere of specific jurisdiction, the phrase 'relates to' incorporates real limits, as it must to

adequately protect defendants foreign to a forum." *Id.* Here, the Initial and Amended Token

Agreements are alleged to serve as the "centerpiece of the parties' broader relationship" that

were aimed at providing Tether "broader access to the United States markets through Celsius."

(AC ¶ 41.) This is sufficient to serve as a non-causal "affiliation between the forum and the

underlying controversy, principally, [an] activity or an occurrence that takes place in the forum

State and is therefore subject to the State's regulation." *Ford Motor*, 592 U.S. at 359–60

(quoting *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S.

255, 262 (2017)). Therefore, the Court concludes that the claims arise from or are related to the

Defendants' contacts with the forum.

### 4. Reasonable Exercise of Jurisdiction

Once there has been a sufficient showing of minimum contacts, it must be then

determined "whether the assertion of personal jurisdiction comports with 'traditional notions of

fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the

particular case." *Fairfield Sentry*, 669 B.R. at 150 (quoting *Bank Brussels Lambert*, 305 F.3d at

129). In making a determination, courts will consider "the burden on the defendant, the interests

of the forum in adjudicating the case, the plaintiff's interest in obtaining convenient and effective

relief, the interstate judicial system's interest in obtaining the most efficient resolution of

controversies, and the shared interest of the states in furthering fundamental substantive social

policies." *Id.*

Here, neither party has addressed whether the Court's exercise of personal jurisdiction

would be reasonable. (*See* Opposition at 17 n.8 (noting only that if New York's long-arm statute

has been satisfied, minimum contacts and reasonableness requirements of due process will also

be met).)  As the Court has already concluded that the Plaintiffs have made the threshold

showing of minimum contacts as required, the Defendants now bear the burden to make a

"compelling case that the presence of some other considerations would render jurisdiction

unreasonable," which they have not done.  *Bank Brussels Lambert*, 305 F.3d at 129 (quoting

*Metro. Life*, 84 F.3d at 568).  Therefore, based on the current record, the Court determines that

exercise of personal jurisdiction over the Defendants is reasonable under the circumstances.

### D.  Failure to State a Claim

#### 1.  Count III (Breach of Contract Under BVI Law)

Count III of the Amended Complaint asserts a cause of action for breach of contract

against TLTD under BVI law.  Specifically, it alleges that the Amended Token Agreement is a

binding contract, which TLTD breached when it "improperly appl[ied] Plaintiffs' collateral to

Plaintiffs' antecedent debt prior to the contractually required ten-hour waiting period after

sending a notice of demand."  (AC ¶¶ 119, 121.)  By contrast, the Plaintiffs have "fully

performed . . . and satisfied any conditions precedent under the Amended Token Agreement."

(*Id.* ¶ 120.)  On account of Count III, the Plaintiffs allege that they have been "harmed by

billions of dollars" and, at a very minimum, have suffered $100 million in damages, a

"proximate result" of TLTD's breaches of contract as well as additional expectation, reliance,

and consequential damages in an amount to be proven at trial.[14]  (*Id.* ¶¶ 122–23.)

---

[14]    The Plaintiffs indicate that the $100 million figure corresponds to the "difference between the average price
for which Tether applied Plaintiffs' collateral and the price that would have been obtained had Tether not breached
the Agreement."  (AC ¶ 123.)

Sections 1.1(b)(4) and 1.1(e)(14) of the Amended Token Agreement authorize TLTD to

"sell, dispose of, and liquidate the Collateral" in certain circumstances.  Section 1.1(b)(4)

provides, in relevant part:

> Should the value of the Collateral fall below a percentage (the "Margin Call Point") of the number of Tokens made available to [CNL] at any time, TLTD shall provide [CNL] notice of such occurrence ("Margin Call Notice") and *[CNL] shall, within ten (10) hours of such Margin Call Notice, provide additional amounts to TLTD's satisfaction* to increase the Collateral to an amount equal to or greater than a percentage, equal to the applicable Initial Margin, of the number of Tokens made available to the Recipient. . . .  *If [CNL] has not posted sufficient additional Collateral in accordance with the foregoing, should the value of the Collateral fall below a percentage* (the "Liquidation Point") *of the number of Tokens made available to [CNL] at any time following the time that is ten (10) hours from the delivery of the applicable Margin Call Notice, TLTD shall have the right, in its sole and absolute discretion, and without further notice to [CNL], to sell, dispose of, and liquidate the Collateral*. . . .

