**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Benjamin I. Finestone
Anil Makhijani
Mario O. Gazzola
Arman Cuneo
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Matthew Scheck
300 West 6th St., Suite 200
Austin, TX 78701
Telephone: (737) 667-6102

*Counsel to Blockchain Recovery Investment Consortium, LLC, Litigation Administrator and
Complex Asset Recovery Manager, as Representative for the Post-Effective Date Celsius Debtors*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br>　　　　　　　　　　　Debtors.<br>CELSIUS NETWORK LIMITED and<br>CELSIUS NETWORK LLC (POST-EFFECTIVE<br>DATE DEBTORS)<br>　　　　　　　　　　　Plaintiffs.<br>　　　　　against<br>TETHER LIMITED;<br>TETHER HOLDINGS LIMITED;<br>TETHER INTERNATIONAL LIMITED; and<br>TETHER OPERATIONS LIMITED<br><br>　　　　　　　　　　　Defendants. | <u>**Second Amended Complaint**</u><br>Chapter 11<br>Case No. 22-10964 (MG)<br>(Jointly Administered)<br><br><br>Adversary Proceeding No.<br>24-04018 (MG) |

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiffs Celsius Network Limited and Celsius Network LLC (the Post-Effective Date

Debtors) ("<u>Post-Effective Date Debtors</u>" or "<u>Celsius</u>" or "<u>Plaintiffs</u>" or "<u>Debtors</u>") bring this

---

[1] The reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Second Amended Complaint against Tether Limited, Tether Holdings Limited, Tether International Limited, and Tether Operations Limited ("Tether" or "Defendants"), and allege the following based on reasonable due diligence of the Debtors' books and records, on personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

### NATURE OF THE CASE

1.     Plaintiffs bring this case to avoid and recover preferential and fraudulent transfers of 39,542.42 Bitcoin[2] from Celsius to Tether, first intended to secure, and subsequently applied on account of, antecedent debt Celsius owed to Tether.  These transfers undoubtedly improved Tether's position, occurring at a time when Debtors were tumbling towards bankruptcy and the price of Bitcoin (and the value of Tether's pre-existing collateral) was collapsing violently.  Indeed, unlike so many other creditors who did not seek to dismember the Debtors during their slide into bankruptcy, as a result of these preferential transfers of Bitcoin, Tether insulated itself from the effect of Celsius's bankruptcy.  Tether's efforts, of course, are now subject to intervening federal bankruptcy law.  Thus, these preferential and fraudulent transfers of Bitcoin should be avoided, and the Bitcoin or its value should be recovered for the benefit of Celsius's estate.  This action also seeks to recover damages caused by Tether's below-market application of such Bitcoin on that same debt, in violation of the terms of the governing agreement.

2.     In 2020, Plaintiff Celsius Network Limited entered into a loan agreement (the "Token Agreement") with Tether Limited, allowing Celsius to borrow stablecoins, Tether token ("USDT") and Euro Tether ("EURT"), from Tether Limited at an interest rate between 0.333-0.55%

---

[2]  Capitalized terms not immediately defined have the meanings ascribed to them below.  ECF document numbers in this Complaint refer to ECF document numbers from Case No. 22-10964-mg.

per month.  Like many of its peer cryptocurrency companies, Celsius relied in large part on "stablecoins" to operate certain critical aspects of its business.  "Stablecoins" are digital currencies whose prices are pegged to those of other assets (such as the dollar).  Stablecoins are typically backed by reserves of *non*-digital assets, like cash or marketable securities, to ensure price stability. The world's most popular stablecoin, USDT, has its price pegged to the United States dollar. USDT was created by Tether in 2014, and has been marketed and controlled by them since then.

3.     To provide security for the loan, Celsius posted collateral in one of several cryptocurrencies (*e.g.*, Bitcoin, Ethereum).  At the peak of its borrowing, Celsius would borrow nearly $2 billion in USDT from Tether, collateralized by tens of thousands of Bitcoin.

4.     The cryptocurrency market steeply declined in the summer of 2022, and the Debtors filed the above-captioned chapter 11 cases on July 13, 2022.  The Debtors' bankruptcy filing was harmful to many of its creditors.  But, during the ninety-day period prior to the bankruptcy filing (the "§ 547(b) Period"), Tether took steps to insulate itself from the effect of bankruptcy. Specifically, on several occasions, Tether demanded, and received, a significant amount of new, incremental collateral to improve its position in the impending bankruptcy.  That is, Plaintiffs transferred 15,658.21 Bitcoin to Defendants to satisfy these demands, each inherently on account of antecedent debt (defined below as the Preferential Top-Up Transfers).

5.     In addition to the Preferential Top-Up Transfers, also during the § 547(b) Period, Plaintiffs transferred 2,228.01 Bitcoin of excess collateral to Defendants in connection with $300,000,000 of new borrowings.  These transfers cross-collateralized Celsius's existing borrowings from Tether (defined below as the Preferential Cross-Collateralization Transfers).  In total, these preferential transfers of Bitcoin are worth in excess of $1.8 billion at current prices, and are separate from and do not include over 7,000 additional Bitcoin transferred to Tether in

connection with new advances of USDT and EURT to Celsius.   Nor do they include 36,684,477.42 EURT and 18,556,675.01 USDT of interest and principal payments made by Celsius to Tether during the ninety-day period prior to Celsius's bankruptcy filing.

6.      Tether issued its final demand to Celsius for additional collateral on June 13, 2022. Pursuant to the terms of the Token Agreement between Celsius and Tether, Celsius was entitled to ten hours to deposit additional collateral with Tether to fulfill that demand.   But rather than affording Celsius the contractually permitted time to post new collateral (or, at worst, allow for a more orderly disposition of collateral), on that same day, Tether forged ahead with an improper application of 39,542.42 Bitcoin—the entirety of the collateral that Celsius had posted—using the pledged Bitcoin to cover its exposure in full, but destroying Celsius's residual interest in the collateral.   This final preferential transfer (as defined below, the "Preferential Application Transfer"), worth in excess of $4 billion in today's dollars, also improved Tether's position because a substantial portion of the putative collateral was avoidable, and comprised of the Preferential Top-Up Transfers, which were commingled with the entirety of the posted Bitcoin.

7.      To make matters worse, Tether facilitated this preferential transfer by making false representations to Celsius.   Tether told Celsius that it had sold the collateral in a series of legitimate, arm's-length, open-market transactions.   In fact, and contrary to what it told Celsius, Tether simply transferred Celsius's Bitcoin to Bitfinex accounts that it owned and controlled, presumably fabricating the prices at which it "sold" Celsius's Bitcoin.

8.      Tether then doubled down on those false representations.   It was not enough for Tether to make itself whole through a massive preferential transfer—as would be sufficient for most recipients of preferential transfers on the eve of bankruptcy.   Tether also sought to retain for itself the upside of prospective Bitcoin appreciation.   In fact, notwithstanding Tether's express

representations to the contrary, Tether stealthily retained the *entirety* of Celsius's Bitcoin in undisclosed Bitfinex wallets, with at least 32,542.42 of Celsius's Bitcoin being kept for more than nine months. Over that nine-month period alone, Celsius's Bitcoin increased in value substantially. Afterwards, Tether transferred the Bitcoin to other crypto wallets commonly known to be associated with Bitfinex to support the continued operations of Tether's affiliated exchange. Thus, Tether reaped the benefits of post-transfer appreciation as a result of its receipt of preferential and fraudulent transfers of Celsius's property, its sham "liquidation," and its secret retention of collateral. In order to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred, Celsius's bankruptcy estate is entitled to an in-kind return of the Preferential Application Transfer.

9.      Tether applied Celsius's property (39,542.42 Bitcoin) to pay itself back for Celsius's outstanding loan, doing so for less than reasonably equivalent value at a time when Celsius was insolvent. As such, this application of collateral was a fraudulent transfer and should be avoided under the Bankruptcy Code and applicable state law.

10.     The Preferential Application Transfer also plainly breached the Token Agreement by forcing Celsius to act before it was required to do so and robbing it of any opportunity to take preventative measures on its own, and its effect was to purportedly dispose of Celsius's property (being held by Tether as collateral) at near the bottom of the Bitcoin market. This breach of contract caused billions of dollars in damages to Celsius, as described below.

11.     These preferential and fraudulent transfers of Bitcoin should be avoided and recovered from Tether, and Tether should be ordered to pay damages for its unlawful application of collateral.

