HERBERT SMITH FREEHILLS
KRAMER (US) LLP
Daniel M. Eggermann
David E. Blabey, Jr.
Jason M. Moff
Gabriel Eisenberger
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

HERBERT SMITH FREEHILLS
KRAMER (US)  LLP
Ariel N. Lavinbuk
Brandon L. Arnold
Jack A. Herman
2000 K Street NW, 4th Floor
Washington, DC  20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>(Jointly Administered) |
| CELSIUS NETWORK LIMITED and<br>CELSIUS NETWORK LLC (POST-EFFECTIVE<br>DATE DEBTORS),<br><br>                    Plaintiffs,<br><br>     against<br><br>TETHER LIMITED;<br>TETHER HOLDINGS LIMITED;<br>TETHER INTERNATIONAL LIMITED; and<br>TETHER OPERATIONS LIMITED,<br><br>                    Defendants. | Adv. Proc. No. 24-04018 (MG) |

## DEFENDANTS' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

---

[1] The reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Defendants Tether Limited ("TLTD"), Tether Holdings Limited ("THL"), Tether

International Limited ("TIL"), and Tether Operations Limited ("TOL"), by its attorneys, Herbert

Smith Freehills Kramer (US) LLP, for their Answer to the Second Amended Complaint, dated July

25, 2025 (Dkt. 56), of Plaintiffs Celsius Network Limited ("CNL") and Celsius Network LLC

("CNLLC"), state, and respond to each of the allegations in the Second Amended Complaint, as

follows:

Opening Paragraph.  Plaintiffs Celsius Network Limited and Celsius Network LLC (the Post-Effective Date Debtors) ("Post-Effective Date Debtors" or "Celsius" or "Plaintiffs" or "Debtors") bring this Second Amended Complaint against Tether Limited, Tether Holdings Limited, Tether International Limited, and Tether Operations Limited ("Tether" or "Defendants"), and allege the following based on reasonable due diligence of the Debtors' books and records, on personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

**RESPONSE**: This unnumbered opening paragraph states a legal conclusion to which no

response is required; to the extent that this paragraph can be construed to contain factual

allegations, Defendants deny them, except that Defendants deny knowledge or information

sufficient to form a belief as to the truth of the allegations regarding Plaintiffs' purported due

diligence.

## NATURE OF THE CASE*

1.      Plaintiffs bring this case to avoid and recover preferential and fraudulent transfers of 39,542.42 Bitcoin[2] from Celsius to Tether, first intended to secure, and subsequently applied on account of, antecedent debt Celsius owed to Tether. These transfers undoubtedly improved Tether's position, occurring at a time when Debtors were tumbling towards bankruptcy and the price of Bitcoin (and the value of Tether's pre-existing collateral) was collapsing violently. Indeed,

---

* The section headers reproduced from the Second Amended Complaint are for organizational purposes only.  To the extent any such heading or subheading is construed as a factual allegation, Defendants deny each such allegation.  All other footnotes in this Answer have been reproduced from the Second Amended Complaint.

[2] Capitalized terms not immediately defined have the meanings ascribed to them below. ECF document numbers in this Complaint refer to ECF document numbers from Case No. 22-10964-mg.

unlike so many other creditors who did not seek to dismember the Debtors during their slide into bankruptcy, as a result of these preferential transfers of Bitcoin, Tether insulated itself from the effect of Celsius's bankruptcy. Tether's efforts, of course, are now subject to intervening federal bankruptcy law. Thus, these preferential and fraudulent transfers of Bitcoin should be avoided, and the Bitcoin or its value should be recovered for the benefit of Celsius's estate. This action also seeks to recover damages caused by Tether's below-market application of such Bitcoin on that same debt, in violation of the terms of the governing agreement.

**RESPONSE**:  The characterizations of the transfers in the first sentence of paragraph 1 is a legal conclusion to which no response is required; to the extent that the characterizations can be construed to contain factual allegations, Defendants deny them and refer to the publicly available Bitcoin blockchain for a record of bitcoin transfers between CNL and TLTD.  Deny knowledge or information sufficient to form a belief as to the truth of the other allegations in the first sentence of paragraph 1.  Deny the allegations in the second and third sentences of paragraph 1, except admit that Plaintiffs filed for bankruptcy on July 13, 2022, and deny knowledge or information sufficient to form a belief as to the truth the allegation concerning when Plaintiffs were "tumbling towards" or "sliding into" bankruptcy.  The fourth and fifth sentences of paragraph 1 contain legal conclusions to which no response is required; to the extent these sentences can be construed to contain factual allegations, Defendants deny them.  The sixth sentence of paragraph 1 contains characterizations of this action and the relief that Plaintiffs seek to which no response is required; to the extent that this sentence can be construed to contain factual allegations, Defendants deny them.  The footnote referenced in paragraph 1 provides characterizations of the Second Amended Complaint to which no response is required.

2.    In 2020, Plaintiff Celsius Network Limited entered into a loan agreement (the "Token Agreement") with Tether Limited, allowing Celsius to borrow stablecoins, Tether token ("USDT") and Euro Tether ("EURT"), from Tether Limited at an interest rate between 0.333-0.55% per month. Like many of its peer cryptocurrency companies, Celsius relied in large part on "stablecoins" to operate certain critical aspects of its business. "Stablecoins" are digital currencies whose prices are pegged to those of other assets (such as the dollar). Stablecoins are typically backed by reserves of *non*-digital assets, like cash or marketable securities, to ensure price stability.

The world's most popular stablecoin, USDT, has its price pegged to the United States dollar. USDT was created by Tether in 2014, and has been marketed and controlled by them since then.

**RESPONSE**:  Deny the allegations in the first sentence of paragraph 2, except admit that CNL and TLTD entered into the February 1, 2020, Token Agreement (the "Token Agreement") and the January 20, 2022, Amended Token Agreement (the "Amended Token Agreement"), and refer to those agreements for their terms.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 2.  Deny the allegations in the third through sixth sentences of paragraph 2, except admit that in 2014 TLTD created USDT, which is a stablecoin pegged to the price of the United States dollar and backed by reserve assets to offer price stability.

3.     To provide security for the loan, Celsius posted collateral in one of several cryptocurrencies (*e.g.*, Bitcoin, Ethereum). At the peak of its borrowing, Celsius would borrow nearly $2 billion in USDT from Tether, collateralized by tens of thousands of Bitcoin.

**RESPONSE**:  Deny the allegations in paragraph 3, except admit that TLTD provided USDT to CNL under the Token Agreement and the Amended Token Agreement and CNL provided collateral to secure its USDT obligations to TLTD, and refer to the publicly available blockchains for a record of transactions between CNL and TLTD.

4.     The cryptocurrency market steeply declined in the summer of 2022, and the Debtors filed the above-captioned chapter 11 cases on July 13, 2022. The Debtors' bankruptcy filing was harmful to many of its creditors. But, during the ninety-day period prior to the bankruptcy filing (the "§ 547(b) Period"), Tether took steps to insulate itself from the effect of bankruptcy. Specifically, on several occasions, Tether demanded, and received, a significant amount of new, incremental collateral to improve its position in the impending bankruptcy. That is, Plaintiffs transferred 15,658.21 Bitcoin to Defendants to satisfy these demands, each inherently on account of antecedent debt (defined below as the Preferential Top-Up Transfers).

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of paragraph 4, except admit that Plaintiffs filed for Chapter 11 bankruptcy on July 13, 2022.  Deny the allegations in the third, fourth, and fifth

sentences of paragraph 4, and refer to the publicly available Bitcoin blockchain for a record of

transactions between CNL and TLTD between April 14, 2022, and July 13, 2022.


5.      In addition to the Preferential Top-Up Transfers, also during the § 547(b) Period,
Plaintiffs transferred 2,228.01 Bitcoin of excess collateral to Defendants in connection with
$300,000,000 of new borrowings. These transfers cross-collateralized Celsius's existing
borrowings from Tether (defined below as the Preferential Cross-Collateralization Transfers). In
total, these preferential transfers of Bitcoin are worth in excess of $1.8 billion at current prices,
and are separate from and do not include over 7,000 additional Bitcoin transferred to Tether in
connection with new advances of USDT and EURT to Celsius. Nor do they include 36,684,477.42
EURT and 18,556,675.01 USDT of interest and principal payments made by Celsius to Tether
during the ninety-day period prior to Celsius's bankruptcy filing.

**RESPONSE**:  Deny the allegations in paragraph 5, except admit that CNL transferred

bitcoin to TLTD in connection with CNL's borrowing of additional USDT pursuant to the

Amended Token Agreement, and refer to the publicly available blockchains for a record of those

and other transactions between CNL and TLTD between April 14, 2022, and July 13, 2022.


6.      Tether issued its final demand to Celsius for additional collateral on June 13, 2022.
Pursuant to the terms of the Token Agreement between Celsius and Tether, Celsius was entitled
to ten hours to deposit additional collateral with Tether to fulfill that demand. But rather than
affording Celsius the contractually permitted time to post new collateral (or, at worst, allow for a
more orderly disposition of collateral), on that same day, Tether forged ahead with an improper
application of 39,542.42 Bitcoin—the entirety of the collateral that Celsius had posted—using the
pledged Bitcoin to cover its exposure in full, but destroying Celsius's residual interest in the
collateral. This final preferential transfer (as defined below, the "Preferential Application
Transfer"), worth in excess of $4 billion in today's dollars, also improved Tether's position
because a substantial portion of the putative collateral was avoidable, and comprised of the
Preferential Top-Up Transfers, which were commingled with the entirety of the posted Bitcoin.

**RESPONSE**:  Deny the allegations in paragraph 6, and refer to the Token Agreement and

Amended Token Agreement for the terms of those agreements between CNL and TLTD, and refer

to the publicly available Bitcoin blockchain for a record of transactions between CNL and TLTD.


7.      To make matters worse, Tether facilitated this preferential transfer by making false
representations to Celsius. Tether told Celsius that it had sold the collateral in a series of legitimate,
arm's-length, open-market transactions. In fact, and contrary to what it told Celsius, Tether simply

transferred Celsius's Bitcoin to Bitfinex accounts that it owned and controlled, presumably fabricating the prices at which it "sold" Celsius's Bitcoin.

**RESPONSE**:  Deny the allegations in paragraph 7.

8.      Tether then doubled down on those false representations. It was not enough for Tether to make itself whole through a massive preferential transfer—as would be sufficient for most recipients of preferential transfers on the eve of bankruptcy. Tether also sought to retain for itself the upside of prospective Bitcoin appreciation. In fact, notwithstanding Tether's express representations to the contrary, Tether stealthily retained the *entirety* of Celsius's Bitcoin in undisclosed Bitfinex wallets, with at least 32,542.42 of Celsius's Bitcoin being kept for more than nine months. Over that nine-month period alone, Celsius's Bitcoin increased in value substantially. Afterwards, Tether transferred the Bitcoin to other crypto wallets commonly known to be associated with Bitfinex to support the continued operations of Tether's affiliated exchange. Thus, Tether reaped the benefits of post-transfer appreciation as a result of its receipt of preferential and fraudulent transfers of Celsius's property, its sham "liquidation," and its secret retention of collateral. In order to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred, Celsius's bankruptcy estate is entitled to an in-kind return of the Preferential Application Transfer.

**RESPONSE**:  Deny the allegations in the first six sentences of paragraph 8, except admit that the market price of bitcoin was higher on March 13, 2023, than on June 13, 2022.  The last sentence of paragraph 8 is a legal conclusion to which no response is required; to the extent that sentence can be construed to contain factual allegations, Defendants deny them.

9.      Tether applied Celsius's property (39,542.42 Bitcoin) to pay itself back for Celsius's outstanding loan, doing so for less than reasonably equivalent value at a time when Celsius was insolvent. As such, this application of collateral was a fraudulent transfer and should be avoided under the Bankruptcy Code and applicable state law.

**RESPONSE**:  Deny the allegations in the first sentence of paragraph 9.  The second sentence of paragraph 9 states legal conclusions to which no response is required; to the extent that this sentence can be construed to contain factual allegations, Defendants deny them.

10.     The Preferential Application Transfer also plainly breached the Token Agreement by forcing Celsius to act before it was required to do so and robbing it of any opportunity to take preventative measures on its own, and its effect was to purportedly dispose of Celsius's property (being held by Tether as collateral) at near the bottom of the Bitcoin market. This breach of contract caused billions of dollars in damages to Celsius, as described below.

**RESPONSE**:  Paragraph 10 states legal conclusions to which no response is required; to the extent that this paragraph can be construed to contain factual allegations, Defendants deny them.

11.    These preferential and fraudulent transfers of Bitcoin should be avoided and recovered from Tether, and Tether should be ordered to pay damages for its unlawful application of collateral.

**RESPONSE**:  Paragraph 11 states a legal conclusion to which no response is required; to the extent that this paragraph can be construed to contain factual allegations, Defendants deny them.

## THE PARTIES

12.    Plaintiff Celsius Network Limited is a private limited company incorporated under the laws of England and Wales with a principal place of business in London, United Kingdom.

**RESPONSE**:  Admitted.  *See City of New York v. Fleet General Ins. Gp.*, 2024 WL 3517856, at *1 (2d Cir. 2024) ("[W]hen a party clearly and deliberately admits to having its principal place of business at a particular . . . specific . . . address, within a given state, the factual components of such a statement in appropriate circumstances are binding on that party throughout the litigation.").