(Amended Token Agreement § 1.1(b)(4) (emphasis added).)  Therefore, by its plain language,

the Amended Token Agreement grants TLTD the right in its "sole and absolute discretion" and

without further notice to sell, dispose, and liquidate the collateral where (i) CNL has not posted

sufficient additional collateral within 10 hours of receiving the Margin Call Notice, and (ii) the

value of the collateral has fallen below the Liquidation Point "at any time *following the time that*

*is ten . . . hours from the delivery of the applicable Margin Call Notice*."  (*Id.* (emphasis

added).)

Meanwhile, section 1.1(e)(14) of the Amended Token Agreement provides, in relevant

part:

> In the event that: (i) [CNL] fails to return any Tokens when due and/or fails to pay any interest payable hereunder (whether by scheduled maturity, demand or otherwise); (ii) [CNL] breaches any covenant or condition of this Agreement; or (iii) *any representation or warranty made on behalf of [CNL] pursuant to, or in connection with, this Agreement, shall have been incorrect or misleading in any material respect when made or deemed repeated, then TLTD may*: (a) demand return of all Tokens (and payment of all other amounts accrued and outstanding hereunder (including any

interest accrued thereon) with immediate effect; (b) terminate this Agreement; **and/or (c) sell, dispose of, and liquidate the Collateral**.

(*Id.* § 1.1(e)(14) (emphasis added).)  Section 4 of the Amended Token Agreement sets forth the representations of TLTD and CNL, indicating that CNL "represents and warrants in favour of TLTD on each Representation Date by reference to the facts and circumstances then existing that the Recipient is: (i) able to pay its debts as they fall due, and: (ii) not otherwise insolvent under the terms of the laws of its jurisdiction of incorporation or continuation."[15]  (*Id.* § 4.2.)

Here, the Defendants contest that section 1.1(b)(4) "required a ten-hour standstill before TLTD could act at CNL's direction" because the language of the provision granted TLTD the ability to take unilateral action, and the Amended Complaint, in any event, states that "[a]midst the chaos of June 13, 2022, Celsius's CEO Alex Mashinsky allegedly gave Tether permission to liquidate Celsius's collateral in an 'orderly' manner."  (MOL at 25–26; AC ¶ 58.)  As to the first argument, while section 1.1(b)(4) provides TLTD a unilateral right to liquidate, such right is conditioned upon whether (i) CNL has posted sufficient additional collateral within 10 hours of receiving a Margin Call Notice, and (ii) the value of the collateral has fallen below the Liquidation Point "at any time" after 10 hours from the delivery of the applicable Margin Call Notice.  (*See* Amended Token Agreement § 1.1(b)(4).)  Therefore, by its clear and plain language, the Amended Token Agreement required a 10-hour waiting period to be provided to CNL, which the Amended Complaint alleges TLTD failed to do.  (*See* AC ¶ 72 ("Celsius was never provided the full 10-hour period to which it was contractually entitled to."); *see also* Carrington Decl. ¶¶ 26–27 (indicating that the BVI courts apply an "objective, 'reasonable reader' standard in determining the meaning of the clauses of a contract," which is "what the

---

[15]     Section 4.1 of the Amended Token Agreement defines "Representation Date" to be "(i) the Amendment Date; (ii) any date upon which TLTD delivers Tokens to [CNL]; and (iii) any date upon which Collateral is provided to TLTD."  (Amended Token Agreement § 4.1.)

parties using those words against the relevant background would reasonably have understood them to mean"); Webster Decl. ¶ 25 (indicating that courts "will have regard to the words used by the parties in the contract and the relevant background, even if the proper construction of the words appear to be imprudent or lead to harsh consequences for one of the parties").)