## THE PARTIES

12.     Plaintiff Celsius Network Limited is a private limited company incorporated under the laws of England and Wales with a principal place of business in London, United Kingdom.

13.     Plaintiff Celsius Network LLC is a Delaware limited liability company with a principal place of business in Hoboken, New Jersey.

14.     Defendant Tether Holdings Limited is incorporated in, and is a citizen of, the British Virgin Islands.  It owns Defendants Tether Limited, Tether Operations Limited, and Tether International Limited.

15.     Defendant Tether Limited is incorporated in, and is a citizen of, Hong Kong.

16.     Defendant Tether Operations Limited is incorporated in, and is a citizen of, the British Virgin Islands.

17.     Defendant Tether International Limited is incorporated in, and is a citizen of, the British Virgin Islands.

18.     The Tether entities acted in concert in carrying out the wrongdoing alleged herein, and each participated in carrying out a scheme described to extract value from Celsius's estate through their preferential and fraudulent transfers, breaches of contract, and improper retention of collateral.

## JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) and the Standing Order of the United States District Court for the Southern District of New York referring to the Bankruptcy Judges of this District all cases and proceedings arising under the Bankruptcy Code.  This court also has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' preference and fraudulent transfer claims arise under federal law, and has supplemental jurisdiction under 28

U.S.C. § 1367 over Plaintiffs' state and foreign law claims, which arise out of the same nucleus of operative facts.

20.     This adversary proceeding is a "core" proceeding as defined in 28 U.S.C. § 157(b)(2).  In the event that this or any other Court finds any part of this adversary proceeding to be "non-core," Plaintiffs consent to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

21.     Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and relates to the above-captioned chapter 11 cases under the Bankruptcy Code already pending in this District.  Venue is additionally proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

22.     This Court's *Findings of Fact, Conclusions of Law, and Order Confirming The Modified Joint Chapter 11 Plan of Celsius Network LLC and Its Debtor Affiliates* (the "Confirmation Order"), ECF Doc. No. 3972, in the above-captioned chapter 11 cases, approves the Debtors' chapter 11 plan, which, at Article XII (12), provides that this Court "shall retain exclusive jurisdiction" to "resolve any cases, controversies, suits, disputes, Causes of Action, or other matters," like this one, "that may arise in connection with the Recovery Causes of Action brought by the Litigation Administrator."[3]

23.     The Court has personal jurisdiction over Defendants pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure because Plaintiffs' claims arise from and relate to Defendants' continuous and systematic contacts with the United States.   Each Defendant

---

[3]   In prosecuting this action, the Debtors are directed by the Blockchain Recovery Investment Consortium ("BRIC"), serving as Litigation Administrator (Complex Asset Recovery Manager). *See* ECF Doc. No. 4172.

transacted business in and maintained substantial contacts with the United States, including by maintaining relationships with United States entities. Each Defendant has purposefully availed itself of the privilege of doing business in the United States, and has invoked the benefits and protections of its laws. Defendants' actions were directed at, and had the intended effect of, causing injury to persons located in the United States, including in this District. Indeed, Defendants have repeatedly submitted to the jurisdiction of courts in this District.

24.    The Court also has quasi in-rem jurisdiction because of Defendants' maintenance of one or more bank accounts in New York.

## FACTUAL BACKGROUND

### A.    Plaintiffs' Business And Reliance On Loans From Tether To Operate

25.    Celsius was a consumer-facing cryptocurrency company that was founded in 2017 by Alex Mashinsky, Shlomi "Daniel" Leon, and Nuke Goldstein. Celsius's primary product was a platform that allowed customers to purchase and deposit various cryptocurrencies. Like a traditional bank, Celsius paid interest to customers who deposited cryptocurrency on its platform. Celsius was known to pay some of the highest interest rates in the market to its depositors.

26.    In order to generate revenue, Celsius lent its customer-deposited cryptocurrencies to third parties, who in turn would pay Celsius interest. Celsius used revenue from those loans to pay its customers interest on their deposits. Celsius also operated a Bitcoin mining operation.

27.    Like many other crypto companies, Celsius borrowed "stablecoins" to fund its day-to-day operations. "Stablecoins" are digital tokens whose price is pegged to another asset (*e.g.*, the United States dollar or gold) and are typically backed by reserves of *non*-digital assets (such as cash or marketable securities) to achieve price stability.

8

28.     Defendants control and market the world's most popular stablecoin, USDT.  Each USDT token is purportedly backed by assets (such as cash and commercial paper) such that one USDT is worth one United States dollar.  Defendants also control and market the EURT token, which is purportedly backed by assets such that one EURT is worth one Euro.  Celsius relied on USDT and EURT to operate critical parts of its business.

**B.     The Celsius-Tether Relationship And The Token Agreement**

29.     Since Celsius's founding, Tether has been one of its most trusted business partners.  When Celsius was founded in 2017, Tether was already a major player in the cryptocurrency market, with billons of USDT tokens in circulation.  When Celsius raised its Series A investment round in the summer of 2022, Tether was Celsius's lead investor for the round, investing $10 million in the fast growing crypto exchange.  When Celsius's Series A investment was publicly announced, Mashinsky stated: "The crypto community has only a few great projects and we are excited by the investment from Tether International as it will help us deliver USD-based services to all our users . . . We are proud to add Tether International as the first institution to participate in our equity fundraising."  The parties' relationship was premised on a basic bargain: Tether would provide Celsius with the funding and connections it would need to grow in the fiercely competitive cryptocurrency industry; in exchange, Celsius would provide Tether with access to the most valuable cryptocurrency market in the world—the United States.

30.     Celsius and Tether quickly began putting this bargain into practice.  Less than a month after the close of Celsius's Series A, Tether sought to collect on its side of the deal, and began planning to use Celsius to exploit the United States cryptocurrency market.  As early as July 4, 2020, Tether's CFO (and controller) Giancarlo Devasini, and its Chief Investment Officer, Silvano Di Stefano, told Alex Mashinsky that Tether "want[s] [Celsius] to service all their US

clients." Just two days later, Mashinsky was planning for Di Stefano to "intro[duce] [Celsius] to his top 5 US customers," and for "Bitfinex to provide [a] buy/sell order book to allow US clients to trade."

31.    A lending relationship was soon formed between Celsius and Tether to pursue their joint objectives. Through Celsius, Tether could provide access to its cryptocurrency token, USDT, (and later Tether Gold (XAUt) and EURT) to Celsius and Tether's customers in the United States. Through Tether, Celsius would receive the liquidity it needed to operate its business in the United States, providing its own customers' BTC as collateral for that liquidity. Both parties recognized the centrality of their lending arrangement to their broader purpose of exploiting the United States market. For example, as Tether coordinated with Celsius to make introductions to Tether's U.S. clients, it simultaneously told Celsius that it was taking steps to "lower borrow rates for USDT so [Celsius] can push it harder" to those same U.S. clients.

32.    Celsius and Tether's lending arrangement was formalized in a series of contracts. The first was a "Token Agreement" entered between Plaintiff Celsius Network Limited and Defendant Tether Limited on February 1, 2020, (the "Initial Token Agreement"). That agreement allowed Celsius to borrow USDT from Tether. Celsius agreed to collateralize the borrowing by posting collateral to Tether in any of the following cryptocurrencies: (1) Bitcoin (BTC) tokens; (2) Ether (ETH) tokens; or (3) Tether Gold (XAUt). If Celsius posted collateral to Tether in Bitcoin, the value of the Bitcoin was initially required to be 140% of the value of the amount borrowed. Celsius paid Tether interest between 0.333% and 0.55%, per month, depending on the type of collateral posted by Celsius. For example, if Celsius posted collateral in Bitcoin, it would have to pay Tether monthly interest of 0.55% on its borrowings.

33.     Significantly, the Initial Token Agreement provided that no change or modification to the agreement would be valid unless made in writing and signed by the Parties—Celsius Network Limited and Tether Limited.

34.     Throughout the parties' relationship under the Token Agreement and Amended Token Agreement, Celsius's top decision-makers have been based in, and its central functions have been controlled from, the United States.  That fact was well-known to Tether when the Amended Token Agreement was negotiated—for example, Tether and its outside counsel told Celsius in November of 2020 that they "know [Celsius] [is] mostly a US-based company."