13.    Plaintiff Celsius Network LLC is a Delaware limited liability company with a principal place of business in Hoboken, New Jersey.

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13.

14.    Defendant Tether Holdings Limited is incorporated in, and is a citizen of, the British Virgin Islands. It owns Defendants Tether Limited, Tether Operations Limited, and Tether International Limited.

**RESPONSE**:  Deny, except admit that THL was previously incorporated in, and was a citizen of, the British Virgin Islands but has since been continued to El Salvador as Tether Holdings, S.A. de C.V.  Admit that TLTD, TOL, and TIL are THL's subsidiaries.

15.    Defendant Tether Limited is incorporated in, and is a citizen of, Hong Kong.

**RESPONSE**:  Admitted.

16.    Defendant Tether Operations Limited is incorporated in, and is a citizen of, the British Virgin Islands.

**RESPONSE**:  Deny, except admit that TOL was previously incorporated in, and was a citizen of, the British Virgin Islands but has since been continued to El Salvador as Tether Operations, S.A. de C.V.

17.    Defendant Tether International Limited is incorporated in, and is a citizen of, the British Virgin Islands.

**RESPONSE**:  Deny, except admit that TIL was previously incorporated in, and was a citizen of, the British Virgin Islands but has since been continued to El Salvador as Tether International, S.A. de C.V.

18.    The Tether entities acted in concert in carrying out the wrongdoing alleged herein, and each participated in carrying out a scheme described to extract value from Celsius's estate through their preferential and fraudulent transfers, breaches of contract, and improper retention of collateral.

**RESPONSE**:  Paragraph 18 states legal conclusions to which no response is required; to the extent that this paragraph can be construed to contain factual allegations, Defendants deny them.

## JURISDICTION AND VENUE

19.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) and the Standing Order of the United States District Court for the Southern District of New York referring

to the Bankruptcy Judges of this District all cases and proceedings arising under the Bankruptcy Code. This court also has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' preference and fraudulent transfer claims arise under federal law, and has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state and foreign law claims, which arise out of the same nucleus of operative facts.

**RESPONSE**:  Paragraph 19 states legal conclusions to which no response is required; to the extent that this paragraph can be construed to contain factual allegations, Defendants deny them.

20.    This adversary proceeding is a "core" proceeding as defined in 28 U.S.C. § 157(b)(2). In the event that this or any other Court finds any part of this adversary proceeding to be "non-core," Plaintiffs consent to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

**RESPONSE**:  Paragraph 20 states legal conclusions to which no response is required; to the extent that this paragraph can be construed to contain factual allegations, Defendants deny them, except that Defendants deny knowledge or information sufficient to form a belief as to the truth of such allegations concerning Plaintiffs' "consent."

21.    Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and relates to the above-captioned chapter 11 cases under the Bankruptcy Code already pending in this District. Venue is additionally proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**RESPONSE**:  Paragraph 21 states legal conclusions to which no response is required; to the extent that this paragraph can be construed to contain factual allegations, Defendants deny them.

22.    This Court's *Findings of Fact, Conclusions of Law, and Order Confirming The Modified Joint Chapter 11 Plan of Celsius Network LLC and Its Debtor Affiliates* (the "Confirmation Order"), ECF Doc. No. 3972, in the above-captioned chapter 11 cases, approves the Debtors' chapter 11 plan, which, at Article XII (12), provides that this Court "shall retain exclusive jurisdiction" to "resolve any cases, controversies, suits, disputes, Causes of Action, or

9

other matters," like this one, "that may arise in connection with the Recovery Causes of Action brought by the Litigation Administrator."[3]

**RESPONSE**:  Paragraph 22 states a legal conclusion to which no response is required, except Defendants admit that the Court entered the Confirmation Order approving the Debtors' Plan and refer to the Confirmation Order and the Plan for their complete contents.  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the footnote referenced in paragraph 22 of the Second Amended Complaint.

23.   The Court has personal jurisdiction over Defendants pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure because Plaintiffs' claims arise from and relate to Defendants' continuous and systematic contacts with the United States. Each Defendant transacted business in and maintained substantial contacts with the United States, including by maintaining relationships with United States entities. Each Defendant has purposefully availed itself of the privilege of doing business in the United States, and has invoked the benefits and protections of its laws. Defendants' actions were directed at, and had the intended effect of, causing injury to persons located in the United States, including in this District. Indeed, Defendants have repeatedly submitted to the jurisdiction of courts in this District.

**RESPONSE**:  Paragraph 23 states legal conclusions to which no response is required; to the extent that this paragraph can be construed to contain factual allegations, Defendants deny them.

24.   The Court also has quasi in-rem jurisdiction because of Defendants' maintenance of one or more bank accounts in New York.

**RESPONSE**:  Paragraph 24 states a legal conclusion to which no response is required; moreover, this paragraph requires no response because Plaintiffs have abandoned the allegations set forth in the paragraph. (*See* Memorandum Opinion and Order Granting in Part and Denying in Part the Defendants' Motion to Dismiss ("Order") at 26 n.8, Dkt. 52.)

---

[3] In prosecuting this action, the Debtors are directed by the Blockchain Recovery Investment Consortium ("BRIC"), serving as Litigation Administrator (Complex Asset Recovery Manager). See ECF Doc. No. 4172

## FACTUAL BACKGROUND

### A.    Plaintiffs' Business And Reliance On Loans From Tether To Operate

25.    Celsius was a consumer-facing cryptocurrency company that was founded in 2017 by Alex Mashinsky, Shlomi "Daniel" Leon, and Nuke Goldstein. Celsius's primary product was a platform that allowed customers to purchase and deposit various cryptocurrencies. Like a traditional bank, Celsius paid interest to customers who deposited cryptocurrency on its platform. Celsius was known to pay some of the highest interest rates in the market to its depositors.

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 25.


26.    In order to generate revenue, Celsius lent its customer-deposited cryptocurrencies to third parties, who in turn would pay Celsius interest. Celsius used revenue from those loans to pay its customers interest on their deposits. Celsius also operated a Bitcoin mining operation.

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 26.


27.    Like many other crypto companies, Celsius borrowed "stablecoins" to fund its day-to-day operations. "Stablecoins" are digital tokens whose price is pegged to another asset (e.g., the United States dollar or gold) and are typically backed by reserves of non-digital assets (such as cash or marketable securities) to achieve price stability.

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 27, except admit that stablecoins are a form of digital token that peg

their price to a fiat currency or other asset.


28.    Defendants control and market the world's most popular stablecoin, USDT. Each USDT token is purportedly backed by assets (such as cash and commercial paper) such that one USDT is worth one United States dollar. Defendants also control and market the EURT token, which is purportedly backed by assets such that one EURT is worth one Euro. Celsius relied on USDT and EURT to operate critical parts of its business.

**RESPONSE**:  Deny the allegations in the first, second, and third sentences of paragraph

28, except admit that USDT tokens are stablecoins pegged to the value of the United States dollar

and backed by assets, and admit that EURT tokens are stablecoins pegged to the value of the Euro

and backed by assets.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of paragraph 28.

### B.     The Celsius-Tether Relationship And The Token Agreement

29.     Since Celsius's founding, Tether has been one of its most trusted business partners. When Celsius was founded in 2017, Tether was already a major player in the cryptocurrency market, with billons of USDT tokens in circulation. When Celsius raised its Series A investment round in the summer of 2022, Tether was Celsius's lead investor for the round, investing $10 million in the fast growing crypto exchange. When Celsius's Series A investment was publicly announced, Mashinsky stated: "The crypto community has only a few great projects and we are excited by the investment from Tether International as it will help us deliver USD-based services to all our users . . . We are proud to add Tether International as the first institution to participate in our equity fundraising." The parties' relationship was premised on a basic bargain: Tether would provide Celsius with the funding and connections it would need to grow in the fiercely competitive cryptocurrency industry; in exchange, Celsius would provide Tether with access to the most valuable cryptocurrency market in the world—the United States.

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to truth of the allegations in the first sentence of paragraph 29, except admit that TLTD and CNL entered into certain agreements with one another, including the Token Agreement and the Amended Token Agreement.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 29.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the third and fourth sentences of paragraph 29, except admit that TIL invested $10 million in CNL's Series A investment round.  Deny the allegations in the fifth sentence of paragraph 29.

30.     Celsius and Tether quickly began putting this bargain into practice. Less than a month after the close of Celsius's Series A, Tether sought to collect on its side of the deal, and began planning to use Celsius to exploit the United States cryptocurrency market. As early as July 4, 2020, Tether's CFO (and controller) Giancarlo Devasini, and its Chief Investment Officer, Silvano Di Stefano, told Alex Mashinsky that Tether "want[s] [Celsius] to service all their US clients." Just two days later, Mashinsky was planning for Di Stefano to "intro[duce] [Celsius] to his top 5 US customers," and for "Bitfinex to provide [a] buy/sell order book to allow US clients to trade."

**RESPONSE**:  Deny the allegations in paragraph 30, and refer to the referenced email (which Tether personnel neither sent nor received) for its complete contents.  *See* Dkt. 42-1, Ex. A (Email dated Jul. 4, 2020 from A. Mashinsky) and Ex. B (Email dated Jul. 6, 2020 from A. Mashinsky to C. Churcher).

31.    A lending relationship was soon formed between Celsius and Tether to pursue their joint objectives. Through Celsius, Tether could provide access to its cryptocurrency token, USDT, (and later Tether Gold (XAUt) and EURT) to Celsius and Tether's customers in the United States. Through Tether, Celsius would receive the liquidity it needed to operate its business in the United States, providing its own customers' BTC as collateral for that liquidity. Both parties recognized the centrality of their lending arrangement to their broader purpose of exploiting the United States market. For example, as Tether coordinated with Celsius to make introductions to Tether's U.S. clients, it simultaneously told Celsius that it was taking steps to "lower borrow rates for USDT so [Celsius] can push it harder" to those same U.S. clients.

**RESPONSE**:  Deny the allegations in the first and second sentences of paragraph 31, except admit that CNL and TLTD entered into the Token Agreement and the Amended Token Agreement, and refer to those agreements for their terms.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 31. Deny the allegations in the fourth sentence of paragraph 31, except deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning CNL's "broader purpose" for entering the Token Agreement and the Amended Token Agreement.  Deny the allegations in the fifth sentence of paragraph 31, and refer to the referenced email (which Tether personnel neither sent nor received) for its complete contents.  *See* Dkt. 42-1, Ex. B (Email dated Jul. 6, 2020 from A. Mashinsky to C. Churcher).

32.    Celsius and Tether's lending arrangement was formalized in a series of contracts. The first was a "Token Agreement" entered between Plaintiff Celsius Network Limited and Defendant Tether Limited on February 1, 2020, (the "Initial Token Agreement"). That agreement allowed Celsius to borrow USDT from Tether. Celsius agreed to collateralize the borrowing by posting collateral to Tether in any of the following cryptocurrencies: (1) Bitcoin (BTC) tokens; (2) Ether (ETH) tokens; or (3) Tether Gold (XAUt). If Celsius posted collateral to Tether in Bitcoin, the value of the Bitcoin was initially required to be 140% of the value of the amount borrowed.

Celsius paid Tether interest between 0.333% and 0.55%, per month, depending on the type of collateral posted by Celsius. For example, if Celsius posted collateral in Bitcoin, it would have to pay Tether monthly interest of 0.55% on its borrowings.

**RESPONSE**:  Deny the allegations in paragraph 32, except admit that CNL and TLTD entered into the Initial Token Agreement as of February 1, 2020, and refer to that agreement for its terms.

33.    Significantly, the Initial Token Agreement provided that no change or modification to the agreement would be valid unless made in writing and signed by the Parties—Celsius Network Limited and Tether Limited.

**RESPONSE**:  Deny the allegations in paragraph 33, except admit that CNL and TLTD were the parties to the Initial Token Agreement, and refer to that agreement for its terms.

34.    Throughout the parties' relationship under the Token Agreement and Amended Token Agreement, Celsius's top decision-makers have been based in, and its central functions have been controlled from, the United States. That fact was well-known to Tether when the Amended Token Agreement was negotiated—for example, Tether and its outside counsel told Celsius in November of 2020 that they "know [Celsius] [is] mostly a US-based company."

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to the allegations in the first sentence of paragraph 34.  Deny the allegations in the second sentence of paragraph 34, and refer to the referenced November 2020 communication for its complete contents.

35.    In its early days Celsius maintained a presence in the United Kingdom, and attempted to gain approval to operate freely there. That changed in 2021, when the UK's Financial Conduct Authority sought to impose new regulatory requirements on cryptocurrency firms like Celsius. Accordingly, in June of 2021, Celsius announced (and specifically informed Tether) that it was "migrating [its] main business activity and headquarters from the [UK] to the United States ...." This included migrating customer relationships from the United Kingdom to United States.

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to the allegations in paragraph 35, except admit that CNL was a UK entity with a presence in the UK. Deny knowledge or information sufficient to form a belief as to the allegations in the second

sentence of paragraph 35. Deny the allegations in the third sentence of paragraph 35, and refer to

the referenced blog post for its full contents. Deny knowledge or information sufficient to form a

belief as to the allegations in the fourth sentence of paragraph 35.

36.     Around the same time, the parties began renegotiating their lending arrangement. The parties' business together had grown, and the Initial Token Agreement was no longer adequate to the task of regulating it. Those negotiations continued throughout late 2021, and eventually resulted in an amendment to the Initial Token Agreement on January 20, 2022 (as amended, the "Token Agreement" or the "Amended Token Agreement"). The Amended Token Agreement is attached as Exhibit A.