As to the second, section 1.4 provides that "[n]o change or modification of this Agreement is valid unless it is in writing and signed by the Parties." (Amended Token Agreement § 1.4 (set forth in the Initial Token Agreement and was not otherwise modified when the agreement was amended).) The Defendants concede that the Amended Token Agreement "was silent on what was to happen if Celsius were to authorize Tether [to] liquidate its Collateral." (Carrington Decl. ¶ 49.) Therefore, Mashinsky's permission to liquidate, which would modify the 10-hour waiting requirement, would need to satisfy the requirements of section 1.4. The Defendants have not contended that a written agreement was entered into to change or modify the Amended Token Agreement. (*See generally* MOL 26–27.) Instead, they argue that a distinction exists between a waiver of a requirement versus an amendment or modification, the latter of which could require more formality. (*See* Carrington Reply Decl. ¶ 9.) However, the language of section 1.4 includes the word "change" in addition to "modification," which the Court believes can encompass waivers. Therefore, Alexander Mashinsky's alleged oral permission to liquidate was insufficient, and Amended Complaint has adequately alleged that TLTD was in breach of section 1.1(b)(4) of the Amended Token Agreement. (*See* Webster Decl. ¶ 36 (indicating that the "modern view" under BVI law is "where the parties to a written contract stipulate the procedure for amending the contract, the procedure must be followed.").)

Notwithstanding, TLTD possesses a right to "sell, dispose of, and liquidate the Collateral" pursuant to section 1.1(e)(14) of the Amended Token Agreement to the extent CNL

is unable to pay its debts as they come due and is not otherwise insolvent "under the laws of its jurisdiction of incorporation or continuation" on each Representation Date. (Amended Token Agreement § 1.1(e)(14).) Here, the Amended Complaint alleges that "Celsius is presumed to be, and in fact was, insolvent at the time of each of the . . . Top-Up Transfers and . . . Cross-Collateralization Transfers." (AC ¶ 59.) As the Top-Up Transfers and Cross-Collateralization Transfers represent transfers of collateral to TLTD, each date of transfer constitutes a Representation Date. (*See* Amended Token Agreement § 4.1 (providing that "Representation Date" includes, among other things, "any date upon which TLTD delivers Tokens to [CNL]" as well as "any date upon which Collateral is provided to TLTD").) Moreover, the Amended Complaint further alleges that, "in April, May, and June of 2022, the value of Celsius liabilities far exceeded the value of its assets" and, in addition to being balance sheet insolvent, Celsius was unable to pay its debts when they came due and did not have adequate capital to operate its business. (AC ¶¶ 60–61.)

To address this, the Plaintiffs instead argue that the Amended Complaint alleges that Tether was fully aware of Celsius's insolvency "throughout the period" and yet continued to perform and receive benefits under the Amended Token Agreement. (Opposition at 43–44; *see also* Webster Decl. ¶ 58 (suggesting that doctrines of estoppel may apply).) Moreover, the Plaintiffs further argue that, "to the extent Tether materially contributed to Celsius's insolvency . . . [it] cannot rely on that insolvency to excuse its continued performance under the contract." (Opposition at 44.) The Amended Complaint suggests that the Defendants did have knowledge of Celsius's financial situation when (i) BTC prices began to fall beginning in April 2022 (AC ¶ 48 (suggesting Tether's concern for exposure to Celsius's insolvency)); (ii) Celsius announced its pause on withdrawals and transfers between accounts in June 2022 (*id.* ¶¶ 64–65 (stating

51

"Tether, of course, knew of Celsius's vulnerable position" since news of the "pause" was well

known)); and (iii) Tether asked for additional collateral to "insulate itself from the impact of

Celsius's impending bankruptcy" (*id.* ¶ 67).

However, it is unclear which doctrine of estoppel under BVI law the Plaintiffs seek to

apply here, and the Plaintiffs appear to acknowledge that there are open factual questions

concerning whether Tether was aware of Celsius's financial situation and elected to proceed

under the Amended Token Agreement notwithstanding.  (*See, e.g.*, Carrington Reply Decl. ¶ 10

(suggesting that BVI law "recognizes various kinds of estoppel at common law and in equity"

and Webster, the Plaintiffs' declarant, failed to identify "which kind of estoppel he seeks to

refer"); Webster Decl. ¶ 58 (stating that "there are factual questions whether, even if Tether was

insolvent, Tether would be able to assert rights under clause 1.1(e)(14) . . . .  For example, if

Tether was aware of Celsius's financial distress. . . . and chose to continue to request (and

accept) collateral from Celsius under the Amended Token Agreement . . . Tether may be barred

from asserting a breach under the principals of estoppel."); Reply at 20 (suggesting that the

Amended Complaint does not allege facts showing that the Defendants knew that CNL or any

specific Celsius entity was insolvent, including for the entire three-month period).)