35.     In its early days Celsius maintained a presence in the United Kingdom, and attempted to gain approval to operate freely there.  That changed in 2021, when the UK's Financial Conduct Authority sought to impose new regulatory requirements on cryptocurrency firms like Celsius.  Accordingly, in June of 2021, Celsius announced (and specifically informed Tether) that it was "migrating [its] main business activity and headquarters from the [UK] to the United States …."  This included migrating customer relationships from the United Kingdom to United States.

36.     Around the same time, the parties began renegotiating their lending arrangement. The parties' business together had grown, and the Initial Token Agreement was no longer adequate to the task of regulating it.  Those negotiations continued throughout late 2021, and eventually resulted in an amendment to the Initial Token Agreement on January 20, 2022 (as amended, the "Token Agreement" or the "Amended Token Agreement").  The Amended Token Agreement is attached as Exhibit A.

37.     Like the Initial Token Agreement, Tether—fully knowing that Celsius was a United States-based company with its key executives working out of the United States—projected itself

into the United States to negotiate, execute, and perform the Amended Token Agreement. Many of the principal terms of the Amended Token Agreement, for example, were agreed to during an all-hands call in December of 2021, just a few weeks before the amendment was signed. United States-based Celsius employees—such as Alex Mashinsky, Ron Deutsch, and Joseph Golding-Ochsner—were present at that meeting and negotiated with Tether's top executives, including Giancarlo Devasini and Silvano Di Stefano. Celsius's lead throughout the negotiations was Joseph Golding-Ochsner, a Celsius attorney based in the United States.

38. The negotiations surrounding the Amended Token Agreement centered on several key terms. Among the most important issues discussed during the negotiations was the contract's provision regarding the timeframe that Tether had to wait before it could start liquidating Celsius's collateral following a demand for additional collateral. Tether wanted to maintain the terms of the original agreement, which Tether believed allowed it to commence liquidation immediately after the value of collateral dropped below a certain threshold. Celsius proposed that it be allowed two business days to deposit additional collateral after receiving a demand for additional collateral before Tether would have any right to liquidate collateral.

39. Ultimately, the parties agreed to change the procedure by which Celsius would post additional collateral and the circumstances under which a liquidation could happen. Unlike the Initial Token Agreement, the Amended Token Agreement required Tether to send notice of a collateral demand to Celsius if the value of Celsius's posted collateral dropped below a specified threshold. After receiving such a notice, the Amended Token Agreement provided Celsius ten hours to satisfy the collateral demand. This is in contrast to the Initial Token Agreement, under which Tether was entitled, "*without further notice to the Recipient*, to sell, dispose of, and liquidate the Collateral." Now, if Celsius was unable to satisfy the collateral demand in that 10-hour window,

only then was Tether permitted to "sell, dispose of, and liquidate the Collateral." Celsius specifically negotiated for this 10-hour window, and regarded it as one of the "key changes in the amendment." This provision was important for the stability of Celsius's business and to protect Celsius's residual interest in its collateral, as discussed below.

40.    The parties also extensively negotiated how Tether would deal with excess proceeds from Celsius's collateral in the event of a liquidation. Celsius wanted excess proceeds returned, and Tether wanted to keep the windfall for itself. This remained an open point through much of the negotiation of the Amended Token Agreement, and was only settled a few weeks later, following a meeting on or about January 12, 2022, between Mashinsky and Di Stefano. Mashinsky was in Hoboken, New Jersey when this critical open item in the negotiation was finally resolved in Celsius' favor.

41.    The Amended Token Agreement was the centerpiece of the parties' broader relationship. Both Celsius and Tether understood that it would form the basis of a long-term collaborative relationship that would allow both parties to profit from Celsius supplying USDT (and later other Tether products such as XAUt (Tether Gold) and EURT (Tether Euro)) on behalf of Tether.

42.    Like its predecessor, the Amended Token Agreement authorized Celsius to borrow USDT or EURT if Celsius posted collateral in the form of Bitcoin, Ether, or, Tether Gold. Importantly, the Amended Token Agreement expressly provides for and protects Celsius's residual interest in collateral. It also clarifies that collateral pledged to secure loans under the agreement was to be held "for the benefit of" Celsius. Moreover, the Amended Token Agreement expressly provides that, any "surplus" from an application of the collateral was to be returned to Celsius.

43.     Both the Initial and Amended Token Agreements were signed on behalf of Celsius Network Limited by employees based in the United States—the Initial Token Agreement by Harumi Urata-Thompson, Celsius's CFO at the time, and the Amended Token Agreement by Alexander Mashinsky and S. Daniel Leon, both directors of Celsius.  Celsius Network Limited was nominally an English company.  But Tether knew that its real counterparties under the Agreement were based in the United States.  Celsius even told Tether that the Tether account created for Celsius Network Limited was associated with a bank account at Signature Bank in New York.

44.     Moreover, as discussed, the fundamental purpose of the Amended Token Agreement was to allow Tether to avail itself of the United States market.  Tether knew that the USDT it nominally transferred to Celsius Network Limited would go to support Celsius's operations in the United States, that the USDT would ultimately benefit United States persons and entities, including Celsius Network LLC and Celsius Network Inc.   Most importantly, Tether knew that this close relationship with Celsius (including its anchor equity investment and lending relationship) would allow it to profit handsomely by supplying USDT (and later XAUt (Tether Gold) and EURT (Tether Euro)) to the U.S. market.

45.     As stated above, Celsius borrowed USDT under the Amended Token Agreement. Celsius posted collateral for those loans in the form of Bitcoin or Ethereum.  By the start of April of 2022, Celsius had $512,330,000 in outstanding borrowings in USDT pursuant to the Amended Token Agreement.[4]  And as of the start of April 2022, Celsius had posted 16,505.17 Bitcoin to Tether as collateral to secure the 512,330,000 USDT in outstanding borrowing.  Transactions

---

[4]   Celsius also borrowed a small amount of EURT from Tether.  Those loans are not a subject of this Complaint.

under the Amended Token Agreement were at times initiated and executed by Celsius employees based in the United States, and transfers under the agreement were often made from United States-based accounts. In performing under the Amended Token Agreement, Defendants had continuous and systematic contact with Celsius's United States-based personnel. As an example, in performing under the Amended Token Agreement—and to execute on the parties' broader vision to allow Tether to get broader access to United States markets through Celsius—beginning in 2020, Tether met on a monthly basis with Celsius's United States-based representatives. In those meetings, the parties would discuss many aspects of their business relationship, including the Amended Token Agreement.

### C.    The Preferential Top-Up And Cross-Collateralization Transfers

46.     The § 547(b) Period in this case began on April 14, 2022. As of that date, Celsius had a balance of 512,330,000 USDT on its loan with Tether. That USDT loan was collateralized by approximately 16,505.17 Bitcoin.

47.     Beginning at around the same time—April 2022—Bitcoin's price began a violent downward slide. The price of Bitcoin continued to fall through early July 2022, around the time Debtors filed their voluntary Chapter 11 petitions.

48.     As Bitcoin's price started to fall, Tether became concerned that it, like all other creditors, would be exposed to Celsius's insolvency. In response, Tether initiated a series of demands under the Amended Token Agreement to improve its security on the antecedent debt owed to it by Celsius. Tether directed these demands to Celsius employees located in the United States. In each case, Celsius responded to these demands by promptly depositing additional collateral with Tether. Celsius made the following Bitcoin transfers to Tether—each on account of antecedent debt—during the § 547(b) Period:

49.     On or about May 3, 2022, Celsius transferred approximately 1,633.35 Bitcoin to Tether.

50.     On or about May 7, 2022, Celsius transferred approximately 2,044.00 Bitcoin to Tether.

51.     On or about May 9, 2022, Celsius transferred approximately 2,214.00 Bitcoin to Tether.

52.     On or about May 11, 2022, Celsius transferred  approximately 2,398.29 Bitcoin to Tether.

53.     On or about May 12, 2022, Celsius transferred  approximately 2,598.15 Bitcoin to Tether.

54.     On or about June 10, 2022, Celsius transferred  approximately 2,807.75 Bitcoin to Tether.

55.     On or about June 12, 2022, Celsius transferred  approximately 3,041.73 Bitcoin to Tether.

56.     In sum, Celsius transferred approximately 16,737.27 Bitcoin to Tether during the § 547(b) Period on account of antecedent debt.   This 16,737.27 Bitcoin—less approximately 1,079.06 Bitcoin released to Celsius on June 6, 2022, for which Celsius did not make an otherwise unavoidable transfer to or for the benefit of Tether—are avoidable as preferences (the "Preferential Top-Up Transfers").   The Bitcoin transferred from Celsius to Tether pursuant to the Preferential Top-Up Transfers was not held in segregated wallets or accounts.   To the contrary, this Bitcoin was commingled with the Bitcoin that Celsius had already transferred to Tether prior to the § 547(b) Period.   These transfers were not made in connection with contemporaneous extensions of USDT loans to Celsius.