**RESPONSE**:  Deny the allegations in paragraph 36, except admit that CNL and TLTD

entered into the Token Agreement and the Amended Token Agreement, and refer to those

agreements for their terms.

37.     Like the Initial Token Agreement, Tether—fully knowing that Celsius was a United States-based company with its key executives working out of the United States—projected itself into the United States to negotiate, execute, and perform the Amended Token Agreement. Many of the principal terms of the Amended Token Agreement, for example, were agreed to during an all-hands call in December of 2021, just a few weeks before the amendment was signed. United States-based Celsius employees—such as Alex Mashinsky, Ron Deutsch, and Joseph Golding-Ochsner—were present at that meeting and negotiated with Tether's top executives, including Giancarlo Devasini and Silvano Di Stefano. Celsius's lead throughout the negotiations was Joseph Golding-Ochsner, a Celsius attorney based in the United States.

**RESPONSE**:  Deny the allegations in paragraph 37.

38.     The negotiations surrounding the Amended Token Agreement centered on several key terms. Among the most important issues discussed during the negotiations was the contract's provision regarding the timeframe that Tether had to wait before it could start liquidating Celsius's collateral following a demand for additional collateral. Tether wanted to maintain the terms of the original agreement, which Tether believed allowed it to commence liquidation immediately after the value of collateral dropped below a certain threshold. Celsius proposed that it be allowed two business days to deposit additional collateral after receiving a demand for additional collateral before Tether would have any right to liquidate collateral.

**RESPONSE**:  Deny the allegations in paragraph 38.

39.    Ultimately, the parties agreed to change the procedure by which Celsius would post additional collateral and the circumstances under which a liquidation could happen. Unlike the Initial Token Agreement, the Amended Token Agreement required Tether to send notice of a collateral demand to Celsius if the value of Celsius's posted collateral dropped below a specified threshold. After receiving such a notice, the Amended Token Agreement provided Celsius ten hours to satisfy the collateral demand. This is in contrast to the Initial Token Agreement, under which Tether was entitled, "*without further notice to the Recipient*, to sell, dispose of, and liquidate the Collateral." Now, if Celsius was unable to satisfy the collateral demand in that 10-hour window, only then was Tether permitted to "sell, dispose of, and liquidate the Collateral." Celsius specifically negotiated for this 10-hour window, and regarded it as one of the "key changes in the amendment." This provision was important for the stability of Celsius's business and to protect Celsius's residual interest in its collateral, as discussed below.

**RESPONSE**:  Deny the allegations in the first five sentences of paragraph 39, except admit that CNL and TLTD entered into the Token Agreement and the Amended Token Agreement, and refer to those agreements for their terms.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the last two sentences of paragraph 39.

40.    The parties also extensively negotiated how Tether would deal with excess proceeds from Celsius's collateral in the event of a liquidation. Celsius wanted excess proceeds returned, and Tether wanted to keep the windfall for itself. This remained an open point through much of the negotiation of the Amended Token Agreement, and was only settled a few weeks later, following a meeting on or about January 12, 2022, between Mashinsky and Di Stefano. Mashinsky was in Hoboken, New Jersey when this critical open item in the negotiation was finally resolved in Celsius' favor.

**RESPONSE**:  Deny the allegations in the first sentence of paragraph 40, and refer to the Token Agreement and the Amended Token Agreement for the terms of those agreements between CNL and TLTD.  Deny the allegations in the second sentence of paragraph 40, except deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning what "Celsius wanted" in connection with the referenced agreements.  Deny the allegations in the third sentence of paragraph 40.  Deny the allegations in the third and fourth sentences of paragraph 40, except deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning Mr. Mashinsky's whereabouts on or about January 12, 2022.

41.     The Amended Token Agreement was the centerpiece of the parties' broader relationship. Both Celsius and Tether understood that it would form the basis of a long-term collaborative relationship that would allow both parties to profit from Celsius supplying USDT (and later other Tether products such as XAUt (Tether Gold) and EURT (Tether Euro)) on behalf of Tether.

**RESPONSE**:  Deny the allegations in paragraph 41, except deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning what "Celsius understood."

42.     Like its predecessor, the Amended Token Agreement authorized Celsius to borrow USDT or EURT if Celsius posted collateral in the form of Bitcoin, Ether, or, Tether Gold. Importantly, the Amended Token Agreement expressly provides for and protects Celsius's residual interest in collateral. It also clarifies that collateral pledged to secure loans under the agreement was to be held "for the benefit of" Celsius. Moreover, the Amended Token Agreement expressly provides that, any "surplus" from an application of the collateral was to be returned to Celsius.

**RESPONSE**:  Deny the allegations in paragraph 42, except admit that CNL and TLTD entered into the Token Agreement and the Amended Token Agreement, and refer to those agreements for their terms.

43.     Both the Initial and Amended Token Agreements were signed on behalf of Celsius Network Limited by employees based in the United States—the Initial Token Agreement by Harumi Urata-Thompson, Celsius's CFO at the time, and the Amended Token Agreement by Alexander Mashinsky and S. Daniel Leon, both directors of Celsius. Celsius Network Limited was nominally an English company. But Tether knew that its real counterparties under the Agreement were based in the United States. Celsius even told Tether that the Tether account created for Celsius Network Limited was associated with a bank account at Signature Bank in New York.

**RESPONSE**:  Deny the allegations in paragraph 43, except admit that the Initial Token Agreement was signed by Harumi Urata-Thompson and the Amended Token Agreement was signed by Alexander Mashinsky and Shlomi Daniel Leon, and refer to the Token Agreement and the Amended Token Agreement for the terms of those agreements between CNL and TLTD.

44.     Moreover, as discussed, the fundamental purpose of the Amended Token Agreement was to allow Tether to avail itself of the United States market. Tether knew that the USDT it nominally transferred to Celsius Network Limited would go to support Celsius's

operations in the United States, that the USDT would ultimately benefit United States persons and entities, including Celsius Network LLC and Celsius Network Inc. Most importantly, Tether knew that this close relationship with Celsius (including its anchor equity investment and lending relationship) would allow it to profit handsomely by supplying USDT (and later XAUt (Tether Gold) and EURT (Tether Euro)) to the U.S. market.

**RESPONSE**:  Deny the allegations in paragraph 44.

45.     As stated above, Celsius borrowed USDT under the Amended Token Agreement. Celsius posted collateral for those loans in the form of Bitcoin or Ethereum. By the start of April of 2022, Celsius had $512,330,000 in outstanding borrowings in USDT pursuant to the Amended Token Agreement.[4] And as of the start of April 2022, Celsius had posted 16,505.17 Bitcoin to Tether as collateral to secure the 512,330,000 USDT in outstanding borrowing. Transactions under the Amended Token Agreement were at times initiated and executed by Celsius employees based in the United States, and transfers under the agreement were often made from United States-based accounts. In performing under the Amended Token Agreement, Defendants had continuous and systematic contact with Celsius's United States-based personnel. As an example, in performing under the Amended Token Agreement—and to execute on the parties' broader vision to allow Tether to get broader access to United States markets through Celsius—beginning in 2020, Tether met on a monthly basis with Celsius's United States-based representatives. In those meetings, the parties would discuss many aspects of their business relationship, including the Amended Token Agreement.

**RESPONSE**:   Deny the allegations in paragraph 45 and the footnote referenced in

paragraph 45, except admit that, as of April 1, 2022, CNL had 512,330,000 USDT in outstanding

principal obligations under the Amended Token Agreement.

### C.     The Preferential Top-Up And Cross-Collateralization Transfers

46.     The § 547(b) Period in this case began on April 14, 2022. As of that date, Celsius had a balance of 512,330,000 USDT on its loan with Tether. That USDT loan was collateralized by approximately 16,505.17 Bitcoin.

**RESPONSE**:  The first sentence of paragraph 46 states a legal conclusion to which no

response is required.  Defendants admit the allegations in the second and third sentences of

paragraph 46.

---

[4] Celsius also borrowed a small amount of EURT from Tether. Those loans are not a subject of this Complaint.

47.    Beginning at around the same time—April 2022—Bitcoin's price began a violent downward slide. The price of Bitcoin continued to fall through early July 2022, around the time Debtors filed their voluntary Chapter 11 petitions.

**RESPONSE**:  Deny the allegations in paragraph 47, except admit that the market price of bitcoin was lower on July 13, 2022 than it was on April 14, 2022 and that the Debtors filed Chapter 11 bankruptcy petitions on July 13, 2022.

48.    As Bitcoin's price started to fall, Tether became concerned that it, like all other creditors, would be exposed to Celsius's insolvency. In response, Tether initiated a series of demands under the Amended Token Agreement to improve its security on the antecedent debt owed to it by Celsius. Tether directed these demands to Celsius employees located in the United States. In each case, Celsius responded to these demands by promptly depositing additional collateral with Tether. Celsius made the following Bitcoin transfers to Tether—each on account of antecedent debt—during the § 547(b) Period:

**RESPONSE**:  Deny the allegations in paragraph 48, except admit that TLTD made margin calls to CNL pursuant to the terms of the Amended Token Agreement between TLTD and CNL, and further admit that CNL posted additional collateral at certain times.

49.    On or about May 3, 2022, Celsius transferred approximately 1,633.35 Bitcoin to Tether.

**RESPONSE**:  Deny the allegations in paragraph 49, except admit that, on or about May 3, 2022, CNL transferred 1,633.35 bitcoin to TLTD.

50.    On or about May 7, 2022, Celsius transferred approximately 2,044.00 Bitcoin to Tether.

**RESPONSE**:  Deny the allegations in paragraph 50, except admit that, on or about May 7, 2022, CNL transferred 2,044.00 bitcoin to TLTD.

51.    On or about May 9, 2022, Celsius transferred approximately 2,214.00 Bitcoin to Tether.

**RESPONSE**:  Deny the allegations in paragraph 51, except admit that, on or about May 9, 2022, CNL transferred 2,214 bitcoin to TLTD.

52.     On or about May 11, 2022, Celsius transferred approximately 2,398.29 Bitcoin to Tether.

**RESPONSE**:  Deny the allegations in paragraph 52, except admit that, on or about May 11, 2022, CNL transferred 2,398.29 bitcoin to TLTD.

53.     On or about May 12, 2022, Celsius transferred approximately 2,598.15 Bitcoin to Tether.

**RESPONSE**:  Deny the allegations in paragraph 52, except admit that, on or about May 12, 2022, CNL transferred 2,598.15 bitcoin to TLTD.

54.     On or about June 10, 2022, Celsius transferred approximately 2,807.75 Bitcoin to Tether.

**RESPONSE**:  Deny the allegations in paragraph 54, except admit that, on or about June 10, 2022, CNL transferred 2,807.75 bitcoin to TLTD.

55.     On or about June 12, 2022, Celsius transferred approximately 3,041.73 Bitcoin to Tether.

**RESPONSE**:  Deny the allegations in paragraph 55, except admit that, on or about June 13, 2022, CNL transferred 3,041.73 bitcoin to TLTD.

56.     In sum, Celsius transferred approximately 16,737.27 Bitcoin to Tether during the § 547(b) Period on account of antecedent debt. This 16,737.27 Bitcoin—less approximately 1,079.06 Bitcoin released to Celsius on June 6, 2022, for which Celsius did not make an otherwise unavoidable transfer to or for the benefit of Tether—are avoidable as preferences (the "Preferential Top-Up Transfers"). The Bitcoin transferred from Celsius to Tether pursuant to the Preferential Top-Up Transfers was not held in segregated wallets or accounts. To the contrary, this Bitcoin was commingled with the Bitcoin that Celsius had already transferred to Tether prior to the § 547(b) Period. These transfers were not made in connection with contemporaneous extensions of USDT loans to Celsius.

**RESPONSE**:  Deny the allegations in the first sentence of paragraph 56, except admit that the transfers from CNL to TLTD identified in paragraphs 49 to 55 totaled 16,737.27 bitcoin.  Deny the allegation in the first clause of the second sentence of paragraph 56, and refer to the publicly

available blockchains for a record of the bitcoin that TLTD released to CNL on June 6, 2022.  The

remainder of the second sentence of paragraph 56 states a legal conclusion to which no response

is required; to the extent that this portion of the second sentence of paragraph 56 can be construed

to contain factual allegations, Defendants deny them.  Deny the allegations in the third, fourth, and

fifth sentences of paragraph 56, except admit that the transfers alleged in this paragraph were not

made in connection with the contemporaneous provision of new USDT to CNL.

57.    In addition to the Preferential Top-Up Transfers, Celsius borrowed additional USDT from Tether on three occasions throughout the § 547(b) Period. On or about April 20, 2022, Celsius borrowed 100,000,000 USDT from Tether. On or about May 5, 2022, Celsius borrowed 100,000,000 USDT from Tether. On or about June 9, 2022, Celsius borrowed 100,000,000 USDT from Tether. In each instance, Celsius posted Bitcoin in connection with the foregoing: 3,095.00 Bitcoin, 3,288.00 Bitcoin, and 4,317.00 Bitcoin, respectively. This Bitcoin was commingled with Celsius's previous collateral postings and cross-collateralized Celsius's existing loan from Tether. Of this 10,700.00 new Bitcoin posted by Celsius, approximately 2,228.01 was excess collateral. Celsius's transfer of this excess—approximately 2,228.01 Bitcoin—to Tether (the "Preferential Cross-Collateralization Transfers") was, like the Preferential Top-Up Transfers, preferential and are subject to avoidance. During the § 547(b) Period, Celsius also made a series of principal and interest payments to Tether, on account of its loans.[5] These transfers are separate and distinct from the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers on account of antecedent debt described above.