Accordingly, whether Count III can be dismissed cannot be determined at this time since

it is unclear that estoppel can adequately bar TLTD from asserting its rights under section

1.1(e)(14) of the Amended Token Agreement.

2.  Count IV (Breach of Covenant of Good Faith and Fair Dealing Under BVI Law)

Count IV of the Amended Complaint asserts a claim for breach of the covenant of good

faith and fair dealing under BVI law against TLTD.  Specifically, the Amended Complaint

alleges that TLTD breach its duty of good faith and fair dealing under the Amended Token

Agreement, which the Plaintiffs believe BVI law implies.  The breach allegedly occurred when TLTD (i) "improperly liquidat[ed] Plaintiffs' collateral, by arbitrarily and irrationally exercising its discretion under the Amended Token Agreement, resulting in the minimization of amounts due to Plaintiffs," and (ii) unfairly interfered "with the Plaintiffs' right to receive the benefits of the Agreement."  (AC ¶ 126.)  Through Count IV, the Plaintiffs seek, at a minimum, $100 million in damages as a "proximate result" of TLTD's alleged breach as well as additional expectation, reliance, and consequential damages in an amount to be proven at trial.  (*Id.* ¶ 127.)

As an initial matter, the Defendants dispute that a general duty of good faith in commercial contracts exists under BVI law.  (*See* MOL at 29–30; Carrington Decl. ¶ 70 (asserting that the statement in the Amended Complaint was "too widely worded to reflect the current position under BVI law").)  Rather, they assert that BVI law implies, instead, "two potentially relevant duties," neither of which the Plaintiffs have adequately pled a violation of: (i) the duty to not exercise a discretionary power in an arbitrary or irrational way (the "*Braganza* Duty"), and (ii) the duty for equitable mortgagees to seek the best price reasonably obtainable at the time that the mortgagee decides to sell.  (MOL at 30.)  The Plaintiffs have characterized this as the Defendants having conceded that these "closely analogous duties apply" and argue that, in any event, the Amended Complaint states a claim under both of these duties.  (Opposition at 44.) It does not.  As the Plaintiffs do not contest the Defendants' assertion that there is no general duty of good faith in commercial contracts under BVI law, which serves as the basis for Count IV, it is irrelevant whether the Amended Complaint's allegations satisfy other "potentially relevant" or "closely analogous" duties.  (*See* AC ¶ 125 (alleging that "[t]he law of the British Virgin Islands implies a duty of good faith and fair dealing in the performance of the Amended Token Agreement" that TLTD breached).)

Accordingly, the Court **DISMISSES** Count IV without prejudice with leave to amend.  It
remains to be seen whether Plaintiffs can allege facts sufficient to bring themselves within the
requirements of BVI law.

### 3.   Avoidance Claims

Counts I, II, V, and VI of the Amended Complaint assert various claims concerning the
avoidance of the Top-Up Transfers, Cross-Collateralization Transfers, and Application Transfer
(collectively, the "Transfers") against all Defendants.  Specifically, the Plaintiffs seek the
avoidance of the Transfers as preferential transfers under section 547 of the Bankruptcy Code
(Count I) and argue that they are entitled to receive a return of their property—15,658.21 BTC
on account of the Top-Up Transfers, 2,228.01 BTC on account of the Cross-Collateralization
Transfers, and 39,542.42 BTC on account of the Application Transfer—or, in the alternative, the
value of such property, pursuant to section 550 of the Bankruptcy Code plus interest and costs
(Count II).  (AC ¶¶ 113, 116.)  The Plaintiffs further seek the avoidance of the Defendants'
application of what they allege was Celsius's collateral in the amount of 39,542.42 BTC against
Celsius's outstanding debt in the amount of $816,822,948 as a constructive fraudulent transfer
pursuant to sections 548(a)(1)(B) and 544(b) of the Bankruptcy Code and the return of such
property or its equivalent value pursuant to section 550 (Counts V and VI).  (*Id.* ¶¶ 133, 140.)