57.     In addition to the Preferential Top-Up Transfers, Celsius borrowed additional USDT from Tether on three occasions throughout the § 547(b) Period.  On or about April 20, 2022, Celsius borrowed 100,000,000 USDT from Tether.  On or about May 5, 2022, Celsius borrowed 100,000,000 USDT from Tether.  On or about June 9, 2022, Celsius borrowed 100,000,000 USDT from Tether.  In each instance, Celsius posted Bitcoin in connection with the foregoing: 3,095.00 Bitcoin, 3,288.00 Bitcoin, and 4,317.00 Bitcoin, respectively.  This Bitcoin was commingled with Celsius's previous collateral postings and cross-collateralized Celsius's existing loan from Tether.  Of this 10,700.00 new Bitcoin posted by Celsius, approximately 2,228.01 was excess collateral.  Celsius's transfer of this excess—approximately 2,228.01 Bitcoin—to Tether (the "Preferential Cross-Collateralization Transfers") was, like the Preferential Top-Up Transfers, preferential and are subject to avoidance. During the § 547(b) Period, Celsius also made a series of principal and interest payments to Tether, on account of its loans.[5]  These transfers are separate and distinct from the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers on account of antecedent debt described above.

58.     The Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers dramatically improved Tether's position as a creditor.  If Tether had not received the

---

[5]  On April 22, 2022, Celsius made a principal payment to Tether of approximately 13,000,000.00 EURT.  On May 2, 2022, Celsius made interest payments to Tether of approximately 97,581.02 EURT and 2,789,566.67 USDT.  On May 5, 2022, Celsius made a principal payment to Tether of approximately 7,451,552.00 EURT.  On May 10, 2022, Celsius made a principal payment to Tether of approximately 3,809,470.00 EURT.  On May 17, 2022, Celsius made a principal payment to Tether of approximately 5,332,296.00 EURT.  On May 19, 2022, Celsius made a principal payment to Tether of approximately 12,250,000.00 USDT.  On May 30, 2022, Celsius made interest payments to Tether of approximately 3,517,108.34 USDT and 34,692.40 EURT.  On June 13, 2022, Celsius made a principal payment to Tether of approximately 5,000,572.97 EURT.  On June 14, 2022, Celsius made principal payment to Tether of approximately 1,958,886.00 EURT.  In sum, Celsius made principal and interest payments to Tether totaling about 36,685,050.39 EURT and 18,556,675.01 USDT during the § 547(b) Period.

Preferential Top-Up Transfers (15,658.21 Bitcoin) and Preferential Cross-Collateralization Transfers (2,228.01 Bitcoin) during the § 547(b) Period, Tether would not have been able to come close to making itself whole on its $812,330,000 USDT loan to Celsius, which it ultimately was able to do with the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers. Indeed, as of the Petition Date, without the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether would have had over $350 million less in collateral.

59.    Celsius is presumed to be, and in fact was, insolvent at the time of each of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers. As of March of 2022, Celsius, by its own account, had a negative net capital position of $60 million, even giving Celsius full credit for CEL Token (Celsius's own cryptocurrency) that it held in its treasury at a value of over $700 million. As noted above, cryptocurrency prices started drastically dropping in April of 2022, and as a result, the value of Celsius's assets—which were primarily in Bitcoin, Ethereum, CEL Token, and other cryptocurrencies—dropped significantly.

60.    Most notably, in April and May of 2022,  CEL Token lost most of its value. Celsius's liabilities at the end of the third quarter of 2022 included over $14 billion of principal and interest payments owed to customers on their deposits, and billions owed to third-party lenders. Although those liabilities also declined, they did not do so at the same rate as Celsius's assets. As a result, in April, May, and June of 2022, the value of Celsius liabilities far exceeded the value of its assets.

61.    In addition to being balance sheet insolvent, Celsius also was unable to pay its debts when they came due and did not have adequate capital to operate its business. The liquid assets that Celsius held during this time period were only a fraction of the liquid assets Celsius needed to

operate its business and meet its expected obligations, rendering it insolvent on a cash flow and adequacy of capital basis.

62.     Each time Celsius fulfilled a collateral demand, by making the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, it was transferring its own interest in property to Tether on account of antecedent debt.  Tether provided no contemporaneous value to Celsius in exchange for the transferred property.

63.     Several of these transfers were initiated from the United States by United States-based Celsius employees, and Celsius employees in the United States gave notice of these transfers to Tether.  Finally, on information and belief, each of these transfers was ultimately overseen and approved by Celsius CEO Alex Mashinsky, who was based in Hoboken, New Jersey at the time of the transfers.

**D.     The Improper Application and Secret Retention of Collateral**

64.     By June 2022, Bitcoin's dropping price had led to a dire situation for Celsius and the cryptocurrency market as a whole.  Celsius's customers began withdrawing deposits from Celsius at increasingly fast rates, putting it under immense financial distress.  Things became so bad for Celsius that on June 12, 2022, Celsius publicly announced that it was "pausing all withdrawals . . . [and] transfers between accounts."  This "pause" was never lifted before Celsius's bankruptcy filing, and, as a result, Celsius customers were never able to withdraw their assets.

65.     Tether, of course, knew of Celsius's vulnerable position—news of Celsius's "pause" was well known in the cryptocurrency market.  Moreover, on June 12, 2022, Celsius's CEO Alex Mashinsky reached out to Tether's CFO Giancarlo Devasini, asking for Tether's "help squeezing [Celsius] short sellers."  In the words of Rod Bolger—who served as Celsius's CFO at the time—

Celsius was "desperate" for Tether's help. Mashinsky and Devasini agreed to talk at nine in the morning on Monday, June 13, 2022.

66.     But Tether had no interest in helping, and instead was solely focused on improving its own position. With the benefit of having received the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether embarked on a three-part plan to do so.

67.     *First*, Tether would ask for additional collateral to ensure that it obtained as much of Celsius's BTC as possible in order to insulate itself from the impact of Celsius's impending bankruptcy.

68.     *Second*, Tether would purport to apply Celsius's collateral to Celsius's entire outstanding loan balance. This would ensure that Tether would extinguish its entire exposure to Celsius, at a time when other creditors (*e.g.*, customers) could not get access to any of their deposits held by Celsius.

69.     *Third*, Tether would then keep Celsius's collateral for itself—but represent to Celsius the opposite, by falsely stating to Celsius that it was selling Celsius's collateral in a series of open-market transactions. In fact, Tether was covertly transferring the economic upside of Celsius's Bitcoin to itself. It was not enough to be preferred over all other creditors. Remarkably, Tether wanted equity-like upside (insulated from any creditor downside), and was willing to make false representations to obtain it.

70.     Tether set its plan in motion late at night (Eastern time) on June 12, 2022, when it issued a collateral demand to Celsius. This collateral demand was directed to Celsius employees in the United States. As noted above, Celsius satisfied that collateral demand promptly, transferring 3,041.73 Bitcoin to Tether early in the morning of June 13. Several hours later, Tether made a second collateral demand to Celsius. Celsius notified Tether that it was "working on

preparing the BTC [Bitcoin]" to satisfy the collateral demand, and reminded Tether that it had ten hours to do so under the Amended Token Agreement. However, Tether's representatives demanded immediate payment notwithstanding expressly acknowledging that Celsius *"have 10h in the [Agreement]*..."

71.    Celsius continued to assure Tether that it was working on providing collateral as soon as possible. But Defendants decided to proceed with an immediate application of Celsius's collateral—regardless of the terms of the Amended Token Agreement, which required a 10-hour waiting period before Tether could initiate the application process. Amidst the chaos of June 13, 2022, Celsius's CEO Alex Mashinsky allegedly gave Tether permission to liquidate Celsius's collateral in an "orderly" manner. However, in contravention of the terms of the Amended Token Agreement, Tether never obtained a written agreement from Mashinsky (or anyone else at Celsius) to amend this contractually mandated 10-hour waiting period.