**RESPONSE**:  Deny the allegations in paragraph 57 and the footnote referenced in

paragraph 57, except admit that: (i) on or about April 20, 2022, CNL transferred 3,095 bitcoin to

---

[5] On April 22, 2022, Celsius made a principal payment to Tether of approximately 13,000,000.00 EURT. On May 2, 2022, Celsius made interest payments to Tether of approximately 97,581.02 EURT and 2,789,566.67 USDT. On May 5, 2022, Celsius made a principal payment to Tether of approximately 7,451,552.00 EURT. On May 10, 2022, Celsius made a principal payment to Tether of approximately 3,809,470.00 EURT. On May 17, 2022, Celsius made a principal payment to Tether of approximately 5,332,296.00 EURT. On May 19, 2022, Celsius made a principal payment to Tether of approximately 12,250,000.00 USDT. On May 30, 2022, Celsius made interest payments to Tether of approximately 3,517,108.34 USDT and 34,692.40 EURT. On June 13, 2022, Celsius made a principal payment to Tether of approximately 5,000,572.97 EURT. On June 14, 2022, Celsius made principal payment to Tether of approximately 1,958,886.00 EURT. In sum, Celsius made principal and interest payments to Tether totaling about 36,685,050.39 EURT and 18,556,675.01 USDT during the § 547(b) Period.

TLTD and TLTD transferred 100,000,000 USDT to CNL; (ii) on or about May 5, 2022, CNL

transferred 3,288 bitcoin to TLTD and TLTD transferred 100,000,000 USDT to CNL; (iii) on or

about June 9, 2022, CNL transferred 4,317 bitcoin to TLTD and TLTD transferred 100,000,000

USDT to CNL; (iv) on or about April 22, 2022, CNL transferred 13,000,000 EURT to TLTD;

(v) on or about May 2, 2022, CNL transferred 97,581.02 EURT and 2,789,566.67 USDT in interest

payments; (vi) on or about May 5, 2022, CNL transferred 7,451,552 EURT to TLTD; (vii) on or

about May 10, 2022, CNL transferred 3,809,470 EURT to TLTD; (viii) on or about May 17, 2022,

CNL transferred 5,332,296 EURT to TLTD; (ix) on or about May 19, 2022, CNL transferred

12,250,000 USDT; (x) on or about May 30, 2022, CNL transferred 3,517,108.34 USDT in interest

payments; (xi) on or about June 1, 2022, CNL transferred 34,692.40 EURT in interest payments;

(xii) on or about June 13, 2022, CNL transferred 5,000,572.97 EURT to TLTD; and (xiii) on or

about June 14, 2022, CNL transferred 1,958,886 EURT to TLTD.

58.     The Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers dramatically improved Tether's position as a creditor. If Tether had not received the Preferential Top-Up Transfers (15,658.21 Bitcoin) and Preferential Cross-Collateralization Transfers (2,228.01 Bitcoin) during the § 547(b) Period, Tether would not have been able to come close to making itself whole on its $812,330,000 USDT loan to Celsius, which it ultimately was able to do with the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers. Indeed, as of the Petition Date, without the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether would have had over $350 million less in collateral.

**RESPONSE**:  Deny the allegations in paragraph 58.

59.     Celsius is presumed to be, and in fact was, insolvent at the time of each of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers. As of March of 2022, Celsius, by its own account, had a negative net capital position of $60 million, even giving Celsius full credit for CEL Token (Celsius's own cryptocurrency) that it held in its treasury at a value of over $700 million. As noted above, cryptocurrency prices started drastically dropping in April of 2022, and as a result, the value of Celsius's assets—which were primarily in Bitcoin, Ethereum, CEL Token, and other cryptocurrencies—dropped significantly.

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 59, except admit that the price of bitcoin and ETH dropped in April

2022.

60.     Most notably, in April and May of 2022, CEL Token lost most of its value.
Celsius's liabilities at the end of the third quarter of 2022 included over $14 billion of principal
and interest payments owed to customers on their deposits, and billions owed to third-party
lenders. Although those liabilities also declined, they did not do so at the same rate as Celsius's
assets. As a result, in April, May, and June of 2022, the value of Celsius liabilities far exceeded
the value of its assets.

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 60.

61.     In addition to being balance sheet insolvent, Celsius also was unable to pay its debts
when they came due and did not have adequate capital to operate its business. The liquid assets
that Celsius held during this time period were only a fraction of the liquid assets Celsius needed to
operate its business and meet its expected obligations, rendering it insolvent on a cash flow and
adequacy of capital basis.

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 61.

62.     Each time Celsius fulfilled a collateral demand, by making the Preferential Top-Up
Transfers and Preferential Cross-Collateralization Transfers, it was transferring its own interest in
property to Tether on account of antecedent debt. Tether provided no contemporaneous value to
Celsius in exchange for the transferred property.

**RESPONSE**:  Paragraph 62 states legal conclusions to which no response is required; to

the extent that this paragraph can be construed to contain factual allegations, Defendants deny

them.

63.     Several of these transfers were initiated from the United States by United States-
based Celsius employees, and Celsius employees in the United States gave notice of these transfers
to Tether. Finally, on information and belief, each of these transfers was ultimately overseen and
approved by Celsius CEO Alex Mashinsky, who was based in Hoboken, New Jersey at the time
of the transfers.

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63.

### D.    The Improper Application and Secret Retention of Collateral

64.    By June 2022, Bitcoin's dropping price had led to a dire situation for Celsius and the cryptocurrency market as a whole. Celsius's customers began withdrawing deposits from Celsius at increasingly fast rates, putting it under immense financial distress. Things became so bad for Celsius that on June 12, 2022, Celsius publicly announced that it was "pausing all withdrawals . . . [and] transfers between accounts." This "pause" was never lifted before Celsius's bankruptcy filing, and, as a result, Celsius customers were never able to withdraw their assets.

**RESPONSE**:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 64, except admit that a blog post on the Celsius website on or about June 12, 2022, announced a pause on withdrawals, and refer to that document for its complete contents.

65.    Tether, of course, knew of Celsius's vulnerable position—news of Celsius's "pause" was well known in the cryptocurrency market. Moreover, on June 12, 2022, Celsius's CEO Alex Mashinsky reached out to Tether's CFO Giancarlo Devasini, asking for Tether's "help squeezing [Celsius] short sellers." In the words of Rod Bolger—who served as Celsius's CFO at the time—Celsius was "desperate" for Tether's help. Mashinsky and Devasini agreed to talk at nine in the morning on Monday, June 13, 2022.

**RESPONSE**:   Deny the allegations in paragraph 65, and refer to the referenced communication between Messrs. Mashinsky and Devasini for its complete contents.

66.    But Tether had no interest in helping, and instead was solely focused on improving its own position. With the benefit of having received the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether embarked on a three-part plan to do so.

**RESPONSE**:  Deny the allegations in paragraph 66.

67.    *First*, Tether would ask for additional collateral to ensure that it obtained as much of Celsius's BTC as possible in order to insulate itself from the impact of Celsius's impending bankruptcy.

**RESPONSE**:  Deny the allegations in paragraph 67.

24

68.    *Second*, Tether would purport to apply Celsius's collateral to Celsius's entire outstanding loan balance. This would ensure that Tether would extinguish its entire exposure to Celsius, at a time when other creditors (*e.g.*, customers) could not get access to any of their deposits held by Celsius.

**RESPONSE**:  Deny the allegations in paragraph 68.

69.    *Third*, Tether would then keep Celsius's collateral for itself—but represent to Celsius the opposite, by falsely stating to Celsius that it was selling Celsius's collateral in a series of open-market transactions. In fact, Tether was covertly transferring the economic upside of Celsius's Bitcoin to itself. It was not enough to be preferred over all other creditors. Remarkably, Tether wanted equity-like upside (insulated from any creditor downside), and was willing to make false representations to obtain it.

**RESPONSE**:  Deny the allegations in paragraph 69.

70.    Tether set its plan in motion late at night (Eastern time) on June 12, 2022, when it issued a collateral demand to Celsius. This collateral demand was directed to Celsius employees in the United States. As noted above, Celsius satisfied that collateral demand promptly, transferring 3,041.73 Bitcoin to Tether early in the morning of June 13. Several hours later, Tether made a second collateral demand to Celsius. Celsius notified Tether that it was "working on preparing the BTC [Bitcoin]" to satisfy the collateral demand, and reminded Tether that it had ten hours to do so under the Amended Token Agreement. However, Tether's representatives demanded immediate payment notwithstanding expressly acknowledging that Celsius ***"have 10h in the [Agreement]***..."

**RESPONSE**:  Deny the allegations in the first sentence of paragraph 70, except admit that TLTD made a margin call to CNL under the Amended Token Agreement on or about June 12, 2022 (Eastern time).  Deny the allegations in the second sentence of paragraph 70, except deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning the exact whereabouts of any individual working on behalf of CNL at the time of the referenced margin call.  Deny the allegations in the third sentence of paragraph 70, except admit that, on or about June 12, 2022, CNL transferred 3,041.73 bitcoin to TLTD.  Deny the allegations in the fourth sentence of paragraph 70, except admit that TLTD made a margin call to CNL pursuant to the terms of the Amended Token Agreement on or about June 13, 2022.  Deny the allegations in the

fifth sentence of paragraph 70, and refer to the referenced communication for its complete contents.

Deny the allegations in the sixth sentence of paragraph 70.

71.    Celsius continued to assure Tether that it was working on providing collateral as soon as possible. But Defendants decided to proceed with an immediate application of Celsius's collateral—regardless of the terms of the Amended Token Agreement, which required a 10-hour waiting period before Tether could initiate the application process. Amidst the chaos of June 13, 2022, Celsius's CEO Alex Mashinsky allegedly gave Tether permission to liquidate Celsius's collateral in an "orderly" manner. However, in contravention of the terms of the Amended Token Agreement, Tether never obtained a written agreement from Mashinsky (or anyone else at Celsius) to amend this contractually mandated 10-hour waiting period.

**RESPONSE**:  Deny the allegations in the first sentence of paragraph 71.  Deny the allegations in the second sentence of paragraph 71, and refer to the Amended Token Agreement for the terms of that agreement between CNL and TLTD.  Deny the allegations in the third sentence of paragraph 71, except admit that CNL expressly agreed and instructed TLTD to proceed with a liquidation of CNL's collateral on June 13, 2022.  The fourth sentence of paragraph 71 states legal conclusions to which no response is required; to the extent that this sentence can be construed to contain factual allegations, Defendants deny them, and refer to the Amended Token Agreement for the terms of that agreement between CNL and TLTD.

72.    Indeed, Celsius was never provided the full 10-hour period to which it was contractually entitled to. With more than half of Celsius's ten-hour period to post additional collateral remaining, Tether purported to begin a fire sale of Celsius's collateral. Throughout this alleged "fire sale" process, Tether directed communications to Celsius employees in the United States. Tether performed this "fire sale" by purportedly selling Celsius's Bitcoin in a series of tranches over a period of several hours. Within hours, all of Celsius's collateral (39,542.42 Bitcoin) had been applied by Tether against Celsius's outstanding indebtedness to Tether (the "Preferential Application Transfer").

**RESPONSE**:  The first sentence of paragraph 72 states a legal conclusion to which no response is required; to the extent that this sentence can be construed to contain factual allegations, Defendants deny them, and refer to the Amended Token Agreement for the terms of that agreement between CNL and TLTD.  Deny the allegations in the second sentence of paragraph 72.  Deny the

allegations in the third sentence of paragraph 72, except deny knowledge or information sufficient

to form a belief as to the truth of the allegations concerning the exact whereabouts of any individual

from CNL at that time.  Deny the allegations in the fourth and fifth sentences of paragraph 72.


73.    Throughout the purported "fire sale," Tether's representatives conspired to give Celsius the false impression that its collateral was being sold in a series of legitimate, arm's-length, open-market transactions. In fact, these purported "sales" were a ruse to allow Tether to appropriate Celsius's collateral for itself at below the market price.

**RESPONSE**:  Deny the allegations in paragraph 73.


74.    At around 8:30 AM on June 13, 2022, Tether's representative, Silvano Di Stefano, told Celsius that they would "start to liquidate all your collateral to repay the USDT loan" in tranches of "2k bitcoin at [a] time." Tether claimed that the sale would be accomplished through its OTC desk, which would be responsible for obtaining a price for each tranche.

**RESPONSE**:  Deny the allegations in paragraph 74, and refer to the referenced

communication for its complete contents.


75.    Over the next two and a half hours, Tether claimed that it was proceeding with legitimate, arm's-length sales of Celsius's collateral through its OTC desk. Tether's representatives presented supposed "quotes" received from the OTC desk for the sale of each tranche of Bitcoin. Tether's "quotes" steadily decreased, dropping from $23,400, to $22,600, to $22,500, to $22,100, and so on—all the way down to $19,400. At one point during the sale, Tether's representatives claimed that they "fou[nd] a cou[n]terparty willing to buy the entire remaining" stock of Celsius's collateral—32542.44 BTC—at a price of $21,000. Celsius was hesitant to accept this offer, but Tether kept pressing: "[I] think considering the market and the liquidity this is a great price"; "I think this otc bid is a real good deal for both ..." Ultimately, Celsius declined Tether's offer. Two days later, Tether transferred the precise amount Celsius had refused to sell—32,542.44 BTC—to a Bitfinex account controlled by Defendant Tether International Limited.