### a.   The Amended Complaint Sufficiently Alleges That the Transfers Are Domestic

As an initial matter, the Defendants contend that dismissal of Counts I, II, V, and VI is
appropriate as the causes of action rely on impermissible extraterritorial applications of the
avoidance provisions of the Bankruptcy Code.  (*See* MOL at 31.)  The presumption against
extraterritoriality, a "basic premise of our legal system," provides that "[a]bsent clearly
expressed congressional intent to the contrary, federal laws will be construed to have only

domestic application." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)). Thus, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255. "An action may proceed if either the statute indicates its extraterritorial reach or the case involves a domestic application of the statute." *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 95 (2d Cir. 2019). "The party asserting that the statute in question applies extraterritorially has the burden of making an 'affirmative showing' of the same.'" *In re Arcapita Bank B.S.C.(c)*, 575 B.R. 229, 242 (Bankr. S.D.N.Y. 2017).

Accordingly, in examining extraterritoriality, courts will engage in a two-step process that can be examined in any order. *See id.* ("To determine whether the presumption against extraterritoriality applies, the Court addresses two questions that can be examined in either order."). The first inquiry looks to "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Nabisco*, 579 U.S. at 337. "The standard is not, however, a 'clear statement rule.'" *Arcapita*, 575 B.R. at 243 (quoting *Morrison*, 561 U.S. at 265). Rather, "[t]he context of the statute, including surrounding provisions of the Bankruptcy Code, may be consulted "to give the most faithful reading of the text . . . ." *Id.*; *see also In re Lyondell Chem. Co.*, 543 B.R. 127, 151 (Bankr. S.D.N.Y. 2016) (stating that the presumption is not a "clear statement rule" and, instead, "courts may look to 'context,' including surrounding provisions of the Bankruptcy Code, to determine whether Congress nevertheless intended that statute to apply extraterritorially"). To the extent it is determined that a statute applies extraterritorially, then "the inquiry is complete." *Arcapita*, 575 B.R. at 243.

Meanwhile, the second inquiry looks to whether the case "involves a domestic application of the statute" that necessarily involves an examination of a "statute's 'focus.'" *Nabisco*, 579 U.S. at 337; *see also Picard*, 917 F.3d at 97 ("The focus of a statute is the conduct it seeks to regulate, as well as the parties whose interests it seeks to protect."). "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *Arcapita*, 575 B.R. at 243 (quoting *Nabisco*, 579 U.S. at 337). By contrast, "if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.* As a general matter, the Bankruptcy Code's avoidance provisions are intended to "protect a debtor's estate from depletion to the prejudice of the unsecured creditor." *Picard*, 917 F.3d at 97 (quoting *In re Harris*, 464 F.3d 263, 273 (2d Cir. 2006)) (alteration omitted). Therefore, relevant here, courts have held that "the focus of the [Bankruptcy Code's] avoidance and recovery provisions is the initial transfer that depletes the property that would have become property of the estate." *Arcapita*, 575 B.R. at 244 (quoting *Spizz v. Goldfarb Seligman & Co. (In re Ampal-American Israel Corp.)*, 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017)); *see also Picard*, 917 F.3d at 97–98 (indicating that the focus should be on the initial transfer).

Here, the Court concludes that the Amended Complaint contains sufficient allegations that the Transfers were domestic. In general, the Court must assess whether "the relevant conduct . . . 'sufficiently touch[ed] and concern[ed] the territory of the United States.'" *Arcapita*, 575 B.R. at 244 (alterations in original). With respect to the Top-Up and Cross-Collateralization Transfers, the Defendants argue that these transfers are foreign because they (i) came from CNL, a U.K. entity, and (ii) "did not involve bank 'accounts' at all." (*See* MOL at