72.    Indeed, Celsius was never provided the full 10-hour period to which it was contractually entitled to. With more than half of Celsius's ten-hour period to post additional collateral remaining, Tether purported to begin a fire sale of Celsius's collateral. Throughout this alleged "fire sale" process, Tether directed communications to Celsius employees in the United States. Tether performed this "fire sale" by purportedly selling Celsius's Bitcoin in a series of tranches over a period of several hours. Within hours, all of Celsius's collateral (39,542.42 Bitcoin) had been applied by Tether against Celsius's outstanding indebtedness to Tether (the "Preferential Application Transfer").

73.    Throughout the purported "fire sale," Tether's representatives conspired to give Celsius the false impression that its collateral was being sold in a series of legitimate, arm's-length,

open-market transactions.  In fact, these purported "sales" were a ruse to allow Tether to appropriate Celsius's collateral for itself at below the market price.

74.    At around 8:30 AM on June 13, 2022, Tether's representative, Silvano Di Stefano, told Celsius that they would "start to liquidate all your collateral to repay the USDT loan" in tranches of "2k bitcoin at [a] time."  Tether claimed that the sale would be accomplished through its OTC desk, which would be responsible for obtaining a price for each tranche.

75.    Over the next two and a half hours, Tether claimed that it was proceeding with legitimate, arm's-length sales of Celsius's collateral through its OTC desk.  Tether's representatives presented supposed "quotes" received from the OTC desk for the sale of each tranche of Bitcoin.  Tether's "quotes" steadily decreased, dropping from $23,400, to $22,600, to $22,500, to $22,100, and so on—all the way down to $19,400.  At one point during the sale, Tether's representatives claimed that they "fou[nd] a cou[n]terparty willing to buy the entire remaining" stock of Celsius's collateral—32542.44 BTC—at a price of $21,000.  Celsius was hesitant to accept this offer, but Tether kept pressing: "[I] think considering the market and the liquidity this is a great price"; "I think this otc bid is a real good deal for both …"  Ultimately, Celsius declined Tether's offer.  Two days later, Tether transferred the precise amount Celsius had refused to sell—32,542.44 BTC—to a Bitfinex account controlled by Defendant Tether International Limited.

76.    The final purported sale was 20,542.44 Bitcoin at a price of $19,400.  Tether's representative stated that he did not think that the OTC desk would be "willing to do it," and that he would "need to contact the other counterparty."  After supposedly checking with the "counterparty," Tether offered to make the sale at a price of $19,400—more than $3,000 *lower*

than the market price of Bitcoin on June 13 of $22,487.39—as long as Celsius was "quick." The purported "liquidation" was over by 11:00 AM.

77.    Throughout the entire process, Tether repeatedly pressed Celsius to liquidate as quickly as possible. Tether pushed Celsius to sell quickly, and warned that it "would need to be fast or [the] price [would] keep moving." Tether repeatedly blamed poor market conditions for the low sale price of Celsius's Bitcoin, claiming, for example, that the market was "getting thinner," and that the prices were "getting ugly." When Celsius asked for an accounting of how much balance was left on the loan, Tether refused to provide one until the entire collateral was supposedly liquidated. In fact, despite repeated requests by Celsius, Tether declined to provide any accounting of the alleged "sale" proceeds until the next day, June 14, in the meantime pacifying Celsius with false reassurances: "Tomorrow we do all the cal[culation]s don't worry … today very very crazy day." When Tether did finally provide that accounting, it represented that "all the trades executed to *sell* [Celsius's] collateral for a total proceed of $816,822,948.00." Tether made no mention of the fact that the purported 'sales' were to Tether itself or its affiliates.

78.    Tether represented to Celsius that it sold the entirety of Celsius's collateral, 39,542.42 Bitcoin, at a dollar value of $816,822,948. The Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers were commingled among this collateral. On the application date, Celsius's outstanding loan balance under the Amended Token Agreement was $812,333,000. Without the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether would have had only 21,656.20 Bitcoin in collateral. At the same average price that Tether claims to have applied the 39,542.42 Bitcoin in satisfaction of the amounts owed Tether, Tether would have realized only $447,349,482.57, leaving a $364,980,517.43 deficiency. In other words, the Preferential Top-Up Transfers, Preferential

Cross-Collateralization Transfers, and Preferential Application Transfer clearly improved Tether's position as of the application date (just as it did as measured as of the Petition Date).

79.    Apart from the fact that these transfers were preferences under the Bankruptcy Code, Tether robbed Celsius of its contractually entitled 10-hour window to satisfy collateral demands.  At the time of Tether's last collateral demand on June 13, 2022, Celsius had sufficient Bitcoin on its balance sheet to post as collateral to Tether, including for, at least, the next 30 days. This was especially true given that Celsius had instituted a "pause" on customer withdrawals, which Tether was well aware of, resulting in the retention of, and access to, a significant amount of Bitcoin.  If Celsius had been given the opportunity to meet the collateral demand—which it had the contractual right to do—it could have been able to avoid the disposition of its Bitcoin at near the bottom of the cryptocurrency market.  Instead, that disposition was carried out for the benefit of just one creditor: Tether.  Moreover, Celsius could have endured through the Petition Date, at which point the automatic stay would have intervened, stopping any attempt by Tether to apply collateral against its claim.  Celsius could have retained pledged Bitcoin worth more than $4 billion today.  Tether's breach has caused Celsius billions of dollars of harm.

80.    Tether's disposition of Celsius's collateral was also arbitrary, irrational, and commercially unreasonable.  Established market practice and commercially reasonable standards of good faith dictate that Tether should have liquidated such a large block of Bitcoin over a period longer than several hours.  Liquidating this amount of collateral over a period longer than several hours would (a) minimize the price impact of the sale, especially during a time where buyers in the cryptocurrency market had fear about the direction of the market; and (b) allow time to market the assets to find buyers willing to transact at market prices.  If Tether had followed established market practices, it would have ensured that the Bitcoin would have been sold at the full prevailing

market price.  Instead, Tether applied Celsius's Bitcoin against obligations owed to it for an average price of $20,656.88 each—considerably less than Bitcoin's market closing price on June 13th, $22,487.39.  In fact, Tether applied Celsius's Bitcoin at an average price considerably below Bitcoin's *low* price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent company, around the time when the collateral was allegedly liquidated.

81.    Upon information and belief, Tether's application of Celsius's collateral was accomplished through the use of United States intermediaries or counterparties, involved transactions routed through United States servers, involved contacts with Celsius's United States-based personnel, and/or involved the use of bank accounts, financial institutions, or cryptocurrency exchanges located in the United States.

82.    Tether did not sell the collateral as it claimed.  Instead, Tether set in motion a series of transactions—transfers quite unlike the supposed "sales" it had described in great detail to Celsius—designed to ensure it could keep Celsius's BTC, and all of its upside, for itself.

83.    Prior to the Preferential Application Transfer, Tether held the entirety of the BTC collateral—that is, the 39,542.42 Bitcoin Celsius transferred to Tether—in a single Bitcoin wallet. Tether made only two transfers from this wallet: first, a transfer of 7,000 Bitcoin on June 14, 2022, to a Bitfinex deposit account in the name of Defendant Tether International Limited, and second, a transfer of 32,542.42 Bitcoin on June 15, 2022, to a different Bitfinex account controlled by Defendant Tether International Limited.  Tether now concedes that neither of these transfers were true arm's-length sales of the collateral, as Tether had falsely represented to Celsius that it was conducting.  Notwithstanding its prior representations, Tether now confesses that the first transfer of 7,000 Bitcoin was not a sale, admitting that this "7,000 BTC was held for the benefit of another BVI entity—Defendant TIL."  In other words (passive voice aside), Tether openly admits it kept

this 7,000 Bitcoin transferred to it by Celsius for its own benefit.   Tether has likewise conceded

that it transferred the 32,542.42 Bitcoin to a  Bitfinex account "controlled" by Defendant Tether

International Limited.  Tether claims that this account—which it controlled—"held collateral for

a different TIL customer, who is a foreign national."  In any event, on information and belief, this

supposed transaction was not an arm's length sale (if indeed it was a sale at all), and it certainly

was not a legitimate sale to a third party who purchased this Bitcoin from Tether at the prices

quoted by Tether to Celsius during the purported liquidation.