**RESPONSE**:  Deny the allegations in the first through fifth sentences of paragraph 75,

except admit that, on or about June 13, 2022, TLTD presented price quotes to CNL for tranches

of bitcoin from CNL's collateral for CNL to approve or reject, and refer to the referenced

communications for their complete contents.  Deny the allegations in the sixth sentence of

paragraph 75, except admit that, on June 15, 2022, the 32,542.42 bitcoin that remained in the CNL

collateral address was transferred to an address that was controlled by TIL and designated to hold

collateral for a TIL customer.

76.     The final purported sale was 20,542.44 Bitcoin at a price of $19,400. Tether's representative stated that he did not think that the OTC desk would be "willing to do it," and that he would "need to contact the other counterparty." After supposedly checking with the "counterparty," Tether offered to make the sale at a price of $19,400—more than $3,000 lower than the market price of Bitcoin on June 13 of $22,487.39—as long as Celsius was "quick." The purported "liquidation" was over by 11:00 AM.

**RESPONSE**:  Deny the allegations in paragraph 76, except admit that CNL agreed to a

price of $19,400 per bitcoin for 20,542.44 bitcoin from its collateral, and refer to the referenced

communications for their complete contents.

77.     Throughout the entire process, Tether repeatedly pressed Celsius to liquidate as quickly as possible. Tether pushed Celsius to sell quickly, and warned that it "would need to be fast or [the] price [would] keep moving." Tether repeatedly blamed poor market conditions for the low sale price of Celsius's Bitcoin, claiming, for example, that the market was "getting thinner," and that the prices were "getting ugly." When Celsius asked for an accounting of how much balance was left on the loan, Tether refused to provide one until the entire collateral was supposedly liquidated. In fact, despite repeated requests by Celsius, Tether declined to provide any accounting of the alleged "sale" proceeds until the next day, June 14, in the meantime pacifying Celsius with false reassurances: "Tomorrow we do all the cal[culation]s don't worry ... today very very crazy day." When Tether did finally provide that accounting, it represented that "all the trades executed to sell [Celsius's] collateral for a total proceed of $816,822,948.00." Tether made no mention of the fact that the purported 'sales' were to Tether itself or its affiliates.

**RESPONSE**:     Deny the allegations in paragraph 77, and refer to the referenced

communications for their complete contents.

78.     Tether represented to Celsius that it sold the entirety of Celsius's collateral, 39,542.42 Bitcoin, at a dollar value of $816,822,948. The Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers were commingled among this collateral. On the application date, Celsius's outstanding loan balance under the Amended Token Agreement was $812,333,000. Without the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether would have had only 21,656.20 Bitcoin in collateral. At the same average price that Tether claims to have applied the 39,542.42 Bitcoin in satisfaction of the amounts owed Tether, Tether would have realized only $447,349,482.57, leaving a $364,980,517.43 deficiency. In other words, the Preferential Top-Up Transfers, Preferential Cross-

Collateralization Transfers, and Preferential Application Transfer clearly improved Tether's position as of the application date (just as it did as measured as of the Petition Date).

**RESPONSE**: Deny the allegations in paragraph 78.


79.     Apart from the fact that these transfers were preferences under the Bankruptcy Code, Tether robbed Celsius of its contractually entitled 10-hour window to satisfy collateral demands. At the time of Tether's last collateral demand on June 13, 2022, Celsius had sufficient Bitcoin on its balance sheet to post as collateral to Tether, including for, at least, the next 30 days. This was especially true given that Celsius had instituted a "pause" on customer withdrawals, which Tether was well aware of, resulting in the retention of, and access to, a significant amount of Bitcoin. If Celsius had been given the opportunity to meet the collateral demand—which it had the contractual right to do—it could have been able to avoid the disposition of its Bitcoin at near the bottom of the cryptocurrency market. Instead, that disposition was carried out for the benefit of just one creditor: Tether. Moreover, Celsius could have endured through the Petition Date, at which point the automatic stay would have intervened, stopping any attempt by Tether to apply collateral against its claim. Celsius could have retained pledged Bitcoin worth more than $4 billion today. Tether's breach has caused Celsius billions of dollars of harm.

**RESPONSE**: Deny the allegations in paragraph 79.


80.     Tether's disposition of Celsius's collateral was also arbitrary, irrational, and commercially unreasonable. Established market practice and commercially reasonable standards of good faith dictate that Tether should have liquidated such a large block of Bitcoin over a period longer than several hours. Liquidating this amount of collateral over a period longer than several hours would (a) minimize the price impact of the sale, especially during a time where buyers in the cryptocurrency market had fear about the direction of the market; and (b) allow time to market the assets to find buyers willing to transact at market prices. If Tether had followed established market practices, it would have ensured that the Bitcoin would have been sold at the full prevailing market price. Instead, Tether applied Celsius's Bitcoin against obligations owed to it for an average price of $20,656.88 each—considerably less than Bitcoin's market closing price on June 13th, $22,487.39. In fact, Tether applied Celsius's Bitcoin at an average price considerably below Bitcoin's *low* price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent company, around the time when the collateral was allegedly liquidated.

**RESPONSE**: The first sentence of paragraph 80 states legal conclusions to which no response is required; to the extent that this sentence can be construed to contain factual allegations, Defendants deny them. Deny the factual allegations of the second sentence of paragraph 80. The third sentence of paragraph 80 states hypothetical scenarios to which no response is required; to

the extent that this sentence can be construed to contain factual allegations, Defendants deny them.

Deny the allegations in the fourth, fifth, and sixth sentences of paragraph 80.

81.    Upon information and belief, Tether's application of Celsius's collateral was accomplished through the use of United States intermediaries or counterparties, involved transactions routed through United States servers, involved contacts with Celsius's United States-based personnel, and/or involved the use of bank accounts, financial institutions, or cryptocurrency exchanges located in the United States.

**RESPONSE**:  Deny the allegations in paragraph 81.

82.    Tether did not sell the collateral as it claimed. Instead, Tether set in motion a series of transactions—transfers quite unlike the supposed "sales" it had described in great detail to Celsius—designed to ensure it could keep Celsius's BTC, and all of its upside, for itself.

**RESPONSE**:  Deny the allegations in paragraph 81.

83.    Prior to the Preferential Application Transfer, Tether held the entirety of the BTC collateral—that is, the 39,542.42 Bitcoin Celsius transferred to Tether—in a single Bitcoin wallet. Tether made only two transfers from this wallet: first, a transfer of 7,000 Bitcoin on June 14, 2022, to a Bitfinex deposit account in the name of Defendant Tether International Limited, and second, a transfer of 32,542.42 Bitcoin on June 15, 2022, to a different Bitfinex account controlled by Defendant Tether International Limited. Tether now concedes that neither of these transfers were true arm's-length sales of the collateral, as Tether had falsely represented to Celsius that it was conducting. Notwithstanding its prior representations, Tether now confesses that the first transfer of 7,000 Bitcoin was not a sale, admitting that this "7,000 BTC was held for the benefit of another BVI entity—Defendant TIL." In other words (passive voice aside), Tether openly admits it kept this 7,000 Bitcoin transferred to it by Celsius for its own benefit. Tether has likewise conceded that it transferred the 32,542.42 Bitcoin to a Bitfinex account "controlled" by Defendant Tether International Limited. Tether claims that this account—which it controlled—"held collateral for a different TIL customer, who is a foreign national." In any event, on information and belief, this supposed transaction was not an arm's length sale (if indeed it was a sale at all), and it certainly was not a legitimate sale to a third party who purchased this Bitcoin from Tether at the prices quoted by Tether to Celsius during the purported liquidation.

**RESPONSE**:  Deny the allegations in paragraph 83, except admit that on June 14, 2022,

7,000.00 bitcoin was transferred from the CNL collateral address to an address for the benefit of

TIL and on June 15, 2022 32,542.42 bitcoin was transferred from the CNL collateral address to an

address controlled by TIL and designated to hold collateral of a TIL customer who is a foreign

national.

84.    Plaintiffs' preliminary investigation—undertaken without the aid of Tether's
documents—has revealed that Tether made false representations to Celsius in order to unlawfully
seize the upside of Celsius's Bitcoins for itself—appreciation that should have belonged to
Celsius's estate. As detailed above, Tether transferred all of Celsius's Bitcoins to its own Bitfinex
accounts. It then continuously held at least 32,542.42 Bitcoin in a Bitfinex account controlled by
Defendant Tether International Limited from July 15, 2022 to March 16, 2023. Between March
17, 2023, and November 10, 2013, the entirety of those 32,542.42 Bitcoin were transferred in a
series of transactions to another wallet publicly known to be controlled by Tether's sister affiliate,
Bitfinex, and associated with the Bitfinex exchange. On information and belief, after this transfer,
Bitfinex and Tether continued to use this Bitcoin to support their ongoing operations. Discovery
will reveal what portion of Celsius's Bitcoin Tether has retained to this day—and the true purpose
of the putative "collateral" pledge to the foreign national.

**RESPONSE**:  Deny the allegations in paragraph 84.

85.    The market price of Bitcoin increased substantially from July 15, 2022 to March
16, 2023 and even more significantly thereafter. As a result, Celsius's Bitcoin significantly
appreciated as it was improperly held in Tether's Bitfinex account. Tether realized this
appreciation only as a result of its receipt of preferential and fraudulent transfers of Celsius's
property, its sham "liquidation," and its secret retention of Celsius's assets. As a result, Celsius's
bankruptcy estate is entitled to a return of its Bitcoin under Section 550 of the Bankruptcy Code
in order to restore the estate to the financial condition it would have enjoyed if the transfer had not
occurred.

**RESPONSE**:  Deny the allegations in the first sentence of paragraph 85, except admit that

the market price of bitcoin was higher on March 16, 2023, than it was on July 15, 2022.  Deny

allegations in the second sentence of paragraph 85.  The third sentence of paragraph 85 states legal

conclusions and characterizations of Plaintiffs' allegations to which no response is required; to the

extent that this sentence can be construed to contain factual allegations, Defendants deny them.

The fourth sentence of paragraph 85 states legal conclusions to which no response is required; to

the extent that this sentence can be construed to contain factual allegations, Defendants deny them.

## CAUSES OF ACTION

## COUNT ONE: PREFERENCE (11 U.S.C. § 547)
### (against all Defendants)

86.    The allegations in paragraphs 1 through 85 are incorporated by reference as if fully set forth below.

**RESPONSE**:  Defendants incorporate by reference their responses set forth in paragraphs 1 through 85.

87.    Plaintiffs have conducted reasonable due diligence into the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and the Preferential Application Transfer, including, inter alia, by reviewing the books and records of Debtors and other information about these transfers. Plaintiffs have also conducted reasonable due diligence into known or reasonably knowable affirmative defenses that Defendant Tether Limited could assert, including under 11 U.S.C. § 547(c).

**RESPONSE**:  Because paragraph 87 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 87.  To the extent that paragraph 87 may be construed to contain factual allegations requiring a response, Defendants deny knowledge or information sufficient to form a belief as to the truth of such allegations.

88.    Celsius made the Preferential Top-Up Transfers described in paragraphs 49 through 55 within the ninety-day § 547(b) Period. The Preferential Top-Up Transfers totaled 15,658.21 Bitcoin.

**RESPONSE**:  Because paragraph 88 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 88.  To the extent paragraph 88 may be construed to contain factual allegations requiring a response, Defendants deny such allegations, and refer to the publicly available blockchains for a record of transactions between CNL and TLTD.

89.    Each of the Preferential Top-Up Transfers was a transfer of Celsius's property— namely, Celsius's Bitcoins.

**RESPONSE**:   Because paragraph 89 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 89.  To the extent that paragraph 89 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

90.    Each of the Preferential Top-Up Transfers was made to or for the benefit of Defendants.

**RESPONSE**:   Because paragraph 90 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 90.  To the extent paragraph 90 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

91.    At the time of each Preferential Top-Up Transfer, Defendant Tether Limited was a creditor of Celsius within the meaning of section 101(10) of the Bankruptcy Code. Defendants received the Preferential Top-Up Transfers, or alternatively the Preferential Top-Up Transfers were made for their benefit.

**RESPONSE**:   Because paragraph 91 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 91.  To the extent paragraph 91 may be construed to contain factual allegations requiring a response, Defendants deny such allegations, and refer to the publicly available blockchains for a record of transactions between CNL and TLTD.

92.    Each of the Preferential Top-Up Transfers was made on account of antecedent debt owed by Celsius to Defendant Tether Limited, and each of the Preferential Top-Up Transfers related to that antecedent debt.

**RESPONSE**:   Because paragraph 92 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 92.  To the extent that paragraph

92 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

93.    Each of the Preferential Top-Up Transfers was made within ninety days of the Petition Date, and was made while Plaintiffs were insolvent.

**RESPONSE**:    Because paragraph 93 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 93.  To the extent that paragraph 93 may be construed to contain factual allegations requiring a response, Defendants deny knowledge or information sufficient to form a belief as to whether and when Plaintiffs became insolvent, and otherwise deny any remaining allegations in paragraph 93, except admit that the transfers referenced in paragraphs 49-55 of this Answer were made within 90 days of July 13, 2022.