56

34–35.)  However, as already noted, the Amended Complaint alleges that CNL was only "nominally an English company" as Tether was fully aware of the true counterparties to the Amended Token Agreement and the "Tether account created for [CNL] was associated with a bank account at Signature Bank in New York."  (AC ¶ 43.)  Moreover, it further provides that, "[t]hroughout the parties' relationship under the [Initial] Token Agreement and Amended Token Agreement, Celsius's top decision-makers have been based in, and its central functions have been controlled from, the United States."  (*Id.* ¶ 34.)  Consistent with this, the Amended Complaint also indicates that the "[t]ransactions under the Amended Token Agreement were at times initiated and executed by Celsius employees based in the United States, and transfers under the agreement were often made from United States-based accounts."  (*Id.* ¶ 45; *see also id.* ¶ 48 (stating that Tether also directed its collateral demands to Celsius employees located in the United States and "[i]n each case, Celsius responded . . . by promptly depositing additional collateral with Tether"); *id.* ¶ 63 (stating that "[s]everal of these transfers were initiated from the United States by United States-based Celsius employees, and Celsius employees in the United States gave notice of these transfers to Tether").)  The Plaintiffs make clear that "each of [the Top-Up and Cross-Collateralization Transfers] was ultimately overseen and approved by Celsius CEO Alex Mashinsky, who was based in Hoboken, New Jersey at the time of the transfers." (*Id.*; *see also* Webster Decl. ¶ 76 (indicating that while BVI courts have not "authoritatively determined" the situs of crypto assets, it has been suggested that "a key factor in deciding the situs of a crypto asset is the location of the person or entity that controls the crypto asset").) Accordingly, the Amended Complaint has adequately alleged that the Top-Up and Cross-Collateralization Transfers are domestic.

Similarly, the Plaintiffs have also put forth sufficient factual allegations that the Application Transfer was domestic as well. The Defendants argue that the Application Transfer was "purely foreign" because (i) the collateral never left TLTD and touched the United States, and (ii) the mere use of intermediaries cannot render a transaction domestic. (MOL at 35–36.) The Defendants, however, fail to recognize that the Amended Complaint goes beyond and alleges that "[u]pon information and belief, Tether's application of Celsius's collateral was accomplished through the use of United States intermediaries or counterparties, involved transactions routed through United States servers, involved contacts with Celsius's United States based personnel, and/or involved the use of bank accounts, financial institutions, or cryptocurrency exchanges located in the United States." (AC ¶ 81.) This is enough to show that the "conduct . . . touched and concerned the United States in a manner sufficient to displace the presumption against extraterritoriality." *Arcapita*, 575 B.R. at 245. Therefore, the Court reaches the same conclusion with respect to the Application Transfer as well.

While it remains to be seen whether, after discovery, the Transfers truly constitute domestic transfers, the Amended Complaint has set forth enough factual allegations that establish that they plausibly are, which is all that is required at this stage. *See Twombly*, 550 U.S. at 560 (indicating that the requirement is one of "plausibility"). As the Court has concluded that the Plaintiffs have sufficiently alleged that the Transfers are domestic, it need not reach the issue of extraterritoriality. *See Picard*, 917 F.3d at 95 (providing that "[a]n action may proceed if either the statute indicates its extraterritorial reach *or* the case involves a domestic application of the statute" (emphasis added)); *see also Arcapita*, 575 B.R. at 248, n.12 (stating that the court was not reaching the issue of whether the Bankruptcy Code's avoidance provisions apply extraterritorially since it had concluded that the transfers were domestic rather than foreign).

> b.  *The Court Declines to Dismiss Counts I and Count II For Failure to*
> *State Claims for Relief*

Counts I and II of the Amended Complaint seek the avoidance of the Transfers as

preferential transfers pursuant to section 547(b) of the Bankruptcy Code and recovery of

property or its equivalent value pursuant to section 550(a), respectively.  Section 547(b) of the

Bankruptcy Code provides, in relevant part, that a trustee may avoid any "transfer of an interest

of the debtor in property": (1) made to or for the benefit of a creditor; (2) for or on account of an

antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor

was insolvent; (4) made on or within 90 days before the date of the filing of the petition; and (5)

that enables such creditor to receive more than it would have received if the case were a chapter

7 liquidation case, the transfer had not been made, and the creditor received payment of the debt

to the extent provided by provisions under the Bankruptcy Code.  11 U.S.C. § 547(b).  In

establishing that a preferential transfer exists, it is generally the trustee who bears the burden of

proving each of the foregoing elements by a preponderance of the evidence.  *See* 11 U.S.C. §

547(g) ("[T]he trustee has the burden of proving the avoidability of a transfer under subsection

(b) of this section.").