84.     Plaintiffs' preliminary investigation—undertaken without the aid of Tether's

documents—has revealed that Tether made false representations to Celsius in order to unlawfully

seize the upside of Celsius's Bitcoins for itself—appreciation that should have belonged to

Celsius's estate.  As detailed above, Tether transferred *all* of Celsius's Bitcoins to its own Bitfinex

accounts.  It then continuously held at least 32,542.42 Bitcoin in a Bitfinex account controlled by

Defendant Tether International Limited from July 15, 2022 to March 16, 2023.  Between March

17, 2023, and November 10, 2013, the entirety of those 32,542.42 Bitcoin were transferred in a

series of transactions to another wallet publicly known to be controlled by Tether's sister affiliate,

Bitfinex, and associated with the Bitfinex exchange.  On information and belief, after this transfer,

Bitfinex and Tether continued to use this Bitcoin to support their ongoing operations.  Discovery

will reveal what portion of Celsius's Bitcoin Tether has retained to this day—and the true purpose

of the putative "collateral" pledge to the foreign national.

85.     The market price of Bitcoin increased substantially from July 15, 2022 to March

16, 2023 and even more significantly thereafter.  As a result, Celsius's Bitcoin significantly

appreciated as it was improperly held in Tether's Bitfinex account.  Tether realized this

appreciation only as a result of its receipt of preferential and fraudulent transfers of Celsius's

property, its sham "liquidation," and its secret retention of Celsius's assets.  As a result, Celsius's bankruptcy estate is entitled to a return of its Bitcoin under Section 550 of the Bankruptcy Code in order to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.

## CAUSES OF ACTION

## COUNT ONE: PREFERENCE (11 U.S.C. § 547)
### (against all Defendants)

86.    The allegations in paragraphs 1 through 85 are incorporated by reference as if fully set forth below.

87.    Plaintiffs have conducted reasonable due diligence into the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and the Preferential Application Transfer, including, *inter alia*, by reviewing the books and records of Debtors and other information about these transfers.  Plaintiffs have also conducted reasonable due diligence into known or reasonably knowable affirmative defenses that Defendant Tether Limited could assert, including under 11 U.S.C. § 547(c).

88.    Celsius made the Preferential Top-Up Transfers described in paragraphs 49 through 55 within the ninety-day § 547(b) Period.  The Preferential Top-Up Transfers totaled 15,658.21 Bitcoin.

89.    Each of the Preferential Top-Up Transfers was a transfer of Celsius's property—namely, Celsius's Bitcoins.

90.    Each of the Preferential Top-Up Transfers was made to or for the benefit of Defendants.

91.    At the time of each Preferential Top-Up Transfer, Defendant Tether Limited was a creditor of Celsius within the meaning of section 101(10) of the Bankruptcy Code.  Defendants

received the Preferential Top-Up Transfers, or alternatively the Preferential Top-Up Transfers were made for their benefit.

92.    Each of the Preferential Top-Up Transfers was made on account of antecedent debt owed by Celsius to Defendant Tether Limited, and each of the Preferential Top-Up Transfers related to that antecedent debt.

93.    Each of the Preferential Top-Up Transfers was made within ninety days of the Petition Date, and was made while Plaintiffs were insolvent.

94.    Each of the Preferential Top-Up Transfers was made on account of a demand by Tether, and as described above, was made outside the ordinary course of business.

95.    The Preferential Top-Up Transfers, if not avoided, would allow Defendant Tether Limited to receive more than it would have if (i) Debtors' chapter 11 case were a case under chapter 7 of the Bankruptcy Code, (ii) the Preferential Top-Up Transfers had not been made, and (iii) Defendant Tether Limited received payment on account of the antecedent debt referenced herein, to the extent provided by the provisions of the Bankruptcy Code.

96.    Celsius made the Preferential Cross-Collateralization Transfers described in paragraph 57 within the ninety-day § 547(b) Period.  The Preferential Cross-Collateralization Transfers totaled 2,228.01 Bitcoin.

97.    Each of the Preferential Cross-Collateralization Transfers was a transfer of Celsius's property—namely, Celsius's Bitcoins.

98.    Each of the Preferential Cross-Collateralization Transfers was made to or for the benefit of Defendants.

99.    At the time of each Preferential Cross-Collateralization Transfers, Defendant Tether Limited was a creditor of Celsius within the meaning of section 101(10) of the Bankruptcy

Code.  Defendants received the Preferential Cross-Collateralization Transfers, or alternatively the Preferential Cross-Collateralization Transfers were made for their benefit.

100.    Each of the Preferential Cross-Collateralization Transfers cross-collateralized antecedent debt owed by Celsius to Defendant Tether Limited, and each of the Preferential Cross-Collateralization Transfers related to that antecedent debt.

101.    Each of the Preferential Cross-Collateralization Transfers was made within ninety days of the Petition Date, and was made while Plaintiffs were insolvent.

102.    Each of the Preferential Cross-Collateralization Transfers was made outside the ordinary course of business.

103.    The Preferential Cross-Collateralization Transfers, if not avoided, would allow Defendant Tether Limited to receive more than it would have if (i) Debtors' chapter 11 case were a case under chapter 7 of the Bankruptcy Code, (ii) the Preferential Cross-Collateralization Transfers had not been made, and (iii) Defendant Tether Limited received payment on account of the antecedent debt referenced herein, to the extent provided by the provisions of the Bankruptcy Code.

104.    Celsius made the Preferential Application Transfer within the ninety-day § 547(b) Period.  The Preferential Application Transfer totaled 39,542.42 Bitcoin.

105.    The Preferential Application Transfer was a transfer of Celsius's property—namely, Celsius's Bitcoins.

106.    The Preferential Application Transfer was made to or for the benefit of Defendants.

107.    At the time of the Preferential Application Transfer, Defendant Tether Limited was a creditor of Celsius within the meaning of section 101(10) of the Bankruptcy Code.  At the time

of the Preferential Application Transfer, Defendants received that transfer, or alternatively the Preferential Application Transfer was made for their benefit.

108.    The Preferential Application Transfer was made on account of antecedent debt owed by Celsius to Defendant Tether Limited.

109.    The Preferential Application Transfer was made within ninety days of the Petition Date, and was made while Plaintiffs were insolvent.

110.    The Preferential Application Transfer was made outside the ordinary course of business, including because it was made in violation of the terms of the Amended Token Agreement and while Celsius was under duress.

111.    In view of the facts that the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers are avoidable transfers, the Preferential Application Transfer, if not avoided, would allow Defendant Tether Limited to receive more than it would have if (i) Debtors' chapter 11 case were a case under chapter 7 of the Bankruptcy Code, (ii) the Preferential Application Transfer had not been made, and (iii) Defendant Tether Limited received payment on account of the antecedent debt referenced herein, to the extent provided by the provisions of the Bankruptcy Code.

112.    As of the date of this Complaint, Defendants have not returned the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, or the Preferential Application Transfer to Celsius.

113.    Plaintiffs are entitled to an order and judgment under 11 U.S.C. § 547 avoiding the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and the Preferential Application Transfer.

## COUNT TWO: RECOVERY OF PROPERTY (11 U.S.C. § 550)
### (against all Defendants)

114.    The allegations made in paragraphs 1 through 113 are adopted as if fully set forth herein.

115.    As alleged in paragraphs 86 through 113 above, Plaintiffs are entitled to avoid the Preferential Top-Up Transfers, the Preferential Cross-Collateralization Transfers, and Preferential Application Transfer under section 547 of the Bankruptcy Code.

116.    Defendants are the initial, immediate, or mediate transferees of the Preferential Top-Up Transfers, the Preferential Cross-Collateralization Transfers, and the Preferential Application Transfer, or the entities for whose benefit such transfers were made.  Accordingly, Plaintiffs are entitled to receive a return of their property—15,658.21 Bitcoin, 2,228.01 Bitcoin, and 39,542.42 Bitcoin (without duplication), respectively, or, in the alternative, the value of such property—pursuant to 11 U.S.C. § 550 plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

117.    As alleged in paragraphs 82 through 85 above, despite Defendants' purported liquidation of the collateral received in connection with the Preferential Top-Up Transfers, the Preferential Cross-Collateralization Transfers, and Preferential Application Transfer, Defendants in fact held at least 32,542.42 Bitcoin of this collateral for at least a nine-month period following the purported liquidation.  Over this period, Plaintiffs' Bitcoin improperly held by Defendants increased in value substantially.  In order to restore the estate to the financial condition it would have enjoyed if the transfers had not occurred, Celsius's bankruptcy estate—not Tether—is entitled to the appreciation of the Bitcoin pursuant to an in-kind return of the Preferential Application Transfer, plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

## COUNT THREE: BREACH OF CONTRACT (BVI LAW)[6]
### (against Tether Limited)

118.    The allegations made in paragraphs 1 through 117 are adopted as if fully set forth herein.

119.    The Amended Token Agreement is a binding contract.

120.    Plaintiffs have fully performed their obligations and satisfied any conditions precedent under the Amended Token Agreement.