94.    Each of the Preferential Top-Up Transfers was made on account of a demand by Tether, and as described above, was made outside the ordinary course of business.

**RESPONSE**:    Because paragraph 94 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 94.  To the extent that paragraph 94 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

95.    The Preferential Top-Up Transfers, if not avoided, would allow Defendant Tether Limited to receive more than it would have if (i) Debtors' chapter 11 case were a case under chapter 7 of the Bankruptcy Code, (ii) the Preferential Top-Up Transfers had not been made, and (iii) Defendant Tether Limited received payment on account of the antecedent debt referenced herein, to the extent provided by the provisions of the Bankruptcy Code.

**RESPONSE**:    Because paragraph 95 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 95.  To the extent that paragraph

95 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

96.     Celsius made the Preferential Cross-Collateralization Transfers described in paragraph 57 within the ninety-day § 547(b) Period. The Preferential Cross-Collateralization Transfers totaled 2,228.01 Bitcoin.

**RESPONSE**:    Because paragraph 96 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 96.  To the extent that paragraph 96 may be construed to contain factual allegations requiring a response, Defendants deny such allegations, except admit that the transfers of bitcoin from CNL to TLTD alleged in paragraph 57 occurred within 90 days of July 13, 2022.

97.     Each of the Preferential Cross-Collateralization Transfers was a transfer of Celsius's property—namely, Celsius's Bitcoins.

**RESPONSE**:    Because paragraph 97 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 97.  To the extent that paragraph 97 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

98.     Each of the Preferential Cross-Collateralization Transfers was made to or for the benefit of Defendants.

**RESPONSE**:    Because paragraph 98 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 98.  To the extent that paragraph 98 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

99.     At the time of each Preferential Cross-Collateralization Transfers, Defendant Tether Limited was a creditor of Celsius within the meaning of section 101(10) of the Bankruptcy

Code. Defendants received the Preferential Cross-Collateralization Transfers, or alternatively the Preferential Cross-Collateralization Transfers were made for their benefit.

**RESPONSE**:   Because paragraph 99 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 99.  To the extent that paragraph 99 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

100.   Each of the Preferential Cross-Collateralization Transfers cross-collateralized antecedent debt owed by Celsius to Defendant Tether Limited, and each of the Preferential Cross-Collateralization Transfers related to that antecedent debt.

**RESPONSE**:   Because paragraph 100 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 100.  To the extent that paragraph 100 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

101.   Each of the Preferential Cross-Collateralization Transfers was made within ninety days of the Petition Date, and was made while Plaintiffs were insolvent.

**RESPONSE**:   Because paragraph 101 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 101.  To the extent that paragraph 101 may be construed to contain factual allegations requiring a response, Defendants admit that the transfers of bitcoin from CNL to TLTD alleged in paragraph 57 occurred within 90 days of July 13, 2022, deny knowledge or information sufficient to form a belief as to whether and when Plaintiffs became insolvent, and otherwise deny any remaining allegations in paragraph 101.

102.   Each of the Preferential Cross-Collateralization Transfers was made outside the ordinary course of business.

**RESPONSE**:   Because paragraph 102 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 102.  To the extent that paragraph

36

102 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

103.    The Preferential Cross-Collateralization Transfers, if not avoided, would allow Defendant Tether Limited to receive more than it would have if (i) Debtors' chapter 11 case were a case under chapter 7 of the Bankruptcy Code, (ii) the Preferential Cross-Collateralization Transfers had not been made, and (iii) Defendant Tether Limited received payment on account of the antecedent debt referenced herein, to the extent provided by the provisions of the Bankruptcy Code.

**RESPONSE**:    Because paragraph 103 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 103.  To the extent that paragraph 103 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

104.    Celsius made the Preferential Application Transfer within the ninety-day § 547(b) Period. The Preferential Application Transfer totaled 39,542.42 Bitcoin.

**RESPONSE**:    Because paragraph 104 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 104.  To the extent that paragraph 104 may be construed to contain factual allegations requiring a response, Defendants deny such allegations, except admit that the transfer alleged in paragraph 72 occurred within 90 days of July 13, 2022.

105.    The Preferential Application Transfer was a transfer of Celsius's property— namely, Celsius's Bitcoins.

**RESPONSE**:    Because paragraph 105 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 105.  To the extent that paragraph 105 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

106.    The Preferential Application Transfer was made to or for the benefit of Defendants.

**RESPONSE**:    Because paragraph 106 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 106.  To the extent that paragraph 106 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

107.    At the time of the Preferential Application Transfer, Defendant Tether Limited was a creditor of Celsius within the meaning of section 101(10) of the Bankruptcy Code. At the time of the Preferential Application Transfer, Defendants received that transfer, or alternatively the Preferential Application Transfer was made for their benefit.

**RESPONSE**:    Because paragraph 107 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 107.  To the extent that paragraph 107 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

108.    The Preferential Application Transfer was made on account of antecedent debt owed by Celsius to Defendant Tether Limited.

**RESPONSE**:    Because paragraph 108 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 108.  To the extent that paragraph 108 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

109.    The Preferential Application Transfer was made within ninety days of the Petition Date, and was made while Plaintiffs were insolvent.

**RESPONSE**:    Because paragraph 109 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 109.  To the extent that paragraph 109 may be construed to contain factual allegations requiring a response, Defendants admit that the transfer alleged in paragraph 72 occurred within 90 days of July 13, 2022, deny knowledge or

information sufficient to form a belief as to whether and when Plaintiffs became insolvent, and otherwise deny any remaining allegations in paragraph 109.

110.    The Preferential Application Transfer was made outside the ordinary course of business, including because it was made in violation of the terms of the Amended Token Agreement and while Celsius was under duress.

**RESPONSE**:    Because paragraph 110 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 110.  To the extent that paragraph 110 may be construed to contain factual allegations requiring a response, Defendants deny such allegations, refer to the Amended Token Agreement between CNL and TLTD for its complete contents, and deny knowledge or information sufficient to form a belief as to whether and when CNL believed it was "under duress," except to the extent that paragraph 110 alleges that Defendants were the cause of any such duress, in which case Defendants deny that allegation.

111.    In view of the facts that the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers are avoidable transfers, the Preferential Application Transfer, if not avoided, would allow Defendant Tether Limited to receive more than it would have if (i) Debtors' chapter 11 case were a case under chapter 7 of the Bankruptcy Code, (ii) the Preferential Application Transfer had not been made, and (iii) Defendant Tether Limited received payment on account of the antecedent debt referenced herein, to the extent provided by the provisions of the Bankruptcy Code.

**RESPONSE**:    Because paragraph 111 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 111.  To the extent that paragraph 111 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

112.    As of the date of this Complaint, Defendants have not returned the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, or the Preferential Application Transfer to Celsius.

**RESPONSE**:   Because paragraph 112 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 112.  To the extent that paragraph 112 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

113.    Plaintiffs are entitled to an order and judgment under 11 U.S.C. § 547 avoiding the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and the Preferential Application Transfer.

**RESPONSE**:   Because paragraph 113 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 113.  To the extent that paragraph 113 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

## COUNT TWO: RECOVERY OF PROPERTY (11 U.S.C. § 550)
### (against all Defendants)

114.    The allegations made in paragraphs 1 through 113 are adopted as if fully set forth herein.

**RESPONSE**:  Defendants incorporate by reference their responses set forth in paragraphs 1 through 113.

115.    As alleged in paragraphs 86 through 113 above, Plaintiffs are entitled to avoid the Preferential Top-Up Transfers, the Preferential Cross-Collateralization Transfers, and Preferential Application Transfer under section 547 of the Bankruptcy Code.

**RESPONSE**:   Because paragraph 115 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 115.  To the extent that paragraph 115 may be construed to contain factual allegations requiring a response, Defendants incorporate by reference their responses set forth in paragraphs 86 through 113 of this Answer as if fully set forth herein, and deny any additional factual allegations in paragraph 115.

116.    Defendants are the initial, immediate, or mediate transferees of the Preferential Top-Up Transfers, the Preferential Cross-Collateralization Transfers, and the Preferential Application Transfer, or the entities for whose benefit such transfers were made. Accordingly, Plaintiffs are entitled to receive a return of their property—15,658.21 Bitcoin, 2,228.01 Bitcoin, and 39,542.42 Bitcoin (without duplication), respectively, or, in the alternative, the value of such property—pursuant to 11 U.S.C. § 550 plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

**RESPONSE**:    Because paragraph 116 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 116.  To the extent that paragraph 116 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

117.    As alleged in paragraphs 82 through 85 above, despite Defendants' purported liquidation of the collateral received in connection with the Preferential Top-Up Transfers, the Preferential Cross-Collateralization Transfers, and Preferential Application Transfer, Defendants in fact held at least 32,542.42 Bitcoin of this collateral for at least a nine-month period following the purported liquidation. Over this period, Plaintiffs' Bitcoin improperly held by Defendants increased in value substantially. In order to restore the estate to the financial condition it would have enjoyed if the transfers had not occurred, Celsius's bankruptcy estate—not Tether—is entitled to the appreciation of the Bitcoin pursuant to an in-kind return of the Preferential Application Transfer, plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

**RESPONSE**:    Because paragraph 117 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 117.  To the extent that paragraph 117 may be construed to contain factual allegations requiring a response, Defendants deny such allegations, except incorporate by reference their responses set forth in paragraphs 82 through 85 of this Answer.

## COUNT THREE: BREACH OF CONTRACT (BVI LAW)[6]
### (against Tether Limited)

118.    The allegations made in paragraphs 1 through 117 are adopted as if fully set forth herein.

**RESPONSE**:  Defendants incorporate by reference their responses set forth in paragraphs 1 through 117, and respond that the footnote referenced in the heading above paragraph 118 states a legal conclusion to which no response is required.

119.    The Amended Token Agreement is a binding contract.

**RESPONSE**:  Because paragraph 119 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 119.  To the extent that paragraph 119 may be construed to contain factual allegations requiring a response, Defendants admit that CNL and TLTD entered into the Amended Token Agreement.

120.    Plaintiffs have fully performed their obligations and satisfied any conditions precedent under the Amended Token Agreement.

**RESPONSE**:  Because paragraph 120 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 120.  To the extent that paragraph 120 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

121.    Defendant Tether Limited has breached the Amended Token Agreement by improperly applying Plaintiffs' collateral to Plaintiffs' antecedent debt prior to the contractually required ten-hour waiting period after sending a notice of a demand.

---

[6] Plaintiffs hereby give notice pursuant to Rule 9017 of the Federal Rules of Bankruptcy Procedure and Rule 44.1 of the Federal Rules of Civil Procedure of their intent to raise issues under the law of the British Virgin Islands ("BVI"), including but not limited to Defendants' liability for breach of contract, breach of the Braganza duty, and breach of the duties of an equitable mortgagee.

**RESPONSE**:   Because paragraph 121 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 121.  To the extent that paragraph 121 may be construed to contain factual allegations requiring a response, Defendants deny such allegations, and refer to the Amended Token Agreement for its complete contents.

122.    At the time of Defendant Tether Limited's last collateral demand on June 13, 2022, Celsius had sufficient Bitcoin on its balance sheet to post as collateral to Tether, including for, at least, the next 30 days. If Celsius had been given its contractually entitled opportunity to meet the collateral demand, it could have avoided the disposition of its Bitcoin at near the bottom of the cryptocurrency market. Celsius could have retained its pledged Bitcoin—worth more than $4 billion today. Celsius has thus been harmed by billions of dollars as a result.

**RESPONSE**:   Because paragraph 122 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 122.  To the extent that paragraph 122 may be construed to contain factual allegations requiring a response, Defendants deny knowledge or information sufficient to form a belief as to the truth of such allegations.

123.    At the very minimum, Plaintiffs have suffered $100 million in damages as a proximate result of Defendant Tether Limited's breaches of contract, corresponding to the difference between the average price for which Tether applied Plaintiffs' collateral and the price that would have been obtained had Tether not breached the Agreement. Plaintiffs have suffered additional expectation, reliance, and consequential damages as a result of Defendant Tether Limited's breaches of contract in an amount to be proven at trial.

**RESPONSE**:   Because paragraph 123 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 123.  To the extent that paragraph 123 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

## COUNT FOUR: BREACH OF *BRAGANZA* DUTY (BVI LAW)
### (against Tether Limited)

124.    The allegations made in paragraphs 1 through 123 are adopted as if fully set forth herein.

43

**RESPONSE**:  Defendants incorporate by reference their responses set forth in paragraphs 1 through 123.

125.    The Amended Token Agreement assigned Tether "discretion" with respect to a liquidation of the collateral.

**RESPONSE**:  Because paragraph 125 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 125.  To the extent that paragraph 125 may be construed to contain factual allegations requiring a response, Defendants deny such allegations, except admit that CNL and TLTD entered into the Amended Token Agreement, and refer to that agreement for its terms.

126.    As a result, the law of the British Virgin Islands imposed a duty on Tether to exercise that discretion "honestly and in good faith," in a manner consistent with the contractual purpose," and not "arbitrarily, capriciously, or unreasonably."  *Braganza v. BP Shipping Ltd.*, (2015) UKSC 17 ¶ 20, 27, 29, 30.  This duty further required Tether to take into account relevant considerations and not take into account irrelevant considerations in exercising its discretion.  *Id.*

**RESPONSE**:  Because paragraph 126 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 126.  To the extent that paragraph 126 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

127.    Tether breached its *Braganza* duties by conducting a purported liquidation that was dishonest, in bad faith, arbitrary, capricious, unreasonable, based on irrelevant and improper considerations, and inconsistent with the purpose of the Amended Token Agreement.