Meanwhile, section 550(a) provides, in relevant part, that:

> (a)     Except as otherwise provided in this section, to the extent that a
> transfer is avoided under section . . . 544 . . . 547 [or] 548 . . . of this title,
> the trustee may recover, for the benefit of the estate, the property
> transferred, or, if the court so orders, the value of such property, from—
>
> > (1)     the initial transferee of such transfer or the entity for whose
> > benefit such transfer was made; or
> >
> > (2)     any immediate or mediate transferee of such initial
> > transferee.

11 U.S.C. § 550(a).

The Defendants contend that dismissal of Counts I and II is appropriate because TLTD was fully secured at the time of each alleged preferential transfer, and the Amended Complaint fails to allege that TLTD was undersecured. (MOL at 36–37.) Therefore, they maintain that the Plaintiffs cannot establish that TLTD received more than it would have in a chapter 7 liquidation. (*Id.*) Here, the Amended Complaint alleges that the "Top-Up Transfers and . . . Cross-Collateralization Transfers dramatically improved Tether's position as a creditor" since "as of the Petition Date, without the benefit of [these transfers], Tether would have had over $350 million less in collateral." (AC ¶ 58.) In addition, the Amended Complaint further states that the Top-Up, Cross-Collateralization, and Application Transfers "clearly improved Tether's position as of the application date (just as it did as measured as of the Petition Date)." (*Id.* ¶ 78.) Thus, the Plaintiffs contend that the Transfers allowed TLTD to receive more than it would have if the transfers had not been made. (*See id.* ¶¶ 95, 103, 111.)

As a general matter, the hypothetical chapter 7 liquidation test set forth in section 547(b)(5) of the Bankruptcy Code codified the Supreme Court's ruling in *Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227 (1936). *See Hassett v. Goetzmann (In re CIS Corp.)*, 195 B.R. 251, 262 n.5 (Bankr. S.D.N.Y. 1996). "In interpreting the preference provision of the former Bankruptcy Act, the Supreme Court observed that the preferential effect of the payment must be determined 'not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results.'" *Id.* at 262 (quoting *Palmer Clay*, 297 U.S. at 229). "Thus, the Code § 547(b)(5) analysis is to be made as of the time the Debtor filed its bankruptcy petition." *Id.*

For secured creditors, "a payment [during a preference period] to a creditor with an allowed fully secured claim is not a preference." *In re Santoro Excavating, Inc.*, 32 B.R. 947, 948 (Bankr. S.D.N.Y. 1983). Thus, "[a] defendant's assertion that it was fully secured is not a defense pursuant to section 547(c), but 'rather a negation of one of the elements of a preference action, pursuant to section 547(b).'" *Off. Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Cap., LLC)*, 501 B.R. 549, 619 (Bankr. S.D.N.Y. 2013) (quoting *Savage & Assocs., P.C. v. Cnty. of Fairfax (In re Teligent Servs. Inc.)*, No. 06 Civ. 03721 (KMW), 2009 WL 2152320, at *6 (S.D.N.Y. July 17, 2009)). "Where a creditor asserts that it was oversecured at the time of the alleged preferential transfer, it is the plaintiff's burden to refute that assertion." *Id.*

The Defendants argue that dismissal is appropriate because the Amended Complaint fails to allege that TLTD was undersecured "at the time of any of the challenged transfers." (MOL at 37.) However, the Amended Complaint does allege that the Transfers "clearly improved Tether's position as of the application date (just as it did as measured as of the Petition Date)." (AC ¶ 78.) Moreover, the Plaintiffs' burden to "refute" the Defendants' assertion that TLTD was oversecured at the time of each challenged transfer only arose after the Defendants raised the argument. *See Residential Cap.*, 501 B.R. at 619 (indicating that the plaintiffs had the burden to prove the defendants were not oversecured during the relevant preference period as it was defendants' position that they were "[t]hroughout [the] case"). Therefore, dismissal of Counts I and II on grounds that the Amended Complaint failed to include an allegation that TLTD was undersecured at the time of each Transfer is premature at this juncture.