121.    Defendant Tether Limited has breached the Amended Token Agreement by improperly applying Plaintiffs' collateral to Plaintiffs' antecedent debt prior to the contractually required ten-hour waiting period after sending a notice of a demand.

122.    At the time of Defendant Tether Limited's last collateral demand on June 13, 2022, Celsius had sufficient Bitcoin on its balance sheet to post as collateral to Tether, including for, at least, the next 30 days.  If Celsius had been given its contractually entitled opportunity to meet the collateral demand, it could have avoided the disposition of its Bitcoin at near the bottom of the cryptocurrency market.  Celsius could have retained its pledged Bitcoin—worth more than $4 billion today.  Celsius has thus been harmed by billions of dollars as a result.

123.    At the very minimum, Plaintiffs have suffered $100 million in damages as a proximate result of Defendant Tether Limited's breaches of contract, corresponding to the difference between the average price for which Tether applied Plaintiffs' collateral and the price that would have been obtained had Tether not breached the Agreement.  Plaintiffs have suffered

---

[6]    Plaintiffs hereby give notice pursuant to Rule 9017 of the Federal Rules of Bankruptcy Procedure and Rule 44.1 of the Federal Rules of Civil Procedure of their intent to raise issues under the law of the British Virgin Islands ("BVI"), including but not limited to Defendants' liability for breach of contract, breach of the *Braganza* duty, and breach of the duties of an equitable mortgagee.

additional expectation, reliance, and consequential damages as a result of Defendant Tether Limited's breaches of contract in an amount to be proven at trial.

## COUNT FOUR: BREACH OF *BRAGANZA* DUTY (BVI LAW)
### (against Tether Limited)

124.    The allegations made in paragraphs 1 through 123 are adopted as if fully set forth herein.

125.    The Amended Token Agreement assigned Tether "discretion" with respect to a liquidation of the collateral.

126.    As a result, the law of the British Virgin Islands imposed a duty on Tether to exercise that discretion "honestly and in good faith," in a manner "consistent with the contractual purpose," and not "arbitrarily, capriciously, or unreasonably." *Braganza v. BP Shipping Ltd.*, [2015] UKSC 17 ¶¶ 20, 27, 29, 30.   This duty further required Tether to take into account relevant considerations and not take into account irrelevant considerations in exercising its discretion.   *Id.*

127.    Tether breached its *Braganza* duties by conducting a purported liquidation that was dishonest, in bad faith, arbitrary, capricious, unreasonable, based on irrelevant and improper considerations, and inconsistent with the purpose of the Amended Token Agreement.

128.    Tether's purported liquidation and secret retention of the collateral and/or transfer of the collateral to affiliates and insiders was conducted dishonestly and in bad faith, including because Tether made false and misleading statements designed to give Celsius the impression that the collateral was being sold in a series of legitimate, arm's-length, open-market transactions, when in reality these purported "sales" were not legitimate, arm's-length, open-market sales. Instead, Tether's purported liquidation of collateral was a ruse to allow Tether to appropriate the collateral for itself and/or its insiders and affiliates at a price below the best price reasonably obtainable in the open market.  Tether's supposed "sale" of the collateral was conducted especially

dishonestly, and in particularly bad faith, including because Tether (a) knew and intended to enter into those transactions with affiliates and/or insiders at a price below the best price reasonably obtainable, for its own benefit and/or for the benefit of its affiliates and insiders, and to the detriment of Celsius; and (b) conducted such transactions secretly and not openly, and acted to mislead Celsius about those purported transactions.

129.    Tether's purported liquidation and secret retention of the collateral was arbitrary, capricious, and unreasonable, including because: (a) Tether transferred the collateral to itself and/or affiliates and insiders, which was (i) contrary to established market practices, (ii) contrary to the interests of Celsius, (iii) contrary to commercial standards of good faith, and caused the collateral to be liquidated at a price far below the best price reasonably obtainable in the open market; (b) Tether improperly considered and prioritized its desire to appropriate the collateral for its own benefit (and/or that of its affiliates and insiders) in determining when and how to carry out the purported liquidation; (c) Tether failed to consider the proper contractual objective of maximizing the price at which the collateral would be liquidated; and (d) Tether failed to properly consider or act in Celsius's interests which would have entailed seeking to sell the collateral on the open market at the best price reasonably obtainable.

130.    Tether's purported liquidation and secret retention of the collateral was inconsistent with the contractual purpose because it (a) improperly considered and preferred its desire to appropriate the collateral for its own benefit (and/or that of its affiliates and insiders) in determining when and how to carry out the liquidation; (b) failed to achieve the best price reasonably obtainable for the collateral in the open market for the benefit of Celsius, and instead resulted in the "sale" of collateral at a price below the best price reasonably obtainable to Tether,

and for its benefit (or that of its affiliates and insiders); and (c) failed to respect Celsius's right to post more collateral within 10 hours of a margin call.

131.   Plaintiffs suffered significant damages as a result of Defendant Tether Limited's breaches of the *Braganza* duty, including: (a) damages reflecting the amount of collateral which Tether dishonestly transferred to itself and/or its affiliates and insiders in bad faith (namely 39,542.42 Bitcoin); (b) at least $100 million in damages corresponding to the difference between the average price for which Tether applied Plaintiffs' collateral and the price that would have been obtained had Tether liquidated Plaintiffs' collateral consistent with its *Braganza* duties; and (c) additional expectation, reliance, and consequential damages as a proximate result of Defendant Tether Limited's breaches of its *Braganza* duties in an amount to be proven at trial.

## COUNT FIVE: BREACH OF EQUITABLE MORTGAGEE'S DUTIES (BVI LAW)
### (against Tether Limited)

132.   The allegations made in paragraphs 1 through 131 are adopted as if fully set forth herein.

133.   The Amended Token Agreement created an equitable mortgage over the collateral because (a) a proprietary interest in Celsius's property was conferred or undertaken to be conferred by Celsius to Tether; (b) Tether could procure at least the partial discharge of Celsius's liability to it by realization of that proprietary interest; and (c) the proprietary interest conferred upon Tether was redeemable by Celsius in the event of Celsius discharging its liability.

134.   As an equitable mortgagee, the law of the British Virgin Islands imposes duties on Tether to act in good faith in conducting any sale or liquidation of the collateral, and to obtain the best price reasonably obtainable for the collateral at the time of the sale or liquidation.

135.    Tether's purported liquidation and secret retention of the collateral breached its duties as an equitable mortgagee, including because it was conducted in bad faith and because Tether did not obtain the best price reasonably obtainable at the time of the sale or liquidation.

136.    Tether's purported liquidation and secret retention of the collateral was conducted in bad faith, including because Tether made false and misleading statements designed to give Celsius the impression that the collateral was being sold in a series of legitimate, arm's-length, open-market transactions, when in reality these purported "sales" were not legitimate, arm's-length, open-market transactions.  Instead, these "transactions" were a ruse to allow Tether to appropriate the collateral for itself and/or its affiliates and insiders at a price below the best price reasonably obtainable.  Tether's "sale" of the collateral was conducted especially dishonestly, and in particularly bad faith, including because Tether (a) knew and intended to enter into transactions with affiliates and/or insiders at a price below the best price reasonably obtainable, for its own benefit and/or for the benefit of its affiliates and insiders, and to the detriment of Celsius; and (b) conducted such transactions secretly and not openly, and acted to mislead Celsius about those purported transactions.

137.    Tether did not obtain the best price reasonably obtainable at the time of its purported liquidation and secret retention of the collateral, including because it (a) sold the collateral in illegitimate related party transactions to itself and/or affiliates and insiders and not on the open market; (b) improperly considered and preferred its desire and its own interests to appropriate the collateral for its own benefit (and/or that of its affiliates and insiders) at a price below the best price reasonably obtainable; and (c) acted contrary to established market practices and commercial standards of good faith.