**RESPONSE**:  Because paragraph 127 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 127.  To the extent that paragraph 127 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

128.    Tether's purported liquidation and secret retention of the collateral and/or transfer of the collateral to affiliates and insiders was conducted dishonestly and in bad faith, including

because Tether made false and misleading statements designed to give Celsius the impression that the collateral was being sold in a series of legitimate, arm's-length, open-market transactions, when in reality these purported "sales" were not legitimate, arm's-length, open market sales. Instead, Tether's purported liquidation of collateral was a ruse to allow Tether to appropriate the collateral for itself and/or its insiders and affiliates at a price below the best price reasonably obtainable in the open market. Tether's supposed "sale" of the collateral was conducted especially dishonestly, and in particularly bad faith, including because Tether (a) knew and intended to enter into those transactions with affiliates and/or insiders at a price below the best price reasonably obtainable, for its own benefit and/or for the benefit of its affiliates and insiders, and to the detriment of Celsius; and (b) conducted such transactions secretly and not openly, and acted to mislead Celsius about those purported transactions.

**RESPONSE**:  Because paragraph 128 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 128.  To the extent that paragraph 128 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

129.    Tether's purported liquidation and secret retention of the collateral was arbitrary, capricious, and unreasonable, including because: (a) Tether transferred the collateral to itself and/or affiliates and insiders, which was (i) contrary to established market practice, (ii) contrary to the interests of Celsius, (iii) contrary to commercial standards of good faith, and caused the collateral to be liquidated at a price far below the best price reasonably obtainable in the open market; (b) Tether improperly considered and prioritized its desire to appropriate the collateral for its own benefit (and/or that of its affiliates and insiders) in determining when and how to carry out the purported liquidation; (c) Tether failed to consider the proper contractual objective of maximizing the price at which the collateral would be liquidated; and (d) Tether failed to properly consider or act in Celsius's interests which would have entailed seeking to sell the collateral on the open market at the best price reasonably obtainable.

**RESPONSE**:  Because paragraph 129 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 129.  To the extent that paragraph 129 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

130.    Tether's purported liquidation and secret retention of the collateral was inconsistent with the contractual purpose because it (a) improperly considered and preferred its desire to appropriate the collateral for its own benefit (and/or that of its affiliates and insiders) in determining when and how to carry out the liquidation; (b) failed to achieve the best price reasonably obtainable for the collateral in the open market for the benefit of Celsius, and instead resulted in the "sale" of collateral at a price below the best price reasonably obtainable to Tether,

and for its benefit (or that of its affiliates and insiders); and (c) failed to respect Celsius's right to post more collateral within 10 hours of a margin call.

**RESPONSE**:  Because paragraph 130 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 130.  To the extent that paragraph 130 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

131.    Plaintiffs suffered significant damages as a result of Defendant Tether Limited's breaches of the *Braganza* duty, including: (a) damages reflecting the amount of collateral which Tether dishonestly transferred to itself and/or its affiliates and insiders in bad faith (namely 39,542.42 Bitcoin); (b) at least $100 million in damages corresponding to the difference between the average price for which Tether applied Plaintiffs' collateral and the price that would have been obtained had Tether liquidated Plaintiffs' collateral consistent with its *Braganza* duties; and (c) additional expectation, reliance, and consequential damages as a proximate result of Defendant Tether Limited's breaches of its *Braganza* duties in an amount to be proven at trial.

**RESPONSE**:  Because paragraph 131 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 131.  To the extent that paragraph 131 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

## COUNT FIVE: BREACH OF EQUITABLE MORTGAGEE'S DUTIES (BVI LAW)
### (against Tether Limited)

132.    The allegations made in paragraphs 1 through 131 are adopted as if fully set forth herein.

**RESPONSE**:  Defendants incorporate by reference their responses set forth in paragraphs 1 through 131.

133.    The Amended Token Agreement created an equitable mortgage over the collateral because (a) a proprietary interest in Celsius's property was conferred or undertaken to be conferred by Celsius to Tether; (b) Tether could procure at least the partial discharge of Celsius's liability to it by realization of that proprietary interest; and (c) the proprietary interest conferred upon Tether was redeemable by Celsius in the event of Celsius discharging its liability.

**RESPONSE**:  Because paragraph 133 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 133.  To the extent that paragraph

133 may be construed to contain factual allegations requiring a response, Defendants deny such allegations, except admit that CNL and TLTD entered into the Amended Token Agreement, and refer to that agreement for its terms.

134.    As an equitable mortgagee, the law of the British Virgin Islands imposes duties on Tether to act in good faith in conducting any sale or liquidation of the collateral, and to obtain the best price reasonably obtainable for the collateral at the time of the sale or liquidation.

**RESPONSE**:   Because paragraph 134 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 134.  To the extent that paragraph 134 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

135.    Tether's purported liquidation and secret retention of the collateral breached its duties as an equitable mortgage, including because it was conducted in bad faith and because Tether did not obtain the best price reasonably obtainable at the time of the sale or liquidation.

**RESPONSE**:   Because paragraph 135 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 135.  To the extent that paragraph 135 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

136.    Tether's purported liquidation and secret retention of the collateral was conducted in bad faith, including because Tether made false and misleading statements designed to give Celsius the impression that the collateral was being sold in a series of legitimate, arm's-length, open-market transactions, when in reality these purported "sales" were not legitimate, arm's-length, open-market transactions.  Instead, these "transactions" were a ruse to allow Tether to appropriate the collateral for itself and/or its affiliates and insiders at a price below the best price reasonably obtainable.  Tether's "sale" of the collateral was conducted especially dishonestly, and in particularly bad faith, including because Tether (a) knew and intended to enter into transactions with affiliates and/or insiders at a price below the best price reasonably obtainable, for its own benefit and/or for the benefit of its affiliates and insiders, and to the detriment of Celsius; and (b) conducted such transactions secretly and not openly, and acted to mislead Celsius about those purported transactions.

**RESPONSE**:   Because paragraph 136 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 136.  To the extent that paragraph

136 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

137.   Tether did not obtain the best price reasonably obtainable at the time of its purported liquidation and secret retention of the collateral, including because it (a) sold the collateral in illegitimate related party transactions to itself and/or affiliates and insiders and not on the open market; (b) improperly considered and preferred its desire and its own interests to appropriate the collateral for its own benefit (and/or that of its affiliates and insiders) at a price below the best price reasonably obtainable; and (c) acted contrary to established market practices and commercial standards of good faith.

**RESPONSE**:   Because paragraph 137 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 137.  To the extent that paragraph 137 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

138.   Even if Tether had sold the collateral in arm's-length, open-market transactions, Tether would have breached its duties as an equitable mortgagee because it purported to liquidate the collateral in a fire sale over mere hours.  Established market practice and commercially reasonable standards of good faith dictate that Tether should have liquidated such a large block of Bitcoin over a period longer than several hours.  Liquidating this amount of collateral over a period of longer than several hours would (a) minimize the price impact of the sale, especially during a time where buyers in the cryptocurrency market had fear about the direction of the market; and (b) allow time to market the assets to find buyers willing to transact at the market price.  If Tether had followed established market practices, the Bitcoin would have been sold at the best price reasonably obtainable.

**RESPONSE**:   Because paragraph 138 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 138.  To the extent that paragraph 138 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

139.   Plaintiffs suffered significant damages as a result of Defendant Tether Limited's breaches of its duties as an equitable mortgagee, including: (a) damages reflecting the amount of collateral that Tether dishonestly transferred to itself and/or its affiliates and insiders in bad faith (namely 39,542.42 Bitcoin); (b) at least $100 million in damages corresponding to the difference between the average price for which Tether applied Plaintiffs' collateral and the price that would have been obtained had Tether liquidated Plaintiffs' collateral in good faith and in a commercially reasonable manner on or around June 13, 2022; and (c) additional expectation, reliance, and

consequential damages as a proximate result of Defendant Tether Limited's breaches of the duties of an equitable mortgagee in an amount to be proven at trial.

**RESPONSE**:  Because paragraph 139 contains legal argument and calls for a legal conclusion, Defendants are not required to respond to paragraph 139.  To the extent that paragraph 139 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

### COUNT SIX: FRAUDULENT TRANSFER (11 U.S.C. §§ 548(A)(1)(B) AND 550)
### (against all Defendants)

140.    The allegations made in paragraphs 1 through 139 are adopted as if fully set forth herein.

**RESPONSE**:  Defendants incorporate by reference their responses set forth in paragraphs 1 through 139.

141.    On June 13, 2024, Tether represented to Celsius that it applied the entirety of Celsius's collateral of 39,542.42 Bitcoin against Celsius's outstanding debt at a dollar value of $816,822,948. That Bitcoin was property of the Debtors. On the application date, Celsius's outstanding loan balance under the Amended Token Agreement was $812,333,000.

**RESPONSE**:  Because paragraph 141 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 141.  To the extent that paragraph 141 may be construed to contain factual allegations, Defendants deny such allegations, and refer to communications between TLTD and CNL on or about June 13, 2022 for their complete contents.

142.    Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding debt happened within two years of Celsius's bankruptcy petition, and while Celsius was (a) insolvent, (b) was engaged in a business or a transaction for which any property remaining with Celsius was an unreasonably small capital, or (c) intended to incur, or believed that it would incur, debts that would be beyond Celsius's ability to repay as such debts matured.

**RESPONSE**:  Because paragraph 142 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 142.  To the extent that paragraph 142 may be construed to contain factual allegations requiring a response, Defendants deny such

allegations, except admit that the alleged transfer of 39,542.42 bitcoin occurred within two years

of July 13, 2022, and deny knowledge or information sufficient to form a belief as to when

Plaintiffs became insolvent.

143.    Celsius received less than reasonably equivalent value in exchange for the
application of its 39,542.42 Bitcoin. Tether applied Celsius's Bitcoin against obligations owed to
it for an average price of $20,656.88 each—considerably less than Bitcoin's market closing price
on June 13th, $22,487.39. In fact, Tether applied Celsius's Bitcoin at an average price considerably
below Bitcoin's low price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent
company, during the three hour window during which the collateral was allegedly liquidated.

**RESPONSE**:   Because paragraph 143 contains legal argument and calls for legal

conclusions, Defendants are not required to respond to paragraph 143. To the extent that paragraph

143 may be construed to contain factual allegations requiring a response, Defendants deny such

allegations.

144.    Each of the transfers is avoidable by creditors who hold allowable unsecured
claims, including creditors who were creditors before the transfers. See ECF Doc. Nos. 7, 974.

**RESPONSE**:   Because paragraph 144 contains legal argument and calls for legal

conclusions, Defendants are not required to respond to paragraph 144. To the extent that paragraph

144 may be construed to contain factual allegations requiring a response, Defendants deny such

allegations.

145.    By virtue of the foregoing, Tether's application of Celsius's 39,542.42 Bitcoin
against Celsius's outstanding loan was a constructive fraudulent transfer avoidable under section
548(a)(1)(B) of the Bankruptcy Code. Accordingly, Plaintiffs are entitled to receive a return of
their property—39,542.42 Bitcoin or, in the alternative, the value of such property—pursuant to
11 U.S.C. § 550 plus interest at the maximum legal rate and costs to the fullest extent allowed by
applicable law.

**RESPONSE**:   Because paragraph 145 contains legal argument and calls for legal

conclusions, Defendants are not required to respond to paragraph 145. To the extent that paragraph

145 may be construed to contain factual allegations requiring a response, Defendants deny such

allegations.

### **COUNT SEVEN: FRAUDULENT TRANSFER (11 U.S.C. §§ 544(B) AND 550)**
**(against all Defendants)**

146.    The allegations made in paragraphs 1 through 145 are adopted as if fully set forth

herein.

**RESPONSE**:  Defendants incorporate by reference their responses set forth in paragraphs

1 through 145.

147.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer
of an interest in their property that is voidable under applicable law by a creditor holding an
allowable unsecured claim. Accordingly, fraudulent or otherwise voidable transfers are avoidable
pursuant to Bankruptcy Code section 544(b) and other applicable law, including the relevant
fraudulent or voidable transfer laws as enacted in the states of New York, New Jersey, and
Delaware.

**RESPONSE**:   Because paragraph 147 contains legal argument and calls for legal

conclusions, Defendants are not required to respond to paragraph 147.  To the extent that paragraph

147 may be construed to contain factual allegations requiring a response, Defendants deny such

allegations.

148.    On June 13, 2024, Tether represented to Celsius that it applied the entirety of
Celsius's collateral of 39,542.42 Bitcoin against Celsius's outstanding debt at a dollar value of
$816,822,948. That Bitcoin was property of the Debtors. On the application date, Celsius's
outstanding loan balance under the Amended Token Agreement was $812,333,000.

**RESPONSE**:   Because paragraph 148 contains legal argument and calls for legal

conclusions, Defendants are not required to respond to paragraph 148.  To the extent that paragraph

148 may be construed to contain factual allegations, Defendants deny such allegations, and refer

to communications between TLTD and CNL on or about June 13, 2022, for their complete

contents.