In addition to the foregoing, the Defendants further contend that (i) the Plaintiffs have failed to plead that the Cross-Collateralization Transfers were made "for or on account of

antecedent debt," and (ii) the Application Transfer was a contemporaneous exchange for new

value.  (MOL at 41–45.)  As to the first argument, the Defendants maintain that the terms of the

Amended Token Agreement, by its terms, makes clear that the Plaintiffs cannot plead this

element as it requires the posting of new BTC "in consideration for" each new provision of

USDT.  (MOL at 42 (quoting Amended Token Agreement § 1.1(b)(3)).)  The Amended

Complaint, however, alleges that the Cross-Collateralization Transfers were "commingled with

Celsius's previous collateral postings and cross-collateralized Celsius's existing loan from

Tether."  (AC ¶ 57.)  Moreover, it further provides that the Cross-Collateralization Transfers

"cross-collateralized antecedent debt owed by Celsius to Defendant [TLTD] and each of the . . .

Cross-Collateralization Transfers related to that antecedent debt."  (*Id.* ¶ 100.)  The Amended

Token Agreement's silence on cross-collateralization does not foreclose the possibility that such

transfers could have also been "for or on account of antecedent debt."  *See Nanobeak*, 656 B.R.

at 361 (indicating that dismissal is warranted only where it is "beyond doubt" that a plaintiff is

unable to prove any set of facts in support the claim that would entitle him or her to relief).

Accordingly, the Court also declines to dismiss Counts I and II with respect to the Cross-

Collateralization Transfers on such grounds as well.

    As for the second argument, section 547(c)(1) of the Bankruptcy Code provides:

    (c) The trustee may not avoid under this section a transfer—

        (1) to the extent that such transfer was—

            (A) intended by the debtor and the creditor to or for whose benefit
            such transfer was made to be a contemporaneous exchange for new
            value given to the debtor; and

            (B) in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1).  Relevant here, "new value" is defined to include, among other things,

"release by a transferee of property previously transferred to such transferee in a transaction that

is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property." 11 U.S.C. § 547(a)(2).

The Defendants maintain that the Application Transfer effectively resulted in a release of TLTD's lien, providing "new value." (MOL at 44.) In response, the Plaintiffs contend that the Amended Complaint has alleged that the "challenged transfers granted Tether liens on otherwise free-and-clear assets, thus greatly increasing Tether's collateral pool at the expense of unsecured creditors and enabling Tether to receive more than it would have in a hypothetical chapter 7." (Opposition at 34.) Tether cannot use its preferential liens, they argue, as a defense to satisfaction of the same. (*Id.*)

Even assuming that new value was provided, "success on a contemporaneous exchange defense requires a finding that the debtor and the transferee or third-party beneficiary intended a substantially contemporaneous exchange for new value." *In re 360networks (USA) Inc.*, 338 B.R. 194, 208 (Bankr. S.D.N.Y. 2005). "The existence of such intent under § 547(c)(1) is a question of fact." *Id.* at 209. Here, however, there is an open factual question whether Tether was right to initiate the application process in the first place and make the Application Transfer. (*See* AC ¶¶ 71–72.) As discussed above in connection with Count III, the parties dispute whether Tether was permitted to liquidate Celsius's collateral as the 10-hour window had not yet concluded and whether Alexander Mashinsky's oral permission to liquidate was valid. The Court, as noted, has declined to dismiss Count III as it is unclear whether estoppel can bar TLTD from asserting its rights under section 1.1(e)(14) of the Amended Token Agreement. In light of

this, the Court declines to dismiss Counts I and II with respect to the Application Transfer on

such grounds.[16]

## IV.   **CONCLUSION**

For the reasons discussed, the Motion is **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

Dated:   June 30, 2025
   New York, New York

          *Martin Glenn*
           MARTIN GLENN
         Chief United States Bankruptcy Judge

---

[16]     The Court declines to address the issue whether the asserted preference claims pertaining to the Application Transfer need to be narrowed at this time and reserves the matter for trial.