138.    Even if Tether had sold the collateral in arm's-length, open-market transactions, Tether would have breached its duties as an equitable mortgagee because it purported to liquidate the collateral in a fire sale over mere hours.  Established market practice and commercially reasonable standards of good faith dictate that Tether should have liquidated such a large block of Bitcoin over a period longer than several hours.  Liquidating this amount of collateral over a period longer than several hours would (a) minimize the price impact of the sale, especially during a time where buyers in the cryptocurrency market had fear about the direction of the market; and (b) allow time to market the assets to find buyers willing to transact at the market price.  If Tether had followed established market practices, the Bitcoin would have been sold at the best price reasonably obtainable.

139.    Plaintiffs suffered significant damages as a result of Defendant Tether Limited's breaches of its duties as an equitable mortgagee, including: (a) damages reflecting the amount of collateral that Tether dishonestly transferred to itself and/or its affiliates and insiders in bad faith (namely 39,542.42 Bitcoin); (b) at least $100 million in damages corresponding to the difference between the average price for which Tether applied Plaintiffs' collateral and the price that would have been obtained had Tether liquidated Plaintiffs' collateral in good faith and in a commercially reasonable manner on or around June 13, 2022; and (c) additional expectation, reliance, and consequential damages as a proximate result of Defendant Tether Limited's breaches of the duties of an equitable mortgagee in an amount to be proven at trial.

## COUNT SIX: FRAUDULENT TRANSFER (11 U.S.C. §§ 548(A)(1)(B) AND 550)
### (against all Defendants)

140.    The allegations made in paragraphs 1 through 139 are adopted as if fully set forth herein.

141.    On June 13, 2024, Tether represented to Celsius that it applied the entirety of Celsius's collateral of 39,542.42 Bitcoin against Celsius's outstanding debt at a dollar value of $816,822,948.   That Bitcoin was property of the Debtors.   On the application date, Celsius's outstanding loan balance under the Amended Token Agreement was $812,333,000.

142.    Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding debt happened within two years of Celsius's bankruptcy petition, and while Celsius was (a) insolvent, (b) was engaged in a business or a transaction for which any property remaining with Celsius was an unreasonably small capital, or (c) intended to incur, or believed that it would incur, debts that would be beyond Celsius's ability to repay as such debts matured.

143.    Celsius received less than reasonably equivalent value in exchange for the application of its 39,542.42 Bitcoin.   Tether applied Celsius's Bitcoin against obligations owed to it for an average price of $20,656.88 each—considerably less than Bitcoin's market closing price on June 13th, $22,487.39.   In fact, Tether applied Celsius's Bitcoin at an average price considerably below Bitcoin's *low* price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent company, during the three hour window during which the collateral was allegedly liquidated.

144.    Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.   *See* ECF Doc. Nos. 7, 974.

145.    By virtue of the foregoing, Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding loan was a constructive fraudulent transfer avoidable under section 548(a)(1)(B) of the Bankruptcy Code.   Accordingly, Plaintiffs are entitled to receive a return of their property—39,542.42 Bitcoin or, in the alternative, the value of such property—pursuant to

11 U.S.C. § 550 plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

### <u>COUNT SEVEN: FRAUDULENT TRANSFER (11 U.S.C. §§ 544(B) AND 550)</u>
**(against all Defendants)**

146.    The allegations made in paragraphs 1 through 145 are adopted as if fully set forth herein.

147.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent or otherwise voidable transfers are avoidable pursuant to Bankruptcy Code section 544(b) and other applicable law, including the relevant fraudulent or voidable transfer laws as enacted in the states of New York, New Jersey, and Delaware.

148.    On June 13, 2024, Tether represented to Celsius that it applied the entirety of Celsius's collateral of 39,542.42 Bitcoin against Celsius's outstanding debt at a dollar value of $816,822,948.  That Bitcoin was property of the Debtors.  On the application date, Celsius's outstanding loan balance under the Amended Token Agreement was $812,333,000.

149.    Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding debt happened within two years of Celsius's bankruptcy petition, and while Celsius was (a) insolvent, (b) was engaged in a business or a transaction for which any property remaining with Celsius was an unreasonably small capital, or (c) intended to incur, or believed that it would incur, debts that would be beyond Celsius's ability to repay as such debts matured.

150.    Celsius received less than reasonably equivalent value in exchange for the application of its 39,542.42 Bitcoin.  Tether applied Celsius's Bitcoin against obligations owed to it for an average price of $20,656.88 each—considerably less than Bitcoin's market closing price

on June 13th, $22,487.39.   In fact, Tether applied Celsius's Bitcoin at an average price considerably below Bitcoin's *low* price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent company, during the time window during which the collateral was allegedly liquidated.

151.    Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.  *See* ECF Doc. Nos. 7, 974.

152.    By virtue of the foregoing, Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding loan was a constructive fraudulent or otherwise voidable transfer avoidable under section 544(b) of the Bankruptcy Code and applicable state law.   Accordingly, Plaintiffs are entitled to receive a return of their property—39,542.42 Bitcoin or, in the alternative, the value of such property—pursuant to 11 U.S.C. § 550 plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that this Court enter judgment in favor of the Plaintiffs and against Defendants and grant the following relief:

(a)     Avoid the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and Preferential Application Transfer as preferential transfers under 11 U.S.C. § 547;

(b)     Direct Plaintiffs to return the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and Preferential Application Transfer, or the value thereof, under 11 U.S.C. § 550;

(c)      Avoid Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding loan as a fraudulent or otherwise voidable transfer under 11 U.S.C. §§ 544, 548, and the law of New York, New Jersey, and Delaware;

(d)      Require Defendants to relinquish to Plaintiffs the 15,658.21 Bitcoin, 2,228.01 Bitcoin, and 39,542.42 Bitcoin (subject to § 550(d) and without duplication) preferentially transferred by Plaintiffs to Defendants during the § 547(b) Period (plus any additional avoidable transfers that Plaintiffs learn, through discovery or otherwise, were made to Defendants during the § 547(b) Period), or, in the alternative, award Plaintiffs the present value of all Bitcoin (subject to § 550(d) and without duplication) preferentially transferred to Defendants during the § 547(b) Period;[7]

(e)      Require Defendants to relinquish to Plaintiffs the 39,542.42 Bitcoin (subject to § 550(d) and without duplication) fraudulently or otherwise voidably transferred by Plaintiffs to Defendants during the two-year period before filing of Celsius's bankruptcy petition (plus any additional avoidable transfers that Plaintiffs learn, through discovery or otherwise, were made to Defendants during the relevant period), or, in the alternative, award Plaintiffs the present value of all Bitcoin (subject to § 550(d) and without duplication) fraudulently or otherwise voidably transferred to Defendants during the two-year period;

(e)      Require Defendants to relinquish to Plaintiffs the 39,542.42 Bitcoin (subject to § 550(d) and without duplication) fraudulently or otherwise voidably transferred by Plaintiffs to Defendants during the two-year period before filing of Celsius's bankruptcy petition (plus any additional avoidable transfers that Plaintiffs learn, through discovery or

---

[7]   Plaintiffs do not waive, and expressly reserve, any and all arguments with respect to the proper valuation date of the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and Preferential Application Transfer and/or the form of recovery on any judgments.

otherwise, were made to Defendants during the relevant period), or, in the alternative, award Plaintiffs the present value of all Bitcoin (subject to § 550(d) and without duplication) fraudulently or otherwise voidably transferred to Defendants;

(f)     Award Plaintiffs no less than $100,000,000.00 in damages for Defendant Tether Limited's breaches of contract;

(g)     Award Plaintiffs no less than 39,542.42 Bitcoin plus $100,000,000.00 in damages for Defendant Tether Limited's breaches of its *Braganza* duty;

(h)     Award Plaintiffs no less than 39,542.42 Bitcoin plus $100,000,000.00 in damages for Defendant Tether Limited's breaches of its duties as an equitable mortgagee;

(i)     Award Plaintiffs their attorneys' fees, pre- and post-judgment interest, and costs; and

(j)     Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

DATED:  July 25, 2025

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**


By  _____/s/  Benjamin I. Finestone_____
Benjamin I. Finestone
Anil Makhijani
Mario O. Gazzola
Arman Cuneo
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000
benjaminfinestone@quinnemanuel.com
anilmakhjiani@quinnemanuel.com
mariogazzola@quinnemanuel.com
armancuneo@quinnemanuel.com

-and-

Matthew Scheck
300 West 6th St., Suite 200
Austin, TX 78701
Telephone:  (737) 667-6102
matthewscheck@quinnemanuel.com

*Counsel to Blockchain Recovery Investment Consortium, LLC, Litigation Administrator and Complex Asset Recovery Manager, as Representative for the Post-Effective Date Celsius Debtors*