149.    Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding debt happened within two years of Celsius's bankruptcy petition, and while Celsius was (a) insolvent, (b) was engaged in a business or a transaction for which any property remaining with Celsius was an unreasonably small capital, or (c) intended to incur, or believed that it would incur, debts that would be beyond Celsius's ability to repay as such debts matured.

**RESPONSE**:    Because paragraph 149 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 149.  To the extent that paragraph 149 may be construed to contain factual allegations requiring a response, Defendants deny such allegations, except admit that the alleged application occurred within two years of July 13, 2022, and deny knowledge or information sufficient to form a belief as to when Plaintiffs became insolvent.

150.    Celsius received less than reasonably equivalent value in exchange for the application of its 39,542.42 Bitcoin. Tether applied Celsius's Bitcoin against obligations owed to it for an average price of $20,656.88 each—considerably less than Bitcoin's market closing price on June 13th, $22,487.39. In fact, Tether applied Celsius's Bitcoin at an average price considerably below Bitcoin's low price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent company, during the time window during which the collateral was allegedly liquidated.

**RESPONSE**:    Because paragraph 150 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 150.  To the extent that paragraph 150 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

151.    Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers. See ECF Doc. Nos. 7, 974.

**RESPONSE**:    Because paragraph 151 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 151.  To the extent that paragraph 151 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

152.    By virtue of the foregoing, Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding loan was a constructive fraudulent or otherwise voidable transfer avoidable under section 544(b) of the Bankruptcy Code and applicable state law. Accordingly, Plaintiffs are entitled to receive a return of their property—39,542.42 Bitcoin or, in the alternative, the value of such property—pursuant to 11 U.S.C. § 550 plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

**RESPONSE**:    Because paragraph 152 contains legal argument and calls for legal conclusions, Defendants are not required to respond to paragraph 152.  To the extent that paragraph 152 may be construed to contain factual allegations requiring a response, Defendants deny such allegations.

## PRAYER FOR RELIEF

**RESPONSE**:    Because the prayer for relief contains legal argument and calls for legal conclusions, Defendants are not required to respond to the prayer for relief.  To the extent the prayer for relief may be construed to contain factual allegations requiring a response, Defendants deny the allegations contained in Plaintiffs' prayer for relief and deny that Plaintiffs are entitled to any relief.

## AFFIRMATIVE AND OTHER DEFENSES

Defendants assert the following affirmative and other defenses and reserve the right to amend this Answer to assert other and further defenses when and if, in the course of its investigation, discovery, or preparation for trial it becomes known and/or appropriate.  By designating these as "affirmative" and "defenses," Defendants do not assume the burden on any defenses for which the burden rests on Plaintiffs, regardless of how such defenses are denominated herein, and such designations in no way relieve Plaintiffs of the burden of proving under the appropriate standard of proof all elements of each claim alleged.  Defendants do not undertake any burdens that properly rest upon Plaintiffs, and do not suggest either that Plaintiffs do not bear the

burden of proof as to such matters or that such matters are not elements that Plaintiffs must establish in order to make out a case against Defendants. In addition, in stating these defenses, Defendants are not admitting to any of the allegations in the Second Amended Complaint beyond the responses to each of Plaintiffs' allegations above.

### First Affirmative Defense

The Second Amended Complaint fails to state a claim upon which relief may be granted.

### Second Affirmative Defense

Plaintiff CNLLC was not a party to the Token Agreement or Amended Token Agreement and owed no antecedent debts to the Defendants.

### Third Affirmative Defense

The Second Amended Complaint alleges no action whatsoever by THL or TOL and alleges only that TIL was a subsequent transferee.

### Fourth Affirmative Defense

Plaintiffs' claims are barred in whole or in part, because they would require an impermissible extraterritorial application of the avoidance provisions of the Bankruptcy Code.

### Fifth Affirmative Defense

The claims are barred in whole or in part by estoppel—including but not limited to judicial estoppel.

### Sixth Affirmative Defense

Plaintiffs are barred in whole or in part from seeking relief by the doctrines of in pari delicto, unclean hands, unjust enrichment, or other equitable doctrines.

**Seventh Affirmative Defense**

Plaintiffs' claims are barred in whole or in part by the doctrines of ratification, acquiescence, and waiver.  Among other things, Plaintiffs' breach of contract claim is barred, because CNL authorized, approved, and ratified the transfers they now complain of, and Plaintiffs have, thus, waived any argument that these transfers were unauthorized.  In addition, the relevant Debtor ratified the transfers that are the subject of the claims in the Second Amended Complaint.

**Eighth Affirmative Defense**

Plaintiffs' claims are barred in whole or in part by the doctrines of accord and satisfaction, promissory estoppel, and estoppel.

**Ninth Affirmative Defense**

Plaintiffs' avoidance claims should be denied to the extent that, at the times of all or some of the alleged transfers, CNL was not insolvent, inadequately capitalized, or unable to pay its debts as they came due.

**Tenth Affirmative Defense**

Plaintiffs' claims and the remedies and relief sought are barred in whole or in part by 11 U.S.C. §§ 546(e) & (g), 556, 560, and 561.

**Eleventh Affirmative Defense**

The relief sought in the Second Amended Complaint should be denied to the extent that such recovery would exceed that permitted under the Bankruptcy Code, including without limitation because and to the extent that such recovery would not provide a benefit to the estate and/or would exceed amounts needed to satisfy allowed claims of, and/or amounts distributable

under the Plan to, holders of claims entitled to receive distributions from the proceeds of such recovery.

### Twelfth Affirmative Defense

The relief sought in the Second Amended Complaint, including without limitation recovery of 39,542.42 BTC, should be denied in whole or in part, because and to the extent that such recovery would provide a windfall to the Post-Effective Date Debtors.

### Thirteenth Affirmative Defense

The alleged transfers, to the extent they were actually received by any Defendant, were received without actual fraudulent intent and for reasonably equivalent value inuring to or for the benefit of the relevant Debtor or Debtors. They are thus not avoidable or recoverable as against these Defendants under 11 U.S.C. §§ 544, 548, and 550 and/or applicable law.

### Fourteenth Affirmative Defense

The alleged fraudulent transfer, to the extent actually received by any Defendant, was taken for value and in good faith, as provided by 11 U.S.C. § 548(c). The alleged fraudulent transfer is thus not avoidable or recoverable as against these Defendants under 11 U.S.C. §§ 548 and 550.

### Fifteenth Affirmative Defense

The alleged transfers, to the extent they were actually received by any Defendant alleged to have been a subsequent, mediate, or immediate transferee, were taken for value, in good faith, and without knowledge of voidability, as provided by 11 U.S.C. § 550(b). They are thus not recoverable as against these Defendants under 11 U.S.C. § 550.

## Sixteenth Affirmative Defense

Plaintiffs' claims and remedies and recoveries, if any, should be barred or precluded in whole or in part, reduced, and/or impressed with a lien in favor of Defendants to the extent that Defendants took any property transferred or obligation incurred (a) in good faith and for value, and/or (b) in good faith and for reasonably equivalent value, and/or (c) for fair consideration and without any knowledge of the fraud, and/or (d) for value, in good faith, and without knowledge of the voidability of the transfer sought to be avoided, and/or (e) without actual fraudulent intent. Any one or more of these findings support an affirmative defense and/or preclude the claims under 11 U.S.C. §§ 544, 548, and 550; section 8 of the Uniform Fraudulent Transfer Act; section 8 of the Uniform Voidable Transactions Act; and/or section 9 of the Uniform Fraudulent Conveyance Act, each as enacted in any state whose law is applicable hereto and/or any similar or analogous applicable federal, state, or local law.

## Seventeenth Affirmative Defense

At all relevant times and at the time of every alleged preferential transfer, Plaintiff CNL's obligations to TLTD were fully secured by collateral in TLTD's possession and control. Because TLTD was a fully secured creditor with respect to any and all alleged antecedent debt owed by CNL to TLTD during the Preference Period, the alleged transfers from CNL to TLTD on account of antecedent debt could not have been preferential.

## Eighteenth Affirmative Defense

Plaintiffs' claims for avoidance of alleged preferential transfers and the relief sought thereunder should be denied, because all or some of the alleged transfers were not made on account of antecedent debt, including without limitation because the alleged transfers were made on account of new borrowings and/or because Defendants were not owed any antecedent debt by

either Plaintiff at the time of all of some of the alleged preferential transfers, as required by 11 U.S.C. § 547.

### Nineteenth Affirmative Defense

Plaintiffs' claims for avoidance of alleged preferential transfers and the relief sought should be denied, because all or some of the alleged transfers were not made to or for the benefit of a creditor, including without limitation, because Defendants were not creditors of any of the Debtors at the time of all or some of the alleged preferential transfers, as required by 11 U.S.C. § 547.

### Twentieth Affirmative Defense

To the extent any alleged preferential transfer occurred, TLTD did not obtain a greater recovery on CNL's obligations than it would have recovered in a hypothetical Chapter 7 bankruptcy proceeding, as required by 11 U.S.C. § 547.

### Twenty-First Affirmative Defense

The relief sought in the Second Amended Complaint should be denied under 11 U.S.C. § 547(c)(1), because all or some of the alleged preferential transfers reflected a contemporaneous exchange for new value.

### Twenty-Second Affirmative Defense

The relief sought in the Second Amended Complaint should be denied under 11 U.S.C. § 547(c)(2), because all or some of the alleged preferential transfers were made in the ordinary course of business and/or according to ordinary business terms.

### Twenty-Third Affirmative Defense

The relief sought in the Second Amended Complaint should be denied under 11 U.S.C. § 547(c)(4), because all or some of the alleged preferential transfers were supported by the provision of subsequent new value.

### Twenty-Fourth Affirmative Defense

Plaintiffs have not suffered any cognizable damages caused by the alleged breach of contract.

### Twenty-Fifth Affirmative Defense

Plaintiffs' claims for damages arising from Defendants' alleged breach of contract are barred in whole or in part, because they are unfounded, too remote, and/or too speculative.

### Twenty-Sixth Affirmative Defense

Plaintiffs' contract claims are barred, because Plaintiffs fraudulently induced Defendants to enter into or perform under the Amended Token Agreement.

### Twenty-Seventh Affirmative Defense

Any alleged contract between any Plaintiffs and any Defendants is voidable and subject to rescission and, therefore, such contract is unenforceable against Defendants.

### Twenty-Eighth Affirmative Defense

Plaintiffs' contract claims are barred in whole or in part by lack of actual or proximate causation.

### Twenty-Ninth Affirmative Defense

Plaintiffs' contract claims are barred, because the alleged damages were caused by intervening and/or supervening causes, the acts or omissions of third parties, and/or the failure to mitigate.

### Thirtieth Affirmative Defense

Any damages Plaintiffs suffered, if any, were proximately caused by Plaintiffs' own misrepresentations and breaches of the Token Agreement and/or Amended Token Agreement—not by any acts or omissions by Defendants.

### Thirty-First Affirmative Defense

To the extent any recovery is not barred or reduced for the value of the property transferred, the Defendants are entitled to a claim under 11 U.S.C. § 502(h) in an amount not less than the value given for the transfer (and any corresponding setoff, as applicable).

### Thirty-Second Affirmative Defense

The Token Agreement and/or the Amended Token Agreement do not on their face contain all of the binding terms and obligations between the parties.

### Thirty-Third Affirmative Defense

Plaintiffs may not recover from Defendants in this action, because CNL breached the Amended Token Agreement.

### Thirty-Fourth Affirmative Defense

Plaintiffs' claims and the relief sought therefor are barred, because all or some of the alleged transfers did not result in a depletion of the estate or the assets that would otherwise be available to creditors in the bankruptcy proceedings.

## <u>RESERVATION & STATEMENT OF JURISDICION</u>

Defendants expressly and specifically reserve the right to amend this Answer to add, remove, or modify defenses based on legal theories, facts, and circumstances that may or will be divulged through discovery and/or further legal analysis of Plaintiffs' position in this litigation.

Where Defendants' consent is required, Defendants do not consent to the entry of final orders or judgment by the Bankruptcy Court.

WHEREFORE, Defendants respectfully request that the Second Amended Complaint be dismissed, with prejudice, and that the Court enter such other relief as it deems just and proper.

DATED:        August 8, 2025
              Washington, D.C.

/s/ Ariel N. Lavinbuk
Ariel N. Lavinbuk
Brandon L. Arnold
Jack A. Herman
HERBERT SMITH FREEHILLS KRAMER (US)
LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
Ariel.Lavinbuk@hsfkramer.com


Daniel M. Eggermann
David E. Blabey, Jr.
Jason M. Moff
Gabriel Eisenberger
HERBERT SMITH FREEHILLS KRAMER (US)
LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Daniel.Eggermann@hsfkramer.com

*Attorneys for Tether Limited, Tether Holdings Limited, Tether International Limited, and Tether Operations Limited*

**<u>Certificate of Service</u>**

I hereby certify that a copy of the *Defendants' Answer to Plaintiffs' Second Amended Complaint* was served electronically on the date of filing through the Court's ECF System on all ECF participants registered in this case at the email addresses registered with the Court.


Dated:  August 8, 2025
       Washington, D.C.

                                    **/s/**  Ariel N. Lavinbuk
                                    Ariel N. Lavinbuk
                                    HERBERT SMITH FREEHILLS KRAMER (US) LLP
                                    2000 K Street NW, 4th Floor
                                    Washington, DC 20006
                                    Telephone: (202) 775-4500
                                    Facsimile: (202) 775-4510